# EXHIBIT 1



**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

January 21, 2020

By courier
(*advance copy by email*)

**Watkins Holdings S.à r.l.**
**and others**
c/o Mr. Antonio Vazquez-Guillen
Mr. David Ingle
Ms. Agustina Álvarez
Mr. Pablo Torres
Ms. Marie Stoyanov
Mr. Alexandre Fichaux
Mr. Tomasz Hara
Mr. Valentin Bourgeois
Allen & Overy LLP
Serrano 73
28006 Madrid
Spain

**Kingdom of Spain**
c/o Mr. José Manuel Gutiérrez Delgado
Mr. Pablo Elena Abad
Mr. Rafael Gil Nievas
Mr. Alberto Torró Molés
Ms. Elena Oñoro Sainz
Mr. Mariano Rojo Pérez
Ms. Gloria María de la Guardia Limeres
Mr. Juan Antonio Quesada Navarro
Ms. Ana María Rodriguez Esquivias
Mr. Javier Comerón Herrero
Ms. Eugenia Cediel Bruno
Mr. Luis Vacas Chalfoun
Mr. Francisco de la Torre Díaz
Ms. Socorro Garrido Moreno
Ms. Estíbaliz Hernández Marquinez
Abogacía General del Estado
Dpto. Arbitrajes Internacionales
c/ Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

Re:   **Watkins Holdings S.à r.l. and others v. Kingdom of Spain**
(ICSID Case No. ARB/15/44)

Dear Mesdames and Sirs,

Please find enclosed certified copies of the English and Spanish versions of the Tribunal's Award dated January 21, 2020 and Prof. Dr. Hélène Ruiz Fabri's Dissenting Opinion.

Pursuant to Arbitration Rule 48, I have authenticated the original texts of the Award and Opinion and deposited them in the Centre's archives. In accordance with Arbitration Rule 48, the Award is deemed to have been rendered on the date of dispatch, which is indicated on the original text of the Award and on all copies.

In accordance with Section 23 of Procedural Order No. 1, the ICSID Secretariat shall not publish any award or decision issued in the present case, without the consent of both parties. I would be grateful if the parties could inform us whether they consent to the publication of the Award and the Dissenting Opinion on the ICSID website by February 21, 2020.

Yours sincerely,

Gonzalo Flores
Acting Secretary-General

Enclosure

cc (by courier with enclosure,
advance copy by email):
Members of the Tribunal

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

## WATKINS HOLDING S.À.R.L, WATKINS (NED) B.V., WATKINS SPAIN S.L., REDPIER S.L., NORTHSEA SPAIN S. L, PARQUE EÓLICO MARMELLAR S.L., AND PARQUE EÓLICO LA BOGA S.L.

(Claimants)

v.

## THE KINGDOM OF SPAIN

(Respondent)

## ICSID Case No. ARB/15/44

---

## AWARD

---

### Members of the Tribunal
Tan Sri Dato' Cecil W.M. Abraham, President of the Tribunal
Dr. Michael C. Pryles AO PBM, Arbitrator
Prof. Dr. Hélène Ruiz Fabri, Arbitrator

### Secretary to the Tribunal
Ms. Catherine Kettlewell

*Date of Dispatch to the Parties: 21 January 2020*

## REPRESENTATION OF THE PARTIES

*Representing the Claimants:*                    *Representing the Respondent:*


Ms. Marie Stoyanov                               Mr. José Manuel Gutiérrez Delgado
Mr. Antonio Vázquez-Guillén                      Mr. Pablo Elena Abad
Mr. Antonio Jiménez-Blanco                       Mr. Antolín Fernández Antuña
Mr. David Ingle                                  Mr. Roberto Fernández Castilla
Ms. Agustina Álvarez                             Ms. Patricia Froehlingsdorf Nicolás
Mr. Pablo Torres                                 Ms. María del Socorro Garrido Moreno
Mr. Alexandre Fichaux                            Mr. Rafael Gil Nievas
Mr. Tomasz Hara                                  Ms. Mónica Moraleda Saceda
Mr. Valentin Bourgeois                           Ms. Elena Oñoro Sainz
Ms. Carmen De La Hera                            Ms. Amaia Rivas Kortazar
                                                 Mr. Mariano Rojo Pérez
                                                 Ms. Almudena Pérez Zurita Gutiérrez
Allen & Overy LLP                                Mr. Diego Santacruz Descartín
Pedro de Valdivia 10                             Mr. Javier Torres Gella
28006, Madrid                                    Mr. Francisco de la Torre Diaz
Spain                                            Mr. Alberto Torró Molés
                                                 Mr. Luis Vacas Chalfoun


                                                 Abogacía General del Estado
                                                 Dirección del Servicio Jurídico del Estado
                                                 Calle Ayala 5
                                                 28001, Madrid
                                                 Spain

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................1

    A.   The Parties ...................................................................................................1

    B.   Overview of the Dispute .............................................................................1

II.    PROCEDURAL HISTORY .................................................................................2

    A.   Initiation of the Arbitration Proceedings and Constitution of the Tribunal............................2

    B.   First Session and Procedural Order No. 1 ..................................................3

    C.   Parties' Written Pleadings and Procedural Requests ..................................4

    D.   The Non-Disputing Party Applications ......................................................7

    E.   Oral Procedure ............................................................................................9

    F.   Post-Hearing Developments .....................................................................11

III.   RELIEF SOUGHT BY THE PARTIES ...........................................................15

    A.   The Claimants ...........................................................................................15

    B.   The Respondent .........................................................................................16

IV.    FACTUAL BACKGROUND..............................................................................16

    A.   Respondent's Renewable Energy Regulatory Framework .......................17

       1.   Initial Framework................................................................................17

          (a)   Basic Feature...............................................................................17

          (b)   Regulators ...................................................................................18

          (c)   The 1997 Electricity Law (Law 54/1997).................................18

          (d)   1998-2006 Regulations ..............................................................20

       2.   Regulatory Developments in 2007-2010 ...........................................23

          (a)   Royal Decree 661/2007...............................................................23

          (b)   The 2009 Renewables Directive .................................................26

          (c)   Royal Decree-Law 6/2009 .........................................................26

          (d)   The Purported 2 July 2010 Agreement .......................................28

          (e)   Royal Decree 1614/2010..............................................................28

       3.   The Disputed Measures........................................................................29

(a)     Law 15/2012 ............................................................................... 29

(b)     Royal Decree-Law 2/2013 ......................................................... 30

(c)     Royal Decree-Law 9/2013 ......................................................... 31

(d)     Law 24/2013 ............................................................................... 34

(e)     Royal Decree 413/2014 and Ministerial Order MO IET/1045/2014 ........... 35

B.     Claimants' Investment in Wind Farms ..................................................... 36

V.     **JURISDICTION** ...................................................................................... **38**

   A.     The Intra-EU Objection ............................................................................. 39

    1.     The Respondent's Position ........................................................................ 39

(a)     Existence of an "Investor" from "another Contracting Party" ............... 39

(b)     Relationship between EU law and the ECT ........................................... 39

(c)     Disconnection clause ............................................................................. 44

(d)     Relevance of previous awards .............................................................. 44

    2.     The Claimants' Position ............................................................................ 46

(a)     Existence of an "Investor" from "another Contracting Party" ............... 46

(b)     Relationship between EU law and the ECT ........................................... 47

(c)     Disconnection clause ............................................................................. 48

(d)     Relevance of previous awards .............................................................. 49

    3.     Tribunal's Analysis .................................................................................... 51

(a)     Existence of an "Investor" from "another Contracting Party" ............... 52

(b)     The primacy/prevalence of EU law argument ....................................... 54

(c)     Disconnection clause ............................................................................. 55

(d)     Relevance of previous awards .............................................................. 57

    4.     The Tribunal's Decision ............................................................................ 63

   B.     The Tax Objection ...................................................................................... 64

    1.     The Respondent's Position ........................................................................ 64

(a)     Spain's consent to arbitration is restricted to disputes pertaining to alleged violations of obligations derived from Part III of the ECT ........... 64

(b)     The ECT does not impose obligations regarding tax measures of the Contracting Parties ............................................................................... 65

(c)     The TPVEE is a tax measure for the purposes of the ECT .......................... 66

ii

(d)     The TPVEE is a bona fide tax measure for the purposes of the ECT ........................... 68

2.     The Claimants' Position ........................................................................ 71

(a)     The "taxation carve-out" under Article 21 of the ECT only applies to *bona fide* taxes 71

(b)     The 7% levy is not a *bona fide* tax ...................................................... 73

(c)     Response to Spain's new submissions .............................................. 76

3.     The Tribunal's Analysis ........................................................................ 76

**VI.     APPLICABLE LAW** ............................................................................ **79**

A.     Article 42 of the ICSID Convention and 26(6) of the ECT .................... 79

B.     Relevance of EU Law ............................................................................ 79

1.     Respondent's Position ........................................................................ 79

2.     Claimants' Position ............................................................................ 82

C.     The Object and Purpose of the ECT ...................................................... 83

1.     Claimants' Position ............................................................................ 83

2.     Respondent's Position ........................................................................ 88

**VII.     MERITS** ............................................................................................ **91**

A.     Article 10(1) of the ECT: Create Stable, Equitable, Favourable and Transparent Conditions ............................................................................ 91

1.     Claimants' Position ............................................................................ 91

2.     Respondent's Position ........................................................................ 95

B.     Article 10(1) of the ECT: Fair and Equitable Treatment Standard .......... 96

1.     Claimants' Position ............................................................................ 96

2.     Respondent's Position ........................................................................ 97

C.     Obligation to provide a stable and predictable regulatory scheme ........ 97

1.     Claimants' Position ............................................................................ 97

2.     Respondent's Position ...................................................................... 106

D.     Alleged frustration of legitimate expectations .................................... 112

1.     Claimants' Position .......................................................................... 112

2.     Respondent's Position ...................................................................... 116

E.     Transparency ...................................................................................... 122

1.     Claimants' Position .......................................................................... 122

2. Respondent's Position................................................................124

F. Obligation of Reasonableness, Proportionality, and Alleged Discriminatory Character of the

 Measures.....................................................................................126

1. Claimants' Position.................................................................126

2. Respondent's Position.............................................................132

G. Tribunal's Analysis.......................................................................139

1. Applicable Law......................................................................140

2. Applicability of EU Law.........................................................142

3. Fair and Equitable Treatment..................................................142

4. Legitimate Expectation..........................................................150

5. Did Spain's measures frustrate the Claimants' reasonable and legitimate expectations?

 .............................................................................................156

(a) Did Spain provide a suitable and predictable regime?.............................158

6. Disputed Measures.................................................................164

7. Retroactivity.........................................................................166

8. Due Diligence.......................................................................169

9. Transparency........................................................................173

10. Were Spain's measures unreasonable?.....................................175

11. Are Spain's measures disproportionate?...................................177

12. Were the Claimants' investment impaired as a result of Spain's measures?.................177

H. Umbrella Clause..........................................................................178

1. Claimants' position................................................................178

2. Respondent's position............................................................181

3. Tribunal's analysis................................................................185

VIII. REPARATION.................................................................................185

A. Claimants' position......................................................................186

1. Reparation............................................................................186

2. Standard of compensation.......................................................187

3. Valuation date.......................................................................187

4. Proof...................................................................................188

5. Valuation method...................................................................188

6.  DCF analysis ................................................................................... 189

7.  Interest rate .................................................................................... 190

8.  Gross-up for tax ............................................................................. 191

B.  Respondent's position ........................................................................ 192

1.  Reparation ...................................................................................... 192

2.  Alternatively, compensation .......................................................... 193

3.  Valuation date ................................................................................ 193

4.  Proof ............................................................................................... 193

5.  Valuation method ........................................................................... 194

6.  Alternatively, "corrected" DCF analysis ...................................... 195

7.  Interest rate .................................................................................... 195

8.  Gross-up for tax ............................................................................. 197

C.  Tribunal's Analysis ............................................................................ 198

1.  Appropriate reparation ................................................................... 198

2.  Compensation standard .................................................................. 199

3.  Valuation date ................................................................................ 199

4.  Proof ............................................................................................... 200

5.  Lost historical cash flows .............................................................. 201

6.  Valuation method ........................................................................... 202

    (a)  Discounted cash flow analysis ................................................ 204

        i.  DCF analysis ....................................................................... 204

7.  Interest rate .................................................................................... 217

8.  Gross-up for tax ............................................................................. 218

IX.  COSTS AND EXPENSES ...................................................................... 220

A.  Costs .................................................................................................... 220

1.  Claimants' Position ........................................................................ 220

2.  Respondent's Position .................................................................... 221

B.  Tribunal's Analysis on Costs ............................................................ 222

X.  AWARD ................................................................................................... 223

## TABLE OF SELECTED ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ABV | Asset-Based Valuation |
| AEE | Wind Power Business Association |
| APV | Adjusted Present Value |
| *Antaris* Award | *Antaris Solar GmbH and Dr Michael Göde v. Czech Republic* (PCA Case n° 2014-01), Final Award, May 8, 2018 |
| *Antin* Award | *Antin Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, June 15, 2018 |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| BCG | Boston Consulting Group |
| Borawind | Borawind Energy, S.L. |
| Bridgepoint | Bridgepoint Advisers Limited |
| C-[#] | Claimants' Exhibit |
| CAPM | Capital Asset Pricing Model |
| CJEU | Court of Justice of the European Union |
| CL-[#] | Claimants' Legal Authority |
| Claimants or Watkins | Watkins Holdings S.à r.l.; Watkins (Ned) BV; Watkins Spain, S.L.; Redpier, S.L.; Northsea Spain S.L.; Parque Eólico Marmellar, S.L.; and Parque Eólico La Boga, S.L. |
| Claimants' Memorial | Claimants' Memorial on the Merits dated November 14, 2016 |
| Claimants' Rejoinder | Claimants' Rejoinder on Jurisdiction dated March 7, 2018 |

| | |
|---|---|
| Claimants' Reply | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated September 28, 2017 |
| Claimants' Post-Hearing | Claimants' Post-Hearing Brief dated September 7, 2018 |
| Claimants' Post-Hearing Reply | Claimants' Post-Hearing Reply Brief dated October 31, 2018 |
| Claimants' Submission on Costs | Claimants' Submission on Costs dated November 30, 2018 |
| CNE | National Energy Commission |
| CNMC | National Commission on Markets and Competition |
| Commission | European Commission |
| Commission's Application | European Commission's Application dated January 16, 2017 |
| Commission's Request | European Commission's Request for Reconsideration dated March 23, 2017 |
| CPI | Consumer Price Index |
| DCF | Discounted Cash Flow |
| Disputed Measures | Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order |
| ECT | Energy Charter Treaty dated December 17, 1994, which entered into force on April 16, 1998 with respect to Spain, Luxembourg and the Netherlands |
| EU | European Union |
| FET | Fair and Equitable Treatment |
| Fifth Claimant | Northsea Spain S.L. |
| First Accuracy Report | Expert Report by Accuracy dated February 10, 2017 |

| | |
|---|---|
| First Ayuso Statement | First Witness Statement of Mr. Juan Ramón Ayuso dated February 9, 2017 |
| First Brattle Quantum Report | Expert Report on quantum by the Brattle Group dated November 14, 2016 |
| First Brattle Regulatory Report | Expert Report on regulatory matters by the Brattle Group dated November 14, 2016 |
| First Claimant | Watkins Holdings S.à r.l. |
| First Moreno Statement | First Witness Statement of Mr. Felipe Moreno Zabala dated November 14, 2016 |
| FIT | Feed-in-Tariff |
| Fourth Claimant | Redpier, S.L. |
| ICSID or Centre | International Centre for Settlement of Investment Disputes |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States |
| ICSID Institution Rules | Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings |
| IDAE | Institute for Diversification and Saving of Electricity |
| June 2014 Order | Ministerial Order IET/1045/2014 dated June 16, 2014 |
| Law 15/2012 | Law 15/2012 on Tax Measures for Energy Sustainability dated December 27, 2012 |
| Law 24/2013 | Law 24/2013 on the Electricity Sector dated December 26, 2013 |
| Ministry | Ministry of Industry, Tourism and Commerce |
| Parque Arroyal | Parque Eólico Arroyal (49.5 MW) |
| Parque El Perul | Parque Eólico El Perul (49.6 MW) |

| | |
|---|---|
| Parque La Lastra | Parque Eólico La Lastra (11.69 MW) |
| Parque Lodoso | Parque Eólico Lodoso (49.5 MW) |
| Parque Lora 1 | Parque Eólico Lora 1 (49.6 MW) |
| Parque Lora 2 | Parque Eólico Lora 2 (49.6 MW) |
| Parque Marmellar | Parque Eólico Marmellar (49.5 MW) |
| Parque Sargentes | Parque Eólico Sargentes (24 MW) |
| Pre-Assignment Register | Pre-Assignment Register mechanism established in RDL 6/2009 |
| Project Companies | Marmellar SL and La Boga SL |
| R-[#] | Respondent's Exhibit |
| RAIPRE | *Registro Administrativo de Instalaciones de Producción en Régimen Especial* |
| RD 2818/1998 | Royal Decree 2818/1998 dated December 23, 1998 |
| RD 436/2004 | Royal Decree 436/2004 dated March 12, 2004 |
| RD 661/2007 | Royal Decree 661/2007 dated May 25, 2007 |
| RD 1614/2010 | Royal Decree 1614/2010 dated December 7, 2010 |
| RD 413/2014 | Royal Decree 413/2014 dated June 6, 2014 |
| RDL 7/2006 | Royal Decree-Law 7/2006 dated June 23, 2006 |
| RDL 6/2009 | Royal Decree-Law 6/2009 dated April 30, 2009 |
| RDL 2/2013 | Royal Decree-Law 2/2013 dated February 1, 2013 |
| RDL 9/2013 | Royal Decree-Law 9/2013 dated July 12, 2013 |
| RE | Renewable Energy |
| REIOs | Regional Economic Integration Organizations |
| REP | Renewable Energy Plan |

| | |
|---|---|
| Request for Arbitration | Request for Arbitration dated October 26, 2015, accompanied by Exhibits C-1 to C-33 |
| Respondent's Counter-Memorial | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction dated February 10, 2017 |
| Respondent's Rejoinder | Respondent's Rejoinder on the Merits and Reply on Jurisdiction dated January 9, 2018 |
| Respondent's Post-Hearing | Respondent's Post-Hearing Brief dated September 7, 2018 |
| Respondent's Post-Hearing Reply | Respondent's Post-Hearing Reply Brief dated October 31, 2018 |
| Respondent's Submission on Costs | Respondent's Submission on Costs dated January 16, 2019 |
| RL-[#] | Respondent's Legal Authority |
| *RREEF* Decision | *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l v. Kingdom of* Spain, ICSID Case No. ARB/13/30, Decision on Responsibility and Principle of Quantum, November 30, 2018 |
| Second Accuracy Report | Expert Report by Accuracy dated January 9, 2018 |
| Second Ayuso Statement | Second Witness Statement of Mr. Juan Ramón Ayuso dated January 9, 2018 |
| Second Brattle Quantum Report | Second Expert Report on quantum matters by the Brattle Group dated September 28, 2017 |
| Second Brattle Regulatory Report | Second Expert Report on regulatory by the Brattle Group dated September 28, 2017 |
| Second Claimant | Watkins (Ned) BV |
| Second Moreno Statement | Second Witness Statement of Mr. Felipe Moreno Zabala dated September 28, 2017 |
| SES | Spanish Electric System |
| Seventh Claimant | Parque Eólico La Boga, S.L. |

| | |
|---|---|
| Sixth Claimant | Parque Eólico Marmellar, S.L. |
| Spain or Respondent | Kingdom of Spain |
| TMR | *Tarifa Media de Referencia* |
| Third Claimant | Watkins Spain, S.L. |
| Tribunal | Arbitral Tribunal constituted on March 31, 2016 |
| TVPEE | Impuesto sobre el valor de la producción de energía eléctrica |
| UNFCCC | United Nations Framework Convention on Climate Change |
| *Vattenfall* Decision | *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, August 31, 2018 |
| VCLT or Vienna Convention | Vienna Convention on the Law of Treaties |
| Wind Farms | Wind farm sites located in the province of Castilla y León in Spain (Parque Arroyal, Parque El Perul, Parque La Lastra, Parque Lodoso, Parque Lora 1, Parque Lora 2, Parque Marmellar, Parque Sargentes) |
| 1997 Electricity Law or Law 54/1997 | Law 54/1997 on the Electricity Sector dated November 27, 1997 |
| 2001 Renewables Directive | European Parliament and Council Directive 2001/77/CE on the promotion of electricity produced from renewable energy sources in the internal electricity market dated September 27, 2001 |
| 2009 Renewables Directive | European Union 2009 Directive on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC dated April 23, 2009 |

## I.      INTRODUCTION

### A.   The Parties

1.      The Claimants are Watkins Holdings S.à r.l. (the "**First Claimant**"), a private limited liability company incorporated under the laws of Luxembourg; Watkins (Ned) BV (the "**Second Claimant**"), a limited liability company incorporated under the laws of the Netherlands and a wholly-owned subsidiary of the First Claimant; Watkins Spain, S.L. (the "**Third Claimant**"), a private limited liability company incorporated under the laws of Spain; Redpier, S.L. (the "**Fourth Claimant**"), a private limited liability company incorporated under the laws of Luxembourg; Northsea Spain S.L. (the "**Fifth Claimant**"); Parque Eólico Marmellar, S.L. (the "**Sixth Claimant**"); and Parque Eólico La Boga, S.L. (the "**Seventh Claimant**"), all three are private limited liability companies incorporated under the laws of Spain.  The seven companies are collectively referred to as "**Watkins**" or the "**Claimants**."  The Claimants are represented in these proceedings by Mses. Virginia Allan, Marie Stoyanov, and Agustina Alvarez, and Messrs. David Ingle, Pablo Torres and Antonio Vazquez-Guillen of Allen & Overy LLP.

2.      The Respondent is the Kingdom of Spain ("**Spain**" or the "**Respondent**," and, collectively with the Claimants, the "**Parties**").  The Respondent is represented in these proceedings by Mses. Mónica Moraleda Saceda, Elena Oñoro Sainz, Amaia Rivas Kortazar, Patricia Froehlingsdorf Nicolás, Gloria de la Guardia Limeres, and Ana María Rodriguez Esquivias, and Messrs. Antolín Fernández Antuña, Diego Santacruz Descartín, Javier Torres Gella, Javier Castro López, Roberto Fernández Castilla, and Álvaro Navas López of the Ministry of Justice of the Government of Spain.

### B.   Overview of the Dispute

3.      This case relates to a dispute arising from the Claimants' investment in the Spanish wind generation sector and, in particular, the purchase of seven wind farm sites located in the province of Castilla y León in Spain ("**Wind Farms**").  The Claimants allege that the Respondent adopted measures radically modifying and dismantling the applicable legal

and economic regime for renewable energy ("**RE**") projects on which the Claimants relied on when making their investment.  According to the Claimants, in adopting such measures, Spain has breached its international obligations.

## II.     PROCEDURAL HISTORY

### A.   Initiation of the Arbitration Proceedings and Constitution of the Tribunal

4.      On October 26, 2015, Watkins filed with the International Centre for Settlement of Investment Disputes Centre ("**ICSID**" or the "**Centre**") a request for arbitration against Spain (the "**Request for Arbitration**") accompanied by Exhibits C-1 to C-33.

5.      The Request for Arbitration was made pursuant to the Energy Charter Treaty dated December 17, 1994, which entered into force on April 16, 1998 with respect to Spain, Luxembourg and the Netherlands (the "**ECT**"), and to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated March 18, 1965, which entered into force on October 14, 1966 (the "**ICSID Convention**").

6.      On October 28, 2015, pursuant to Rule 5 of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ("**ICSID Institution Rules**"), the Centre acknowledged receipt of the Request for Arbitration, and, on October 29, 2015, it transmitted a copy of the Request for Arbitration to Spain as well as to the Embassy of Spain in Washington D.C.

7.      On November 4, 2015, the Secretary-General of ICSID registered the Request for Arbitration pursuant to Article 36(3) of the ICSID Convention and ICSID Institution Rules 6 and 7 and notified the Parties of the registration.  The Secretary-General invited the Parties to proceed, as soon as possible, with the constitution of the Arbitral Tribunal pursuant to ICSID Institution Rule 7(d).

8.      In accordance with Article 37(2)(a) of the ICSID Convention, the Parties agreed that the Arbitral Tribunal would comprise of three arbitrators, one arbitrator appointed by the

2

Claimants, one arbitrator appointed by the Respondent, and a third, presiding arbitrator, to be appointed by the Secretary-General of ICSID.

9.      Accordingly, the Claimants appointed Dr. Michael C. Pryles AO PBM, an Australian national, the Respondent appointed Prof. Dr. Hélène Ruiz Fabri, a French national and pursuant to the Parties' agreement, the Secretary-General of ICSID appointed Tan Sri Dato' Cecil W.M. Abraham, a Malaysian national, to serve as the President of the Arbitral Tribunal.

10.     On March 31, 2016, the Secretary-General informed the Parties that all three arbitrators had accepted their appointments.  The Arbitral Tribunal (the "**Tribunal**") was thus deemed to have been constituted and the proceeding to have begun as of that date pursuant to Rule 6 of the Rules on Procedure for Arbitration Proceedings (the "**Arbitration Rules**").  On the same date, Mr. Gonzalo Flores, ICSID Deputy Secretary-General, was designated to serve as the Secretary of the Tribunal with the assistance of Ms. Ana Conover, ICSID Legal Associate.

### B.   First Session and Procedural Order No. 1

11.     On May 23, 2016, the Tribunal held the first session by telephone conference.  An audio recording of the session was made and was distributed to the Parties as well as to the Members of the Tribunal.

12.     During the first session, the Tribunal and the Parties considered (i) the draft agenda and the draft procedural order circulated by the Secretary of the Tribunal on April 6, 2016 and (ii) the Parties' agreements and positions on the draft agenda and the draft procedural order received on May 6, 2016.  Among other items on the agenda, the Parties expressed their agreement that the Tribunal had been properly constituted in accordance with the relevant provisions of the ICSID Convention and the Arbitration Rules, and that they did not have any objections in this respect.

13.    On May 26, 2016, the President of the Tribunal, on behalf of the Tribunal, issued
       Procedural Order No. 1 embodying the Parties' agreements on procedural matters and
       the Tribunal's decisions on the disputed issues.  Procedural Order No. 1 provided, *inter
       alia*, that (i) the applicable Arbitration Rules would be those in force as of April 10,
       2006; (ii) the place of the proceeding would be Washington, DC; and (iii) the procedural
       languages would be English and Spanish.  Procedural Order No. 1 also set out the
       procedural calendar for the present proceeding.

14.    On July 8, 2016, Mr. Gonzalo Flores, Acting Secretary-General, informed the Parties
       that Ms. Ana Conover, ICSID Legal Associate, was designated to serve as Secretary of
       the Tribunal in the present case.

   **C.  Parties' Written Pleadings and Procedural Requests**

15.    On November 14, 2016, the Claimants filed their Memorial on the Merits (the
       "**Claimants' Memorial**") in accordance with the procedural calendar.  The Claimants'
       Memorial was accompanied by Exhibits C-34 to C-173; Legal Authorities CL-1 to CL-
       93; a Witness Statement by Mr. Felipe Moreno Zabala (the "**First Moreno
       Statement**"); two Expert Reports by the Brattle Group, *i.e.* an Expert Report on
       regulatory matters (the "**First Brattle Regulatory Report**") and an Expert Report on
       quantum (the "**First Brattle Quantum Report**"), supported, respectively, by Exhibits
       BRR-1 to BRR-156 and BQR-1 to BQR-45. On December 5, 2016, the Claimants
       submitted the corresponding translations into the other language of the proceeding.

16.    On February 10, 2017, as provided in the procedural calendar, the Respondent filed its
       Counter-Memorial on the Merits and Memorial on Jurisdiction (the "**Respondent's
       Counter-Memorial**") in Spanish. The Respondent's Counter-Memorial was
       accompanied by Exhibits R-1 to R-278; Legal Authorities RL-4 to RL-71; a Witness
       Statement by Mr. Juan Ramón Ayuso (the "**First Ayuso Statement**"), along with
       Exhibits W-01001-W-01013, W-01021-W-01035, W-01037, W-01043-W-01044, W-
       01084-W-01085, W-01087, W01095, W-01101-W-01131, and W-01142; and an Expert
       Report by Accuracy (the "**First Accuracy Report**"), supported by Exhibits ACQ-2 to

ACQ-55.  On March 2, 2017, the Respondent submitted the corresponding translations into the other language of the proceeding.

17. On April 28, 2017, following exchanges between the Parties, and in accordance with Procedural Order No. 1, the Parties jointly filed their document production applications in the form of Redfern Schedules.

18. On May 16, 2017, the Tribunal issued Procedural Order No. 4, ruling on the Parties' document production applications.  Procedural Order No. 4 established, *inter alia*, that (i) "the Parties shall produce the documents ordered by the Tribunal by June 9, 2017;" and that (ii) the Respondent shall "elaborate on its objections to produce the minutes of the Council of Ministers on the grounds of privilege and secrecy by 23 May 2017," and "the Claimants may submit a responsive submission within seven days upon receiving the Respondent's observations."

19. On May 25, 2017, the Respondent requested an extension until May 29, 2017 to elaborate on its objections to produce the minutes of the Council of Ministers on the grounds of privilege and secrecy.  The Tribunal granted the time extension on May 26, 2017.

20. On May 29, 2017, the Respondent submitted its comments as ordered in Procedural Order No. 4 and pursuant to the extension granted by the Tribunal, along with three supporting documents.

21. On June 5, 2017, in accordance with the time-limit set forth in Procedural Order No. 4, the Claimants filed their observations to the Respondent's objection to produce the minutes of the Council of Ministers.

22. On June 15, 2017, the Tribunal issued Procedural Order No. 5 denying the Claimants' request to produce the minutes of the Council of Ministers' meetings, noting, *inter alia*, that "*they are secret, that no documentation reflecting the discussions held within the*

*Council of Ministers exists, and therefore the legal impediment in Article 9.2(b) of the IBA Rules would apply.*"

23.     On August 25, 2017, Martina Polasek, the Acting Secretary-General, informed the Parties that Ms. Catherine Kettlewell, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal in the present case.

24.     On September 19, 2017, the Parties informed the Tribunal that they had reached an agreement to extend certain deadlines of the procedural calendar.  On the same date, the Tribunal confirmed the Parties' agreement.

25.     On September 28, 2017, the Claimants filed their Reply on the Merits and Counter-Memorial on Jurisdiction (the "**Claimants' Reply**").  The Claimants' Reply was accompanied by Appendices 1 to 6, Exhibits C-174 to C-265; Legal Authorities CL-94 to CL-159; a Witness Statement by Mr. Felipe Moreno Zabala (the "**Second Moreno Statement**"); and two Expert Reports by the Brattle Group, on regulations (the "**Second Brattle Regulatory Report**") and on quantum (the "**Second Brattle Quantum Report**"), with their respective Exhibits BRR-157 to BRR-266 and BQR-46 to BQR-52.  On October 18, 2017, the Claimants submitted the corresponding translations into the other language of the proceeding.

26.     On January 9, 2018, the Respondent filed its Rejoinder on the Merits and Reply on Jurisdiction (the "**Respondent's Rejoinder**").  The Respondent's Rejoinder was accompanied by Exhibits R-279 to R-380; Legal Authorities RL-72 to RL-95; a Witness Statement by Mr. Juan Ramon Ayuso (the "**Second Ayuso Statement**") along with Exhibits W-01146, W-01152-W-01154, W-01157, W-01162-W-01163, W-01165, W-01167, W-01170-W-01171, W-01174-W-01183, W-02005, W-R-0084, W-R-0224, W-R-0237, W-R-0238, W-R-0260; and an Expert Report by Accuracy (the "**Second Accuracy Report**") along with Exhibits ACQ-56 to ACQ-82. On January 18, 2018, the Respondent submitted the corresponding translations into the other language of the proceeding.

27.     On February 22, 2018, the Parties agreed to extend the deadline for the Claimants to submit the Rejoinder on Jurisdiction.  On February 23, 2018, the Tribunal confirmed the Parties' agreement to extend the deadline.

28.     On March 7, 2018, the Claimants filed their Rejoinder on Jurisdiction (the "**Claimants' Rejoinder**") with two Appendices. On March 27, 2018, the Claimants submitted the corresponding translations into the other language of the proceeding.

29.     On May 7, 2018, the Parties exchanged their corresponding new document request pursuant to Procedural Order No. 6.  On May 9, 2018, each Party submitted to the Tribunal the objections to the other Party's request.  On May 10, 2018, the Tribunal issued its decision in this regard.

**D.   The Non-Disputing Party Applications**

30.     On January 16, 2017, the European Commission (the "**Commission**") filed with the Centre, an application for leave to intervene as a non-disputing party (the "**Commission's Application**") pursuant to Arbitration Rule 37(2).

31.     On January 18, 2017, the Tribunal invited the Parties to comment on the Commission's Application.

32.     On February 2, 2017, each Party filed their observations on the Commission's Application.  The Claimants' observations were accompanied by Attachments 1 to 3, and the Respondent's observations were accompanied by Legal Authorities RL-1 to RL-3.

33.     On March 21, 2017, the Tribunal issued Procedural Order No. 2 embodying the Tribunal's analysis of and decision on the Commission's Application.  Noting that "[t]*he Respondent in its* [...] *Counter-Memorial on the Merits and Memorial on Jurisdiction* [...] *has raised two jurisdictional objections*," the Tribunal concluded that the "*Respondent would be able to argue the issue of jurisdiction*."  However, observing

that the "*Commission may have a particular knowledge or insight which may be of assistance to the Tribunal in its consideration of the jurisdictional issue*," the Tribunal decided that "*it is appropriate for the Commission to intervene*."

34.     Accordingly, the Tribunal authorised the Commission to intervene as a non-disputing party and "*to file a written submission of not more than 30 pages by 3 April 2017.*"  The Tribunal specified, *inter alia*, that such submission "*shall set out all matters that the Commission wishes to bring to the Tribunal's attention regarding jurisdiction;*" that "[t]*he Commission shall not attend or observe the hearings*;" and, "*as a condition for being given leave to file a non-disputing party submission*s," the Commission was required to "*provide the Tribunal with a written undertaking* [...] *to pay the additional costs of legal representation which may be reasonably incurred by the parties in responding to the Commission's Submissions*."  Finally, the Tribunal invited the Parties to "*submit their observations on the Submission of the Commission to the Tribunal by 18 April 2017*."

35.     On March 23, 2017, the Commission submitted a request for the Tribunal to reconsider Procedural Order No. 2 "*in so far as it require[d] the Commission to provide an undertaking on costs, and to remove the procedural direction set out in paragraph 53(e) thereof*" (the "**Commission's Request**").

36.     On March 27, 2017, the Centre communicated the Commission's Request to the Parties. On the same date, the Tribunal invited the Parties to provide their observations. Furthermore, the Tribunal informed the Parties that the filing dates related to the Commission's written submission as set forth in Procedural Order No. 2 were suspended, and that it would notify the Commission and the Parties of the new filing dates upon issuance of its decision on the Commission's Request.

37.     On April 7, 2017, the Claimants filed their observations on the Commission's Request.

38.    On April 10, 2017, the Respondent filed its observations on the Commission's Request and on the same date, ICSID transmitted the Parties' observations to the Tribunal.

39.    On April 27, 2017, the Tribunal issued Procedural Order No. 3 rejecting the Commission's Request to alter Procedural Order No. 2 and inviting the Commission, as a condition for being given leave to file a non-disputing party submission, to provide the cost undertaking as described in Procedural Order No. 2.  Further, the Tribunal updated the schedule pertaining to the filing of the Commission's written submission, indicating that (i) "*the Commission may file its written submission by 26 May 2017;*" and that (ii) "*the Parties shall present their observations on the Commission's written submission in their respective briefs.*"

40.    On May 2, 2017, the Commission informed the Tribunal that it would not provide the undertaking on costs.

   **E.   Oral Procedure**

41.    On April 24, 2018, the Tribunal held a pre-hearing organisational meeting with the Parties by telephone conference.

42.    On April 24, 2018 the Tribunal issued Procedural Order No. 6, amended on April 26, 2018, embodying the Parties' agreements on the procedural matters related to the Hearing and the Tribunal's decisions on the matters in which there was disagreement between the Parties.

43.    The Hearing was held from May 21, 2018 to May 24, 2018 in Paris, France.  The list of participants was as follows:

   Tribunal:

   | | |
   |---|---|
   | Tan Sri Dato' Cecil W.M. Abraham | President of the Tribunal |
   | Dr. Michael Pryles | Arbitrator |
   | Prof. Dr. Hélène Ruiz Fabri | Arbitrator |

ICSID Secretariat:

Ms. Catherine Kettlewell                Secretary of the Tribunal


For the Claimants:

Ms. Marie Stoyanov                      Allen & Overy LLP
Mr. Antonio Vazquez-Guillén             Allen & Overy LLP
Mr. Antonio Jiménez-Blanco              Allen & Overy LLP
Mr. David Ingle                         Allen & Overy LLP
Mr. Alexandre Fichaux                   Allen & Overy LLP
Mr. Tomasz Hara                         Allen & Overy LLP
Mr. Pablo Torres                        Allen & Overy LLP
Mr. Valentin Bourgeois                  Allen & Overy LLP
Ms. Carmen de la Hera                   Allen & Overy LLP
Mr. Carlos Lapuerta                     The Brattle Group
Mr. Richard Caldwell                    The Brattle Group
Mr. José Antonio García                 The Brattle Group
Ms. Annika Opitz                        The Brattle Group
Ms. Henna Trewn                         The Brattle Group
Mr. Juan Arteche                        Bridgepoint
Mr. Felipe Moreno                       Self-employed

For the Respondent:

Mr. Diego Santacruz Descartín           State Attorney's Office Ministry of Justice
Ms. Mónica Moraleda Saceda              State Attorney's Office Ministry of Justice
Ms. Elena Oñoro Sainz                   State Attorney's Office Ministry of Justice
Mr. Antolín Fernández Antuña            State Attorney's Office Ministry of Justice
Mr. Joaquín Garrigos Millán             State Attorney's Office Ministry of Justice
Ms. Almudena Pérez-Zurita Gutiérrez     State Attorney's Office Ministry of Justice
Ms. Carmen María Roa Tortosa            IDAE
Mr. Juan Ramón Ayuso Ortiz              IDAE
Mr. Eduard Saura                        Accuracy
Mr. Nicolas Barsalou                    Accuracy
Ms. Laura Cózar                         Accuracy
Mr. Alberto Fernández                   Accuracy
Mr. Carlos Canga                        Accuracy
Ms. Aurea Alvarez                       Accuracy

Court Reporters:

Mr. Trevor McGowan                      The Court Reporter Ltd.
Mr. Paul Pelissier                      DR-Esteno
Ms. Luciana Sosa                        DR-Esteno

Interpreters:

Mr. Juan María Burdiel Pérez
Mr. Jesus Getan Bornn
Ms. Amalia Thaler-de Klemm

44.     The following persons were examined during the Hearing:

On behalf of Claimants:

Fact Witness
Mr. Felipe Moreno Zavala

Expert Witnesses
Mr. José Antonio García
Mr. Carlos Lapuerta
Mr. Richard Caldwell

On behalf of Respondent:

Fact Witness
Mr. Juan Ramón Ayuso

Expert Witnesses
Mr. Eduard Saura
Mr. Nicolas Barsalou

## F.   Post-Hearing Developments

45.     On May 29, 2018, the Tribunal instructed the Parties to submit the corrections to the
hearing transcripts by Tuesday, June 12, 2018 or any other date as the Parties agreed
upon.

46.     On the same date, the Parties informed the Tribunal that both Parties agreed to submit
the corrections by June 29, 2018.  On July 10, 2018, not having received the corrections,
the Tribunal invited the Parties to inform the status of the corrections, which were then
submitted by the Parties on July 11, 2018.

47.     On August 13, 2018, the Claimants requested the introduction into the record of the award in the *Antin Infrastructure Services Luxembourg S.à.r.l and Antin Energia Termosolar B.V. v. Kingdom of Spain* (ICSID Case No. ARB/13/31) ("***Antin* award**"). The Tribunal admitted the *Antin* award into the record as Exhibit CL-176 and invited the parties to comment on the *Antin* award in their Post-Hearing submissions due on September 7, 2018.

48.     On September 6, 2018, the Parties informed the Tribunal that they had agreed to modify section 11.4 of Procedural Order No. 1 and only submit their Post-Hearing briefs and Reply Post-Hearing briefs in English.  The Parties clarified that English and Spanish would continue to be the procedural languages of the arbitration.  On the same date, the Tribunal confirmed the Parties' agreement.

49.     On September 7, 2018, the Parties simultaneously submitted their Post-Hearing briefs.

50.     On October 18, 2018, the Claimants requested the introduction into the record of the following: (i) the "Decision on the *Achmea* Issue" dated 31 August 2018 rendered in *Vattenfall AB and others v. Federal Republic of Germany* (ICSID Case No. ARB/12/12) (the "***Vattenfall* Decision**"); and (ii) the Final Award dated 8 May 2018 rendered in *Antaris Solar GmbH and Dr Michael Göde v. Czech Republic* (PCA Case n° 2014-01) (the "***Antaris* award**").  This request from the Claimants was based on Section 16.3 of Procedural Order No. 1.  On October 22, 2018, the Tribunal granted the Claimants' request to introduce both documents into the record and invited both Parties to comment on these decisions in their respective Reply Post-Hearing briefs due on October 31, 2018.

51.     On October 30, 2018, the Respondent informed the Tribunal of a technical problem affecting its ability to file its Submission on Costs.  On November 2, 2018, the Tribunal extended the deadline to file each Parties' Submission on Costs until November 30, 2018.

52.     On October 31, 2018, the Parties informed the Tribunal of their agreement to limit to 40 pages their Reply Post-Hearing Brief and Submission on Costs, which the Tribunal confirmed.

53.     On October 31, 2018, the Parties simultaneously submitted their Reply Post-Hearing briefs.  The Claimants' Reply Post-Hearing brief was submitted together with CL-177 and CL-178.[1]

54.     On November 30, 2018, the Respondent requested a further extension because the technology issue had not been resolved.  On the same date, the Claimants filed their corresponding Submission on Costs.

55.     On December 3, 2018, the Tribunal granted the Respondent an extension to file its Submission on Costs until January 2, 2019.  On December 28, 2018, the Respondent requested a further extension to file its Submission on Costs.  The Tribunal granted the further extension.  On January 16, 2019, the Respondent submitted its Submission on Costs. On January 18, 2019, the Secretary of the Tribunal then circulated to the Parties the respective Submissions on Costs.

56.     On 8 April 2019 the Respondent requested authorization to add a new legal authority, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l v. Kingdom of Spain*, to the record.  The Claimants did not object to the addition of the legal authority but sought directions to file further submissions.

57.     The Tribunal on 19 April 2019 gave the following set of directions:

        (a)     The Tribunal grants the Respondent's request to introduce into the record the *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.a.r.l v. Kingdom of Spain* (ICSID Case No.

---

[1] These two legal authorities were admitted by the Tribunal on October 22, 2018.

ARB/13/30) Decision on Responsibility and Principle of Quantum dated 30 November 2018 ("**RREEF Decision**");

(b)     The Tribunal also grants leave to introduce the Partial Dissenting Opinion of Prof. Robert Volterra to the *RREEF* Decision requested by the Claimants;

(c)     The Tribunal invited the Parties to comment on the *RREEF* Decision and the Partial Dissenting Opinion of Prof. Robert Volterra;

(d)     The Respondent was to file its comments by 3 May 2019 and the Claimants were to file their comments by 17 May 2019.

58.     The Respondent filed its Comments on the *RREEF* Decision by 3 May 2019.

59.     The Claimants filed their Comments on the *RREEF* Decision and Partial Dissent on 17 May 2019.

60.     On 11 October 2019, the Claimants requested leave to the Tribunal to introduce "new awards which concerned the Kingdom of Spain."[2]  The Tribunal invited the Respondent to comment on the Claimants' request.  On 21 October 2019, the Respondent filed its response.

61.     On 22 October 2019, the Tribunal decided that the new awards rendered were not necessary for the Tribunal's decision for this case and, therefore, denied the Claimants' request.

62.     On 4 December 2019, the Respondent requested leave to the Tribunal to introduce two new awards to the record of this case.  The Tribunal invited the Claimants to comment on the Respondent´s request.  On 11 December 2019, the Claimants filed their response.

63.     On 17 December 2019, the Tribunal decided that the new awards indicated by the Respondent were not necessary for the Tribunal to deliver its decision and, therefore,

---

[2] Claimants' Letter dated 11 October 2019, *citing*  Hearing Transcript, Day 4, 179:8-10.

denied the Respondent's request.

64.     On 18 December 2019, the Tribunal declared the proceedings as closed.

## III.    RELIEF SOUGHT BY THE PARTIES

### A.  The Claimants

65.     The Claimants requested that the Tribunal grants the following relief:

> (a) DECLARING that Spain has breached Article 10(1) of the ECT; and
>
> (b) ORDERING that Spain:
>
> > (i)     provide full restitution to the Claimants by re-establishing the situation which existed prior to Spain's breaches of the ECT, together with compensation for all losses suffered before restitution; or
> >
> > (ii)    pay the Claimants compensation for all losses suffered as a result of Spain's breaches of the ECT; and
> >
> > in any event:
> >
> > (iii)   pay the Claimants pre-award interest at a rate of 1.16% compounded monthly; and
> >
> > (iv)    pay post-award interest, compounded monthly at a rate to be determined by the Tribunal on the amounts awarded until full payment thereof; and
> >
> > (v)     pay the Claimants the costs of this arbitration on a full-indemnity basis, including all expenses that the Claimants have incurred or will incur in respect of the fees and expenses of the arbitrators, ICSID, legal counsel, experts and consultants; and
> >
> > (vi)    any such other and further relief that the Tribunal shall deem just and proper.[3]

66.     The Claimants reserved their rights to request in the course of the proceedings any additional, alternative or different relief as may be appropriate, including conservatory, injunctive or other interim relief.

---

[3] Claimants' Memorial, ¶ 540; Claimants' Reply ¶ 792.

67.     In the Claimants' Reply, the Claimants also asked the Tribunal to dismiss all of Spain's jurisdictional objections.[4]

## B.   The Respondent

68.     The Respondent requested that the Tribunal grants the following relief:

> (a) Declare its lack of jurisdiction over the claims of the Claimants or, if applicable, the inadmissibility of said claims.
> (b) Subsidiarily, in the event that the Arbitral Tribunal decides that it has jurisdiction to hear this dispute, to dismiss all the claims of the Claimants regarding the Merits, as the Kingdom of Spain has not breached the ECT in any way, pursuant to section III herein, with regard to the Merits.
> (c) Subsidiarily, to dismiss all the Claimant's claims for damages as the Claimant has no right to compensation, in accordance with section V herein; and
> (d) Order the Claimant to pay all costs and expenses derived from this arbitration, including ICSID administrative expenses, arbitrators' fees, and the fees of the legal representatives of the Kingdom of Spain, their experts and advisors, as well as any other cost or expense that has been incurred, all of this including a reasonable rate of interest from the date on which these costs are incurred until the date of their actual payment.[5]

69.     The Respondent reserved its right to supplement or modify the above request for relief at any time during the proceeding.[6]

## IV.   FACTUAL BACKGROUND

70.     In this Section, the Tribunal addresses the events relevant to the dispute in a chronological manner. The Tribunal wishes to state that this summary of the factual background is not an exhaustive summary. The Tribunal has considered the entirety of the Parties' submissions of fact in their written and oral submissions, whether or not they are expressly discussed in this section.

---

[4] Claimants' Reply ¶ 792.

[5] Respondent's Counter-Memorial, ¶ 1112.

[6] Respondent's Counter-Memorial, ¶ 1113.

### A. Respondent's Renewable Energy Regulatory Framework

71.    Spain's development of RE dates back to the United Nations Framework Convention on Climate Change ("**UNFCCC**"), which was adopted on 9 May 1992 and entered into force on 21 March 1994. [7] The UNFCCC established a framework for inter-governmental efforts to tackle climate change.

72.    Spain's commitments under the UNFCCC were expanded through the Kyoto Protocol, negotiated in 1997 by the parties to the UNFCCC, which fixed upon its signatories (including members states of the European Union) binding greenhouse gas emissions targets. As such, the European Union set greenhouse gas emission targets for its member states to align with the objectives of the Kyoto Protocol. The Kyoto Protocol was signed by Spain on 29 April 1998 and ratified on 31 May 2002. It entered into force on 16 February 2005. [8]

### 1. Initial Framework

#### (a) Basic Feature

73.    Spain's Energy Policy (also referred as the Spanish Electrical System) is found in a number of laws and regulations, which are as follows: [9]

    (1)    *The Spanish Constitution of 1978*, which is the supreme legislation of the Spanish Legal System.

    (2)    *Statute Law*, which is of two kinds, namely: (a) organic law and (b) ordinary laws.

    (3)    *Royal Decree Law*, which, as regulation, has the force of law. The Constitution authorises the Spanish Government to approve Royal Decree Law in situations of   extraordinary need or urgency. The approval of

---

[7] **Exhibit C-36**.

[8] **Exhibit C-37**.

[9] Respondent's Counter-Memorial, ¶ 213.

Royal Decree Law is subject to strict conditions, controls, and limits and requires subsequent Parliamentary validation.

(4)   *Royal Decree*, which is a regulatory standard that emanates from the Government. It complements or implements laws and is hierarchically inferior to them.

(5)   *Ministerial Orders*, which are a regulatory standard emanating from one or several ministerial departments.

### (b) Regulators

74.   Regulators of Spain's Energy Policy include, first, the Ministry of Industry, Energy and Tourism, which has the primary responsibility for regulation of energy matters. Second, the Secretary of State for Energy exercises specific responsibilities for energy policies. Third, the Institute for Diversification and Saving of Electricity ("**IDAE**") provides advice to policymakers on technical and economic issues and drafting of legislations and acts as a liaison between the Government and Industry.

75.   Another relevant agency is the National Energy Commission ("**CNE**"), [10] which oversees competition in market settlement of regulated costs of the electricity system and monitors the technical compliance of both conventional and renewable power facilities. The CNE is now known as the National Commission on Markets and Competition ("**CNMC**"). [11]

### (c) The 1997 Electricity Law (Law 54/1997)

76.   On 27 November 1997, Spain adopted Law 54/1997 on the Electricity Sector ("**1997 Electricity Law**" or "**Law 54/1997**"), which partially opened up the electricity sector to competition and put an end to the previous State-controlled system. [12] Law 54/1997 set up the framework for various public authorities to exercise competence in Spain's electricity sector. In particular, and as mentioned above, within the central Government

---

[10] Respondent's Counter-Memorial, ¶ 229.

[11] Respondent's Counter-Memorial, ¶¶ 229-231.

[12] Law 54/1997 of 27 November 1997, **Exhibit C-39**.

the relevant public authorities would include the CNE and the Ministry of Industry, Tourism and Commerce.[13]

77.     Among the objectives of the Law 54/1997 was the "promotion of renewable energy" and for RE sources to "cover at least 12% of Spain's total energy demand by the year 2010 [...]."[14]

78.     For the purposes of encouraging the production of energy from renewable sources, Law 54/1997 distinguished between an "**Ordinary Regime**" applicable to conventional sources of energy—such as coal-fired power plants—and a "**Special Regime**" applicable to energy production facilities of less than 50MW, which generated electricity from "*non-consumable renewable energy sources.*"[15] Under the Special Regime, electricity generators benefitted from a supplementary premium over and above the market price.

79.     Spain explains that the creation of a double regime stemmed from the "need to encourage production using energy sources which can only obtain a price in the competitive market that is insufficient to cover its costs of construction and operation, with reasonable return on the investment. Therefore, they require subsidies to be profitable."[16] For the Claimants, "reasonable return" is an "undefined legal concept."[17]

80.     The basis of remuneration under the Special Regime was a *feed-in-tariff* ("**FIT**") calculated in Euro/c per kWh of electricity produced. The amount of premium was set out in Article 30.4 of Law 54/1997, which reads as follows:

---

[13] Law 3/2013 of 4 June 2013 (published on 5 June 2013) ("**Law 3/2013**"), **Exhibit C-69**; Royal Decree 657/2013 of 30 August 2013 (published on 31 August 2013) ("**RD 657/2013**"), **Exhibit C-70**;, Order ECC/1796/2013 of 4 October 2013 (published on 5 October 2013) ("**Order ECC/1796/2013**"), **Exhibit C-71**; and CNMC, "*Spanish Energy Regulator's National Report to the European Commission 2014*", 31 July 2014, p. 27, **Exhibit C-72**.

[14] Law 54/1997 of 27 November 1997, Preamble; Sixteenth Transitory Provision, **Exhibit C-39**.

[15] Law 54/1997 of 27 November 1997, Article 27(1), **Exhibit C-39**.

[16] Respondent's Counter-Memorial, ¶ 284.

[17] Claimants' Memorial, ¶ 87.

In order to determine the premiums, account shall be taken of the level of delivery voltage of the energy to the grid, effective contribution to improvement of the environment, saving in primary energy and energy efficiency, production of economically justifiable useful heat and the investment costs which have been incurred, in order to achieve reasonable rates of return by reference to the cost of money in the capital market.[18]

### (d) 1998-2006 Regulations

    *i.   Royal Decree 2818/1998*

81.    On 23 December 1998, Spain adopted Royal Decree 2818/1998 ("**RD 2818/1998**") on electricity production installations supplied by renewable energy, waste or cogeneration.[19] RD 2818/1998 was the first regulatory development of Article 30.4 of Law 54/1997. The objective of RD 2818/1998 was to establish "a *system of temporary incentives for those facilities that require them in order to place them in a competitive position in a free market*."[20]

82.    RD 2818/1998 enabled RE generators qualifying under the Special Regime to sell electricity either under a regulated tariff or a premium paid on top of the wholesale market price. The premiums and regulated tariffs were reviewed by the Spanish Government annually, depending on the variation of the average price of electricity.[21]

83.    RD 2818/1998 also established the Administrative Registry for Production Facilities under the Special Regime ("*Registro Administrativo de Instalaciones de Producción en Régimen Especial*" or "**RAIPRE**") to facilitate the Government's management and control of the retribution under the legislation.[22]

---

[18] Law 54/1997 of 27 November 1997, Article 30.4, **Exhibit C-39**.

[19] RD 2818/1998 of 23 December 1998, **Exhibit C-73**.

[20] RD 2818/1998 of 23 December 1998, Preamble, **Exhibit C-73**.

[21] RD 2818/1998 of 23 December 1998, Article 28, **Exhibit C-73**.

[22] RD 2818/1998 of 23 December 1998, Article 9, **Exhibit C-73**.

    *ii.    The 2001 Renewables Directive*

84.    On 27 September 2001, following the adoption of the Kyoto Protocol in 1997, the European Parliament and Council passed Directive 2001/77/CE "*on the promotion of electricity produced from renewable energy sources in the internal electricity market*" (the "**2001 Renewables Directive**").[23] The 2001 Renewables Directive established obligations for the EU Member States to take appropriate measures to increase future electricity consumption derived from RE sources.[24] This Directive also recognised the "*need for public support in favour of renewable energy sources is recognised in the Community guidelines for State aid for environmental protection.*"[25] It further required EU Member States to establish "*national indicative targets for the consumption of electricity produced from renewable sources*" consistent with the overall target of 12% of electricity consumption from renewable sources by 2010.[26]

85.    In addition, the 2001 Renewables Directive required EU Members States to implement a RE plan to comply with the Directive by 2003 and ensure that the charging of transmission and distribution fees did not discriminate against electricity from RE sources, among others.[27] Spain's specific target was to draw 29.4% of its electricity from RE sources by 2010.[28]

    *iii.    Royal Decree 436/2004*

86.    Spain enacted Royal Decree 436/2004 ("**RD 436/2004**") on 12 March 2004,[29] and which repealed RD 2818/1998.  This decree, published on 27 March 2004, updated and systemised the legal and economic regime under the Special Regime by establishing that qualifying installations could sell electricity (i) at a regulated fixed tariff; or (ii) at

---

[23] 2001 Renewables Directive of 27 September 2001, **Exhibit C-38**.

[24] 2001 Renewables Directive of 27 September 2001, Recital (5), **Exhibit C-38**.

[25] 2001 Renewables Directive of 27 September 2001, Recitals (12), **Exhibit C-38**.

[26] 2001 Renewables Directive of 27 September 2001, Recitals (5) and (7), **Exhibit C-38**.

[27] 2001 Renewables Directive of 27 September 2001, Articles 3(3) and 9, **Exhibit C-38**.

[28] 2001 Renewables Directive of 27 September 2001, Annex, **Exhibit C-38**.

[29] RD 436/2004 of 12 March 2004, **Exhibit C-41**.

market prices and receive a premium FIT payment over and above the market price per kWh produced.[30] Both options were calculated by reference to a percentage of the average electricity tariff fixed by the Government on an annual basis, the "*tarifa media de referencia*" ("**TMR**").[31] Both values were subject to market fluctuations because the regulated tariff and FIT were linked to the average cost of electricity.

87.    Further, Article 40 established that:

> 1. During 2006, […] the tariffs, premiums, incentives and supplements defined in this Royal Decree shall undergo revision. […]. Every four years, starting from 2006, a new revision shall take place.
> 2. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall come into force on January 1st of the second year subsequent to the year that the revision has been carried out.
> 3. The tariffs, premiums, incentives and supplements resulting from any of the revisions provided for in this section shall apply solely to the plants that commence operating subsequent to the date of the entry into force referred to in the paragraph above and shall not have a backdated effect on any previous tariffs and premiums. […].[32]

### iv.    The 2005-2010 Renewable Energy Plan

88.    Spain's Council of Ministers approved the 2005-2010 Renewable Energy Plan on 26 August 2005, which revised the earlier 2000-2010 Renewable Energy Plan adopted in 1999.[33] The objective of the revised Renewable Energy Plan, prepared by IDAE, was to maintain Spain's commitment to cover at least 12% of the total energy demand with renewable sources by 2010, and incorporate two other objectives: 29.4% of electricity generation from renewables and 5.75% from biofuels in transport.[34]

---

[30] RD 436/2004 of 12 March 2004, Article 22(1), **Exhibit C-41**.

[31] RD 436/2004 of 12 March 2004, Articles 23 and 24, **Exhibit C-41**.

[32] RD 436/2004 of 12 March 2004, Article 40, **Exhibit C-41**.

[33] 2005-2010 Renewable Energy Plan, August 2005, **Exhibit C-75**.

[34] 2005-2010 Renewable Energy Plan, August 2005, p.7, **Exhibit C-75**.

89.     The 2005-2010 Renewable Energy Plan established that the RD 436/2004 FIT regime allowed wind producers to receive internal return rates above 7%, with own resources and after tax.[35] It also recommended increasing the installed capacity limit on tariffs, incentives and premiums for wind sources from 13,000 MW to 20,000 MW.[36]

> *v.*     *Royal Decree-Law 7/2006*

90.     Royal Decree Law 7/2006 ("**RDL 7/2006**") was enacted on 23 June 2006.[37] It amended Law 54/1997 and gave RE installations priority of access to transmission and distribution network.[38] This would allow generators to sell their electricity output in preference to any other non-renewable producer.

91.     RDL 7/2006 also provided that future variations of the TMR would not apply to the RD 436/2004 FIT, which meant that the RD 436/2004 remuneration options would be calculated in accordance with the TMR applicable in 2006.[39]

## 2.  Regulatory Developments in 2007-2010

### (a)  Royal Decree 661/2007

92.     On 25 May 2007, Spain passed Royal Decree 661/2007 ("**RD 661/2007**") regulating the activity of electricity production under the Special Regime.[40] RD 661/2007 replaced RD 436/2004. The objectives of the new policy are set out in the Preamble:

> [A]lthough the growth experienced by the special electricity generation regime as a whole has been noteworthy, the targets set for certain technologies are still far from being achieved. From the point of view of compensation, the business of the production of electrical energy under the special regime is characterised by the possibility that the compensation

---

[35] 2005-2010 Renewable Energy Plan, August 2005, p. 49, **Exhibit C-75**.

[36] 2005-2010 Renewable Energy Plan, August 2005, p. 57, **Exhibit C-75**.

[37] RDL 7/2006 of 23 June 2006, **Exhibit C-42**.

[38] RDL 7/2006 of 23 June 2006, Article 1, ¶ 12, amending Article 30(2)(b) of Law 54/1997, **Exhibit C-42**.

[39] RDL 7/2006 of 23 June 2006, Second Transitory Provision, **Exhibit C-42**.

[40] RD 661/2007 of 25 May 2007, **Exhibit C-44**.

system can be supplemented by the receipt of a premium under the terms and conditions established in the regulations, in order to determine which such factors as the voltage level of the energy delivered into the grid, the contribution to the improvement in the environment, primary energy saving, energy efficiency, and the investment costs incurred, may all be taken into account.[41]

93.     RD 661/2007 notably increased the installed capacity target for wind power generation from 13,000 MW to 20,155 MW.[42] Article 22 established that when the 85% target of the installed capacity was reached for any technology, there would be a time limit of at least 12 months within which wind installations would be required to register with the RAIPRE to benefit from RD 661/2007's economic regime.[43] By registering with RAIPRE, the installation qualified under the Special Regime and could thus benefit from the support schemes established under RD 661/2007.[44]

94.     With regard to the electricity output, RD 661/2007 provided qualifying RE generators the right to choose between two forms of remuneration:

a) Sell the electricity to the system through the transport or distribution grid, receiving for it a regulated tariff, which shall be the same for all scheduling periods expressed in Euro cents per kilowatt/hour.
b) Sell the electricity in the electrical energy production market. In this case the sale price of the electricity shall be the price obtained in the organised market or the price freely negotiated by the proprietor or the representative of the facility, supplemented where appropriate by a premium, in Eurocents per kilowatt/hour.[45]

95.     A "*regulated tariff*" is defined by Article 25 as a "*fixed sum which shall be the same for all scheduling periods and shall be determined as a function of the Category, Group, of*

---

[41] RD 661/2007 of 25 May 2007, Preamble, **Exhibit C-44**.

[42] RD 661/2007 of 25 May 2007, Article 38(2), **Exhibit C-44**.

[43] RD 661/2007 of 25 May 2007, Article 22(1), **Exhibit C-44**.

[44] RD 661/2007 of 25 May 2007, Article 17, **Exhibit C-44**.

[45] RD 661/2007 of 25 May 2007, Article 24(1), **Exhibit C-44**.

*Sub-Group to which the facility belongs, and the installed power, and where applicable the length of time since the date of commissioning [...]"*[46]

96. Article 2 of RD 661/2007 defined categories of facilities based on the primary energy used, the type of technology and the energy yield. Wind facilities were included under Category b.2 and the regulated tariff was set out in Table 3 of Article 36 as follows:[47]

| Group | Sub-Group | Power | Term | Regulated Tariff, c€/kWh | Reference premium, c€/kWh | Upper Limit, c€/kWh | Lower Limit, c€/kWh |
|---|---|---|---|---|---|---|---|
| b.1 | b.1.1 | P≤100 kW | first 25 years | 44.0381 | | | |
| | | | thereafter | 35.2305 | | | |
| | | 100 kW<P≤10 MW | first 25 years | 41.7500 | | | |
| | | | thereafter | 33.4000 | | | |
| | | 100<P≤50 MW | first 25 years | 22.9764 | | | |
| | | | thereafter | 18.3811 | | | |
| | b.1.2 | | first 25 years | 26.9375 | 25.4000 | 34.3976 | 25.4038 |
| | | | thereafter | 21.5498 | 20.3200 | | |
| b.2 | b.2.1 | | first 20 years | 7.3228 | 2.9291 | 8.4944 | 7.1275 |
| | | | thereafter | 6.1200 | 0.0000 | | |

97. Further, and contrary to what was established under RD 436/2004, tariffs for wind energy producers were de-linked from the TMR and indexed to the consumer price index ("**CPI**"). Article 44(3) indeed provided that:

> [t]he values of the tariffs, premiums, supplements, and lower and upper limits to the hourly price of the market as defined in this Royal Decree, for Category b) [...] shall be updated on an annual basis using as a reference the increase in the CPI less the value set out in the Additional Provision One of the present Royal Decree.[48]

98. Particularly, Article 44(3) defined tariffs, premiums, supplements and lower and upper limits as follows:

> In 2010, in view of the results of the follow-up reports on the extent to which the Renewable Energy Plan for 2005-2010 and the Energy Savings and Efficiency Plan for Spain (E4) have been achieved, as well as the new objectives included in the next Renewable Energy Plan for 2011-2020, tariffs, premiums, additional payments, and lower and upper thresholds set

---

[46] RD 661/2007 of 25 May 2007, Article 25, **Exhibit C-44**.

[47] RD 661/2007 of 25 May 2007, Article 36, **Exhibit C-44**.

[48] RD 661/2007 of 25 May 2007, Article 44(1), **Exhibit C-44**.

out in this royal decree will be reviewed, taking into account the costs associated with each of these technologies, the degree of participation of the special regime in meeting demand and its impact on the technical and economic management of the system, guaranteeing reasonable returns with reference to the cost of money on capital markets. Every four years thereafter a new adjustment will be carried out using the above criteria.

The adjustment to the regulated tariff and the lower and upper threshold referred to in this section will not affect the facilities for which the start-up document was issued before January 1 of the second year in which the adjustment was implemented.[49]

99.   Finally, RD 661/2007 also provided priority of access and dispatch to qualifying installations and a bonus compensation for "reactive energy."[50]

### (b) The 2009 Renewables Directive

100.   On 23 April 2009, the EU approved the 2009 Directive "on the promotion and use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC" (the "**2009 Renewables Directive**").[51] The 2009 Renewables Directive's objective was to obtain 20% of its total energy consumption requirements with RE sources by 2020.[52] Spain's RD 661/2007 anticipated the measures set out in the 2009 Renewables Directive.

### (c) Royal Decree-Law 6/2009

101.   Shortly after the adoption of the 2009 Renewables Directive, on 30 April 2009, Royal Decree-Law 6/2009 ("**RDL 6/2009**") was enacted by Spain.[53] RDL 6/2009 recognised the existence of a "*growing tariff deficit*" in Spain and defined it as "*the difference between revenue from the regulated tariffs that are set by the Administration and that consumers pay for their regulated supply and from the access tariffs that are set in the*

---

[49] RD 661/2007 of 25 May 2007, Article 44(3), **Exhibit C-44**.

[50] RD 661/2007 of 25 May 2007, Annex XI and Article 29(1), **Exhibit C-44**.

[51] 2009 Renewables Directive, **Exhibit C-64**.

[52] 2009 Renewables Directive, Annex I, **Exhibit C-64**.

[53] RDL 6/2009 of 30 April 2009, **Exhibit C-100**.

*liberalised market and the real costs associated with these tariffs.*"[54] RDL 6/2009 further noted that the deficit was having a "*profound effect on the system*" and placing at risk "*not only the financial situation of the companies that make up the Electricity Industry, but also the very sustainability of the system.*"[55]

102.   Because of the "unsustainable" imbalance, which "undermines the security and the capacity to fund the investments needed for the supply of electricity at the levels of quality and security that Spanish society requires," RDL 6/2009 recognised the "need to adopt an urgent measure that serves to guarantee the necessary legal security of those who have made investments."[56]

103.   To tackle the tariff deficit, RDL 6/2009 set yearly limits from 2009 to 2012 on the amount the tariff deficit could grow.[57] RDL 6/2009 also established that from 1 January 2013, access tariffs should be sufficient to meet the entire cost of regulated activities without *ex ante* deficit.[58] It thus required an increased regulated portion of the prices of the end user electricity so as to comply with the tariff deficit yearly limits.[59]

104.   Article 4 of RDL 6/2009 also introduced a pre-assignment register mechanism ("**Pre-Assignment Register**") and stated that enrolment in the Pre-Assignment Register was a necessary condition to benefit from the economic regime established in RD 661/2007.[60] The Pre-Assignment Register was a prior step to the RAIPRE registration and qualifying under the RD 661/2007 economic regime. Further, pursuant to RDL 6/2009, RE projects had to meet certain criteria in order to be registered. Once registered with the Pre-Assignment Register, facilities had a limit of 36 months to be registered

---

[54] RDL 6/2009 of 30 April 2009, Preamble, **Exhibit C-100**.

[55] RDL 6/2009 of 30 April 2009, Preamble, **Exhibit C-100**.

[56] RDL 6/2009 of 30 April 2009, Preamble, **Exhibit C-100**.

[57] RDL 6/2009 of 30 April 2009, Article 1, **Exhibit C-100**.

[58] RDL 6/2009 of 30 April 2009, Article 1, **Exhibit C-100**.

[59] RDL 6/2009 of 30 April 2009, Article 1, **Exhibit C-100**.

[60] RDL 6/2009 of 30 April 2009, Article 4, **Exhibit C-100**.

with RAIPRE and enter into commercial operation to be able to benefit from the RD 661/2007 economic regime.

105.    The Council of Ministers adopted on 24 November 2009 a resolution establishing a timetable classifying installations in four different phases with a view to establishing the progressive entry into operation of those facilities and allow a more controlled commissioning of wind plants.[61]

### (d) The Purported 2 July 2010 Agreement

106.    On 2 July 2010, the Spanish Government issued a press release in which it stated that the Ministry of Industry, Tourism and Commerce had reached an "agreement" with the wind power sector, including the Wind Power Business Association ("**AEE**"), to revise their rate structures.[62] The Claimants and the Respondent are in disagreement as to the nature of the 2 July 2010 "agreement".

107.    In the 2 July 2010 press release, the Government declared that there would be a fixed limit to the numbers of hours during which wind facilities could benefit from the FIT and that it would apply a reduction to the Premium of 35% until 1 January 2013.[63]

### (e) Royal Decree 1614/2010

108.    On 7 December 2010, Spain adopted Royal Decree 1614/2010 on "regulating and modifying certain aspects relating to the production of electricity based on thermoelectric and wind technologies" ("**RD 1614/2010**").[64] RD 1614/2010, which

---

[61] Resolution of the Secretary of State for Energy of 19 November 2009, publishing the Agreement of the Council of Ministers, ordering the projects and installations presented to the Pre-Assignment Register for electricity generation installations set forth in RDL 6/2009 (published on 24 November 2009), Section III, **Exhibit C-101**; *see also*, RDL 6/2009 of 30 April 2009, Preamble, **Exhibit C-100**.

[62] Government of Spain, Ministry of Industry, Tourism and Commerce, Press Release: "*The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks*", 2 July 2010, **Exhibit C-45**.

[63] Government of Spain, Ministry of Industry, Tourism and Commerce, Press Release: "*The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks*", 2 July 2010, p. 2, **Exhibit C-45**.

[64] RD 1614/2010 of 7 December 2010, **Exhibit C-46**.

applied to qualifying wind installations, introduced, inter alia, a limit on operating hours per year benefitting from the FIT pursuant to RD 661/2007.[65] RD 1614/2010 also established the reduction by 35% until 1 January 2013.[66] Thereafter, the full premium regime under RD 661/2007 would apply to all qualifying wind installations.[67]

109.    Furthermore, Article 5 of RD 1614/2010 provided as follows:

> [f]or wind technology facilities adhered to Royal Decree 661/2007, of 25 May, the revisions of the tariffs, premiums and upper and lower limits referred to in article 44.3 of the aforementioned Royal Decree, shall not affect facilities registered definitively in the Administrative Registry of production facilities entitled to the special regime that is maintained by the Directorate-General for Energy and Mining Policy as of 7 May 2009, nor to those that would have been registered in the Remuneration Pre-assignment Registry under the fourth transitional provision of Royal Decree-Law 6/2009, of 30 April, and that were to meet the obligation envisaged in article 4.8 thereof.[68]

110.    In other words, reviews under Article 44(3) of RD 661/2007 would depend on whether the installations were definitely registered with the RAIPRE as of 7 May 2009 or whether they satisfied the requirements for registration in the Pre-Assignment Register.

### 3.  The Disputed Measures

111.    The following section describes a series of measures adopted by Spain beginning 2012, which are at issue in the present arbitration.

### (a) Law 15/2012

112.    On 27 December 2012, Spain adopted Law 15/2012 on "*Tax Measures for Energy Sustainability,*" which entered into effect on 1 January 2013 ("**Law 15/2012**").[69]

---

[65] RD 1614/2010 of 7 December 2010, Article 2, **Exhibit C-46**.

[66] RD 1614/2010 of 7 December 2010, Article 5.2, **Exhibit C-46**.

[67] RD 1614/2010 of 7 December 2010, Article 2.4, **Exhibit C-46**.

[68] RD 1614/2010 of 7 December 2010, Article 5.3, **Exhibit C-46**.

[69] Law 15/2012 of 27 December 2012, **Exhibit C-48**.

113.   Pursuant to its Preamble, Law 15/2012 meant to "*harmonise*" Spain's tax system through "a more efficient and respectful use of the environment and sustainable development [and] bring it into line with the basic principles that govern the tax, energy and of course the environmental policy of the European Union."[70]

114.   Among other tax measures, Law 15/2012 introduced a 7% levy on "*the total amount that corresponds to the tax payer for the production of electricity and its incorporation into the electricity system, measured at power station bus bars, for each facility, in the tax period.*"[71] This levy, known as the "*Impuesto sobre el valor de la producción de energía eléctrica*" ("**TVPEE**") applied to all electricity production facilities, whether they were registered under the Ordinary Regime or Special Regime.

115.   According to the Respondent, the impact of the TVPEE on RE producers "*has been neutrali*zed" because the "*the specific remuneration received by renewable producers enables them to recover certain costs that, unlike conventional technologies, cannot be recovered in the market, and, also, to obtain a reasonable return. Among those costs is precisely the TVPEE.*"[72] For Claimants, the 7% levy is a "*disguised tariff cut for RE installations and an additional limitation to the RD 661/2007 economic regime.*"[73]

   **(b) Royal Decree-Law 2/2013**

116.   On 1 February 2013, Spain adopted Royal Decree-Law 2/2013 "*concerning urgent measures within the electricity system and the financial sector*" ("**RDL 2/2013**").[74]

117.   RDL 2/2013 introduced several measures, two of which are impugned by the Claimants. First, RDL 2/2013 reduced to zero the amount of the premium that both existing and future installations expected to receive as a supplement to the market price for electricity

---

[70] Law 15/2012 of 27 December 2012, Preamble, **Exhibit C-48**.

[71] Law 15/2012 of 27 December 2012, Article 6, **Exhibit C-48**.

[72] Respondent's Counter-Memorial, ¶ 662.

[73] Claimants' Memorial, ¶ 227.

[74] RDL 2/2013 of 1 February 2013, **Exhibit C-49**.

under Article 36 of RD 661/2007.[75] Thus, facilities under the Special Regime were forced to receive the fixed tariff.

118.   Second, RDL 2/2013 introduced a change to the inflation index applicable to the FIT. RDL 2/2013 provided that tariffs applicable to the electricity sector would no longer be updated by reference to the CPI but rather, to the "*CPI at constant tax rates, excluding unprocessed foods and energy products*" as of 1 January 2013.[76] According to the Claimants, the impact of this measure on the Claimants' investments was "limited."[77]

119.   On 19 February 2015, the Spanish Constitutional Court dismissed a challenge against RDL 2/2013, upholding its constitutionality.[78] On 26 March 2015, the Supreme Court upheld the legality of the RDL 2/2013.[79]

   **(c)   Royal Decree-Law 9/2013**

120.   On 12 July 2013, the Government enacted Royal Decree-Law 9/2013 adopting urgent measures "*to guarantee the financial stability of the electricity system*" ("**RDL 9/2013**"), which entered into force on 14 July 2013.[80] Pursuant to its Preamble, the objective of RDL 9/2013 was to introduce:

> a series of measures which are urgent, balanced, proportional and reaching, aimed at guaranteeing the financial stability of the electricity system as an unavoidable prerequisite for the economic sustainability thereof and to ensure a secure supply, and which are addressed to all electricity sector activities.[81]

---

[75] RDL 2/2013 of 1 February 2013, Article 2, **Exhibit C-49**.

[76] RDL 2/2013 of 1 February 2013, Article 1, **Exhibit C-49**.

[77] Claimants' Memorial, ¶ 241.

[78] Judgment of the Constitutional Court 28/2015, of 19 February 2015, in Constitutional Question number 6412-2013, **Exhibit R-0151**.

[79] Judgment of the Supreme Court, of 26 March 2015, **Exhibit R-0153**.

[80] RDL 9/2013 of 12 July 2013, **Exhibit C-51**.

[81] RDL 9/2013 of 12 July 2013, Preamble, **Exhibit C-51**.

121.   RDL 9/2013 made substantial modifications to the 1997 Electricity Law, by repealing RD 661/2007 and establishing a new remuneration regime for RE facilities, which applied to both existing and new installations. For the Claimants, the regime under RDL 9/2013 ("**New Regime**") represented a "*complete overhaul of the Special Regime*."[82] According to the Claimants, the New Regime "*resulted in a 41% reduction in the Claimants' cash flows.*"[83]

122.   In particular, the New Regime amended Article 30(4) of RD 661/2007 as follows:

> 4. Additionally, subject to the terms that the Council of Ministers might adopt pursuant to Royal Decrees, in relation to the remuneration for the generation of electricity calculated according to market price, installations may receive a specific remuneration [the Special Payment] composed of an amount per unit of installed capacity. Such amount shall cover, as appropriate, the investment costs of a standard installation that cannot be recovered through the sale of energy, as well as an amount for the operation of the installation to cover, as the case may be, the difference between exploitation costs and the revenues obtained from the participation of such a standard installation in the market.
>
> For the calculation of that specific remuneration, the following elements shall be considered, based on the installation's regulatory useful life and by reference to the activities carried out by an efficient and well administered business:
>
> a) The standard revenues for the sale of generated energy valued at market price of production;
>
> b) The standard exploitation costs; and
>
> c) The standard value of the initial investment.
>
> To that effect, the costs or investments determined by laws or administrative regulations that do not apply to the Spanish territory shall not be considered in any case. In the same manner, only those costs and investments related to the activity of electric energy generation can be taken into account.

---

[82] Claimants' Memorial, Section 7.2.

[83] Claimants' Memorial, ¶ 262.

> As a result of the individual characteristics of the electricity system in the Spanish islands or the extra-peninsular territories, a standard installation for each of those electricity systems may be defined.
>
> This remuneration regime shall not exceed the minimum required level to cover the costs that are necessary for installations to compete on an equal footing with the rest of the technologies in the market in order to allow those installations to obtain a reasonable return, by reference to the standard installation, as the case may be. Notwithstanding the above, exceptionally, the remuneration regime might also include an incentive to investments and timely execution of an installation, if this was going to result in a significant cost reduction for the Spanish islands or the extra-peninsular territories' electricity systems.
>
> Such reasonable return will be based on, before taxes, the average returns in the secondary market of the State's ten-year bonds plus the adequate differential.
>
> The parameters of the remuneration regime can be revised every six years.[84]

123.   By repealing RD 661/2007, RDL 9/2013 repealed the remunerative scheme for RE producers based on the Regulated Tariff or a premium in addition to electricity market prices.[85] Under the New Regime, RE producers were to receive a "**Special Payment**" taking into account the following elements: (i) the "*standard revenues for the sale of generated energy valued at market price of production*;" (ii) the "*standard exploitation costs*;" and (iii) the "*standard value of the initial investment.*"[86]

124.   RDL 9/2013 also provided that the parameters of the remuneration regime could be revised every six years.[87] Further, the "*reasonable rate of return*" for facilities benefitting from the FIT as of the effective date of RDL 9/2013 was to be "*referenced, before tax, to the average yield during the ten years prior to the this Royal Decree-Law coming into effect from ten-year Government Bonds in the secondary market, increased by 300 base points.*"[88]

---

[84] RDL 9/2013 of 12 July 2013, Article 1(Two), **Exhibit C-51**.

[85] RDL 9/2013 of 12 July 2013, Sole Repeal Provision; Article 1, **Exhibit C-51**.

[86] RDL 9/2013 of 12 July 2013, Article 1, **Exhibit C-51**.

[87] RDL 9/2013 of 12 July 2013, Article 1, **Exhibit C-51**.

[88] RDL 9/2013 of 12 July 2013, First Additional Provision, **Exhibit C-51**.

125.   On 17 December 2015 and 18 February 2016, Spain's Constitutional Court dismissed challenges against certain provisions of RDL 9/2013.[89]

   **(d) Law 24/2013**

126.   On 26 December 2013, Spain adopted Law 24/2013 on the Electricity Sector, which replaced Law 54/1997 ("**Law 24/2013**").[90] In its Preamble, Law 24/2013 says that Law 54/1997 "*has proven to be insufficient in terms of guaranteeing the financial balance of the system, amongst other reasons because the system for paying or rewarding regulated activities is lacking in the necessary flexibility for its adaptation to cope with the significant changes pertaining to the electric system or in economy trends*."[91]

127.   Law 24/2013 incorporated and extended the economic regime established in RDL 9/2013. Notably, Law 24/2013 formally eliminated the distinction between the Ordinary Regime and Special Regime.[92]

128.   Further, Article 14(4) of Law 24/2013 provided that, in the New Regime, "*remuneration parameters*" for RE projects would remain valid for regulatory periods of six years, and could be "*revised prior to the start of the regulatory period*."[93] Pursuant to Article 14(7), the remuneration mechanism would be calculated to provide reasonable profits for the installations and would rely on (i) the standard revenue from the energy produced (revised every three years for the rest of the regulatory period); (ii) the standard operating costs; and (iii) the standard value of the initial investment.[94] It further established that the "*reasonable return*" was to be calculated throughout the "*regulatory life of the plant*."[95]

---

[89] Judgment of the Constitutional Court of 17 December 2015, delivered in constitutional challenge 5347/2013, **Exhibit R-0154**; Judgment of the Constitutional Court of 18 February 2016, delivered in constitutional challenge 5852/2013, **Exhibit R-0156**; Judgment of the Constitutional Court of 18 February 2016, delivered in constitutional challenge 6031/2013, **Exhibit R -0157**.

[90] Law 24/2013 of 26 December 2013, **Exhibit C-52**.

[91] Law 24/2013 of 26 December 2013, Preamble, **Exhibit C-52**.

[92] Law 24/2013 of 26 December 2013, Fifth Final Provision, **Exhibit C-52**.

[93] Law 24/2013 of 26 December 2013, Article 14(4), **Exhibit C-52**.

[94] Law 24/2013 of 26 December 2013, Article 14(7), **Exhibit C-52**.

[95] Law 24/2013 of 26 December 2013, Third Final Provision (3), **Exhibit C-52**.

129.    Law 24/2013 did not however fully define the economic regime under the New Regime. As described below, additional implementing measures were required to define the applicable economic regime for RE installations.

   **(e)   Royal Decree 413/2014 and Ministerial Order MO IET/1045/2014**

130.    On 6 June 2014, Spain adopted Royal Decree 413/2014 "*regulating the production of electricity from renewable energy sources, cogeneration and waste*" ("**RD 413/2014**").[96] This regulation was adopted to implement the new regime set forth by Law 23/2014.

131.    Among other measures, RD 413/2014 established the formulas for calculating the two components of the Special Payment under the new regime: (i) a remuneration per MW of installed capacity; and (ii) a remuneration per MWh of electricity produced to cover the operating costs that cannot be met by market prices.[97] RD 413/2014 also subjected the Special Payment to certain thresholds of operating hours.[98]

132.    RD 413/2014 also provided that the "*remuneration parameters*" could be revised at the end of each "*regulatory period*" of six years but also at the end of each "*semi (regulatory)*" period of three years.[99]

133.    On 16 June 2014, the Ministry of Industry and Tourism issued Ministerial Order IET/1045/2014 to further implement the New Regime and define the applicable economic regime for RE producers ("**June 2014 Order**").[100] The June 2014 Order approved the remuneration parameters of standard installations for the production of

---

[96] RD 413/2014 of 6 June 2014, **Exhibit C-54**.

[97] RD 413/2014 of 6 June 2014, Article 11(6), **Exhibit C-54**.

[98] RD 413/2014 of 6 June 2014, Article11(6), **Exhibit C-54**.

[99] RD 413/2014 of 6 June 2014, Article 15, **Exhibit C-54**.

[100] Order IET/1045/2014 of 16 June 2014, **Exhibit C-53**.

electricity from RE sources, co-generation and waste. Notably, the June 2014 Order fixed the reasonable return for existing installations at 7.398% pre-tax.[101]

**B. Claimants' Investment in Wind Farms**

134.   According to the Claimants, in 2011, Watkins Spain, Redpier and Northsea "*acquired the entire share capital*" of the Marmellar SL and La Boga SL.[102] Marmellar SL holds the wind farm known as Parque Eólico Marmellar (49.5 MW) ("**Parque Marmellar**") and La Boga SL holds the following seven wind farms:

   1.   Parque Eólico Lodoso (49.5 MW) ("**Parque Lodoso"**);

   2.   Parque Eólico El Perul (49.6 MW) ("**Parque El Perul**");

   3.   Parque Eólico La Lastra (11.69 MW) ("**Parque La Lastra**");

   4.   Parque Eólico Lora 1 (49.6 MW) ("**Parque Lora 1"**);

   5.   Parque Eólico Lora 2 (49.6 MW) ("**Parque Lora 2**");

   6.   Parque Eólico Sargentes (24 MW) ("**Parque Sargentes**"); and

   7.   Parque Eólico Arroyal (49.5 MW) ("**Parque Arroyal**" and, together, the "**Wind Farms**").[103]

135.   The Wind Farms are located in the province of Burgos, in the autonomous region of Castilla y León and have a total installed production capacity of 332.99 MW. Marmellar SL and La Boga SL are jointly referred to as the "**Project Companies**."[104]

136.   The Claimants are affiliates of Bridgepoint Advisers Limited ("**Bridgepoint**"), a private equity firm that invests in different sectors in Europe.[105] According to the Claimants, Bridgepoint's strategy is to "*acquire controlling stakes in companies with a strong market position and potential for growth in the long term through: (i) operational*

---

[101] Order IET/1045/2014 of 16 June 2014, Annex III (1.3), **Exhibit C-53**.

[102] Claimants' Memorial, ¶ 14; *see also*, Share purchase agreement between Bridgepoint Europe IV Bidco 3 Limited, Bridgepoint Europe IV Bidco 6 Limited and Bridgepoint Europe IV Bidco 8 Limited and EYRA, Urbaenergía and Iverduero dated 12 August 2011, **Exhibit C-35**.

[103] Claimants' Memorial, ¶ 14.

[104] Claimants' Memorial, ¶ 14.

[105] Claimants' Memorial, ¶ 11.

*improvement; (ii) refocusing of strategies; and (iii) the acquisition of additional companies which can be consolidated with the initial investment*."[106]

137.    According to the Claimants, in May 2011, the Claimants were "approached by the corporate finance departments of Société Générale and Mediobanca regarding the opportunity to invest in a portfolio of wind farms being divested by the Spanish construction conglomerate Actividades de Construcción y Servicios (ACS)" and were provided with an information memorandum, which contained general information on investing in the wind facilities in Spain.[107] The Wind Farms, which were registered with RAIPRE, would be held by a newly-incorporated company, Borawind Energy, S.L. ("**Borawind**").[108]

138.    The Claimants commissioned a series of due diligence reports, including a report by the Boston Consulting Group ("**BCG**") to analyse the "*sustainability of the regulatory report*."[109] The Claimants also received a final technical due diligence report from Garrigues on 22 July 2011, a final tax due diligence report from KPMG on 27 July 2011 and an executive report on the legal due diligence from Allen & Overy on 2 August 2011.[110]

139.    On 12 August 2011, the sale and purchase agreement between the Wind Farms vendor and various entities controlled by Bridgepoint was signed.[111] Further, on 8 May 2012,

---

[106] Claimants' Memorial, ¶ 11.

[107] Claimants' Memorial, ¶ 195.

[108] Claimants' Memorial, ¶ 199; *see also*, Certificate of Registration in the RAIPRE for Parque Marmellar dated 24 April 2007, **Exhibit C-105**; Certificate of Registration in the RAIPRE for Parque Lodoso dated 17 August 2007, **Exhibit C-106**; Certificate of Registration in the RAIPRE for Parque El Perul dated 20 June 2006, **Exhibit C-107**; Certificate of Registration in the RAIPRE for Parque La Lastra dated 19 September 2006, **Exhibit C-108**; Certificate of Registration in the RAIPRE for Parque Lora 1 dated 28 December 2007, **Exhibit C-109**; Certificate of Registration in the RAIPRE for Lora 2 dated 28 December 2007, **Exhibit C-110**; Certificate of Registration in the RAIPRE for Parque Sargentes dated 27 November 2009, **Exhibit C-111**; and Resolution registering in the RAIPRE for Parque Arroyal dated 9 December 2010, **Exhibit C-112**.

[109] Claimants' Memorial, ¶ 202.

[110] Claimants' Memorial, ¶¶ 202, 208-210; Technical Due Diligence Report on La Boga prepared by Garrigues Medio Ambiente dated 22 July 2011, **Exhibit C-117**; Tax Due Diligence Report on Project Greco prepared by KPMG dated 27 July 2011, **Exhibit C-118**; Legal Due Diligence Executive Report for Project Greco prepared by Allen & Overy dated 2 August 2011, **Exhibit C-119**.

[111] Claimants' Memorial, ¶ 213.

*"upon fulfilment of the conditions precedent applicable to the Wind Farms, the entire share capital of the Project Companies were transferred to Watkins Spain, Redpier and Northsea."*[112] On the same day, according to the Claimants, *"the intragroup loans in place between the Project Companies and the sellers were transferred to Watkins Holdings, Redpier Holdings S.à r.l. and Northsea Holdings S.à r.l."*[113]

140. The Claimants paid EUR 91 million for the Wind Farms, including equity and intragroup loans.[114] The construction of the Wind Farms was financed through *"(i) project finance agreements; (ii) shareholders' undertaking agreements; (iii) intragroup loan agreements and profit participative Sloan agreements; and (iv) comfort letters."*[115]

## V. JURISDICTION

141. The Respondent raises two general objections to the Tribunal's jurisdiction.

- *First*, Spain asserts that the Tribunal lacks *ratione personae* jurisdiction because the law of the European Union ("**EU**") precludes the applicability of the ECT to disputes involving investments in an EU state by EU investors (the intra-EU Objection);

- *Second,* Spain contends that the 7% TVPEE, created by Law 15/2012 of 27 December 2012 on fiscal measures for energy sustainability, is a tax measure which falls outside the scope of protection of the ECT (the TVPEE Objection).

---

[112] Claimants' Memorial, ¶ 213.

[113] Claimants' Memorial, ¶ 213.

[114] Claimants' Memorial, ¶ 214.

[115] Claimants' Memorial, ¶ 215; *see also*, Schedule III of the Share Sale and Purchase Agreement dated 12 August 2011, **Exhibit C-124**.

## A.  The Intra-EU Objection

### 1.  The Respondent's Position

142.   Spain submits that the Tribunal does not have jurisdiction *ratione personae* because the ECT does not apply to disputes involving investments made within the EU by investors from other EU countries (intra-EU investors).  Spain advances several arguments in support of its position laid out below.

#### (a)  Existence of an "Investor" from "another Contracting Party"

143.   Spain recalls that Article 26(1) of the ECT requires that the dispute submitted to arbitration occur between "*a Contracting Party and an investor of another Contracting Party*."[116] Noting that the Claimants, on the one hand, are nationals of Luxembourg, the Netherlands,[117] *i.e.* EU Member States, and the Respondent, on the other hand, is also a national of the EU—*itself* a party to the ECT—, Spain concludes that this "*inevitably implies the exclusion of* [Article 26(1) of the ECT] *from any case where an investor of an EU State has a dispute with an EU State, in relation to an investment in said State*."[118]

#### (b)  Relationship between EU law and the ECT

144.   The Respondent alleges that the Claimants' investment is made within the internal market in electricity of the EU which confers protection on EU-investors which is "preferential to the protection conferred by the ECT and any BIT."   Since both Spain and the Claimants were already EU Member States when the ECT was concluded, "*they had transferred their sovereignty to the* [EU]"[119] with respect to the energy market,

---

[116] Respondent's Counter-Memorial, ¶ 50; Respondent's Rejoinder, ¶ 95.

[117] Respondent further notes that the Spanish companies, Watkins Spain S.L., Redpier S.L., Northsea Spain S.L., Parque Eólico Marmellar S.L., and Parque Eólico La Boga S.L. are organised under the laws of the Kingdom of Spain but controlled by Watkins (Ned) BV, therefore, considered nationals of another Contracting Party for purposes of Article 25(2)(b) of the ICSID Convention and Article 26(7) of the ECT.  *See* Respondent's Counter-Memorial, ¶ 51.

[118] Respondent's Counter-Memorial, ¶ 50.

[119] Respondent's Counter-Memorial, ¶ 83.

Spain explains, and were thus no longer able "*to contract obligations between themselves*"[120] related to this area.

145.    The Respondent further alleges that EU law forbids the existence of any dispute settlement mechanism other than those established by EU treaties.  If the Tribunal was to decide on this matter, it would be "*interfering with the competence of the judicial system of the EU.*"[121]

146.    In this context, the jurisdictional system of the EU, Spain maintains, has "*the monopoly*" on "*the latest interpretation of EU Law,*"[122] and the EU prevents the settlement of intra-EU disputes by "*any dispute settlement mechanism other than that established by its Treaties, which may interfere with the bases of the Internal Market.*"[123]

147.    Citing *Costa v. ENEL*, the Respondent argues that the foregoing stems from "*the essential principle on which the objection to the jurisdiction of the Arbitral Tribunal is raised,*" that is to say, "*the principle of primacy of EU law.*"[124]

148.    Further, according to Spain, that "*the intra-EU investor protection system prevails over any in any other international treaty*" does not arise solely from the specific attributes of the EU, but it also has "*its literal recognition in the ECT itself.*"[125] The Respondent finds support for its position in an "*effective interpretation*"[126] of the ECT's wording, context and purpose, referring, in particular, to the ECT's provisions pertaining to Regional Economic Integration Organizations (the "**REIOs**").

---

[120] Respondent's Counter-Memorial, ¶ 53.

[121] Respondent's Counter-Memorial, ¶ 56.

[122] Respondent's Counter-Memorial, ¶ 63.

[123] Respondent's Counter-Memorial, ¶ 55.

[124] Respondent's Rejoinder, ¶¶ 99-100; *citing* Ruling by the CJEU of 15 July 1964 in Case 6/64 on *Flaiminio Costa v. ENEL*, **Exhibit RL-0084**.

[125] Respondent's Counter-Memorial, ¶ 67.

[126] Respondent's Rejoinder, ¶ 148.

149.    The Respondent relies, inter alia, on several provisions of the ECT to support this
argument.  For example, Article 1(2) of the ECT, which defines the Contracting Party
as "*a state or* [REIO] *which has consented to be bound by this Treaty and for which the
Treaty is in force.*"[127]  Another article invoked by Spain is Article 1(3) of the ECT,
which defines a REIO as "*an organization constituted by states to which they have
transferred competence over certain matters a number of which are governed by this
Treaty, including the authority to take decisions binding on them in respect of those
matters.*"[128] According to Spain, this provision demonstrates that the ECT expressly
recognises that the EU may exercise sole competence with respect to certain matters,
"*because its Member States no longer have competence to do so.*"[129] In this regard,
Spain notes that the EU is the only REIO that is part of the ECT.  Spain continues its
allegation on the interpretation of the ECT by referring to Article 25 of the ECT, which
provides that the ECT's most-favuored-nation treatment obligations do not extend to
preferential treatment accorded to members of an Economic Integration Agreement
eliminating or prohibiting discriminatory measures among its members. In Spain's
view, Article 25 of the ECT recognises the principle of primacy of EU law in intra-EU
relations and acknowledges that "*the process of economic integration in the EU is more
advanced than that of the ECT and ultimately more favorable to the investor.*"[130] Article
36(7) of the ECT accords to a REIO a number of votes equivalent to the number of its
member States when voting on matters as to which the REIO has competence. In this
context, Spain submits that the decision "*as to who is the competent Contracting Party
in each matter is not the responsibility of the Arbitral Tribunal, but of the CJEU.*"[131]

150.    Moreover, Spain invokes Article 26(6) of the ECT in support of its argument that the
law applicable to the present dispute is "*this Treaty and applicable rules and principles*

---

[127] Respondent's Rejoinder, ¶ 139; Respondent's Counter-Memorial, ¶ 69.

[128] Respondent's Rejoinder, ¶ 140; Respondent's Counter-Memorial, ¶ 69.

[129] Respondent's Rejoinder, ¶ 141; Respondent's Counter-Memorial, ¶ 70.

[130] Respondent's Rejoinder, ¶ 147.

[131] Respondent's Rejoinder, ¶ 144.

*of international law*," which, Spain maintains, includes EU law.[132] In this context, Spain quotes *Electrabel v. Hungary*:

> […] the Tribunal concludes that Article 307 EC precludes inconsistent preexisting treaty rights of EU Member States and their own nationals against other EU Member States; and it follows, if the ECT and EU law remained incompatible notwithstanding all efforts at harmonization, that EU law would prevail over the ECT's substantive protections and that the ECT could not apply inconsistently with EU law to such a national's claim against an EU Member State.[133]

151. Spain also refers to Article 344 of the Treaty on the Functioning of the European Union (the "**TFEU**"), which provides that "*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*"[134]

152. In Spain's view, this provision prevents Spain from submitting any matters related to the harmonised internal electricity market to arbitration.[135] Admitting this possibility, Spain contends, would mean that the Tribunal would have to rule upon the rights of EU investors in the internal market.[136] In this respect, Spain points out that the Court of Justice of the European Union (the "**CJEU**") had already opined that such situation would be incompatible with EU law because the CJEU has exclusive jurisdiction over the interpretation of EU law.[137]

153. Likewise, Spain considers that its position is in line with that of the Commission, which "*has reiterated that arbitration is not applicable as a mechanism of dispute resolution ever since the first intra-community disputes arose relating to BITs.*"[138] In the same

---

[132] Respondent's Counter-Memorial, ¶ 75; Respondent's Rejoinder, ¶ 147.

[133] Respondent's Counter-Memorial, ¶ 76, *citing Electrabel S.A. v. Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, of 30 November 2012, ¶ 4.189, **Exhibit RL-0002**.

[134] Respondent's Counter-Memorial, ¶ 77.

[135] Respondent's Counter-Memorial, ¶ 77.

[136] Respondent's Counter-Memorial, ¶ 78.

[137] Respondent's Counter-Memorial, ¶¶ 79-82.

[138] Respondent's Rejoinder, ¶ 131.

vein, Spain invokes supportive writings which state, *inter alia*, that "*there seem to be good reasons for the Commission to push for ensuring that EU law is the only regime governing investment flows within the European market and that the [CJEU] is the only ultimate instance for interpreting and applying these rules.*"[139]

154.    In further support of its position, the Respondent alludes to the purpose of the ECT, which, according to its interpretation, was not intended to "*cover an area, that of intra-EU investments, which had been totally covered—and in a far superior manner—for years by EU Law.*"[140] Rather, the ECT's objective "*lies in the wish of the Council of the then EC to speed up the economic recovery of Eastern Europe after the fall of the Berlin Wall through cooperation in the energy sector.*"[141]

155.    Finally, Spain concludes its intra-EU Objection by referring to the Commission's decision in *Micula v. Romania*, implying that the Commission might regard any monetary award by the Tribunal in favour of the Claimants as impermissible State aid, incompatible with EU law.[142]

156.    In support of this argument, Spain provided further evidence in its Rejoinder indicating that the Commission's Decision in the State aid procedure SA.40348 (20151NN) from November 2017 which declared the incompatibility of the measures in dispute with EU Law.[143]

---

[139] Respondent's Counter-Memorial, ¶ 91, citing, *Investment protection and EU Law: the intra- and extra- EU dimension of the Energy Charter* Treaty, Jan Kleinheisterkamp, Journal of International Economic Law 15(1), Oxford University Press, 2012, pp. 101, 103 and 108, **Exhibit RL-0064**. *See also*, Respondent's Counter-Memorial, ¶ 91.

[140] Respondent's Counter-Memorial, ¶ 86.

[141] Respondent's Counter-Memorial, ¶ 88.

[142] Respondent's Counter-Memorial, ¶¶ 96-99.

[143] Respondent's Rejoinder, ¶ 98. Decision of the European Commission of November 2017, S.A. 40348 (2015/NN), **Exhibit RL-0081**. *See also*, Respondent's Post-Hearing, ¶ 89.

### (c) Disconnection clause

157.   Quoting the Opinion 1/03 of the Commission, [144] the Respondent notes that it is irrelevant that the ECT does not contain an express disconnection clause when such a clause is related to covered areas where there has been total harmonization. [145]

158.   In its Post-Hearing submissions, the Respondent raised the disconnection clause to address Claimants' argument that "*the conflict between EU law and Article 26 of the ECT should be solved by applying Article 16 of the ECT.*"[146] Spain's contention is that Article 26(6) requires the Tribunal to apply EU law in this dispute which in turn makes this article the "*disconnection clause*"[147] Respondent further clarified that it intends for the ECT to be applied "*with all its consequences, which include the lack of jurisdiction of the Arbitral Tribunal to hear intra-EU disputes concerning a key institution in European law: State Aid.*"[148]

### (d) Relevance of previous awards

159.   Spain denies the adequacy of the Claimants' assertion that all international investment tribunals dealing with the intra-EU objection have rejected it.   In Spain's view, these cases must be distinguished either because (i) they involve bilateral investment treaties and not the ECT, which is signed by the EU; or (ii) they concern obligations assumed by States that were not yet members of the EU when they signed the ECT; or (iii) they do not consider the principle of primacy of EU law. [149]

---

[144] Opinion 1/03 of the plenary of the Court of Justice of the European Union of 7 February 2006, E**xhibit R-0362**.

[145] Respondent's Rejoinder, ¶¶ 157-158.

[146] Respondent's Post Hearing Brief, ¶ 110, *citing*, Hearing Transcript, Day 2, 55:10-18 (Ms. Stoyanov).

[147] Respondent's Post-Hearing, ¶ 111, *see also* Respondent's Post-Hearing Reply, ¶ 8.

[148] Respondent's Post-Hearing, ¶ 112, *see also*, Respondent's Post-Hearing Reply, ¶ 9.

[149] Respondent's Rejoinder, ¶ 113.

160. *First*, in Spain's view, the tribunal in *Eureko v. Slovakia,* invoked by the Claimants, expressly recognised the "*inability to extrapolate its findings to treaties such as the ECT.*"[150]

161. *Second*, Spain also differentiated the *Electrabel v. Hungary* case where the respondent State signed the ECT when it had not yet joined the EU. According to Spain, Hungary, unlike Spain, Luxembourg and the Netherlands, was thus able to enter into obligations under Part III of the ECT.[151]

162. *Third*, *PV Investors v. Spain*, *Charanne v. Spain*, *RREEF v. Spain, Isolux v. Spain* and *Eiser v. Spain* must all be distinguished, Spain maintains, on the basis that they fail to examine an "*essential element of* [Spain's] *objection,*" the principle of primacy of EU law.[152] In this regard, Spain underlines that it is precisely requesting an express pronouncement from the Tribunal about the "*validity and application*" of the principle of primacy of EU law.[153]

163. In its Counter-Memorial and Rejoinder, Spain noted that it "*maintain[ed] this jurisdictional objection*" until the CJEU resolves two cases pending before it and pertaining to the compatibility between intra-EU BITs and EU law, *Achmea* and *Micula v. Romania*. Spain considers that the Tribunal shall also bear in mind several Commission's decisions on the aid systems of Spain and the Czech Republic regarding renewable energy, in which the Commission held that arbitration was incompatible with EU law.[154]

---

[150] Respondent's Rejoinder, ¶ 114, *citing Eureko B.V. v. Republic of Poland,* Partial Award, 19 August 2005, ¶ 218, **Exhibit RL-0043**.

[151] Respondent's Rejoinder, ¶ 116.

[152] Respondent's Rejoinder, ¶ 130.

[153] Respondent's Rejoinder, ¶ 130.

[154] Respondent's Rejoinder, ¶¶ 97-98, 131.

164.    In its Post-Hearing submission, Spain further developed its arguments on the *Achmea* based on the decision of 6 March 2018.[155]  Spain argues that the three prerequisites of the *Achmea* case are also present in this case.  The first refers to "*whether the disputes which the [ ] Tribunal is called on to resolve are liable to relate to the interpretation or application of EU law.*"[156]  Spain argues that the "*dispute concerns […] fundamental freedoms of EU [and]... State Aid*" and that the first prerequisite is "*met in the case at hand.*"[157]

165.    Regarding the second prerequisite, on the principle of autonomy, Spain says that the Tribunal is not a court because it "*lacks permanence, state nature, and mandatory competence,*" which results in that it does not belong to the EU judicial system and "*cannot make a reference for a preliminary ruling to the CJEU.*"[158]

166.    Finally, the third prerequisite, a decision of this Tribunal would only allow for review by an *ad hoc* Committee which is contrary to EU law which requires that arbitral awards be subject to review by a court of a Member State.[159]

    **2.    The Claimants' Position**

        **(a) Existence of an "Investor" from "another Contracting Party"**

167.    According to the Claimants, "both the EU and its Member States are Contracting Parties to the ECT and may be subject to claims brought by Investors from other Contracting Parties," including the different Member States of the EU.[160]

---

[155] Respondent's Post-Hearing, ¶¶ 95-96.

[156] Respondent's Post-Hearing, ¶ 97.

[157] Respondent's Post-Hearing, ¶ 97.

[158] Respondent's Post-Hearing, ¶ 97.

[159] Respondent's Post-Hearing, ¶ 97.

[160] Claimants' Rejoinder, ¶ 45.

**(b) Relationship between EU law and the ECT**

168.   For the Claimants, nothing in Article 26 of the ECT could be construed as to prohibit intra-EU disputes.[161] The plain meaning of Article 26 provides for the constant intent of the Contracting Parties to the ECT to provide their "*unconditional consent to arbitration.*"[162]

169.   The Claimants further dispute that the ECT provisions pertaining to REIOs cited by Spain demonstrate that the ECT excludes intra-EU claims.[163] The text of these Articles, the Claimants maintain, "*is clear and can in no way be construed to deprive EU Investors of the right to bring a claim against EU Member States under Article 26 of the ECT.*"[164]

170.   Moreover, the Claimants deny Spain's contention that Article 344 of the TFEU precludes the submission of intra-EU disputes to arbitration pursuant to Article 26 of the ECT. In the Claimants' view, "*a plain reading of Article 344 of the TFEU shows that it applies only to disputes involving two or more EU Member States*" and it "*does not refer to investor-State arbitration.*" This was confirmed, according to the Claimants, by the tribunals in, *inter alia*, *Eiser, Electrabel* and *Charanne*.[165]

171.   The Claimants also specify that, contrary to Spain's stance, the subjective intentions of the EU and its Member States are irrelevant to an interpretation of Article 26 of the ECT.[166] Yet, the Claimants observe, even if it were permissible to interpret Article 26 of the ECT in such fashion, "*there is nothing within the provisions of EU law that could be understood to override the rights granted in Article 26 of the ECT.*" Referring to *Electrabel, Eastern Sugar, Charanne* and *RREEF*, the Claimants contend that "*the ECT*

---

[161] Claimants' Rejoinder, ¶ 50.

[162] Claimants' Rejoinder, ¶ 50.

[163] Claimants' Reply, ¶¶ 510-513.

[164] Claimants' Reply, ¶ 510.

[165] Claimants' Reply, ¶¶ 514-515.

[166] Claimants' Reply, ¶¶ 517-520.

*grants investors rights that are additional to any other rights provided by the internal market and that there is no inconsistency between EU law and the ECT*."[167]

172.   In this respect, the Claimants add that "[e]ven if the ECT and EU treaties were found to cover the same subject matter, Article 16 of the ECT provides that the provision more favourable to the investor shall apply." Accordingly, "if there were a provision of the EU treaties prohibiting Investor-State arbitration (which there is not), Article 26 would prevail."[168]  In their Rejoinder, the Claimants highlight that EU law does not offer investors the recourse to international arbitration, whereas the ECT does; and that "the right of qualifying Investors such as the Claimants to bring their claims under the ECT is "favourable" precisely because it de-politicises the dispute by removing it from the purview of Spain's national courts."[169]

### (c) Disconnection clause

173.   According to the Claimants, "*ECT, the EU and its Member States did not negotiate a [disconnection] clause for their inter se relationships*"[170] and reading an implicit intra-EU disconnection clause into the ECT is irreconcilable with the ordinary meaning of the ECT.

174.   While noting that "the Respondent does not maintain the existence of an explicit or implicit disconnection clause," and that it "is a point on which the Parties now agree,"[171] the Claimants contend that Spain continues to rely on the Commission's opinion that the ECT contains an implicit disconnection clause without, however, explaining in what context it relies on it.

---

[167] Claimants' Reply, ¶¶ 521 and 525.

[168] Claimants' Reply, ¶ 526.

[169] Claimants' Rejoinder, ¶ 44.

[170] Claimants' Reply, ¶ 535.

[171] Claimants' Rejoinder, ¶ 51.

175.    In its Post-Hearing submission, the Claimants noted on the basis of a recent decision that the "*absence of a disconnection clause in the ECT is telling*,"[172]

### (d) Relevance of previous awards

176.    The Claimants argue that there have been, to date, no fewer than fifteen tribunals that have considered and rejected the intra-EU argument.[173] The Claimants note that in six of these cases, the respondent State was Spain.[174] Spain's attempts to distinguish these awards are, in the Claimants' view, unavailing.

177.    Further, the Claimants reject the Respondent's unsupported contention that there are two categories of Contracting Parties under the ECT, *i.e.* the "old" and "new" EU Member States.[175] The Claimants assert that this contention is unhelpful to Spain because it would mean that Article 26 would only be applicable to intra-EU disputes "*so long as either the home State of the claimant-investor or the respondent-host State was not an EU Member State at the time the ECT was signed*."[176]  For the Claimants, this interpretation is not supported in the text, object or purpose of the ECT.[177]

178.    As regards the *Achmea* and *Micula v. Romania* cases invoked by the Respondent regarding the compatibility between BITs and EU law, the Claimants note the following:

-    As for *Achmea*, the Claimants note that the CJEU has ruled on the matter in its recent judgment of 6 March 2018, and held that the submission to arbitration set forth in Article 8 of the BIT between the Netherlands and Slovakia is incompatible with EU law. According to the Claimants, the case must however be distinguished because "(*i*) *the CJEU only addresses a BIT*

---

[172] Claimants' Reply Post-Hearing, ¶ 93, *citing Vattenfall AB and others v. Federal Republic of Germany* (ICSID Case No. ARB/12/12), Decision on the Achmea Issue, 31 August 2018, ¶ 202, **Exhibit CL-177**.

[173] Claimants' Rejoinder, ¶ 14.

[174] Claimants' Rejoinder, ¶ 13.

[175] Claimants' Reply, ¶¶ 495-496.

[176] Claimants' Rejoinder, ¶ 16.

[177] Claimants' Rejoinder, ¶ 16.

*and not the ECT, a circumstance which the CJEU itself goes out of its way to highlight; and (ii) the CJEU's decision is not binding on this Tribunal which, as confirmed by numerous arbitral precedents, is not called upon to apply EU law.*"[178]   The Claimants further explain that there are several differences between the Netherlands-Slovakia BIT and the ECT. The Claimants analyse that in this case, "[Article 26(6) *provides that disputes shall be solely resolved on the basis of (i) the ECT and (ii) applicable rules of international law*."[179]   This Tribunal would then not be called to apply EU law.[180]   The Claimants further argue that, different from the *Achmea* case, this case is "*been brought before ICSID,*"[181] the question before the CJEU "*has no relevance in this ECT arbitration*"[182] as Spain, The Netherlands and Luxembourg had already acceded the EU when the ECT was ratified, and "*the Tribunal derives its jurisdiction from the ECT and it is not bound by the decisions of European Institutions.*"[183]

- As for *Micula v. Romania*, the Claimants observe that Spain fails to mention that no Intra-EU Objection was raised by Romania in the *Micula v. Romania* jurisdictional proceedings, that the objection was only raised by the Commission, intervening as a non-disputing party, during the annulment proceedings, and that the *ad hoc* committee dismissed the Commission's submission, holding that the tribunal had not lacked jurisdiction to hear the Claimants' claims. The Claimants also note that Spain refers to an application to the CJEU to annul the Commission's decision of 30 March 2015 on the non-enforceability of the arbitral award in *Micula v. Romania*, payment of which has been deemed by the Commission to constitute illegal

---

[178] Claimants' Rejoinder, ¶ 17.

[179] Claimants' Rejoinder, ¶ 62.

[180] Claimants' Rejoinder, ¶ 62.

[181] Claimants' Rejoinder, ¶ 67.

[182] Claimants' Rejoinder, ¶ 68.

[183] Claimants' Rejoinder, ¶ 69.

State aid. For the Claimants, the application relates to whether the enforcement within the EU of an arbitral award pursuant to Article 54 of the ICSID Convention could be considered incompatible with EU law; it does not concern jurisdiction-related matters.

179.   Further, for the Claimants, Spain's references to the Commission's decisions on support schemes are irrelevant since, as held in *Charanne*, "*the question of whether a certain support scheme could constitute incompatible State aid under EU law could only possibly affect the merits of the relevant dispute, not jurisdiction, and then only at the enforcement stage of the proceedings.*"[184]

### 3.  Tribunal's Analysis

180.   The Respondent submitted the following regarding the Tribunal's lack of jurisdiction concerning an intra-EU claim:

1)   The Tribunal lacks jurisdiction *ratione personae* as the Claimants are not investors "of another Contracting Party" under Article 26(a) of the ECT.

2)   The Tribunal lacks jurisdiction because of the relationship between EU law and the ECT.

3)   The Tribunal lacks jurisdiction because of the existence of an implicit disconnection clause within the ECT.

4)   The Tribunal lacks jurisdiction because of the impact of the *Achmea* judgment of the CJEU.

---

[184] Claimants' Rejoinder, ¶ 20.

### (a) Existence of an "Investor" from "another Contracting Party"

181.  According to the Respondent, the Tribunal lacks jurisdiction *ratione personae* as the Claimants do not comply with the definition of a protected investor provided for in the ECT. The general idea is that the *élément d'extranéité* required in this provision is missing as far as an intra-EU dispute is concerned.

182.  The dispute settlement clause, Article 26 ECT, specifies that "*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably*". Absent any amicable settlement, parties will have recourse to investment arbitration. The Respondent objects that the conditions set up in Article 26(1) ECT are not satisfied.

183.  Like other tribunals have already considered in relation to this objection,[185] the present Tribunal considers that the starting point to answer such an objection should be an interpretation of Article 26 ECT in the light of customary rules of treaty interpretation under public international law, as codified in Articles 31-32 of the Vienna Convention on the Law of Treaties ("**VCLT**" or "**Vienna Convention**").

184.  First, the Tribunal has to verify whether the EU membership of the State of nationality of the investor and of the host State of the investment implies that the condition of diversity of territory (Area in the terms of the ECT) is not respected.

185.  Article 1.10 ECT defines the concept of "area" as "*the **territory under its sovereignty**, it being understood that territory includes land, internal waters and the territorial sea*". Moreover, in relation to regional international organizations of economic integration, such as the EU it clarifies that: "*with respect to a Regional Economic Integration Organization which is a Contracting Party, Area means **the Areas of the member states***

---

[185] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. The Kingdom of Spain*, ICSID Case No. ARB/13/36, Award., 4 May 2017, ¶ 179, **Exhibit CL-154**; *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶ 635, **Exhibit RL-0072**.

***of such Organization***, *under the provisions contained in the agreement establishing that Organization*".

186.   It follows from an interpretation of Article 26 ECT in light of Article 1.10 ECT and in conformity with customary rules of treaty interpretation, that the dispute here opposes Investors of several Contracting Parties (Luxembourg and the Netherlands) to another Contracting Party (Spain) on the territory of whom the investment was made.

187.   Another possible way of approaching the objection consists in focusing on the notion of "***another Contracting Party***" stressed in Article 26 ECT. The Claimants have the nationality of an EU Member State and the Respondent is itself an EU Member State. This kind of intra-EU dispute would not enter within the jurisdiction of the Tribunal under Article 26 ECT.

188.   Even taking this approach in interpreting Article 26 ECT, the Tribunal cannot agree with the reasoning developed by the Respondent, be it by taking the perspective of public international law or of EU law. The European Court of Justice has clarified in the *Micheletti* case that "*under international law, it is for each Member State, having due regard to Community law, to lay down the conditions for the acquisition and loss of nationality.*"[186] The European citizenship is based on superimposition on the nationality of a Member State and this concept could not be used to take out any *élément d'extranéité* within the present dispute.

189.   The reasoning would be totally different if one were to accept the existence of an implicit disconnection clause argument that the Tribunal will analyse separately *infra*.

---

[186] Case C-369/90 - *Micheletti and Others v. Delegación del Gobierno en Cantabria*, Judgment of the Court of 7 July 1992, ECLI:EU:C:1992:295, ¶ 10.

### (b) The primacy/prevalence of EU law argument

190.   The crux of the Respondent's arguments relates to an idea of primacy or prevalence of EU law over the ECT, be it because the investment is made within the internal market, or because EU law forbids the use of any dispute settlement mechanism not established by EU treaties or because of the monopoly of the CJEU concerning the interpretation of EU law.

191.   The Tribunal doubts that, even from an EU law perspective, EU treaties prohibit the existence of any dispute settlement mechanism not established by EU treaties or that the monopoly of interpretation of EU law by the CJEU would have the implications that the Respondent tries to achieve. However, it considers that these considerations are not relevant for the assessment of the jurisdiction of a treaty-based investment tribunal.

192.   This is all the more the case given that this Tribunal is an ICSID tribunal. As clarified in the *Electrabel* award:

> [T]his Tribunal is placed in a public international law context and not a national or regional context. Moreover, this ICSID arbitration does not have its seat or legal place of arbitration in Hungary or elsewhere in the European Union. Such an arbitral seat could trigger the application of the *lex loci arbitri* and give rise to the jurisdiction of the local courts in regard to the arbitral process, including challenges to the award. This ICSID arbitration is a dispute resolution mechanism governed exclusively by international law.[187]

193.   As international law is the sole body of law governing its jurisdiction, this Tribunal derives its jurisdictional power exclusively from the ECT,[188] which is a valid and enforceable treaty.

---

[187] *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 4.112, **Exhibit CL-86**.

[188] *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Award, 15 February 2018, ¶ 463, **Exhibit CL-160**.

194.    Moreover, as clearly stated in the *Charanne* award, "this case does not entail any assessment with regards to the validity of community acts or decisions adopted by European Union organs. Additionally, it does not concern in any way allegations by the European Union that EU law has been violated, nor claims against such organization. In this arbitration there is not an argument according to which the content of the disputed provisions [...] is contrary to EU law."[189]

195.    For this reason, the Tribunal considers that it does not have to solve any question of hierarchy between EU law and international law for jurisdictional purposes. What is more, the CJEU in *Achmea* confirmed that investment tribunals are not tribunals within the meaning of Article 267 TFEU and therefore do not operate *stricto sensu* within the EU judicial system. This dualist reasoning reinforces the idea that ICSID tribunals are located in a legal space solely governed by international law that is the only source of jurisdiction.

196.    The arguments of the Respondent concerning the primacy or prevalence of EU law over the ECT are therefore rejected.

(c)  **Disconnection clause**

197.    The Tribunal is also not convinced by the Respondent's argument concerning the existence of an implicit disconnection clause in Article 26 ECT. According to the meaning of a "disconnection clause", some parties to a multilateral treaty modify the effect of this agreement in their *inter se* relations by applying different specific rules, agreed among them.

198.    The adoption of disconnection clauses in favour of EU law is developed in some European treaty practice. This practice has attracted strong criticism. The use of explicit disconnection clauses was contested first in the context of the ILC Study Group on Fragmentation, according to whom this practice raises serious problems of equal

---

[189] Private translation of the *Charanne* award, mentioned in *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Award, 15 February 2018, ¶ 462, **Exhibit CL-160**.

application of treaty norms between parties.[190] The Council of Europe similarly shed doubts on this practice: the Parliamentary Assembly "oppose[d] such a clause, which has the potential to give rise to new divisions in Europe between the parties which are members of the European Union and those which are not." [191]

199. In this context, the Tribunal cannot but be reluctant to accept the idea of an implicit or tacit disconnection clause.

200. As clearly put in the *RREEF* case, the idea of an implicit disconnection clause would challenge the very fundamental international law principle of *pacta sunt servanda*: "*if one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable, given that that article already contains express exceptions.*" [192]

201. In awards or decisions such as *Charanne* and *RREEF* it was argued that, in any case, such a clause would be moot as there is no conflict between the ECT and the TFEU.[193] The present Tribunal recalls that the decision of the CJEU in the *Achmea* case clearly took the opposite stance and declared the existence of a constitutional conflict between EU procedural law principles and a BIT mixed arbitration mechanism. That is why this line of argumentation should be taken with caution.

202. From the perspective of the international law of treaties, an implicit *inter se* modification of this type cannot be considered as existing. What is more, even from the perspective

---

[190] UN General Assembly, Official Records. Sixtieth Session: Report of the International Law Commission (ILC). Fifty-seventh session (2 May-3 June and 11 July-5 August 2005). Supplement No. 10 (A/60/10), ¶ 293.

[191] CoE, Parliamentary Assembly, Draft Convention on the protection of children against sexual exploitation and sexual abuse, Report of the Committee on Legal Affairs and Human Rights, 18 April 2007, Doc. 11256, ¶ 38.

[192] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶ 85, **Exhibit CL-152**.

[193] *Charanne BV and Construction Investment S.A.R.L. v. Kingdom of Spain*, Arbitration SCC V 062/2012, Award, 21 January 2016, ¶ 438, **Exhibit RL-0049**; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 83, 87, **Exhibit CL-152**.

of EU constitutional law, the existence of an implicit disconnection clause is systemically debatable. Article 3(5) of the TEU recalls that the European Union is subject "*to the strict observance and the development of international law*". In its *Western Sahara Campaign* case, the CJEU interpreted Article 3(5) of the TEU as a treaty provision that requires a consistent and harmonious interpretation of European treaty practice with international law.[194] That is why both international law and EU law counter the argument of an implicit disconnection clause.

### (d) Relevance of previous awards

203.   An important debate exists in international investment arbitration concerning the relevance of previous awards. A paragraph of the *Burlington* award epitomises the divergences on this point:

> The Tribunal considers that it is not bound by previous decisions. At the same time, it is of the opinion that it must pay due consideration to earlier decisions of international tribunals. The majority believes that, subject to compelling contrary grounds, it has a duty to adopt solutions established in a series of consistent cases. It also believes that, subject to the specifics of a given treaty and of the circumstances of the actual case, it has a duty to seek to contribute to the harmonious development of investment law, and thereby to meet the legitimate expectations of the community of States and investors towards the certainty of the rule of law. Arbitrator Stern does not analyze the arbitrator's role in the same manner, as she considers it her duty to decide each case on its own merits, independently of any apparent jurisprudential trend.[195]

204.   The Tribunal does not believe that, to answer to the jurisdictional issues raised, it is necessary to adopt any general position on the relevance of precedents in international investment law or to decide which arbitral awards having decided on the relations between EU law and the ECT should be followed or not. The primary function of an arbitral tribunal is to solve the dispute between the parties applying the chosen law to the facts. While so doing, the Tribunal can of course take inspiration from previous

---

[194] C-266/16, *Western Sahara Campaign UK*, ECLI:EU:C:2018:118, ¶¶ 52-85.

[195] *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, ¶ 100, **Exhibit RL-0036**.

awards, in as far as their legal reasoning helps the instant tribunal to clarify the content of the law.

205.   The most disputed question in this regard is how to take into account the *Achmea* decision of the CJEU and the arbitral awards having taken a stance in this regard.

206.   The CJEU rendered its *Achmea* decision on March 6, 2018, holding that investor-state dispute settlement in intra-EU BITs is incompatible with EU law. In this *Achmea* case, the CJEU dealt with an intra-EU BIT and decided that the ISDS provision contained in Article 8 of the Netherlands-Slovakia BIT (1991) is incompatible with Articles 267[196] and 344[197] TFEU because, by empowering the arbitral tribunals to apply EU law while simultaneously removing disputes from the jurisdiction of the courts of EU Member States, it undermines the autonomy of the EU's legal order.[198]

207.   Arbitral tribunals having to deal with intra-EU investment cases have consistently rejected the idea that the *Achmea* judgment of the CJEU could have a bearing on their own jurisdiction. This Arbitral Tribunal sees that the reasoning has, up to now, followed three different paths. According to a first reasoning, some tribunals have reached a different conclusion from the CJEU on the relationship between EU law and international investment law: they defend the absence of incompatibility between the two regimes. A second reasoning has rejected the *Achmea* stance as being not pertinent because of the difference of legal nature of the treaty used as a basis for jurisdiction. A third reasoning has strongly advocated the parallelism of treaties and refused to identify any conflict between the investment treaty and the European treaties.

---

[196] Article 267 TFEU allows courts and tribunals of EU Member States to refer questions on the interpretation of EU law and validity of EU secondary legislation to the CJEU, *see* **Exhibit RL-0001**.

[197] Article 344 TFEU precludes Member States from submitting disputes concerning the interpretation or application of EU law to any method of settlement other than those provided in the EU Treaties, *see* **Exhibit RL-0001**.

[198] Judgment of the European Court of Justice in Case C-284/16 dated 6 March 2018, **Exhibit CL-162**.

*(i)  First line of argumentation: Achmea's solution is ill-grounded*

208.   A first kind of reasoning consists in taking the position opposite to the CJEU's one concerning the relationship between EU law and international investment law generally, and the ECT more specifically. Some tribunals clearly try to demonstrate that there is no such incompatibility between the two sets of rules.

209.   The *Electrabel* award adopted this solution before the *Achmea* judgment, stating that the genesis of the ECT generates a presumption of absence of contradiction between EU law and the ECT. Following such reasoning, the *Isolux* tribunal considered that EU law does not prohibit the submission of a dispute to investment arbitration.[199]

210.   In *Blusun*, the tribunal considered that the ECT had given rise to valid *inter se* obligations of EU Member States[200]. First, the tribunal considered that even if, as a matter of EU law, the EU had exclusive competence over matters of international investment, Member States to the EU signed the ECT without qualification or reservation. The *inter se* obligations in the ECT do not have to be considered invalid or inapplicable because of such an allocation of competence to the EU.[201] Second, the tribunal rejected the submission that subsequent EU treaties implicitly repealed the earlier ECT under the *lex posterior* rule in Article 30 of the VCLT, whereby "*successive treaties relating to the same subject-matter will prevail over the earlier to the extent that the treaties are not compatible,*" finding no incompatibility with respect to substantive protections or dispute resolution.[202]

---

[199] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶¶ 645-655, **Exhibit RL-0072**.

[200] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 280 *et seq*, **Exhibit RL-0082**.

[201] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic,* ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶ 283, **Exhibit RL-0082**.

[202] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic,* ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 285-291, **Exhibit RL-0082**.

211.    The *PL* tribunal considered, for instance, that contrary to what the CJEU considered Article 344 of the TFEU is not applicable as the dispute before the tribunal is not between two EU member States even if it ultimately arises out of a treaty between them.[203]

> *(ii)   Second line of argumentation: Achmea is not pertinent in a multilateral treaty-based context*

212.    In the *Masdar* award,[204] the tribunal stressed the fact that the *Achmea* decision was of "*limited application*"[205] since it focused on the incompatibility of a bilateral investment treaty in the intra-EU context. The basic distinguishing criterion is the difference between the bilateral context of the *Achmea* case and the multilateral context of an ECT-based arbitration.

213.    The *Masdar* tribunal relied on the opinion of Advocate General Wathelet before the CJEU who had himself attracted the attention of the Court on the difference between a bilateral and a multilateral context.[206] As the CJEU did not further elaborate on this idea, it had to be considered that the Court had not dealt with this last scenario and that, therefore, "*the Achmea Judgment has no bearing upon the present case.*"[207]

214.    This argument was approved in the *Vattenfall* decision. For the tribunal, it was "*an open question whether the same considerations necessarily apply to the ECT.*"[208] Thus, agreeing with the *Masdar* tribunal, the tribunal found no clear rule relevant to

---

[203] *PL Holdings S.A.R.L. v. Republic of Poland*, SCC Case No V2014/163, Partial Award, 28 June 2017, ¶¶ 314-317.

[204] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, **Exhibit CL-175**.

[205] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶ 679, **Exhibit CL-175**.

[206] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 680-681, **Exhibit CL-175** .

[207] *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶ 678, **Exhibit CL-175**.

[208] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, ¶ 161, **Exhibit CL-177**.

interpretation of the ECT in the *Achmea* ruling. The *Greentech* tribunal also followed the same reasoning.[209]

> (iii) *Third line of argumentation: Achmea's solution has no bearing in another legal order*

215.   A last line of argumentation is based on two basic ideas, grounded in public international law: the parallelism of treaties and the distinction between the EU legal order and the international legal order. Some decisions followed a dualist argument distinguishing clearly between the EU legal order and the international legal order. The two legal orders are distinct and should not be seen as working in conflict but in harmony.

216.   Investment tribunals have thought the relationship between treaties dealing with investment issues in terms of parallelism even before the *Achmea* debate burgeoned. The *European American Investment Bank* tribunal, most notably, stated that "*the parallel rules under the BIT and the ECT are not incompatible, but should be viewed as cumulative.*"[210]

217.   Facing more precisely the *Achmea* debate, different arguments can be traced back to this general idea. In both the awards in the *Eiser* and *Antin* cases, it was maintained that the ordinary meaning of Article 26 of the ECT confers jurisdiction on the tribunal. An exclusion for intra-EU disputes would have to be express and clear, especially given that the EU is a party to the treaty.[211]

218.   This is also the idea developed in the *RREEF* Decision. Because of treaty parallelism, the two treaties are both applicable. Therefore, they must be interpreted in such a way as not to contradict each other. Indeed, there is no conflict between Article 26 ECT and

---

[209] *Greentech Energy Systems A/S and others v. Kingdom of Spain*, SCC Case No. V2015/150, Final Award, 14 November 2018, ¶¶ 220-221.

[210] *European American Investment Bank AG (EURAM) v. Republic of Slovakia*, CNUDCI, PCA no 2010-17, Award on Jurisdiction, 22 October 2012, ¶ 231.

[211] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 215, **Exhibit CL-176**.

Article 344 TFUE, as they concern the settlement of two different kinds of disputes. In any case, in case of any contradiction between the ECT and EU law, the tribunal would have to apply the ECT; if there must be a "*hierarchy*" between these norms, it must be determined from the perspective of public international law.[212]

219.    The *Anglia* tribunal stated that the BIT tribunal has jurisdiction only to determine the matters of interpretation and application of the BIT between the disputing parties and in relation to their dispute. Therefore, as the BIT tribunal has no jurisdiction to interpret the TFEU, EU law has no bearing on an enforceable treaty existing in the international legal order.[213] The *UP* tribunal similarly considered that as the tribunal's jurisdiction is based on the ICSID Convention, the tribunal is placed in a public international law context and not in a national or regional context. The two legal orders evolve in parallel and the tribunal finds its jurisdiction in a treaty validly established in the international legal order.[214]

220.    The *Vattenfall* tribunal has used both sorts of arguments.[215] On the one hand, there is no conflict between Article 26 ECT and Articles 267 and 344 TFEU, and it is therefore not necessary for the tribunal to apply the rules of conflict of law so as to resolve any purported conflict between them.[216] Moreover, it is stated that there is "*no principle of public international law, or even of EU law, which would permit the tribunal to interpret the words of the ECT, being its foundational jurisdictional instrument, so as to give priority to external treaties (the TFEU and the TEU) and a court judgment interpreting those treaties.*"[217]

---

[212] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 75-77, **Exhibit CL-152**.

[213] *Anglia Auto Accessories Ltd. v. Czech Republic*, SCC Case No. V2014/181, Final Award, 10 March 2017, ¶ 127.

[214] *UP (formerly Le Chèque Déjeuner) and C.D Holding Internationale v. Hungary*, ICSID Case No. ARB/13/35, Award, 9 October 2018, ¶¶ 253-259.

[215] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, **Exhibit CL-177**.

[216] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, ¶ 214, **Exhibit CL-177**.

[217] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018, ¶131, **Exhibit CL-177**.

### 4.   The Tribunal's Decision

221.   First, having been rendered in the context of a BIT, it is clear that the *Achmea* judgment is silent as far as the ECT is concerned. Nevertheless, the case of the ECT is particular as the genesis of the treaty generates a presumption of absence of contradiction between EU law and the ECT itself. As the CJEU did not elaborate on this precise legal instrument and the *Achmea* judgment is silent on the case of ECT-based arbitration, the Tribunal cannot infer the position of the CJEU dealing with this scenario.

222.   As the ordinary meaning of Article 26 of the ECT confers jurisdiction on the Tribunal, any exclusion of intra-EU disputes would have to be express and clear, especially given that the EU is a party to the treaty.

223.   Second, as already stated, the Tribunal believes that "*this ICSID arbitration is a dispute resolution mechanism governed exclusively by international law*."[218] Because of the principle of treaty parallelism, the Tribunal has to rely on the ECT and to apply its jurisdictional provisions.

224.   The idea of *parallelism of treaties* is a fundamental principle of public international law. The principle was clearly elaborated in the *Bluefin Tuna* arbitration[219], but can be traced back to the case law of the Permanent Court of International Justice elaborating on this fundamental principle[220] that has since become well-established.[221] Since treaties

---

[218] *Electrabel S.A. v The Republic of Hungary,* ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 4.112, **Exhibit CL-86**.

[219] *Southern Bluefin Tuna Cases (New Zealand v. Japan; Australia v. Japan),* Award on Jurisdiction and Admissibility, Decision of 4 August 2000,¶ 52: "There is frequently a parallelism of treaties, both in their substantive content and in their provisions for settlement of disputes arising thereunder. The current range of international legal obligations benefits from a process of accretion and cumulation; in the practice of States, the conclusion of an implementing convention does not necessarily vacate the obligations imposed by the framework convention upon the parties to the implementing convention."

[220] PCIJ *Customs Regime between Germany and Austria (Protocol of March 19, 1931),* Advisory Opinion, 5 September 1931, Series A/B, no 41, p. 48.

[221] Among others, ICJ *Aegean Sea Continental Shelf (Greece v. Turkey),* Judgment 19 December 1978, *CIJ Rep.* 1978, ¶ 91: "By these Treaties and by the General Act, therefore, Greece and Turkey appear, prima facie, to have provided for two parallel systems of pacific settlement, for so long as the 1930 Treaty and the General Act might continue in force, and both Greece and Turkey have stated that they consider the 1930 Treaty still to be in force."

evolve in parallel, the presumption is the absence of conflict between them, as also clarified in WTO case law.[222]

225.    The Tribunal's jurisdiction is based on the ICSID Convention, the ECT, and general international law principles governing State consent. The Tribunal is placed in a public international law context and not in a national or regional context. The two legal orders (the EU legal order and the ECT normative space) evolve in parallel and the Tribunal finds its jurisdiction in a treaty validly established in the international legal order.

226.    As maintained by the tribunal in *Marfin*, "*The Tribunal recalls in this context that its jurisdiction derives not only from the Treaty, but also from the ICSID Convention. It is thus the Tribunal's duty to give effect to this legal instrument*"[223].

## B.    The Tax Objection

### 1.    The Respondent's Position

227.    The Respondent contends that the Tribunal lacks jurisdiction to hear the dispute over the tax measures that Spain had adopted through the introduction of the TVPEE by Law 15/2012, which, according to the Claimants, resulted in the breach of Spain's obligations under Article 10(1) of the ECT.[224] Spain's main arguments in support of its Tax Objection are described *in seriatim* below.

#### (a)    Spain's consent to arbitration is restricted to disputes pertaining to alleged violations of obligations derived from Part III of the ECT

228.    According to Spain, under Article 26 of the ECT, it "[has] *only consented to submit to investment arbitration alleged breaches of obligations derived from Part III of the*

---

[222] Panel Report, *Indonesia — Certain Measures Affecting the Automobile Industry*, WT/DS54/R-WT/DS55/R-WT/DS59/R-WT/DS64/R, 23 July 1998,¶ 14.28.

[223] *Marfin Investment Group Holdings S.A. and others v. Republic of Cyprus*, ICSID Case No. ARB/13/27, Award, 26 July 2018, ¶ 592.

[224] Respondent's Counter-Memorial, ¶¶ 102-105.

*ECT*."[225]  Yet, pursuant to Article 21 of the ECT, Spain maintains, *"section (1) of Article 10 of the ECT, invoked by the Claimants, despite being located in Part III of the ECT, does not give rise to obligations with regard to taxation measures of the Contracting Parties."*[226]

### (b) The ECT does not impose obligations regarding tax measures of the Contracting Parties

229.   Spain supports this objection on, *inter alia*, Articles 21(1) and 21(7)(a) of the ECT. Article 21(1) provides:

> (1) Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties. In the event of any inconsistency between this Article and any other provision of the Treaty, this Article shall prevail to the extent of the inconsistency.[227]

230.   While Article 21(7) reads as follows:

(a) The term 'Taxation Measure' includes:

> (i) any provision relating to taxes of the domestic law of the Contracting Party or of a political subdivision thereof or a local authority therein; …[228]

231.   Spain contends that the ECT does not impose obligations or create rights with respect to the Contracting Parties' tax measures so there is a general exclusion of taxation measures from the scope of the ECT (*taxation carve-out*) unless it is included in the expressly defined exceptions under Article 21 of the ECT (*claw-backs*).[229]

---

[225] Respondent's Counter-Memorial, ¶ 104.

[226] Respondent's Counter-Memorial, ¶ 105, *see also* Respondent's Counter-Memorial, ¶¶ 122-134; Respondent's Rejoinder, ¶ 162.

[227] Energy Charter Treaty, Art. 21(1), **Exhibit RL-0006**.

[228] Energy Charter Treaty, Art. 21(7)(a), **Exhibit RL-0006**.

[229] Respondent's Counter-Memorial, ¶ 124.

232.    Sections (2) through (5) are as follows:

> (2) Article 7(3) shall apply to Taxation Measures other than those on income or on capital, except that such provision shall not apply to: […]
> (3) Article 10(2) and (7) shall apply to Taxation Measures of the Contracting Parties other than those on income or on capital, except that such provisions shall not apply to: […]
> (4) Article 29(2) to (8)63 shall apply to Taxation Measures other than those on income or on capital.
> (5)      (a) Article 13 shall apply to taxes.
> (b) Whenever an issue arises under Article 13, to the extent it pertains to whether a tax constitutes an expropriation or whether a tax alleged to constitute an expropriation is discriminatory, the following provisions shall apply: […][230]

233.    Referring to these exceptions, Spain observes that "*none of the exceptions […] by which taxation measures are included in the scope of protection of the ECT comprises section (1) of Article 10 of the ECT.*"[231]   Accordingly, Spain concludes, "*section (1) of Article 10 of the ECT, on which the Claimants try to base their claims, does not impose any obligations for the Contracting Parties regarding taxation measures.*"[232]

234.    Spain concedes that the only sections of Article 10 of the ECT that do apply to taxation measures are sections (2) and (7), however, the Claimants support their claim on Section 10(1).   Consequently, section (1) of Article 10 of the ECT invoked by Claimants, is not applicable to taxation measures.[233]

### (c) The TPVEE is a tax measure for the purposes of the ECT

235.    According to Spain, there are two possible interpretations of the above-mentioned provision of the ECT for the purposes of determining whether a challenged measure is a "tax measure" and falls under the scope of the ECT's taxation carve-out:  either (i) the

---

[230] Energy Charter Treaty, Art. 21(2) through 21(5), **Exhibit RL-0006**.

[231] Respondent's Counter-Memorial, ¶ 131.

[232] Respondent's Counter-Memorial, ¶ 131.

[233] Respondent's Counter-Memorial, ¶ 134.

measure must be defined in reference to the domestic law of the Contracting Party, or (ii) it must be defined from the perspective of international law.[234]

236.    Spain submits that, in accordance, *inter alia*, with arbitration case law,[235] the wording of Section (7)(a)(i) of Article 21 of the ECT itself, or Article 3 of the double taxation Convention between Spain and Luxembourg, the Tribunal shall adopt the first interpretation.[236] Notwithstanding this recommendation, Spain remarks that "*to the extent relevant for this arbitration, either of the two stated interpretations of Article 21(7)(a)(i) of the ECT leads us to conclude that the TVPEE is a tax.*"[237]

237.    *First,* in regards to the TVPEE being a tax under the domestic law, Spain contends that Law 15/2012 is domestic law, approved by the Spanish Parliament in accordance with the ordinary legislative procedure governed by Spanish law.[238] Spain further alleges that Law 15/2012 "*is clear about the taxation nature of the TVPEE,*"[239] which was also ratified by the Spanish Constitutional Court.[240] On the latter, Spain refers to the Spanish Constitutional Court Judgment of 6 November 2014 which dismissed an appeal against the TVPEE and declaring the "*TVPEE regulation contained in Law 15/2012 as perfectly valid and in accordance with the Spanish Constitution.*"[241]

---

[234] Respondent's Counter-Memorial, ¶¶ 136-149.

[235] Respondent's Counter-Memorial,¶ 147. Spain cited the *Saipem v. Bangladesh* case as an example of the ordinary meaning of a treaty to make reference to domestic law in the definition of a term.  *Saipem S.p.A. v. The People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Decision on Jurisdiction and Recommendation on Provisional Measures, 21 March 2007, ¶ 82, **Exhibit RL-0029** ("*in absence of any indication that the contracting states intended to refer to 'property' as a notion of Bangladeshi law, the Tribunal cannot depart from the general rule that treaties are to be interpreted by reference to international law*").

[236] Respondent's Counter-Memorial, ¶¶ 137-145.

[237] Respondent's Counter-Memorial, ¶ 147.

[238] Respondent's Counter-Memorial, ¶ 150, *citing* **Exhibit R-0034**; Respondent's Rejoinder, ¶ 168.

[239] Respondent's Counter-Memorial, ¶ 156, *citing* **Exhibit R-0030**, Article 1.

[240] Respondent's Counter-Memorial, ¶¶ 155, 165-168.

[241] Respondent's Counter-Memorial, ¶167, *citing* Judgment 183/2014, 6 November 2014, Constitutional Court Plenary on unconstitutionality appeal number 1780-2013 promoted by the Cabinet of the Andalusian Regional Government with regard to articles 4, 5 and 8 of Act15/2012, published on 4 December 2014 in the *Boletin Oficial Español* ("**Judgement 183/2014**"), **Exhibit R-0043**.

238. *Second*, with respect to international law, Spain affirms that the TVPEE also has the characteristics of a tax measure under international law (i) as interpreted by international investment tribunals,[242] and (ii) confirmed by the European Commission, which had specifically ratified the tax nature of the TVPEE and its compliance with EU law.[243] Thus, Spain concludes, "*there is no doubt that the TVPEE is a tax, both from the perspective of Spanish law and from the perspective of international law*."[244]

239. In the light of the foregoing, Spain concludes that "the provisions relating to the TVPEE of Law 15/2012 are provisions relating to taxes of the domestic law of the Kingdom of Spain,"[245] and, accordingly, the TVPEE is a tax for the purposes of the ECT.[246]

### (d) The TPVEE is a bona fide tax measure for the purposes of the ECT

240. In its Rejoinder, Spain asserts that, to determine whether the TPVEE is a taxation measure for the purposes of the ECT, the Tribunal only needs to analyse whether the TPVEE falls within the ECT definition. It does not, according to Spain, need to examine the *bona fide* nature of the tax, including its economic effect, as urged by the Claimants.[247]

241. In this context, Spain distinguishes the case of *Yukos*, invoked by the Claimants, noting that it involved "*extraordinary circumstances*," and, as a result, "*the analysis of the good faith of the taxation measures undertaken in the Yukos case is not applicable to the present case.*"[248]

---

[242] Respondent's Counter-Memorial, ¶¶ 172-194, *citing Encana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, ¶ 142, **Exhibit RL-0027**; *Duke Energy Eletroquil Partners & Eletroquil S.A. v. Republic of Ecuador*, ICSID Case No. ARB/04/19, Award, 18 August 2008, ¶ 174, **Exhibit RL-0033**, and *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, 2 June 2010, ¶¶ 164-165, **Exhibit RL-0036**.

[243] Respondent's Counter-Memorial, ¶¶ 195-206; Respondent's Rejoinder, ¶ 172.

[244] Respondent's Rejoinder, ¶ 169.

[245] Respondent's Counter-Memorial, ¶ 205.

[246] Respondent's Counter-Memorial, ¶ 206.

[247] Respondent's Rejoinder, ¶¶ 175-183.

[248] Respondent's Rejoinder, ¶ 178, *citing Yukos Universal Limited (Isle of Man) vs. The Russian Federation,* UNCITRAL, PCA Case No. AA 227, Final Award, 18 July 2014, ¶1407, **Exhibit RL-0086**.

242.    Spain further refers to *EnCana v. Ecuador* to stress that the Tribunal is only to consider the "*legal operation*" of a taxation measure, and not its "*economic effect*."[249]

243.    However, should the Tribunal proceed with the additional analysis suggested by the Claimants to determine whether the TPVEE falls within the taxation carve-out under Article 21 of the ECT, in Spain's view, it must only conclude that the TPVEE is a *bona fide* tax.[250] Spain advances three arguments in support of this assertion.

244.    *First*, Spain sustains that the TVPEE, as a tax of general application, applies to all energy producers, both renewable and conventional.[251] It applies to all producers without distinction.   The general application, according to the Respondent, is a legitimate option of the legislator, which has been recognised by the Spanish Constitutional Court.[252] Spain further argues that the fact that the TVPEE equally applies to conventional as well as to renewable producers, "*without including tax benefits for renewable producers, cannot be construed in any way as the reason to deny the bona fide nature of this taxation measure*."[253]

245.    *Second*, in response to the Claimants' contention that RE producers, as opposed to conventional producers, are unable to pass the tax to the consumer results in the TPVEE being discriminatory, the Respondent alleges that it is not discriminatory from the perspective of its legal consequence or economic consequence.   On the legal consequence, Spain explains that the TPVEE is a direct tax that is not passed on by taxpayers, whether they are producers of renewable or conventional energy.[254] On the economic consequence, Spain argues that there is no discrimination between

---

[249] Respondent's Rejoinder, ¶ 179, *citing Encana Corporation v. Republic of Ecuador*, LCIA Case No. UN 3481, Award, 3 February 2006, ¶ 142, **Exhibit RL-0027**.

[250] Respondent's Rejoinder, ¶ 181.

[251] Respondent's Rejoinder, ¶ 184.

[252] Judgment 183/2014, **Exhibit R-0043**.

[253] Respondent's Rejoinder, ¶ 195.

[254] Respondent's Rejoinder, ¶¶ 199-214.

conventional and renewable energy producers because both would recover the amount of the TVPEE through the market price.[255]

246.    *Third*, to counter the Claimants' assertion that the TPVEE constitutes a disguised tariff cut, Spain notes that the TVPEE is a public income included in the General State Budget, [256] which contributes to the State resources for financing of public expenditures.[257]  Spain highlights that an amount equivalent to the estimated annual collection deriving from the taxes included in Law 15/2012, among them the TVPEE, is destined to the promotion of RE.[258] In other words, Spain maintains, "*the purpose of the TVPEE is to raise revenue for the Spanish State for public purposes.*"[259]

247.    Spain also referred the Tribunal to the decisions in *Isolux* and *Eiser*, in which, according to Spain, the tribunals agreed with Spain's position when declaring their lack of jurisdiction to hear disputes regarding the alleged breach of obligations derived from Section (1) of Article 10 of the ECT resulting from the enactment of the TVPEE by Law 15/2012.[260]

248.    In its Post-Hearing brief, Spain affirms its position that the tribunal lacks jurisdiction to hear the claim of an alleged breach of Article 10(1) by the enactment of the TVPEE and further notes that "*all Awards rendered so far in Spanish cases have upheld this Jurisdictional Objection.*"[261]

---

[255] Respondent's Rejoinder, ¶¶ 197(b), 212.

[256] Respondent's Rejoinder, ¶ 216, *see also* **Exhibits R-0079, R-0080, R-0081, R-0010, R-0293**.

[257] Respondent's Rejoinder, ¶ 217.

[258] Respondent's Rejoinder, ¶¶ 215-220.

[259] Respondent's Rejoinder, ¶ 220.

[260] Respondent's Rejoinder, ¶¶ 221-225.

[261] Respondent's Post-Hearing, ¶ 85.

### 2.   The Claimants' Position

### (a) The "taxation carve-out" under Article 21 of the ECT only applies to *bona fide* taxes

249.   According to the Claimants, Spain's arguments aimed at establishing the TVPEE's character as a "*tax*" under domestic law are irrelevant.[262]   Instead, the question is whether the taxation measure is *bona fide* and therefore entitled to the benefit of the taxation carve-out under Article 21 of the ECT.

250.   In the Claimants' view, the basis for the requirement under Article 21 is that taxation measures must be *bona fide* derived from the basic principle of good faith in international law. The Claimants argue that Spain cannot avail itself of the exemption under Article 21 if the measure is disguised as a tax with the ultimate intent to achieve another purpose.[263]   On this argument, the Claimants call the Tribunal's attention to the text of Article 21 and the *Yukos* case to conclude that the fact that a measure is labelled as a tax does not imply that the taxation carve-out applies.[264]

251.   The Claimants also contend Respondent's interpretation of the *EnCana v. Ecuador* case asking the tribunal to consider only the "*legal operation*" of the taxation measure and not the "*economic effect.*"[265]   The Claimants point out that the *EnCana* tribunal noted that "*arbitrary measures would not qualify for exemption under the taxation carve-out contained*" in the corresponding BIT.[266]

252.   The Claimants contend that there is a clear distinction between *bona fide* and abusive taxation measures under international law.   The Claimants argue that good faith is a fundamental principle of treaty interpretation and performance, which "*pervades all*

---

[262] Claimants' Reply, ¶¶ 599-611.

[263] Claimants' Reply, ¶ 547.

[264] Claimants' Reply, ¶¶ 548-551.

[265] Claimants' Rejoinder, ¶ 77.

[266] Claimants' Rejoinder, ¶ 77.

*aspects of Investor-State relations*."[267] According to the Claimants, this is demonstrated, *inter alia*, by Article 31(1) of the VCLT, extensive scholarship and international case-law, which is also associated with the concept of estoppel.[268]

253.    The Claimants argue that the Tribunal must look into the State's pattern of conduct to determine, on the balance of probabilities, whether the measure concerned is *bona fide*.[269]  The Claimants dispute Spain's contention that the tribunal in *Yukos* recognised a presumption in favour of the validity of tax measures, claiming instead that the *Yukos* decision demonstrates that the *bona fide* nature (or lack thereof) of a tax measure must be assessed from the conduct of the State on the basis of the balance of probabilities.[270] In this regard, the Claimants allege that there is *prima facie* evidence that the 7% tax is arbitrary and discriminatory.[271]

254.    In this regard, the Claimants also refer to *Feldman v. Mexico* to assert that "*where a taxation measure is prima facie arbitrary or discriminatory, the burden of proof switches to the respondent State to provide a rational explanation for its conduct*."[272] The Claimants conclude that "*Article 21 is not triggered and that there is a breach of the ECT if the balance of evidence and surrounding circumstances are more consistent*

---

[267] Claimants' Reply, ¶ 552.

[268] Claimants' Reply, ¶¶ 541-551, *citing Saluka Investments B.V. v. The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 307 ("A foreign investor protected by the Treaty may in any case properly expect that the Czech Republic implements its policies *bona fide* by conduct that is, as far as it affects the investors' investment, reasonably justifiable by public policies and that such conduct does not manifestly violate the requirements of consistency, transparency, even-handedness and non-discrimination.") **Exhibit CL-43**; *see also Nova Scotia Power Incorporated (Canada) v. The Bolivarian Republic of Venezuela*, UNCITRAL, Decision on Jurisdiction, 22 April 2010, ¶ 141 ("The existence of the doctrine of *estoppel*, or the prohibition of *venire contra factum proprium*, is consolidated in public international law, even though its existence as a general principle of law or as customary law is subject to debate.  There is a consensus around the origin of the doctrine, which in public international law can be viewed as connected to the principle of good faith.  Its applicability has been recognised in investment arbitration for a long time."), **Exhibit CL-127**.

[269] Claimants' Reply, ¶ 558.

[270] Claimants' Reply, ¶¶ 558-563; Claimants' Rejoinder, ¶ 75.

[271] Claimants' Reply, ¶ 562.

[272] Claimants' Reply, ¶ 562, *citing Marvin Roy Feldman Karpa v. The United Mexican States*, ICSID Case No. ARB(AF)/99/1, Award, 16 December 2012, ¶¶ 177-178, **Exhibit CL-140**. *See also, Asian Agricultural Products Limited v. The Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/87/3, Award, 27 June 1990, ¶ 56 ("In a case a party adduces some evidence which *prima facie* supports his allegations, the burden of proof shifts to his opponent."), **Exhibit CL-101**.

*with the claim that the 7% Levy was implemented as a disguised cut of the rights granted under RD 661/2007.*"[273]

255.     In their Post-Hearing Reply brief, the Claimants further this argument on the basis of the *Antaris v. Czech Republic* award.  In this award, according to the Claimants, the tribunal applied the two-limb test to determine whether the carve-out applied: (i) the domestic law of the host State must first characterise the measure as a tax for Article 21 to apply, and (ii) tribunal must determine whether the measure is also a tax within the scope of Article 21 by looking at the requirement of whether it is "*directed at raising general revenue for the state.*"[274]  In this case, the Claimants concentrate on the second limb and allege that the funds raised by the TVPEE are not used for the general public purpose of the State but rather redirected to the electricity system.[275]

###### (b) The 7% levy is not a *bona fide* tax

256.     According to the Claimants, the TPVEE is not a *bona fide* tax, but a tariff cut. In their Reply, the Claimants summarise their views as follows: "*it is readily apparent from Spain's conduct that the 7% Levy is not a real tax measure, but was in fact a measure designed to strip away the rights of the Claimants' installations under the RD 661/2007 regulatory regime.*"[276]  The most obvious illustration of this is, according to the Claimants, the fact that "*the money raised by the 7% Levy goes from the electricity producers within the electricity system to the State budget and then back to the electricity system in order to cover the costs of the electricity system.*"[277]

257.     In particular, the Claimants argue that (i) Spain's conduct reveals that even though denominated as a tax, the TPVEE was intended to be a tariff cut; (ii) the TPVEE, *de*

---

[273] Claimants' Reply, ¶ 563.

[274] Claimants' Post-Hearing Reply, ¶ 107, *citing Antaris Solar GmbH and Dr. Michael Gode v. Czech Republic*, PCA Case No. 2014-01, Award, 2 May 2018, ¶ 248, **Exhibit CL-178**.

[275] Claimants' Post-Hearing Reply, ¶ 107.

[276] Claimants' Reply, ¶ 564.

[277] Claimants' Rejoinder, ¶ 79.

*facto*, accomplishes the opposite of its stated official aim; and (iii) it is part of a Government scheme to dismantle the RD 661/2007 economic regime through which the Claimants were encouraged to invest.

258.   *First*, the Claimants explain that to understand Spain's intent regarding the TVPEE, it is important to understand the context in which Law 15/2012 was approved.[278]   The Claimants then refer to a statement made by the Ministry of Industry, Energy and Tourism after the enactment of the disputed measure, acknowledging that the Government could have opted to reduce premiums for RE installations, but instead chose to adopt the tax on generation.[279] The Claimants further note that the Minister's comments as well as the implementation of the TPVEE occurred at a time when Spain *"(a) was already defending ECT claims; (b) had retained legal advice to defend those claims; and (c) was aware of the Article 21 ECT provision containing the taxation carve-out."*[280] Hence, the Claimants conclude, that the TVPEE is not a *bona fide* tax based on that *"[t]he inference must be that the 7% Levy was framed as a tax with the purpose of avoiding liability for breaching investors' rights under the ECT."*[281]

259.   *Second*, the Claimants allege that the measure discriminates against RE plants because, unlike their conventional counterparts that can raise prices to pass the tax to consumers, the government determines renewable plants' revenues, preventing them to pass along the burden of the tax.[282]   Additionally, the Claimants submit that, while the Preamble of the TPVEE indicates that the measure's aim is to protect the environment, Spain has not provided a rational link between the TVPEE and its professed aim, but rather the opposite that it purports to achieve resulting in an impact on the incentives that RE

---

[278] Claimants' Reply, ¶ 566.

[279] Claimants' Reply, ¶ 572.

[280] Claimants' Rejoinder, ¶ 81.

[281] Claimants' Rejoinder, ¶ 81; *see also* Claimants Reply, ¶ 574.

[282] Claimants' Reply, ¶¶ 576-587.

installations were supposed to receive.[283]  Further to this argument, the Claimants say that the TVPEE had a disparate impact on RE plants.[284]

260.  *Third*, the Claimants indicate that they are not challenging the TVPEE as a discrete measure in isolation but rather considering all measures taken by Spain and their impact on the Claimants' investment.[285]  The Claimants distinguish the *Plama v. Bulgaria* case relied by the Respondent on the basis that the investors in that case made their investments when the Bulgarian taxation laws were already in place.  Differently from this case, the Claimants say, where the taxation measures were implemented after the investment was made.[286]

261.  Finally, the Claimants sustain that Spain's labelling of the measure as a tax under its internal law is irrelevant to determine whether Article 21 is applicable, as it has been supported by several authorities.[287]  The Respondent gives the TVPEE an appearance of a tax by channelling the funds levied through the Law 15/2012 through the State Budget and then return to the electricity system.[288]  Even if the measure was enacted in compliance with its domestic law, the Claimants contend that this is irrelevant if the Respondent is evading its international obligations.[289] Furthermore, for Claimants, the fact that it complies with the definition of tax under international law as Respondent contends, does not demonstrate that the TVPEE is *bona fide*.[290]

---

[283] Claimants' Reply, ¶ 585.

[284] Claimants' Rejoinder, ¶ 83.

[285] Claimants' Reply, ¶¶ 593-597.

[286] Claimants' Reply, ¶ 597.

[287] Claimants' Reply, ¶ 599-603, *citing Yukos Universal Limited (Isle of Man) v. The Russian Federation*, Case PCA No. AA 227, Final Award, 18 July 2014, ¶ 1433, **Exhibit CL-157**; *see also Renta 4 S.V.S.A. Ahorro Corporacion Emergentes F.I., Wuasar de Volars SICAV S.A., Orgor de Valores SIVAC S.A., GBI 9000 SICAV S.A., ALOS 34 S.L. v. The Russian Federation*, Case SCC No. 24/2007, Award, 20 July 2012, ¶ 179, **Exhibit CL-137**.

[288] Claimants' Reply, ¶ 603.

[289] Claimants' Reply, ¶ 605.

[290] Claimants' Reply, ¶ 606-611.

**(c)  Response to Spain's new submissions**

262.  The Claimants also responded to the following new submissions of Spain contained in its Rejoinder in defence to the TVPEE: (i) the tax measure had a valid purpose, (ii) the cost of the TVPEE is covered by the remuneration in the New Regime, and (iii) Spain's position regarding the TVPEE has been shared by other tribunals, in particular, the *Isolux* and *Eiser* tribunals.[291]

263.  The Claimants point out that Spain has not explained why the environmental effects caused by transport and distribution networks should be attributed in greater measure to the RE installations.  Further to this argument, the Claimants call the Tribunal's attention to a decision from the Spanish Supreme Court calling for doubts as to the environmental purpose of the TVPEE.[292]

264.  The Claimants also argue that the New Regime does not cover the cost of the TVPEE. The Claimants allege that the disputed measures have caused the Claimants to loss value of their investment and that the TVPEE allows Spain to reduce the revenues of existing RE installations.[293]

265.  Finally, the Claimants differentiate this case from the *Isolux* and *Eiser* cases alleging that they have proven that the TVPEE was not to raise revenues but rather to reduce the tariff deficit and to reduce the economic rights for investors.[294]

**3.    The Tribunal's Analysis**

266.  Relying on the fact that Article 21(1) ECT is a "*carve out*" clause, the Respondent argues that taxation measures are excluded from the treaty protection and that the

---

[291] Claimants' Rejoinder, ¶ 85.

[292] Claimants' Rejoinder, ¶88.

[293] Claimants' Rejoinder, ¶¶ 86-89.

[294] Claimants' Rejoinder,¶¶ 90-92.

Tribunal lacks jurisdiction for the claims concerning the violation of Article 10(1) because of the adoption of Law 15/2012, having introduced the TVPEE.

267. The Claimants do not put into question the qualification of the TVPEE as "*tax*" but they basically contend that this measure is not a *bona fide* taxation measure, as it is arbitrary and discriminatory.[295] It would be a tariff cut, designed to strip away the rights of the Claimants under the RD 661/2007 regulatory regime.[296] Therefore, the measure would not be covered by the Article 21 exemption.

268. Article 21(1) ECT established that: "*Except as otherwise provided in this Article, nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties*". The provision entails a lack of jurisdiction *ratione materiae* of the tribunal, whose jurisdiction is limited to the disputes relating to the rights and obligations stemming from the ECT.[297]

269. As for the question concerning the *bona fide* character of the tax, this Tribunal recalls that the *Yukos Universal v. Russia* award clarified that "*the carve out of Article 21(1) can apply only to bona fide taxation actions, i.e., actions that are motivated by the purpose of raising general revenue for the State. By contrast, actions that are taken only under the guise of taxation, but in reality aim to achieve an entirely unrelated purpose (such as the destruction of a company or the elimination of a political opponent) cannot qualify for exemption from protection standards.*"[298] Fundamentally, the Tribunal's standard of review here lies in controlling the existence of an "*abuse of tax law.*"[299]

---

[295] Claimants' Reply, ¶ 562.

[296] Claimants' Reply, ¶ 564.

[297] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶ 721, **Exhibit RL-0072**.

[298] *Yukos Universal Limited (Isle of Man) vs. The Russian Federation*, UNCITRAL, PCA Case No. AA 227, Final Award, 18 July 2014, ¶1407, **Exhibit RL-0086**.

[299] *RosInvestCo UK Ltd. v. The Russian Federation*, SCC Case No. V079/2005, Award, 12 September 2010, ¶ 628.

270.    The Claimants bear the duty to prove that the tax measure was not adopted in order to raise the revenue of the State but for other purposes.[300] This burden of proof is particularly demanding, as "*States have a wide latitude in imposing and enforcing taxation law, even if resulting in substantial deprivation without compensation.*"[301] Arbitral awards having decided that such was the case were faced with extreme situations, where the State was aiming at destructing a political opponent.[302] The presumption is the *bona fide* exercise of the taxation power: "*the power to tax is a core sovereign power that should not be questioned lightly.*"[303]

271.    In relation to that, the Claimants tried to shift the burden of proof claiming that the taxation measure was arbitrary and discriminatory, relying on the principle established by the *Feldman v. Mexico* award.[304]

272.    Nevertheless, the Tribunal agrees with previous cases that the standard of review in relation to a carve-out clause is limited to the assessment of an egregious abuse of tax power. The Claimants have not proved that this is the case.

273.    In addition, the Claimants contended that the TVPEE was a mere tariff cut while being presented as an environmental measure. As clearly established in the *Isolux* award, even if the finality of the tax measure was not purely the protection of the environment but the enrichment of the State, this objective would nevertheless coincide with the aim of a taxation measure and would not be sufficient to establish the bad faith of the Respondent.[305] The present Tribunal shares this view.

---

[300] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶ 734, **Exhibit RL-0072**.

[301] *RosInvestCo UK Ltd. v. The Russian Federation*, SCC Case No. V079/2005, Award, 12 September 2010, ¶ 580.

[302] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶ 739, **Exhibit RL-0072**.

[303] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v The Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 270, **Exhibit CL-154**.

[304] Claimants' Reply, ¶ 562.

[305] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶ 740, **Exhibit RL-0072**.

274.   The Tribunal considers that the Claimants failed to demonstrate any improper or abusive use of the State's power to tax. Therefore, Article 21(1) of the ECT applies to carve out taxation measures from the jurisdiction *ratione materiae* of the Tribunal.

## VI.   APPLICABLE LAW

### A.   Article 42 of the ICSID Convention and 26(6) of the ECT

275.   The Parties agree that Articles 42(1) of the ICSID Convention and Article 26(6) of the ECT define the law applicable to the merits of this dispute.

276.   The Claimants assert that (i) the ECT serves as the primary source of law, and, (ii) where the ECT is silent, "*the Tribunal should apply customary international law and general principles of international law.*"[306]

277.   The Respondent agrees with the Claimants that the Tribunal shall apply the rules contained within the ECT and other rules and principles of International Law to the merits of this case.

278.   However, as regards to the "*rules and principles of international law,*" Spain points out that this provision incorporates rules of EU law, the application of which should lead the Tribunal to the dismissal of the Claimants' claims.[307]

### B.   Relevance of EU Law

#### 1.   Respondent's Position

279.   The Respondent contends that EU law is applicable international law,[308] and that it must be applied by the Tribunal to decide all the issues in dispute, including jurisdictional,

---

[306] Claimants' Memorial, ¶ 327.

[307] Respondent's Counter-Memorial, ¶ 883-890.

[308] Respondent's Rejoinder, ¶ 132.

merits and quantum issues as required by Article 26(6) of the ECT.[309]  Spain further argues that Article 26(6) of the ECT does not grant ECT prevalence over any other applicable rule or principle of international law.[310]

280.  The Respondent argues that the present dispute is an intra-EU dispute that concerns investments of investors of Member States of the EU made in another Member State of the EU.  The Respondent explains that the Claimants made their investment in reliance of the fundamental freedoms provided under EU law and not in reliance with the ECT.[311]  Therefore, Spain argues, EU law has to be applied to this intra-EU relationship.

281.  In addition to citing the *Electrabel, Blusun* and *Wirtgen* cases, the Respondent supports this argument on the ruling of the CJEU in the Preliminary Ruling of 6 March 2018 in the *Achmea* decision:

> (…) According to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law.  EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves. Those characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other (see, to that effect, Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 165 to 167 and the case-law cited).
>
> EU law is thus based on the fundamental premise that each Member State shares with all the other Member States, and recognises that they share with it, a set of common values on which the EU is founded, as stated in Article 2 TEU. That premise implies and justifies the existence of mutual trust between the Member States that those values will be recognised, and therefore that the law of the EU that implements them will be respected. It

---

[309] Respondent's Post-Hearing, ¶ 7.

[310] Respondent's Post-Hearing, ¶¶ 8-9.

[311] Respondent's Post-Hearing, ¶11.

is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere cooperation set out in the first subparagraph of Article 4(3) TEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU (Opinion 2/13 (Accession of the EU to the ECHR) of 18 December 2014, EU:C:2014:2454, paragraphs 168 and 173 and the case-law cited).[312]

282.    The Respondent also contends that the Tribunal must apply EU law to resolve this dispute, otherwise, any adopted decision by the Tribunal would be contrary to EU regulation governing State aid in favour of renewable energy in member States.[313]  This is regardless of whether the dispute is intra-EU or not.[314]  The Respondent notes that the EU Commission has established that the subsidies provided under RD 661/2007 (as amended by RD 1614/2010) are State aid under EU law.[315]  The Respondent further argues on this point that EU law is decisive to determine the scope of the Claimants' rights,[316] their legitimate expectations,[317] and the proportionality and reasonability of the disputed measures.[318]

---

[312] Respondent's Post-Hearing, ¶ 13, *citing* Judgment of the EUCJ Case C-284/16, Republic of Slovakia/Achmea BV, March 6, 2018, Preliminary Ruling, **Exhibit CL-162**.

[313] Respondent's Rejoinder, ¶ 885.

[314] Respondent's Post-Hearing, ¶ 9.

[315] Respondent's Post-Hearing, ¶¶ 29-31, *citing* Response from the EU Commission of 29 February 2016 to the request for investigation from the National Association of Renewable Energy Producers and Investors, **Exhibit R-0185**, and EU Commission Decision on State Aid SA.40348, dated 10 November 2017,on the Spanish regime of support for electricity generation from renewable energy resources, **Exhibit RL-0081**.

[316] Respondent's Post-Hearing, ¶ 50.

[317] Respondent's Post-Hearing, ¶¶ 51-70, *citing* Response from the EU Commission of 29 February 2016 to the request for investigation from the National Association of Renewable Energy Producers and Investors, **Exhibit R-0185**; EU Commission's Decision regarding the support scheme developed by Czech Republic, **Exhibit RL-0021**; *Electrabel S.A. v The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, **Exhibit RL-0002**; Commission Decision on State Aid of 10 November 2017, **Exhibit RL-0081**; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, **Exhibit RL-0082**, and Community Guidelines for State Aid on environmental protection 2008/C/82/01, **Exhibit R-0065**.

[318] Respondent's Post-Hearing, ¶¶ 71-75, *citing* Community Guidelines for State Aid on environmental protection 2008/C/82/01, **Exhibit R-0065**; and *Mr. Jürgen Wirtgen, Mr. Stefan Wirtgen, Mrs. Gisela Wirtgen and JSW Solar (swei) GmbH & Co. KG v. The Czech Republic*, Award, 11 October 2017, ¶174, **Exhibit RL-0096**.

283.   The Respondent contends that State aid is only permissible under EU law as long as they contribute to the purpose for which they were created.[319]

284.   The Respondent also argues that EU law and principles applied to decide all issues in dispute are not limited to Treaties but also comprise acts of EU institutions and notes that it has been interpreted as such in other cases such as *Electrabel*, *Blusun*, and *Wirtgen*.

285.   The Respondent therefore argues that the Commission's Decision on State aid is binding and this Tribunal "*cannot elude its application... [as it] affects matters of public order.*"[320]

286.   The Respondent further adds that EU law is part of Spanish law.  Therefore, Spanish Courts are part of the EU legal system to ensure compliance with EU regulations.[321]  EU law on State aid is a matter of public order in the EU territory.[322]

### 2.   Claimants' Position

287.   In response to Spain's allegation that no investor could have legitimate expectations to receive the RD 661/2007 FIT, the Claimants respond that when Bridgepoint invested in August 2011, it could not have expected that RD 661/2007 could be declared to be unlawful State aid because this was not clarified until the Order of 22 October 2014 of the CJEU.[323]

---

[319] Respondent's Rejoinder, ¶ 887.

[320] Respondent's Post-Hearing, ¶ 83, *citing Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain,* SCC Case No. 062/2012, Award, 21 January 2016, ¶ 449, **Exhibit RL-0049**.

[321] Respondent's Rejoinder, ¶ 890.

[322] Respondent's Reply Post-Hearing, ¶ 29.

[323] Claimants' Reply Post-Hearing, ¶ 76.

288.  The Claimants also point out that RD 661/2007 has not been found to constitute State aid.[324]

289.  The Claimants respond to Spain's argument that the Tribunal is bound by the EU Commission's decisions that awarding the Claimants damages in this arbitration would not be in breach of EU State aid rules.  To support this argument, the Claimants note that "*the returns the Claimants would obtain at the project level under RD 661/2007 But-For scenario would be between 8% and 9% post-tax. These figures do not qualify as windfall profits and would fall well within the range of returns that the EU Commission has considered proportionate*."[325]

290.  The Claimants oppose the Respondent's argument that the Tribunal should apply Spanish law in the present dispute.  The Claimants note that "*a State cannot, by pleading that its conduct conforms to the provisions of its internal law, escape the characterisation of that conduct as wrongful by international law*."[326]

C.  **The Object and Purpose of the ECT**

1.  **Claimants' Position**

291.  The Claimants state that, as required by Articles 31 and 32 of the VCLT, the "*ECT shall be interpreted in good faith in accordance with the ordinary meaning given to its terms in their context and in the light of the ECT's object and purpose*."[327]

292.  The Claimants understand that the fundamental objective of the ECT is to facilitate transactions and investments in the energy sector by reducing political and regulatory risks.[328]  The ECT seeks to accomplish this objective, in particular, by requiring the

---

[324] Claimants' Reply Post-Hearing, ¶ 77.

[325] Claimants' Reply Post-Hearing, ¶ 79; *see also* Claimants' Post-Hearing, ¶¶ 167, 177, and First Brattle Quantum Report, ¶ 81.

[326] Claimants' Reply, ¶ 605, *citing* ILC Articles, **Exhibit CL-27**.

[327] Claimants' Reply,  ¶507.

[328] Claimants' Memorial, ¶ 336, *see also* **Exhibit C-153**.

Contracting States to maintain a stable, predictable and transparent legal and regulatory framework for such investments.[329]

293.  By ratifying the ECT, Contracting States agreed: (a) to provide such a framework to investors in the energy sector; and (b) to be held to account in the event that they fail to do so.[330]

294.  The Claimants argue that energy investments are different from many other types of investments due to: (a) their capital-intensive nature, with very high upfront capital costs; (b) the lengthy period of time required for the investor to receive a return of and on their investment; and (c) their decades-long operating horizons. These particular characteristics make a stable, predictable and transparent legal and regulatory framework a *sine qua non* for energy investments.[331]

295.  Contrary to the Respondent's argument, the Claimants assert that the ECT provides a high level of protection for investors in the energy sector, in particular those for their long-term and capital-intensive nature.[332]

296.  The Claimants understand that there is a fundamental distinction between the protection of national treatment and FET under the ECT. National treatment is a contingent standard of investor protection. It is necessary to show that a local investor has received better treatment than the foreign investor to establish a breach of the national treatment standard. In contrast, FET is a non-contingent investor protection. The contingent and non-contingent standards "*operate independently*" in that "*the fact that an investor is treated as well as a local one will not necessarily mean that the foreigner has received fair and equitable treatment*."[333]

---

[329] Claimants' Memorial, ¶ 336.

[330] Claimants' Reply, ¶ 326

[331] Claimants' Memorial, ¶ 337

[332] Claimants' Reply, ¶ 326.

[333] Claimants' Reply, ¶ 332, *see also* C McLachlan, L Shore, M Weiniger, International Investment Arbitration: Substantive Principles (2nd ed. Oxford University Press, 2007), ¶ 7.192, **Exhibit CL-117**.

297.    In this context, the Claimants differentiate the cases cited by Spain from this case. The Claimants explain that the FET standard is broader than the minimum standard of proof.[334]   Spain contends that the *Total* tribunal applied the minimum standard of protection required by the FET, which would allow a State to modify its legal framework, provided that the investor is still able to recover its operating costs, amortise its investment and make a "reasonable return" over said period of time. However, according to the Claimants, the *Total* decision is unhelpful to Spain's case as: (a) it was not rendered pursuant to the ECT but to the 1991 France-Argentina BIT, which, unlike the ECT, does not contain any engagement with regard to stable conditions for investors; (b) contrary to what Spain contends, the *Total* tribunal considered that the FET standard "*cannot be read as 'treatment required by the minimum standard of treatment of aliens/investors under international law'*" and  (c) the quotations from *Total* used by Spain were remarks made when weighing the investors' legitimate expectations on the one hand and the Respondent's legitimate regulatory interests on the other in the absence of any specific stability commitment, as noted above. In this context, the *Total* tribunal found that the concept of "regulatory fairness" or "regulatory certainty" intervenes to ensure that the investors recover their operation costs and make a "reasonable return." In the Claimants' view, these facts clearly differentiate the *Total* tribunal's findings from the issue at hand, which is whether Spain may radically change the remuneration regime on which the Claimants relied when making their investment when it made the express commitment not to.[335]

298.    The Claimants also point out that Spain has not analysed the exceptions found in Article 24 of the ECT but rather read in two exceptions to the FET standard that are not in the text.[336]   The Claimants counter Spain's argument that considers Article 10(8) and Article 9 of the ECT to provide an exception to FET in relation to "the public aid regime." The Claimants respond that Article 10(8) of the ECT simply does not apply in

---

[334] Claimants' Reply, ¶¶ 330-338.

[335] Claimants' Reply, ¶ 337, *citing Total S.A. v The Argentine Republic,* ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 116, **Exhibit RL-50**.

[336] Claimants' Reply, ¶ 345.

the context of this case as the present dispute does not concern treatment afforded by Spain in relation to "*energy technology research and development*."[337]

299.   The Claimants also respond to Spain's alleged exception contained in Article 9(4) of the ECT that it only relates to the obligations on Contracting Parties contained in Article 9 itself.   The Claimants' plain reading of Article 9 makes clear that the Article 9(4) exceptions do not apply to any other provision of the ECT.[338]

300.   As to Spain's reliance on the "Energy Charter Treaty Readers Guide" to claim that no liability under the ECT can arise from "*macroeconomic control measures*", the Claimants' response is that it is plainly wrong to rely on such a document, since the document does not form part of the ECT.[339]

301.   The Claimants invested approximately €91 million into the Spanish wind generation sector. In doing so, upon inducements and promises made by Spain, they reasonably relied on the expectations that the Wind Farms, in which they invested, would be entitled to the economic regime of RD 661/2007, conferring immutable economic rights protected by the ECT, for their entire operational lifetime. This was, according to the Claimants, "*a sine qua non to the Claimants' decision to invest in the plant*."[340]

302.   However, contrary to the Claimants' reasonable expectations and Spain's assurances, Spain has, through the acts and omissions of its organs, allegedly taken several wrongful measures, which have fundamentally altered the applicable legal and regulatory framework in reliance upon which the Claimants' investments were made.   These include, but not limited to, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order ("**Disputed Measures**").[341] As a result of the

---

[337] Claimants' Reply, ¶ 346.

[338] Claimants' Reply, ¶ 347.

[339] Claimants' Reply, ¶ 349.

[340] Claimants' Memorial, ¶ 363, *see also* Moreno Witness Statement, ¶ 59.

[341] Claimants' Memorial, ¶ 364.

Disputed Measures, the Claimants allege that they have suffered considerable losses. The Claimants allege that Spain's measures violated Article 10(1) of the ECT, namely:

(a)     the obligation under Article 10(1) to accord, at all times, to the Claimants' investment, "*stable, equitable, favourable and transparent conditions*,"

(b)     the obligation under Article 10(1) to accord, at all times, to the Claimants' investment, fair and equitable treatment ("**FET**"), and

(c)     the obligation under Article 10(1) to observe obligations it had entered into with the Claimants or their investments (the Umbrella Clause).[342]

303.    According to the Claimants, Spain adopted, *inter alia*, the following Disputed Measures:[343]

- Law 15/2012, introducing the TPVEE which, according to the Claimants, amounts to a tariff cut;

- RDL 2/2013, which, *inter alia*, deprived the Claimants of "*the most attractive support scheme option under RD 661/2007*," the Premium option (which offered the possibility of maximizing revenues by way of selling to the market when demand in the network was the highest);

- RDL 9/2013, which revoked RD 661/2007 and established a New Regime for RE power-generation installations radically different from the framework established by RD 661/2007;

- Law 24/2013, which, *inter alia*, (i) repealed the distinction between Ordinary Regime and Special Regime established by RDL 9/2013, (ii) put conventional and RE generators on an equal footing and, most importantly, (iii) established the applicability of a "*reasonable return*" over the entire life of the plant, thereby implementing a "*maximum degree*" retroactivity. According to the Claimants, both the future and past income streams were

---

[342] Claimants' Memorial, ¶ 366.

[343] Claimants' Memorial, ¶¶ 35-50.

thus affected: "*the Project Companies would be penalised for their past returns*" and "*Spain introduced "maximum degree" retroactivity by directly impacting the past income streams of the plant, effectively altering the rules of the game over the energy already produced and already sold on the market by the Claimants.*"

- In June 2014, 11 months after Spain announced the New Regime, the Government passed the necessary implementing regulation to fully define the economic regime that would henceforth apply to RE installations. The first measure was RD 413/2014 of 6 June 2014 as an implementing measure, and the June 2014 Order that fixed the compensation parameters for a standard installation.

304.   Therefore, Spain's treatment of the Claimants, its specific breaches of the ECT and the interpretation of the standards in the ECT, according to the Claimants, must all be viewed in the light of the above context, objectives and purposes of the ECT.

### 2.   Respondent's Position

305.   Spain disputes the Claimants' reading of the purpose of the ECT, as well as of the scope of the FET, stating that the primary objective of the ECT is non-discrimination, and that the ECT does not bar States from adopting reasonable macroeconomic control measures.

306.   The Respondent agrees with the Claimants that the protection standards of the ECT need to be analysed in accordance with the ordinary meaning of the terms of the ECT in their context and in light of the object and purpose of the ECT.[344]   In this regard, the Respondent argues that the protection that the ECT offers to investments is not an unfettered one but rather it is to achieve a free energy market throughout Europe, based on the principle of non-discrimination.  Consequently, the primary or main objective with respect to an investor is to "*achieve the introduction of a free market in order to*

---

[344] Respondent's Counter-Memorial, ¶ 853.

*carry out energy-related activities without discrimination on account of the investor's nationality.*"[345]

307.    The Respondent argues that the Claimants have failed to address the real objectives and principles established by the ECT, and which are applicable to this case pursuant to Article 2 of the ECT. These objectives are: "*foster the development of an efficient energy market throughout Europe and a better functioning of the global market, based in both cases in the principle of nondiscrimination and on a determination of prices based on the market, taking into account the concerns expressed in relation to the environment.*"[346]

308.    The Respondent explains that the objective of non-discrimination has not been fully achieved in the ECT. The Respondent argues that the reluctance of States to limit their regulatory powers even minimally in such a strategic sector as the energy sector, led the signatories of the ECT to differentiate two moments: (1) the so-called "*making-investment process*" (paragraphs (2) and (3) of Article 10 of the ECT), in which the conditions to ensure the objective of national treatment or non-discrimination were postponed until the signing of a "*supplementary treaty*", which has not yet been signed and (2) the moment after the investment is made, when the guarantee of national treatment and the most favoured nation clause are applied to the overseas investor, albeit with certain limitations.[347]

309.    The Respondent affirms that once the investment has been made, the best standard of protection afforded by the ECT to the investor and to foreign investments is the "*national treatment*" standard. According to the Respondent, the greatest ambition of the ECT is non-discrimination. In other words, when Article 10(1) of the ECT establishes the obligation to give investments already made "*no less favorable treatment than that required by international law,*" it recognises the minimum standard of

---

[345] Respondent's Counter-Memorial, ¶ 859; *see also* Respondent's Rejoinder, ¶¶ 901-907.

[346] Respondent's Counter-Memorial, ¶ 857.

[347] Respondent's Counter-Memorial, ¶ 860.

protection guaranteed by international law. The maximum aspiration of the ECT is, according to Respondent, national treatment since this treatment will be applied to overseas investments whenever it is more favourable.[348]

310.    The Respondent alleges that Article 10 of the ECT contains a significant exception in the area of public subsidies or aid.[349] According to the Respondent, this exception is applicable to this case because the Claimants are requesting the payment of subsidies or State aid for the production of electricity.[350]

311.    The Respondent further alleges that Article 9 of the ECT provides that a State may adopt measures which do not breach the non-discrimination principle if the regulatory measure is (i) proportionate, (ii) justified on the grounds of public interest, and (iii) applied without discrimination to both national and foreign investors.[351]

312.    Spain asserts that in the absence of a specific stability commitment, an investor cannot have an expectation that a regulatory framework will not be modified.[352]  It finds a support in the reading of the Energy Charter Treaty Guide which makes it very clear that the ECT does not prevent States from exercising their macroeconomic control power.[353] The Respondent argues that the Claimants were aware or should have been aware of this.

---

[348] Respondent's Counter-Memorial, ¶¶ 863-864.

[349] Respondent's Counter-Memorial, ¶ 866.

[350] Respondent's Counter-Memorial, ¶ 866.

[351] Respondent's Counter-Memorial, ¶¶ 868-870.

[352] Respondent's Counter-Memorial, ¶¶ 872-886.  Respondent finds support in the following cases: *Plama Consortium Limited v. Republic of Bulgaria*, Award of 27 August 2008, ¶ 219, **Exhibit RL-0034**; *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, para 9.3.25; upheld by the Decision of the Ad hoc Committee for the Annulment, of 29 June 2012, ¶ 95; **Exhibits RL-0039 and RL-0042**; *Electrabel S.A. v. Hungary* (ICSID Case No. ARB/07/19, Award 25 November 2015, ¶¶ 165, 166, **Exhibit RL-0048**; *Charanne B.V. y Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC V 062/2012, Final Award, 21 January 2016, dissenting vote, ¶¶ 493, 510, **Exhibit RL-0049**.

[353] Respondent's Counter-Memorial, ¶ 877; *see also* Respondent's Rejoinder, ¶ 910.

313.     On this matter, the Respondent concludes that the ECT establishes no more limits on the regulatory power of the States than the minimum standards of international law, with the objective of non-discrimination, and that even this treatment does not apply on the subject of public subsidies or aid.[354] In any case, the ECT allows the adoption of macroeconomic control measures by the signatory States, based on reasons of public interest.

## VII.   MERITS

314.     The Claimants allege that after the Disputed Measures were implemented, the system left in place completely dismantled the prior legal framework applicable to the Claimants' companies.  The Claimants say that the new regime was also plagued by uncertainty, lack of transparency and long-term instability.  The Government retained the discretion to define the "return rate" and the right to change the remuneration regime every six years with respect to existing installations.[355]

315.     The Respondent sustains that it did not breach any international obligations under the ECT and requests the Tribunal to fully dismiss the Claimants' claims on the merits.[356]

### A.   Article 10(1) of the ECT: Create Stable, Equitable, Favourable and Transparent Conditions

#### 1.   Claimants' Position

316.     The Claimants note that the first sentence of Article 10(1) of the ECT imposes upon Spain the obligation to "*encourage and create stable, equitable, favourable and transparent conditions*" for investors, particularly for sectors that require a substantial amount of capital typically committed at the outset.[357]

---

[354] Respondent's Counter-Memorial, ¶ 882.

[355] Claimants' Memorial, ¶ 393.

[356] Respondent's Counter-Memorial, ¶¶ 8-9.

[357] Claimants' Memorial, ¶ 368.

317.    The Claimants clarify that it is not their position that the obligation to accord "*stable*" and "*transparent*" conditions in the ECT means that a host State must completely freeze its regulatory regime.  It does, however, according to the Claimants, mean that Spain "*knowingly accepted limitations on its regulatory power, in particular... its ability fundamentally to alter the regulatory framework applicable to existing investments.*"[358]

318.    The Claimants understood that stability was important to renewable energy projects and it was recognised in RD 661/2007 by offering investors certainty with respect to: (i) the exact cents per kWh that renewable energy installations would receive per unit of production;[359] (ii) the sale of renewable energy installations' entire production;[360] and (iii) the stability of the FIT as its protection against its revision for existing installations.[361]

319.    According to the Claimants, Article 44(3) of RD 661/2007 was a self-binding commitment of the Spanish regulator to protect existing installations against changes to the FIT, otherwise permissible under Spanish law.[362]  The stability of the regime was supported, according to the Claimants, by Spain, including its own regulator, the *Comision Nacional de Energia*, also known as CNE.[363]  Moreover, the Ministry of Industry, Tourism and Commerce accompany the issuance of RD 661/2007 with a press release indicating that "*future adjustments to said tariffs will not affect installations*

---

[358] Claimants' Memorial, ¶ 371.

[359] Claimants' Memorial, ¶ 372, *citing* RD 661/2007 of 25 May 2007, Article 36, **Exhibit C-44**.

[360] RD 661/2007 of 25 May 2007, Article 17, **Exhibit C-44**.

[361] RD 661/2007 of 25 May 2007, Article 44(3), **Exhibit C-44**.

[362] Claimants' Memorial, ¶ 373.

[363] Claimants' Memorial, ¶ 373, *citing* CNE Report 3/2007, p. 16, **Exhibit C-85** ("The CNE understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, incentivising investments in new capacity and minimizing the cost of financing projects, thus reducing the final cost to the consumer. The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.") and p. 25 ("Ultimately, what the CNE proposes is regulatory stability to recover investments, maintaining regulated tariffs during the service life of existing facilities (with a transparent annual adjustment mechanism).")

The Claimants cite other CNE presentations: CNE Presentation, "Legal and Regulatory Framework for the Renewable Energy Sector," 29 October 2008, p. 25, **Exhibit C-95**; CNE Presentation, "Las Energías Renovables: El Caso Español" (Cartagena de Indias), 9-13 February 2009, p. 67, **Exhibit C-97**; CNE Presentation, "Las Energías Renovables: El Caso Español" (Barcelona), February 2009, p. 25, **Exhibit C-98**; CNE Presentation, "Renewable Energy Regulation in Spain," February 2010, p. 29, **Exhibit C-96**.

*which are already in operation.  This guarantees legal certainty for the electricity producer and stability for the sector.*"[364]  The Claimants also refer to joint publications from the Ministry, InvestInSpain,[365] and ECOFYS.[366]

320.  The Claimants stress that after RD 661/2007, Spain re-confirmed its commitment to provide stable conditions in RD 1614/2010, establishing that any future changes to the RD 661/2007 economic regime would not apply to duly registered, existing installations.[367]

321.  In the Claimants' view, (i) the "*roller coaster*" of constant regulatory changes that the Claimants' investment was subject to over the 18-month period from December 2012 to June 2014;[368] (ii) the total uncertainty that characterised the eleven-month "*limbo*" period from July 2013 to June 2014;[369] as well as (iii) the system left in place marred by "*uncertainty, lack of transparency and long-term instability*," provide sufficient proof of Spain's failure to encourage and create stable, equitable, favourable and transparent conditions as required, according to the Claimants, by the first sentence of Article 10(1) of the ECT.[370]

322.  First, the Claimants allege that in December 2012, Law 15/2012 imposed a 7% levy on electricity produced and fed into the national grid during a calendar year, including all generators, both conventional and renewable.[371]

---

[364] Claimants' Memorial, ¶ 375, *citing* Government of Spain, Ministry of Industry, Tourism and Commerce, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power," 25 May 2007, p. 1, **Exhibit C-92**.

[365] Claimants' Memorial, ¶ 376, *citing* Government of Spain, Ministry of Industry, Tourism and Commerce, Presentation, "Legal Framework for Renewable Energies in Spain," undated, p. 4, **Exhibit C-163**.

[366] Claimants' Memorial, ¶ 377, *citing* Ecofys, Task 2 Report, "Design Features of Support Schemes for Renewable Electricity," 27 January 2014, p. 24, **Exhibit C-152**.

[367] Claimants' Memorial, ¶379.

[368] Claimants' Memorial, ¶¶ 382, 392.

[369] Claimants' Memorial, ¶¶ 386, 392.

[370] Claimants' Memorial, ¶ 393.

[371] Claimants' Memorial, ¶ 383.

323.    Secondly, the Claimants state that just two months after Law 15/2012, in February 2013, RDL 2/2013 deprived the Claimants of the most attractive support scheme option under RD 661/2007, on which they relied when undertaking their investment: the Premium option. The Premium had been a key part of the Claimants' decision to invest, given the possibility of maximizing revenues by way of selling to the market when demand in the network was the highest. RDL 2/2013 also replaced the annual adjustment index based on the Spanish CPI for updating the FIT to account for inflation.[372]

324.    The Claimants assert that four months later, Spain decided to repeal the RD 661/2007 FIT regime entirely. RDL 9/2013, of 12 July 2013, brought substantial changes to the 1997 Electricity Law by: (i) repealing RD 661/2007; and (ii) establishing a New Regime for RE power-generation installations radically different from the framework established by RD 661/2007 and effective as of the date of RDL 9/2013.[373]

325.    The Claimants note that the New Regime was not fully defined or implemented until June 2014. This meant that the entire RE sector had to endure 11 months of uncertainty during which, according to the Claimants, it was impossible to discern the details of the regulatory framework or the remuneration parameters to which the Project Companies were or would be subject.

326.    The Claimants sustain that in December 2013, Law 24/2013 introduced further harmful measures: (i) the distinction between the Ordinary Regime and the Special Regime announced by RDL 9/2013 formally disappeared; and (ii) conventional and RE generators were put on an equal footing, thereby depriving the RE installations of the unconditional right of priority of grid access and priority of dispatch that existed under the previous regime.[374] Moreover, Annex III established the applicability of the defined "*reasonable return*" over the entire useful life of the plant, implementing a "*maximum degree*" retroactivity. In this way, both the future and past income streams of the

---

[372] Claimants' Memorial, ¶ 384.

[373] Claimants' Memorial, ¶ 385.

[374] Claimants' Memorial, ¶ 388.

Claimants were affected. This meant that: (i) the Project Companies would be penalised for their past returns; and (ii) Spain introduced "*maximum degree*" retroactivity by directly impacting the past income streams of the plant, effectively altering the rules of the game over the energy already produced and already sold on the market by the Claimants.[375]

327.   Finally, the Claimants point out that in June 2014, 11 months after Spain announced the New Regime, the Government passed the necessary implementing regulation to fully define the economic regime that would henceforth apply to RE installations. The first such implementing measure was RD 413/2014 of 6 June 2014.[376]

328.   By June 2014, according to the Claimants, none of the "*key features of the regulatory regime*" in reliance of which the Claimants invested, remained.[377] In the Claimants' view that was a "*fundamental change*."[378]

### 2.   Respondent's Position

329.   The Respondent objects to the Claimants' characterization that there is an autonomous standard of the FET generating an obligation to "*create stable, equitable, favorable and transparent conditions*" for foreign investment. [379]

330.   Relying, *inter alia*, on the tribunals' findings in *Isolux* and *Plama* (both related to the ECT),[380] Spain disputes the Claimants' assertion that Article 10(1) of the ECT contains an autonomous standard to create stable conditions for investment.

---

[375] Claimants' Memorial, ¶ 389.

[376] Claimants' Memorial, ¶ 390.

[377] Claimants' Post-Hearing, ¶ 9.

[378] Claimants' Post-Hearing, ¶ 10.

[379] Respondent's Rejoinder, ¶ 918.

[380] Respondent's Rejoinder, ¶ 919.  The Respondent finds support in the following cases: *Isolux Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153, Award of 12 July 2016), ¶¶ 764-766, **Exhibit RL-0077**; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award 27 December 2016, ¶ 315 (c), **Exhibit RL-0082**.

331.    Therefore, the Respondent analysed the obligation to create stable conditions within the FET standard of the ECT, and not as an autonomous obligation.[381]

### B.    Article 10(1) of the ECT: Fair and Equitable Treatment Standard

#### 1.    Claimants' Position

332.    For the Claimants, the ordinary meaning of Article 10(1), "*read in good faith and in the light of the object and purpose of the ECT*," demonstrates that the FET standard in the ECT is an independent and autonomous standard.[382] Therefore, the Claimants conclude, the FET standard is additional to the international minimum standard under customary international law.

333.    In arbitral practice, the Claimants contend, "*the preferred method [of application of the FET] has been to unfold the standard on the basis of casuistic subgroups which will be seen as typical emanations of the standards.*"[383] Accordingly, in the present case, the Claimants submit that:

- Spain has breached the Claimants' reasonable and legitimate expectations;
- Spain failed to provide a stable and predictable legal and business framework in relation to the investment;[384]
- Spain's conduct has not been transparent;
- Spain's measures are unreasonable and arbitrary,
- Spain's measures are disproportionate and discriminatory.[385]

---

[381] Respondent's Rejoinder, ¶ 923.

[382] Claimants' Memorial, ¶ 397.

[383] Claimants' Memorial, ¶ 405.

[384] Claimants clarify that "*the ECT gives the obligation of the host State to provide stability in the first sentence of Article 10(1). As such, it is a stand-alone obligation under the ECT and therefore addressed separately in Section 14.2 above. Importantly, the FET standard contained in the second sentence of the ECT also encompasses an obligation on the host State to provide a stable legal and business framework. This has been confirmed by numerous tribunals, as explained below. This obligation in the ECT imposes a burden to provide stability that is more onerous than the FET obligation contained in a typical investment treaty given the particular object and purpose of the ECT.*" Claimants' Memorial, ¶ 405, fn. 563.

[385] Claimants' Memorial, ¶¶ 405, 407.

## 2.   Respondent's Position

334.   The Respondent alleges that the Claimants have the burden to prove a breach of the FET standard through the measures challenged.[386]

335.   The Respondent affirms that the Claimants do not invoke cases where the FET standard was applied in ECT cases. Instead, according to the Respondent, the Claimants invoke less relevant precedents that were rendered on the basis of breach of contracts or administrative concessions in countries such as Mexico, Ecuador, Chile or Argentina.[387]

336.   The Respondent further notes that arbitral tribunals that have applied the FET standard under the ECT have held that such standard requires a balance between the investor's rights and the power and duty of the host state to adopt measures for the general interest.[388]

337.   The Respondent insists that the "*Claimants had not justified: (i) the existence of a 'grandfathering' institution in Spanish Law, (ii) the existence of a 'grandfathering' commitment in the Spanish Regulatory framework not (iii) the existence of a commitment by the Kingdom of Spain to petrify the retribution scheme of the RD 661/2007.*"[389]   Therefore, the Respondent argues, the Tribunal cannot conclude that Spain has violated the FET standard contained in the ECT.[390]

## C.   Obligation to provide a stable and predictable regulatory scheme

### 1.   Claimants' Position

338.   Relying on investment arbitration scholarship and several landmark decisions, the Claimants contend that a "*central feature of the State's obligation to ensure FET for*

---

[386] Respondent's Counter-Memorial, ¶ 888.

[387] Respondent's Counter-Memorial, ¶ 891.

[388] Respondent's Rejoinder, ¶ 924.

[389] Respondent's Rejoinder, ¶ 927.

[390] Respondent's Rejoinder, ¶ 928.

*investments is the general principle that the State must not frustrate a foreign investor's legitimate expectations on which that investor relied at the time it made its investment*."[391] In particular, the Claimants maintain, "*the ECT expressly recognizes an obligation on the part of the host state to provide for legal stability*," as part of the host State's obligation to respect the investor's legitimate expectations.[392]

339.   This obligation, the Claimants pursue, is "*of particular importance in the energy sector*" where, as in this case, a substantial amount of capital is invested at the outset in the hope of generating a long-term return.

340.   The Claimants note that it has been well-established that the State's conduct, which contributes to the creation of a reasonable expectation and upon which an investor relies, may take the form of the legal framework in relation to, or surrounding the investment.[393]   The Claimants further explain that the legal framework on which the investor is entitled to rely, comprises "*legislation and treaties, and assurances contained in decrees, licences and similar executive assurances or undertakings*," as stated in numerous awards, including *Enron v. Argentina* and *LG&E v. Argentina*.[394]

341.   The Claimants argue that they had two distinct expectations: (i) one pertaining to the nature, amount and duration of the FIT offered under RD 661/2007 and RD 1614/2010; and (b) another pertaining to the stability of the RD 661/2007 economic regime, expecting that any potential modifications to the regime would only apply prospectively, leaving existing installations unaffected.[395]

---

[391] Claimants' Memorial, ¶ 409.

[392] Claimants' Memorial, ¶ 409, *citing* R Dolzer, "Fair and Equitable Treatment: Today's Contours" (2014) 12 Santa Clara Journal of International Law 7, p. 23, **Exhibit CL-91**.

[393] Claimants' Memorial, ¶ 415.

[394] Claimants' Memorial, ¶¶ 409-416.

[395] Claimants' Memorial, ¶¶ 417, 419.

342. First, regarding the nature, level and duration of the FIT, at the time the Claimants invested in the Marmellar SL and La Boga SL, the Project Companies, they expected that once the installations were finally registered with the RAIPRE:

      a.    the Project Companies would have a choice between selling electricity at a Fixed Tariff or at the Premium, with the amounts that were set out in Article 36 of RD 661/2007;

      b.    the FIT would apply to all of the electricity produced, without any limitations on production;

      c.    the FIT would apply for the entire operational life of the installations; and

      d.    the FIT would be subject to inflation adjustments, as provided in RD 661/2007.[396]

343. Secondly, in the Claimants' view, Spain explicitly promised that the economic regime for qualifying Special Regime installations would remain stable under RD 661/2007, which contains a stabilization commitment in Article 44(3).[397] According to the Claimants, Spain subsequently reiterated this commitment in the July 2010 Agreement[398] and RD 1614/2010, which provided that any revisions to the Fixed Tariff and the Premium pursuant to Article 44(3) of RD 661/2007 would not affect duly registered, existing installations. According to the Claimants, these "*stability commitments*" were core to the Claimants' expectations.

344. The Claimants affirm that their expectations on the continued application of the RD 661/2007 economic regime for the Project Companies were legitimate and reasonable due to the following:

---

[396] Claimants' Memorial, ¶ 418.

[397] Claimants' Memorial, ¶ 420.

[398] Claimants' Reply, ¶ 101.

a.   The RD 661/2007 FIT provided very specific tariffs that would apply to the Project Companies. Article 36 specified the Fixed Tariff and Premium that the Claimants would receive for 20 years and thereafter.

b.   Article 44(3) of RD 661/2007 committed not to change that Fixed Tariff or the upper and lower thresholds of the Premium option for existing installations. According to the Claimants, this commitment was later reinforced in RD 1614/2010 by including the Premium itself within the scope of the protection. According to the Claimants, this was a "*self-binding*" commitment entered into by Spain in order to protect against "*minimum degree*" retroactivity.

c.   The RD 661/2007 economic regime was part of a wider international and domestic policy to develop renewable energy power-generation infrastructure. In the Claimants' position, RD 661/2007 was the necessary instrument for Spain to reach its renewable energy targets.

d.   For the Claimants, the regime that Spain put in place was sufficiently attractive to encourage the necessary investments in renewable energy projects, such as the projects in which the Claimants invested. [399]

345.   The Claimants also specify that Spain's own conduct prior to the Claimants' investment confirms that Spain's expectations on the application and stability of the RD 661/2007 economic regime were the same as the Claimants' expectations. In the Claimants' view, clearly those expectations were reasonable. [400]

346.   The Claimants state that Spain advances a number of arguments, which are clear *ex-post* constructs, regarding the RD 661/2007. [401] The Claimants argue that FIT schemes are currently in place in at least 103 countries worldwide, including 25 European member states. FITs are designed to provide long-term certainty as to the price at which electricity from RE producers will be purchased. As repeatedly recognised by Spain,

---

[399] Claimants' Memorial, ¶ 421.

[400] Claimants' Memorial, ¶ 423.

[401] Claimants' Reply, ¶ 47.

FIT schemes seek to correct a market failure in order to induce investment in RE. According to the Claimants, Spain enacted a FIT scheme fully in line with international standard practice, offering a long-term guarantee to qualifying investors.[402] In the Claimants' view, Spain's *ex post* arguments regarding the interpretation of the RD 661/2007 FIT disregard the stated object and purpose behind the economic regime.[403] The Claimants affirm that rather than describing the regime as specifically designed to induce investment through the provision of a stable regulatory framework, Spain now presents the RD 661/2007 regime as providing merely a discretionary subsidy that the Government was free to withdraw at any time for both new and existing installations.

347.   The Claimants respond to Spain's contention that Article 44.3 was not a stabilization commitment or grandfathering provision because it did not say that an entirely new and different norm could not be passed.[404] In the Claimants' view, this makes no sense because it also flatly contradicts Spain's contemporaneous assurances concerning Article 44.3 and the drafting process giving rise to the inclusion of Article 44.3.

348.   The Claimants supported the argument that Article 44.3 was a "*guarantee*" against tariff changes with documentation, including: (1) Ministry of Industry, Tourism and Commerce's ("**Ministry**") press release accompanying the issuance of RD 661/2007;[405] (2) CNE Report 3/2007 of 14 February 2007;[406] (3) four separate publications where the Ministry and InvestInSpain referred to the RD 661/2007 FIT;[407] (4) 2008 statements

---

[402] Claimants' Reply, ¶ 59.

[403] Claimants' Reply, ¶ 54.

[404] Claimants' Reply, ¶ 70.

[405] Government of Spain, Ministry of Industry, Energy and Tourism, announcement of RD 661/2007, "The Government prioritises profitability and stability in the new Royal Decree on renewable energy," 25 May 2007, p. 1, **Exhibit C-93**.

[406] CNE Presentation, "Renewable Energy Regulation in Spain", February 2010, p. 29, **Exhibit C-96**.

[407] Government of Spain, Ministry of Industry, Tourism and Commerce and InvestInSpain, Presentation, "Legal Framework for Renewable Energies in Spain", undated, p. 4, **Exhibit C-163**; InvestInSpain Presentation, "Opportunities in Renewable Energy in Spain" (Graz), dated 15 November 2007, p. 32, **Exhibit C-164**; InvestInSpain Presentation, "Opportunities in Renewable Energy in Spain", (Vienna), dated 16 November 2007, p. 32 **Exhibit C-165,** and InvestInSpain, Presentation, "Opportunities in Renewable Energy in Spain", undated, p. 16, **Exhibit C-199**.

made by the CNE;[408] (5) CNE presentation of 29 October 2008;[409] (6) 2009 and 2010 statements by the CNE;[410] and (7) the Ministry's public announcement of the July 2010 Agreement.[411]

349.   The Claimants also note that the evolution of the draft of the regulation that would ultimately become RD 661/2007 also confirms that the inclusion of the stability commitment at Article 44.3 was deliberate to provide an important guarantee to investors.[412]

350.   In the first draft of RD 661/2007 the stabilization clause was not present[413] and, according to the Claimants, the CNE urged the Ministry to include a protection against tariff changes for existing installations in the new regulation. The Ministry, the Claimants argue, evidently accepted the CNE's position and included this special provision in the next draft of RD 661/2007 dated 19 March 2007, which became Article 44.3.[414]

351.   The Claimants counter Spain's argument that Article 44.3 only protected installations against tariff revisions made "*in the periodic reviews every four years*" and that Spain was therefore free to make wholesale changes to the incentive regime at any other time.

---

[408] CNE Report 30/2008 of 25 May, 29 July 2008, p. 20, **Exhibit C-94**.

[409] CNE Presentation, "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008, p. 25. *See also* pp. 11, 27, **Exhibit C-95**, and CNE, "2008 Model for the Determination of Prices of Renewable Generation: The International Experience", 22 April 2008, pp. 25 and 27, **Exhibit C-200** ; and First Brattle Regulatory Report, ¶ 12.

[410] CNE Presentation, "Legal and Regulatory Framework for the Renewable Energy Sector", 29 October 2008, p. 25, **Exhibit C-95**; CNE Presentation, "Las Energías Renovables: El Caso Español" (Cartagena de Indias), 9-13 February 2009, pp. 67, 69 and 71, **Exhibit C-97**; CNE Presentation, "Las Energías Renovables: El Caso Español" (Barcelona), February 2009, pp. 21, 23 and 25, **Exhibit C-98**; and CNE Presentation, "Renewable Energy Regulation in Spain", February 2010, p. 29, **Exhibit C-96**.

[411] Government of Spain, Ministry of Industry, Tourism and Commerce, Press Release, "The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks", 2 July 2010, **Exhibit C-45**.

[412] Claimants' Reply, ¶ 81.

[413] Claimants' Reply, ¶ 83.

[414] Claimants' Reply, ¶ 86: *see also* CNE Report 3/2007 of 14 February 2007, pp. 6, 19, **Exhibit C-85**.

According to the Claimants, that interpretation is absurd and is against the plain language of Article 44.3.[415]

352.   Moreover, the Claimants sustain that the fact that RD 661/2007 is a "*Royal Decree*" and, therefore, subject to change by another law or regulation, is irrelevant. According to the Claimants, the question for the Tribunal is not whether Spanish law allowed a "*Royal Decree*" to be amended by subsequent legislation, but, rather, whether the Claimants had an expectation that Spain would not make retroactive changes to the RD 661/2007 FIT applicable to the Wind Farms, much less overhaul the remuneration regime altogether.[416]

353.   Any law or regulation in Spain (or, indeed, anywhere else) can, as a matter of domestic law, be changed or repealed by a subsequent act of equal or higher rank. The 1997 Electricity Law itself was modified 35 times during the 16 years it was in force. This, according to the Claimants, does not change the fact that a regulation can give rise to legitimate expectations.[417]

354.   In response to Spain's argument that the Claimants knew or should have known that Spain could introduce retroactive changes to the regulation applicable to their investment, changes that would entirely overhaul the parameters for remuneration of the Wind Farms, as the Disputed Measures did, the Claimants respond as follows:

   a.   A guarantee in which one party can unilaterally modify the key terms – including the return that the other party may earn – is clearly no guarantee at all. This is not how FITs work generally nor is it consistent with the terms of RD 436/2004, RD 661/2007, or RD 1614/2010. These regulations expressly exempted registered installations from future tariff revisions.[418]

---

[415] Claimants' Reply, ¶ 89.

[416] Claimants' Reply, ¶ 91.

[417] Claimants' Reply, ¶¶ 92-93.

[418] Claimants' Reply, ¶ 127.

b.      Had Spain implemented a dynamic rate of return, it would not have been able to attract RE investment. This is because most of the investment in wind farms is made up front and can only be repaid after many years.[419]

c.      Regarding Spain's claim that the reference in the 1997 Electricity Law to the cost of money on the capital markets (*i.e.* interest rates) should have put the Claimants on notice that retroactive changes could be made if there was a change in interest rates. Claimants respond that the only reference to "*cost of money on the capital markets*" in RD 661/2007 is in Article 44.3, i.e. in relation to tariffs to be set for new plants. That was a clear confirmation by Spain that interest rates would play a role in the future, but that changes in interest rates would not affect existing plants.[420]

d.      The dynamic character allegedly "*makes it possible to determine whether profitability at a given time is reasonable or not*." According to the Claimants, not a single contemporaneous document supports this. Moreover, the Claimants state that Spain never made any finding that the Wind Farms were being unreasonably profitable.[421]

355.   Spain stated in its Counter-Memorial that the due diligence made by the Claimants, was flawed, leading to their misunderstanding of the regulatory framework, which is denied by the Claimants, pointing out to the documents relied upon to make the investment.[422] Also, according to the Claimants, Spain states that "*the Claimant made an investment without knowing the essential aspects of the Spanish regulatory framework.*"[423]

356.   In response to the Respondent's statement that the Claimants should have anticipated the Disputed Measures because the Spanish Supreme Court "*since 2005, establishes the rights of investors in the event of changes in the remuneration models of the* [Special

---

[419] Claimants' Reply, ¶ 128.

[420] Claimants' Reply, ¶ 129.

[421] Claimants' Reply, ¶ 131.

[422] Claimants' Reply, ¶¶ 397-415.

[423] Claimants' Reply, ¶ 391.

Regime]", the Claimants respond that Spain refers to a number of judgments that post-date the Claimants' investment, which are irrelevant to this dispute.[424]

357.    The Claimants contend that the judgments that pre-date the Claimants' decision to invest, relate to incentives that were not part of the guaranteed renewable energy regime and so cannot have constituted the Claimants' expectations.[425] In the Claimants' view, there is no judicial interpretation of the meaning of the specific clauses in the legislation whereby Spain undertook to respect existing investors' rights, i.e., Article 40.3 of RD 436/2004, Article 44.3 of RD 661/2007 or Article 5.3 of RD 1614/2010. Indeed, according to the Claimants, Spain has not been able to provide any judicial support for its strained interpretation of these provisions. Equally, according to Claimants, no Spanish judgment has ever held that the "*reasonable return*" concept is "*dynamic*."[426] That is the reason why the cases invoked by Spain were not flagged by the Claimants' legal advisors despite the Claimants' thorough due diligence in the regulatory regime prior to investing.[427]

358.    The Claimants reiterated this point when they addressed Spain's request to introduce the *RREEF* Decision into the record.  In this regard, the Claimants disagreed that there was a consolidated trend of ECT cases as portrayed by Spain but rather to the contrary, in the *Eiser, Masdar, Novenergia, Antin* and *Greentech* awards, Spain was found to have "*(i) introduced investors to invest in Spanish RE with the implementation of a favourable regime; and (ii) significantly changed the fundamentals of that Regime through the New Regime, thus breaching the ECT.*"[428]

---

[424] Claimants' Reply, ¶ 186.

[425] Claimants' Reply, ¶ 187.

[426] Claimants' Reply, ¶ 188.

[427] Claimants' Reply, ¶ 189.

[428] Claimants' Comments on Respondent's Request for Leave to Introduce the *RREEF* Decision, dated April 17, 2019, p. 2.

359.    The Claimants also point out that the Supreme Court's review is limited to consider whether a Royal Decree or Ministerial Order complies with higher-ranking norms.[429] As far as the Supreme Court's analysis is concerned, once a Royal Decree has been replaced, its provisions no longer exist.[430] In other words, according to the Claimants, unless the derogated provision is contained in a higher-ranking law, the Supreme Court cannot consider whether that provision has been violated.[431]

### 2.    Respondent's Position

360.    The Respondent contends that in order to determine if there has been a violation of the FET standard, the Tribunal must assess the legitimate expectations that the Claimants had when making the investment in relation to the treatment that the said investment would receive. These expectations must be reasonable and objective with respect to the general regulatory framework in place. As part of this assessment, the Respondent asks the Tribunal to first analyse the investor's knowledge of the general regulatory framework when making its investment, or rather, what this knowledge should have included.

361.    The Respondent contends that the Claimants' investment was made in May 2012 and not in August 2011.[432]

362.    According to the Respondent, the following events should be relevant for the Tribunal's assessment: (a) the announcement of future regulatory changes made by Mr. Mariano Rajoy in his inauguration speech as President; (b) the CNE's press release dated 28 December 2011 urging a reform;[433] (c) RDL 1/2012, issued on 27 January, announcing

---

[429] Claimants' Reply, ¶ 197.

[430] Claimants' Reply, ¶ 198.

[431] Claimants' Reply, ¶ 200.

[432] Respondent's Rejoinder, ¶240.

[433] CNE Press release, 28-12-2011. "The CNE is analyzing the review of the access charges and certain tariffs and premiums of the special regime facilities," **Exhibit R-0170**.

the reform in its preamble;[434] (d) the CNE's Report issued on 7 March 2012 analysing the SES unsustainable situation and proposing measures both for its revenues and costs to attempt to reinstate its financial balance;[435] (e) the National Reform Program;[436] the Memorandum of Understanding executed with the EU and its Member States in July 2012, where Spain undertook to solve the tariff deficit issue comprehensively;[437] the judgments delivered by the Supreme Court after April 2012,[438] thus consolidating their case law.[439]

363.   In Spain's view, international arbitration case law[440] is clear that when making its investment, an investor should know and understand (i) the regulatory framework, (ii) how this is applied (iii) how it affects its investment. An investor makes its investment based on this knowledge and should be aware of the risks it takes on when making such.[441]

364.   According to Spain, every investor must know or should have known the essential conditions of the Special Regime remuneration system and the jurisprudence of the Supreme Court.[442]

365.   In Spain's view, it is the Claimants' obligation to be informed of the general regulatory framework that governs investments, and which includes all regulations and jurisprudence applicable to the investment.  The Respondent alleges that the Claimants do not provide evidence of having had the degree of diligence that could be expected

---

[434] RD 1/2012 of 27 January 2012, **Exhibit R-0091**.

[435] CNE Report, 7 March 2012, **Exhibit R-0131**.

[436] National Reform Program of 2012, **Exhibit R-0121**.

[437] Memorandum of Understanding on Financial-Sector Policy Conditionality subscribed with EU 20 July 2012: "VI. Public Finances, Macroeconomic Imbalances And Financial Sector Reform", **Exhibit RL-0067.**

[438] Judgments of the Supreme Court 2011-2012, **Exhibit R-0279**.

[439] Respondent's Rejoinder, ¶ 229.

[440] The Respondent finds support in the following cases: *Electrabel S.A. v. Hungary* (ICSID No. ARB/07/19), Award of 25 November 2015, ¶ 7.78, **Exhibit RL-0048**; *Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain*, SCC V 062/2012, Award of 21 January 2006, ¶¶ 495, 505, **Exhibit RL-0049**.

[441] Respondent's Counter-Memorial, ¶ 897.

[442] Respondent's Counter-Memorial, ¶¶ 324, 346.

from a foreign investor in a heavily regulated sector like the energy industry, where thorough prior analysis of the legal framework applicable thereto is essential to make an investment.[443]

366.    The Respondent argues that, even if the Claimants had actually performed an exhaustive due diligence, Spain has not violated the Claimants' legitimate expectations.  The Respondent sustains that arbitral tribunals have confirmed that the ECT is not a type of insurance policy of investors against the risk of changes in a regulatory framework.[444] Therefore, the Respondent further argues, the Claimants neither (a) had a specific commitment by the Kingdom of Spain nor (b) the Claimant's expectations were reasonable or justified.[445]

367.    The Respondent asserts that an interpretation that requires immutability of the regulatory framework, irrespective of the ensuing economic circumstances, apart from not being realistic, would infringe the concept of fair and equitable treatment, as is internationally conceived.[446]

368.    Spain affirms that the standard that the Claimants' claim has to be considered is within the FET standard of the ECT, as stated by the Tribunal in the *Plama* case: *"stable and equitable conditions are clearly part of the fair and equitable treatment standard under the ECT."*[447]

369.    The Respondent notes that according to consolidated arbitral case-law on the ECT, the *"stable conditions"* referred to by the ECT clearly allow the adoption of reasonable and

---

[443] Respondent's Counter-Memorial, ¶ 905. Respondent supports this argument in the *Electrabel* and *Charanne* cases.

[444] Respondent's Counter-Memorial, ¶ 907, *citing Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 219, **Exhibit RL-0034**; as well as *AES Summit Generation Limited and AES-Tisza Erömü Kft v The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 **Exhibit RL-0039**, *EDF (Services) Limited v. Rumania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, **Exhibit RL-0035**, and *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain*, SCC Case No. 062/2012, Award, 21 January 2016, **Exhibit RL-0049**.

[445] Respondent's Counter-Memorial, ¶ 908.

[446] Respondent's Counter-Memorial, ¶ 928.

[447] Respondent's Counter-Memorial, ¶ 929, *see also Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award dated 27 August 2008, ¶ 173, **Exhibit RL-0034**.

proportionate macroeconomic control measures, provided these are as a result of a reasonable cause.[448]

370.    The Respondent affirms that the measures challenged by the Claimants are based on the need to guarantee the sustainability and balance of the SES and were carried out respecting the principle that governed this type of investment according to the 1997 Electricity Law: the granting of a fair return that the 2005-2010 Spanish Renewable Energy Plan ("**REP**"), in harmony with the 2000-2010 REP, calculated to ensure that standard facilities could achieve a return of around 7% during their useful life.[449]

371.    The Respondent affirms that the costs of the electrical system have evolved exponentially according to the evolution of investments in the various activities, particularly in transportation, distribution and generation.[450]

372.    The trend shows that all the costs of the SES were multiplied by 3.2 between 2006 and 2013; and that the income, despite the fall in demand, was multiplied by 2, by increasing the electricity bills paid by consumers. The Respondent describes the tariff deficit as the difference between revenues and costs.[451]

373.    The Respondent affirms that this deficit has generated an accumulated debt which reached 40,326 million euros. Although this debt has been amortised gradually, in 2015 the amount remaining was still over 26,000 million euros. The Respondent establishes

---

[448] Respondent's Counter-Memorial, ¶ 930. The Respondent finds support to its position in the following cases: *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 219, **Exhibit RL-0034**; *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary, AES Summit*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶¶ 9.3.29, 9.3.30, **Exhibit RL-0039**; *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v. Republic of Albania*, ICSID Case No. ARB/11/24, Award, 30 March 2015, ¶¶ 617-618, **Exhibit RL-0046**, and *Charanne BV and Construction Investment S.A.R.L. v. Kingdom of Spain*, SCC Arbitration No. 062/2012, Award, 21 January 2016, ¶ 499, **Exhibit RL-0049**.

[449] Respondent's Counter-Memorial, ¶ 933.

[450] Respondent's Counter-Memorial, ¶ 256.

[451] Respondent's Counter-Memorial, ¶ 260.

that this debt is being paid by Spanish consumers on electricity bills at a rate of about 2,800 million euros annually.[452]

374.  Spain asserts that the model of remuneration derived from the Spanish regulatory framework as a whole was planned with the aim that all investors could recover, taking as a reference a "*standard installation*," (1) the cost of their investment, (2) the operating costs and (3) obtain reasonable profitability.[453] Consequently, the Respondent affirms that it has granted the Claimants stable conditions according to the ECT's standard, as with the contested measures it has maintained the essential characteristics of the regulatory framework in which the Claimants invested.  Following the 2013 reform, the Kingdom of Spain establishes that it has maintained the subsidies and the dispatch priority, allowing RE investments to recover, in accordance with the "*standard facilities*": (i) investment costs, (ii) operating costs and additionally, (iii) obtain reasonable profitability in accordance with the cost of money in the capital market. In summary, the Respondent alleges that the Claimants maintain the financial balance of the investment.[454]

375.  Furthermore, the Respondent contends that it is not possible to talk about the violation of stable conditions since the profitability renewable energy producers can hope to achieve was determined by Law following RDL 9/2013.[455]

376.  Moreover, Spain concluded that the Claimants' arguments contradict with the results obtained with the sale of their assets in 2016. The assets subject of this arbitration were sold to a third party by the Claimants. With such sale, the Claimants have obtained a return of 11.2%. Such return is above that expected when making the investment.[456]

---

[452] Respondent's Counter-Memorial, ¶ 263.

[453] Respondent's Counter-Memorial, ¶ 934.

[454] Respondent's Counter-Memorial, ¶ 935.

[455] Respondent's Counter-Memorial, ¶ 936.

[456] Respondent's Counter-Memorial, ¶ 937.

377. According to the Respondent, the Claimants, by explaining their theory, make a new, basic and conceptual error for a regulation to be retroactive, it must affect acquired rights. Spain argues that based on the facts in the record, it can be concluded that the Claimants have never had an "*acquired right*" to any future remuneration, *sine die*, by means of a fixed and unchangeable FIT, not subject to possible measures of macroeconomic control or SES reforms. Spain affirms that the reform contained in RDL 9/2013 only affected the future, without affecting acquired rights.[457]

378. The Respondent further states that the Supreme Court and the State Council ratified the legality of the legislative modifications which apply to the future, without affecting the acquired rights. According to Spain, that doctrine is the same as the one applied by the international arbitration tribunals.[458]

379. The Respondent alleges that the Disputed Measures "*maintained the essential features of the regulatory framework in which Claimants took the decision to invest: (i) they guarantee the priority of access to the grid, (ii) they guarantee the priority of dispatch and (iii) they guarantee a reasonable return on the investment according to the cost of money in the capital markets.*"[459]

380. Furthermore, when commenting on the *RREEF* Decision, Spain called for the case law which indicated that the "*regulatory framework…does not include stabilisation clauses or compromises to the investors to maintain unchanged regulation approved in order to promote the renewable energies.*"[460]  Spain, supported on what it argued to be the case law, said that the FET standard would not prevent a State from changing their

---

[457] The Respondent finds support to its position by citing the following cases: *Nations Energy Inc. and others v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, ¶¶ 642, 644, 646, **Exhibit RL-0040**; *Charanne B.V. and Construction Investments S.A.R.L. v. Kingdom of Spain*, SCC Arbitration 062/2012, Award, 21 January 2016, ¶¶ 546, 548, **Exhibit, RL-0049**, and *Isolux Netherlands, BV v. Kingdom of Spain*, SCC V2013/153, Award ,12 July 2016, **Exhibit RL-0072**.

[458] The Respondent finds support to its position by citing the following cases: Judgment of the Constitutional Court of 17 December 2015, delivered in constitutional challenge 5347/2013, **Exhibit R-0154**; Judgment of the Constitutional Court of 18 February 2016, delivered in constitutional challenge 6031/2013, **Exhibit R-0157**; and Judgment of the Constitutional Court of 18 February 2016, delivered in constitutional challenge 5852/2013, **Exhibit R-0156**.

[459] Respondent's Post-Hearing, ¶ 169.

[460] Respondent's Request for Leave to Introduce *RREEF* Decision, dated April 8, 2019, p. 2.

regulations and that if a State did change a regulation, this regulatory change "*must be analysed in the light of the public legitimate purpose that justifies their approval.*"[461]

381.   Accordingly, Respondent concludes, it has not breached its obligation to maintain a stable and predictable regulatory framework.

### D.   Alleged frustration of legitimate expectations

#### 1.   Claimants' Position

382.   According to the Claimants, their expectations were both legitimate and reasonable, because they relied, *inter alia*, on Spain's general policy aiming to develop renewable energy power-generation infrastructure, Spain's active campaign to reach these goals, or the enactment by Spain of regulations confirming that installations, such as the Wind Farms, would not be affected by any review of the FIT under RD 661/2007.[462]

383.   The Claimants conclude that by adopting the Disputed Measures described *supra*, and in particular, "*by wiping out the RD 661/2007 economic regime in its entirety in July 2013 (under RDL 9/2013), and introducing an entirely differently regime that is substantially less favourable to the Claimants,*" Spain frustrated the Claimants' legitimate expectations, in breach of the FET under the ECT.[463]

384.   The Claimants affirm that the Spanish authorities, having knowingly sought out and induced investments on the basis of these specific representations and undertakings, hastily withdrew them after the investments had been made.[464]

385.   According to the Claimants, Spain has, since December 2012, through a process extending over two years and comprising a succession of harmful measures, frustrated

---

[461] Respondent's Request for Leave to Introduce *RREEF* Decision, dated April 8, 2019, p. 2.

[462] Claimants' Memorial, ¶¶ 421-423.

[463] Claimants' Memorial, ¶ 425.

[464] Claimants' Memorial, ¶ 424.

the Claimants' legitimate expectations and entirely dismantled the legal and business framework on which the Claimants relied in making their investment.[465]

386.   First, the Claimants allege that in December 2012, Law 15/2012 imposed a 7% levy on electricity produced and fed into the national grid during a calendar year, including all generators, both conventional and renewable. [466]

387.   Secondly, the Claimants state that just two months after Law 15/2012, in February 2013, RDL 2/2013 deprived the Claimants of the most attractive support scheme option under RD 661/2007, on which they relied when undertaking their investment: the Premium option. According to the Claimants, the Premium had been a key part of their decision to invest, given the possibility of maximizing revenues by way of selling to the market when demand in the network was the highest. RDL 2/2013 also replaced the annual adjustment index based on the Spanish CPI for updating the FIT to account for inflation.[467]

388.   The Claimants assert that four months later, Spain decided to repeal the RD 661/2007 FIT regime entirely. RDL 9/2013, of 12 July 2013, brought substantial changes to the 1997 Electricity Law by: (i) repealing RD 661/2007; and (ii) establishing a New Regime for RE power-generation installations radically different from the framework established by RD 661/2007 and effective as of the date of RDL 9/2013.[468]

389.   The Claimants note that the New Regime was not fully defined or implemented until June 2014. This meant that the entire RE sector had to endure 11 months of uncertainty during which, according to the Claimants, it was impossible to discern the details of the

---

[465] Claimants' Memorial, ¶ 425.

[466] Claimants' Memorial, ¶ 383.

[467] Claimants' Memorial, ¶ 384.

[468] Claimants' Memorial, ¶ 385.

regulatory framework or the remuneration parameters to which the Project Companies were or would be subject.[469]

390.    The Claimants sustain that in December 2013, Law 24/2013 introduced further harmful measures: (i) the distinction between the Ordinary Regime and the Special Regime announced by RDL 9/2013 formally disappeared; and (ii) conventional and renewable energy generators were put on an equal footing, thereby depriving the RE installations of the unconditional right of priority of grid access and priority of dispatch that existed under the previous regime.  Moreover, Annex III established the applicability of the defined "*reasonable return*" over the entire useful life of the plant, implementing a "*maximum degree*" retroactivity. In this way, both the future and past income streams of the Claimants were affected.  This meant that: (i) the Project Companies would be penalised for their past returns; and (ii) Spain introduced "*maximum degree*" retroactivity by directly impacting the past income streams of the plant, effectively altering the rules of the game over the energy already produced and already sold on the market by the Claimants.[470]

391.    According to the Claimants, the New Regime is retroactive. The Claimants use the term retroactive to refer to measures that apply to investments that have already been made.[471] The Claimants state that under Spanish law, there are broadly two forms of retroactivity. The first is "*improper*" (or "*minimum degree*") retroactivity, which is generally permissible under Spanish law. Applying new tariffs to existing installations for the remainder of their useful life is a case of improper retroactivity, i.e. a change in the law that affects a pre-existing situation. The second is "*genuine*" (or "*maximum degree*") retroactivity, which occurs under Spanish law and under most legal systems when the regulation not only affects pre-existing situations but also affects activities or results that have already occurred in the past (in this case, the electricity already produced, sold on the market, and for which the tariffs or premiums have already been

---

[469] Claimants' Memorial, ¶ 386.

[470] Claimants' Memorial, ¶ 389.

[471] Claimants' Reply, ¶ 379.

paid).[472] The Claimants note that Spain stresses that the Disputed Measures are permissible under Spanish law because they do not involve a "*maximum degree*" of retroactivity. However, the Claimants assert that Spain introduced genuinely retroactive changes since the Disputed Measures "*claw-back*" past revenues. The Claimants sustain that although the Project Companies were not required to pay back any "*excess*" amounts received in the past beyond the newly-imposed cap of the 7.398% "*reasonable return*" over the lifetime of their plants, the New Regime does discount the "*excess*" from future payments, which in practice is precisely the same thing.[473]

392.   Finally, the Claimants point out that in June 2014, 11 months after Spain announced the New Regime, the Government passed the necessary implementing regulation to fully define the economic regime that would henceforth apply to RE installations. The first such implementing measure was RD 413/2014 of 6 June 2014.[474]

393.   By June 2014, according to the Claimants, none of the key features of the regulatory regime in reliance of which the Claimants invested, remained.  In the Claimants' view that was a fundamental change.[475]

394.   In the Claimants' position, the complete upheaval of a given regulatory regime may result in a violation of the FET standard, such as the *Micula* tribunal understood.[476]

395.   According to the Claimants, similarly to *Micula*, in the present case, Article 36 of RD 661/2007 provided that the FIT would be available for a specified amount for kWh of electricity produced "*for the first 20 years*" of a wind installation's life and then "*thereafter*" for a different, lower amount for each kWh produced in subsequent years. RD 661/2007 went beyond this by providing a "*guarantee*" at Article 44(3) of RD

---

[472] Claimants' Reply, ¶ 386.

[473] Claimants' Reply, ¶ 387.

[474] Claimants' Memorial, ¶ 390.

[475] Claimants' Memorial, ¶ 365.

[476] *Ioan Micula, Viorel Micula and others v Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, **Exhibit CL-88**.

661/2007 that, once registered and in operation, any reviews of that FIT would only affect future wind installations, which was later confirmed by RD 1614/2010.[477] However, in the Claimants' view, only a few years after RD 661/2007 was enacted, Spain has eviscerated all of its key characteristics. It has reneged on its promises, thereby frustrating the Claimants' legitimate expectations and upsetting the legal framework it had previously guaranteed.[478]

396.    The Claimants further supported their argument when commenting on the *RREEF* Decision.  The Claimants pointed out that the *RREEF* tribunal found that the disputed measures lowered the rate of return by radically altering the regulatory regime in reliance on which the Claimants had invested.[479]   The Claimants also note that the tribunal in *RREEF* concluded that the retroactive nature of the new regime breached Art. 10(1) of the ECT and that "*must result in an appropriate compensation for the damage that the breach caused the Claimants.*"[480]

## 2.    Respondent's Position

397.    As regards the legitimate expectations under the FET standard of the ECT, Spain highlights that such expectations must be "*reasonable*" and "*objective.*"[481]

398.    In Spain's view, the Claimants' reliance on the "*alleged stabilisation commitments*" contained in the Spanish regulatory framework, particularly, in Articles 36 and 44.3 of RD 661/2007 and Article 5.3 of RD 1614/2010 is neither reasonable nor objective. The regulatory framework only guaranteed that renewable energy facilities, during their useful life, could achieve a reasonable profitability.

---

[477] Claimants' Memorial, ¶ 428.

[478] Claimants' Memorial, ¶ 429.

[479] Claimants' Comments on *RREEF* Decision, dated May 17, 2019, p. 3.

[480] Claimants' Comments on *RREEF* Decision, dated May 17, 2019, p. 4.

[481] Respondent's Rejoinder, ¶¶ 943-952.

399. For Spain, in sum, the Claimants (i) "*could not have the legitimate expectation that the Spanish regulatory framework for supporting renewables would remain unchanged if the economic sustainability of the SES was at risk,*" (ii) nor that "*the regime for supporting renewables based on set economic parameters would remain unchanged if said economic parameters changed radically, as was the case in Spain from 2009 to 2014,*"[482] and (iii) "*the agreement of 2 July 2010 does not mean a commitment of immovability of RD 661/2007,*" rather, the agreement was "*the result of a process of consultations imposed by article 24 of the Act of Governance, which regulates the process of preparing the regulations in Spain.*"[483]

400. In support of this position, Spain relies on the awards in *Charanne* and *Isolux* which have, according to Spain, both confirmed that "*RD 661/2007 did not contain promises or guarantees of freezing regulations in favour of investors such as the Claimant[s] or their investments.*"[484]

401. Furthermore, Spain expresses that the lack of existence of a specific commitment has already been declared by the tribunal in the *Charanne* case, which examined the existing legal framework in the electricity sector during 2007 and 2008 in Spain.[485] This award has corroborated what the Kingdom of Spain claims and what RE Associations in the sector argued in 2009 and 2010: that RD 661/2007 did not contain any promises or guarantees of freezing of its regime. The contention on the part of Spain means that neither (i) the remunerative regime nor (ii) the regime of hours or years of subsidised production nor (iii) the tariff update regime, were set in stone.[486]

402. The Respondent stresses that no fully informed investor could expect the freezing in its favour of all of these regimes due to the fact of fulfilling a regulatory requirement to

---

[482] Respondent's Rejoinder, ¶ 952.

[483] Respondent's Rejoinder, ¶¶ 967-968.

[484] Respondent's Rejoinder, ¶ 960.

[485] *Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain*, SCC V 062/2012, Award of 21 January 2006, ¶¶ 504-508, **Exhibit RL-0049**.

[486] Respondent's Counter-Memorial, ¶ 911.

obtain subsidies, such as registration in a mandatory administrative register. Nor could they expect these conditions be maintained indefinitely or be improved in the absence of any commitment in this regard.

403.   The Respondent states that the most evident proof that the Claimants knew before making their investment about the possibility of regulatory changes is precisely the sale and purchase agreement whereby the Claimants acquired their investment, which expressly foresees the possibility of regulatory changes and it is agreed that the sellers will not be liable for those regulatory changes, whether retroactive or not.[487]

404.   The Respondent argues that the expectations upheld by the Claimant with regard to the setting in stone are not consistent either with the basic principles over which the Spanish regulatory framework is based or with the evolution of the Spanish regulatory framework in the years prior to the Claimants' investment.

405.   The Spanish regulatory framework had the following essential principles: (1) The regulatory system governed by the principle of regulatory hierarchy and the result of the legally stipulated procedures for drafting regulations; (2) The regulatory framework is not limited to RD 661/2007 and RD 1614/2010 as claimed by the Claimants, but rather configured from the 1997 Electricity Law and the regulations which developed it, as interpreted by case-law; (3) The fundamental principle that subsidies to the Special Regime, are a cost for the Spanish Electricity System ("**SES**"), subordinate to the principle of its economic sustainability; (4) Right to the priority access and dispatch of electricity production; (5) That the remuneration of the RE consists of a subsidy which, added to the market price, provides renewable energy plants with reasonable profitability, in the framework of its useful life, in accordance with the capital market, which is dynamic and balanced within the SES and the profitability was linked exclusively to the cost of construction and operation of the plants; (6) That the determination of the subsidies is fixed on the basis of changing demand and other basic

---

[487] Respondent's Counter-Memorial, ¶ 608.

economic data, set out in the RE Plans on the costs of investment and operation of standard installations with the objective that these installations achieve reasonable profitability during their useful life, and (7) That the regulatory changes to the remuneration regime of REs since 2004 have been motivated by (i) correcting situations of over-payment, or (ii) by the strong alteration of the economic data that served as the basis for the estimate of the subsidies.[488]

406.    The Respondent observes that these basic principles constitute the objective legitimate expectations of a diligent investor. Therefore, no diligent investor could expect the Spanish State, faced with a situation of economic deficit or imbalance that affected the sustainability of the SES, not to adopt measures to be able to resolve such. In the same way, no investor would expect that in a situation of "*over-remuneration*" the State would not correct this situation. The *leit motiv* inherent to all of the measures has been, precisely, to address that situation of unsustainability of the SES and correct situations of over-remuneration, preventing consumers from exclusively bearing the costs.

407.    The Respondent establishes that the Claimants make an unnecessary argument so that all of its expectations revolve around Article 44.3 of RD 661/2007. According to the Respondent, paragraph 2 of Article 44.3 RD 661/2007: (a) It says nothing about "*updates*", "*feed-in hours*", "*operational life of plants*" or "*priority dispatch*", nor the remaining elements of the legal regime applicable to plants, (b) neither does it refer to "*any*" review of tariffs. Its wording is limited to the periodic reviews of the previous paragraph, nothing else. And the previous paragraph does not guarantee that "*the tariffs shall remain in force, unchangeable except in the periodic reviews every four years*". Accordingly, "*any*" modification that is not obligatory is excluded from the sphere of article 44.3. That is, it excludes the modifications that are necessary to (1) ensure the economic sustainability of the SES or (2) to correct situations of over-remuneration. In Respondent's view, this has been the clear interpretation of the Supreme Court since 2005.[489]

---

[488] Respondent's Counter-Memorial, ¶ 916.

[489] Respondent's Counter-Memorial, ¶ 920.

408.    Moreover, in Spain's view, the Claimants refer to four PowerPoint presentations that allegedly reinforced its expectations, from 2007 to 2009. According to Spain, the Claimants are unable to substantiate these presentations which, in any case, are at least two years prior to its investment in Spain. Accordingly, the Respondent states that the relevance for its expectations is zero.[490]

409.    The Respondent notes that the award of the case *ECE Projektmanagement v. Czech Republic*[491] declared that legitimate expectations could hardly be generated based on statements made by subjects lacking the capacity or the competence to be able to comply with that stated.

410.    Also, the Respondent considers that the Court of the *Charanne* case has already dismissed the possibility of the information contained in advertising brochures being capable of generating a real, objective expectation for a diligent investor.[492]

411.    Moreover, to further substantiate its contention that the expectations of the Claimants were neither reasonable nor objective, Spain notes that (i) the Claimants have not conducted proper legal diligence;[493] (ii) the rest of reports obtained by the Claimants prior to their investment did not acknowledge the alleged immutability of the remuneration regime;[494] and (iii) the possibility of regulatory changes was expressly provided for in the contracts for the acquisition of the investment.[495]

412.    Lastly, the Respondent negates the existence of any stabilization commitment with respect to the Claimants.  According to the Claimants, the alleged commitments arising

---

[490] Respondent's Counter-Memorial, ¶ 922.

[491] *ECE Projektmanagement International GmbH and Kommanditgesellschaft PANTA Achtundsechzigste Grundstücksgesellschaft mbH & Co v. Czech Republic*, CPA Case No. 2010-5, Award, 19 September 2013, ¶ 477, **Exhibit RL-0045**.

[492] *Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain*, SCC Arbitration No. 062/2012, Award of 21st January 2006, ¶¶ 496, 497, **Exhibit RL-0049**.

[493] Respondent's Rejoinder, ¶¶ 973-991.

[494] Respondent's Rejoinder, ¶ 992.

[495] Respondent's Rejoinder, ¶ 993.

out of the regulation itself, the RAIPRE registration, a press release of the Ministry, the July 2010 Agreement, as well as presentations by the CNE, IDEA and InvestInSpain. The Respondent categorically denies that any of these constitute a commitment with respect to the Claimants.[496]

413. First, the evolution of the Spanish legal framework had occurred before the Claimants made their investment, which proved that no such stabilization existed from the regulation.[497]   Second, the Respondent argues, the Claimants invested in a highly regulated sector.  Therefore, the rights and obligations come from a regulation and are not derived from contracts.[498]   Third, this was also reflected by the repeated jurisprudence from the Spanish Supreme Court even before the Claimants made their investment.[499]   Fourth, the Respondent argues that the Claimants had invested in a highly liberalised market which purpose and limits to subsidies cannot be disregarded.[500]

414. Spain submitted further comments on legitimate expectations on the basis of the introduction into the record of the *RREEF* Decision.[501]   According to the Respondent in the *RREEF* case, "*claimants in that proceeding could not legitimately expect that the rules applicable to their investments would remain unchanged for the entire duration of the plants, but their legitimate expectation was limited to a reasonable return on their investments.*"[502]   The Respondent also refers to the *RREEF* Decision to explain what the investor can expect a "*reasonable return*" according to the cost of money in the capital market.[503]

---

[496] Respondent's Opening Presentation (Presentation on Fundamental Facts), Slides 61 to 75; Respondent's Opening Presentation on Merits, Slides 47-51.  *See also* Tr. Day 1, 212:14-218:14; Tr. Day 2, 20:19-25:4.

[497] Respondent's Post-Hearing, ¶ 151.

[498] Respondent's Post-Hearing, ¶¶ 153-154.

[499] Respondent's Post-Hearing, ¶ 157.  The Respondent cites the Ruling of the Third Chamber of the Supreme Court on 9 December 2009, appeal 152/2007, reference El Derecho EDJ 2009/307357, Point of Law 6, p. 4, **Exhibit R-0002**.

[500] Respondent's Post-Hearing, ¶ 160.

[501] Respondent's Comments on the *RREEF* Decision, 5 May 2019.

[502] Respondent's Comments on the *RREEF* Decision, 5 May 2019.

[503] Respondent's Comments on the *RREEF* Decision, 5 May 2019.

### E.   Transparency

#### 1.   Claimants' Position

415.   Relying, in particular, on *Plama*, *Electrabel* and *Tecmed*, the Claimants contend that the FET standard further requires that the State's conduct towards investors and its legal environment be transparent. In the Claimants' view, Spain's conduct, in adopting the Disputed Measures, was characterised by uncertainty and ambiguity, thus in breach of the requirement of transparency under the FET.

416.   In the Claimants' position, the reference to transparency in the ECT can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations.[504]

417.   In the present case, the Claimants stated that Spain dismantled the RD 661/2007 economic regime in a manner that was not transparent.[505]

418.   First, the Claimants raised that the Government abused the function of Royal Decree Laws to implement the New Regime. The ability to issue Royal Decree Laws applies only in cases of "*extraordinary and urgent need*." There was, however, no "*need*" for RD 661/2007 to be modified by way of Royal Decree Law. It is therefore reasonable to assume that the only reason Spain implemented the New Regime via Royal Decree Law was to deprive stakeholders of the possibility to influence or challenge the measure.

---

[504] The Claimants find support of its position in the following cases: *Técnicas Medioambientales Tecmed S. A. v The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003,¶ 154, **Exhibit CL-33**; *Electrabel S.A. v The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.79, **Exhibit CL-86**, and *Plama Consortium Limited v The Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 178, **Exhibit CL-63**.

[505] Claimants' Memorial, ¶ 437.

419. Secondly, the Claimants note that RDL 9/2013 not only wiped out the investment regime for the Claimants' investment, but was followed by a transitory regime of more than 11 months during which the Government gave no indication regarding the precise remuneration that any qualifying plants would be entitled to.

420. Thirdly, the Claimants recall that with the necessary implementing measures of June 2014 (*i.e.* 11 months after RDL 9/2013 was introduced), the Government was meant to define the precise economic regime that would apply to qualifying installations. However, neither RD 413/2014 nor the June 2014 Order provide any transparent analysis explaining the underlying criteria or calculations behind the Special Payment (including how the standard costs of the standard installation were calculated), or those that will underpin the future updates of the economic regime.

421. Fourthly, the Claimants consider that under the New Regime, the Government also retains the right to review the Special Payment in order to make sure that the prevailing yield on ten-year Spanish bonds plus a spread (*i.e.* what Spain considers to be a "*reasonable return*" or rather will consider to be a "*reasonable return*" in the future) continues to apply.

422. In the Claimants' view, the New Regime does not provide any clear indication as to the timeframe during which the remuneration for installed capacity (which is in theory aimed at compensating for investments made in the installations) will apply. According to the Claimants' Memorial, the Government has also not provided any transparent methodology for determining whether a plant has, in the Government's view, earned reasonable profits.

423. The Claimants state that Spain selectively refers to the annulment committee decision in the *MTD v. Chile* case to contend that a host State's obligations cannot solely stem from the investor's expectations. However, according to the Claimants, nowhere have the Claimants in this case stated that their claim arises out of their own expectations only. The legitimate expectations of the Claimants were not just subjectively held but

objectively legitimate. In the Claimants' view, this is clearly recognised in the annulment committee decision in *MTD v. Chile*.[506] The Claimants sustain that a proper reading of the annulment committee decision in *MTD v. Chile*[507] illustrates that it did not "*question*" the *Tecmed v. Mexico* award as Spain claims.

## 2.   Respondent's Position

424.   Likewise, Spain argues that it had not breached its obligation under the ECT to provide transparent conditions. In this context, Spain points out that the need to adopt measures with the view of eliminating the tariff deficit (i) had been announced and known to all investors, [508] and (ii) the Disputed Measures were thus neither obscure nor unpredictable.[509]

425.   According to the Respondent, the Claimants once again make the mistake of considering that the ECT guarantees the full predictability of the regulatory framework of a State while the investment is in effect even when there is no commitment to maintain it.

426.   The Respondent states that the announcement of a reform to the SES, as part of the macroeconomic control measures, was made more than one year prior to its actual adoption, i.e. from December 2011.[510]  The Respondent further alleges that:

   i.       it has never committed itself to the Claimants to keep its regulatory framework immutable or the regime established in RD 661/2007;

   ii.      it has publicised the need to carry out reforms since 2009 as a result of the international crisis and the necessary sustainability of the system. The Respondent states that RDL 6/2009, the Report of RD 1614/2010 and RDL

---

[506] Claimants' Reply, ¶ 438.

[507] *MTD Equity Sdn Bhd. & MTD Chile S.A. v The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007, p. 28, **Exhibit RL-0030**.

[508] Respondent's Rejoinder, ¶¶ 1032-1040.

[509] Respondent's Rejoinder, ¶¶ 1041-1043.

[510] Respondent's Rejoinder, ¶ 834; *see also* Transcription of the Speech of Mariano Rajoy in his inaugural address as President of the Government, to the Spanish Congress, Monday 19 December 2011, **Exhibit R-0192** .

14/2010, in their respective Preambles alluded to the impact of the global crisis on the Spanish economy, falling electricity demand and the need to adapt the SES by means of the necessary reforms. Also, Spain states that the RE Associations themselves proposed the reform of the sector in 2009, 2010 and 2012, and even proposed the text of a new Law for RE in 2009. Additionally, announcements for a new Electricity Sector Law were made by the Government constantly since December 2011;

iii.     it has followed the legally established procedures in all the measures taken since 2009, without incurring undue delays and ensuring participation in the legislative process of the holders of legitimate rights;

iv.     it has approved a predictable, dynamic regulatory system that continues to guarantee reasonable returns for RE projects and the financial balance of the investment;[511]

v.     for the drafting of the report 2/2012 "On the Spanish Energy Sector" of 7 March 2012, the CNE opened a public consultation period in early February 2012 in which 477 claims were obtained from the various companies and sectors concerned;[512]

vi.     there was a public hearing during the drafting of RD 413/2014 of June 6 and that numerous other claims were submitted for this draft Royal Decree;[513] and

vii.     during the drafting of the Ministerial Order IET 1045/2014 of 16 June more than 600 claims of all interested parties of the SES were presented and the draft was circulated to interested parties of the electricity sector on February 3, 2014.[514]

427.     Therefore, Respondent concludes, it has fully complied with its obligation of transparency under Article 10(1) of the ECT.

---

[511] Respondent's Counter-Memorial, ¶ 959.

[512] Respondent's Rejoinder, ¶837: *see also* Information on the public consultation on regulatory adjustment measures in the energy sector submitted on 2 February 2012 and 9 March 2012, **Exhibit R-0194**.

[513] Respondent's Rejoinder, ¶¶ 839-841.

[514] Respondent's Rejoinder, ¶843.

**F.  Obligation of Reasonableness, Proportionality, and Alleged Discriminatory Character of the Measures**

**1.  Claimants' Position**

428.    The Claimants mention that the tribunal in *Plama v. Bulgaria*[515] defined "*unreasonable*" measures as "*those which are not founded in reason or fact but on caprice, prejudice or personal preference.*" A determination of whether a State's conduct has been reasonable requires demonstration that the conduct "*bears a reasonable relationship to some rational policy*".[516]

429.    Thus, in the Claimants' view, in order for Spain to justify the measures at issue, it must first identify a rational policy goal and then it must show that the measures taken were reasonable, i.e. reasonably correlated, or appropriately tailored, to addressing that policy goal with due regard for the consequences imposed on foreign investors such as the Claimants.[517] In addition, the Claimants request that the Tribunal assess whether the Disputed Measures were necessary in the light of alternatives available to the Disputed Measures and whether, balancing the aim of the State against the significant financial burden on the Claimants, the Disputed Measures are justified.[518]

430.    The Claimants contend that there is a disagreement between the Parties on the burden of proof.  Spain suggests that the Claimants must show that: (a) the Disputed Measures were unreasonable and disproportionate; and (b) the alternatives to addressing the tariff deficit have "*legal, economic and budgetary validity.*" According to the Claimants, proportionality is only relevant where a State has interfered with an investor's rights. The proportionality enquiry provides the State with an opportunity to explain why,

---

[515] *Plama Consortium Limited v The Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 184, **Exhibit CL-63** .

[516] *Saluka Investments B. V. v The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 460, **Exhibit CL-43**; *Ioan Micula, Viorel Micula and others v Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 525, **Exhibit CL-88**.

[517] Claimants' Memorial, ¶¶ 439, 450. *See also Saluka Investments B. V. v The Czech Republic*, UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 460, **Exhibit CL-43**.

[518] Claimants' Reply, ¶ 446.

notwithstanding that its measures have interfered with an investor's rights, the interference is nevertheless justified because it is proportionate. The very nature of the test means that the burden rests with the State. In the Claimants' view, Spain fails to meet that burden. [519]

431.   According to the Claimants, Spain's dismantling of the entire legal and business framework applicable to the Claimants' investment is contrary to the expectations of the Claimants and, indeed, of any reasonable person. [520]

432.   Spain's stated justification for the regulatory measures adopted against the Project Companies, is that the measures had to be adopted due to the so-called tariff deficit.  In the Claimants' view, the tariff deficit is, however, the result of Spain's own regulatory decisions, and the burden of fixing it cannot be attributed to foreign investors protected under the ECT, such as the Claimants, in violation of their reasonable and legitimate expectations. [521]

433.   The Claimants affirm that the reason why the tariff deficit developed is quite simple: Spain has consistently failed to raise regulated tariffs to the level necessary to cover the costs of the SES, even though, under its own laws, it was under an obligation to abide by the income-sufficiency principle, as confirmed by the Spanish Supreme Court. [522]

434.   The Claimants argue that on any view, tackling the tariff deficit by adopting sudden and drastic changes to the regulatory regime for renewables is not a rational policy goal. [523]

---

[519] Claimants' Reply, ¶ 448.

[520] *BG Group Plc. v The Argentine Republic*, UNCITRAL, Award, 24 December 2007, ¶¶ 343, 346, **Exhibit CL-58**.

[521] Claimants' Memorial, ¶ 441.

[522] First Brattle Regulatory Report, ¶¶ 118-126. *See also* Spanish Supreme Court Decision Contentious-Administrative Chamber), Appeal No. 321/2010, 31 October 2011, **Exhibit C-55**; and Spanish Supreme Court Decision (Contentious-Administrative Chamber), Appeal No. 348/2010, 4 November 2011, **Exhibit C-56**.

[523] Claimants' Memorial, ¶ 442.

435.    Moreover, according to the Claimants, Spain's measures under the New Regime were unreasonable in the light of the limited contribution of wind to the tariff deficit. The Claimants state that there were various other measures that could have been taken by the Government that would have been far less harmful to the Claimants' investment.[524] Spain fails to discharge its burden of showing that there was no other less intrusive way to address the tariff deficit.[525]

436.    The Claimants contend that the tariff deficit could have been avoided had Spain properly set consumer prices as it was required to do as a matter of Spanish law under Article 17 of the 1997 Electricity Law and RDL 6/2009[526] and that the Spanish Supreme Court has issued several judgments and two sets of interim measures finding that Spain's failure to comply with the requirements of RDL 6/2009 was a clear violation of Spanish law.[527]

437.    The Claimants state that although Spain appears to accept that the aim of the Disputed Measures was to address the tariff deficit, Spain then seeks to expand the scope of the purpose of the Disputed Measures beyond the tariff deficit.[528] However, the Claimants understand that all the other reasons mentioned by Spain are potential justifications for addressing the tariff deficit as the overarching policy goal.

438.    The Claimants sustain that Spain failed to set Network Access Tolls at sufficient levels for plainly political reasons. As such, the tariff deficit continued to worsen and with it the potential burden on consumers. Rather than complying with its own laws, Spain, who is responsible for balancing the budget, watched the deficit grow over a period of

---

[524] Claimants' Memorial, ¶ 442.

[525] Claimants' Reply, ¶ 463.

[526] Claimants' Memorial, ¶ 450.

[527] Spanish Supreme Court Decision (Contentious-Administrative Chamber), Appeal No. 321/2010, 31 October 2011, **Exhibit C-55**; and Spanish Supreme Court Decision (Contentious-Administrative Chamber), Appeal No. 348/2010, 4 November 2011, **Exhibit C-56**.

[528] Claimants' Reply, ¶ 452.

time and ultimately decided that the cost of that deficit should be borne by the Claimants and other investors in the RE sector.[529]

439.    According to the Claimants, Spain argued that the Disputed Measures were taken to avoid "*excessive returns*" and relies on the award in *AES Summit v. Hungary* to support its view that addressing "*luxury profits*" is a rational policy aim. However, in the Claimants' view, there is a significant hurdle that Spain cannot overcome in this regard: The Disputed Measures were not designed to address the alleged excessive profits nor has Spain sought to show that the Claimants were receiving returns in excess of what Spain considered reasonable under RD 661/2007. The Claimants state that no analysis on "*excessive returns*" was undertaken at the time the Disputed Measures were implemented; nor is there any analysis before this Tribunal.

440.    The Claimants assert that the economic crisis (and the corresponding decrease in demand) had already affected Spain when it opted to implement RD 1614/2010, which reiterated the application of the RD 661/2007 economic regime for existing installations. This did not represent a change in Spain's circumstances that could somehow support a reasonable correlation between addressing the tariff deficit and the complete withdrawal of the RD 661/2007 economic regime.

441.    Therefore, according to the Claimants, there is no reasonable correlation between addressing the tariff deficit and implementing the Disputed Measures.[530]

442.    Finally, in its analysis of the FET standard, Spain contends that Article 10(1) of the ECT prohibits Spain from impairing investments by "*unreasonable or discriminatory measures.*" According to the Claimants, demonstrating that Spain's adverse measures are either unreasonable or discriminatory suffices to establish a breach of Article 10(1) of the ECT. However, the Claimants note that a breach of this obligation results simultaneously in a breach of the FET standard.

---

[529] Claimants' Reply, ¶ 456.

[530] Claimants' Reply, ¶ 462.

443.    In this context, the Claimants refer to the *Saluka* case which describes the standard of "*reasonableness*," requiring that the "*State's conduct bear a reasonable relationship to some rational policy*." Accordingly, for the Claimants, Spain must show that its measures were (i) taken in pursuance of a rational policy goal, and (ii) were carefully tailored to achieve that goal. [531] The Claimants contend that, contrary to Spain's arguments, the tariff deficit is "*the product of Spain's regulatory failures and, therefore, is not a policy goal*." As a result, the Claimants conclude that the Disputed Measures, in addition to constituting a breach of the FET, have also "*impaired*" the Claimants' investment in breach of Article 10(1) of the ECT.[532]

444.    The Claimants allege that in order to assess whether a State measure is proportionate or not, there must be a reasonable relationship between the burden imposed on the foreign investor and the aim sought to be realised by the State measure. [533] This test is not satisfied in the present case.

445.    First, the stated objective of Spain's measures has been to address the issue of the tariff deficit. The Claimants refers that the regulatory measures aimed at curtailing the FIT for wind cannot be considered "suitable" measures to achieve the intended purpose since the remuneration to wind farms was not the source of the tariff deficit.[534]

446.    Secondly, a State measure is not proportionate unless it is necessary to achieve the goals pursued. The Claimants affirm that this analysis implies an assessment as to whether there are other less intrusive means with regard to the rights affected that are equally able to achieve the stated goal. The Claimants sustain that Spain's own organs contemporaneously identified alternative solutions less harmful to investors, such as a tax on all CO2 emissions. Therefore, according to the Claimants, on the basis that Spain

---

[531] Claimants' Memorial, ¶¶ 450-452.

[532] Claimants' Memorial,¶ 452.

[533] The Claimants find support of its position in the following cases: *Técnicas Medioambientales Tecmed S. A. v The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 122, **Exhibit CL-33**; and *Case Concerning the Gabcikovo-Nagymaros Project (Hungary/Slovakia)*, ICJ Rep 1997, Judgment of 25 September 1997, ¶ 85, **Exhibit CL-14**.

[534] Claimants' Memorial, ¶¶ 444, 445.

had alternative solutions to tackle the problem of the tariff deficit, less harmful to investors, Spain's measures cannot be considered to be proportionate.[535]

447.   The Claimants also allege that Spain has violated Article 10(1) of the ECT which prohibits Spain from impairing investments by "*unreasonable or discriminatory measures.*"[536]

448.   The Claimants sustain that whether a measure falls foul of the non-impairment clause requires considering whether an unreasonable or discriminatory measure has impaired the investment in question.  According to the Claimants, the test for unreasonableness in this context is the same as the test within the confines of the FET standard.[537]

449.   The Claimants state, as explained above, that the measures were not taken by Spain in pursuance of a rational goal or tailored to achieve that goal.  As a result, the tariff deficit cannot constitute a reasonable policy goal for the Disputed Measures. According to the Claimants, it cannot be disputed that those measures have "*impaired*" the Claimants' investment. In the Claimants' view, Spain's actions have caused damages to Claimants' investment in the amount of EUR 119.6 million. Therefore, in addition to a violation of the FET standard under the ECT, Spain's actions violate the obligation under Article 10(1) of the ECT to refrain from impairing the Claimants' investment through unreasonable measures.

450.   The Claimants reject Spain's application of the test set out in *EDF v. Romania* and its suggestions that: (a) the purpose of the Disputed Measures was legitimate; (b) the Disputed Measures complied with Spanish law; (c) the Disputed Measures were not taken for an ulterior reason (but were to address the tariff deficit); and (d) the Disputed Measures were implemented in a manner that respected due process and procedure. [538]

---

[535] Claimants' Memorial, ¶¶ 446, 447.

[536] Claimants' Memorial, ¶ 449.

[537] Claimants' Reply, ¶ 444.

[538] Claimants' Reply, ¶ 467.

### 2.   Respondent's Position

451.   Spain contends that pursuant to "*tests*" established under *EDF v. Romania, AES v. Hungary* and *Total v. Argentina*, Spain's measures are not discriminatory, abusive or disproportionate.[539] Importantly, contrary to the Claimants' position, Spain underscores that "*there was a rational policy to adopt macroeconomic control measures.*" In Spain's view, the tariff deficit, but also the economic crisis, presented important challenges in light of which the measures that Spain undertook shall not be deemed as irrational. In this respect, Spain also invokes that the subsidies for the production of RE must comply with EU rules on State aids.[540]

452.   Spain also states that the Disputed Measures were proportionate and reasonable since they provide the Claimants with reasonable return.[541]

453.   The Respondent observes that the Claimants state that the measures contested are not reasonable because the reasons (excess capacity and the tariff deficit) are attributable to Spain.

454.   The Respondent points out to certain facts that, according to its position, are not attributable to the Kingdom of Spain, such as (1) the principal of sustainability of the SES; (2) the worsening of the international crisis between 2007 and 2012; (3) the exceptional fall in electricity demand; and (4) the international commitments assumed through the memorandum of understanding with the EU in July 2012 to bail out Spain's financial sector.

455.   The Respondent affirms that the conclusions of the award in *BG v. Argentina* are not applicable to this case, since in this case there is no commitment to maintain the tariffs for a certain amount of time.[542]

---

[539] Respondent's Rejoinder, ¶¶ 1047-1050.

[540] Respondent's Rejoinder, ¶ 1059.

[541] Respondent's Rejoinder, ¶¶ 1067-1074.

[542] Respondent's Counter-Memorial, ¶ 964.

456.    The Respondent mentions that the Claimants declare that the measures are disproportionate (1) by attacking the tariff deficit through removing the regime of RD 661/2007, when the wind and hydraulic sector tariffs played a limited role in the tariff deficit, and (2) as there are other alternatives such as increasing the bill to consumers or establishing taxes to fund the deficit.

457.    The Respondent stresses that the Claimants omit to say that the measures were applied to the entire system, including consumers, to re-balance the SES. The Respondent asserts that the measures not only affected the RE Sector, because these are not an island within the SES, but rather affected all activities that involve a cost for the SES. In addition, Spain clarifies that within the renewable sector, the measures affected all technologies. The Respondent stress that it is as a whole that the proportional nature of the measures should be understood, not in one specific sector as the Claimants are attempting to do.[543]

458.    Furthermore, the Respondent states that the Claimants have not substantiated the legal, economic and budgetary validity of the alternatives they propose to re-balance the SES and guarantee their future sustainability. Moreover, the Respondent states that, this reveals ignorance (1) of the public deficit obligations assumed by Spain through the memorandum of understanding signed with the EU and (2) of the Spanish tax and budgetary regulations.

459.    The Respondent points out four facts that led to the changes in the SES: (1) the existence of an international economic crisis that led to a reduction in electricity demand; (2) the rise in consumer tariffs, (3) the existence of excess remuneration in the RE Sector, and (4) the existence of expectations of growth of the tariff deficit. According to the Respondent, all of the mentioned circumstances implied the economic unsustainability of the SES.[544]

---

[543] Respondent's Counter-Memorial, ¶ 968.

[544] Respondent's Counter-Memorial, ¶ 974.

460.    The Respondent further establishes that the RE Association, APPA, with the legal support of Cuatrecasas, Gonçalves Pereira, proposed that the remuneration of renewable energies should be determined in 2009 in a similar way to that established in 2013 by RDL 9/2013. The relevance of this proposal is obvious, because it proves the fact that the remuneration system laid down in 2013 does not violate the FET standard of the ECT. In other words, these 2013 remuneration measures are reasonable and proportionate if the majority APPA Association proposed a similar system as the best one (1) for achieving reasonable return rates with reference to the cost of money in the capital market, (2) provide "*security and stability for investments*" and (3) allow "*the RE to develop their potential in a sustainable and lasting manner.*"[545]

461.    In the Respondent's view, the current regulatory regime attracted over 5 billion euros in investment in RE in Spain in 2015. This is due to the stability and security of the current system in terms of the receipt of income. However, the Respondent states that the Claimants omitted these facts before the Tribunal, giving a partial and incomplete view of the reform of the disputed regulatory framework. The Claimants omitted the so-called "*renewable energy boom*" in the year 2015.[546]

462.    The Respondent further alleges that the Claimants also omit any reference to the positive assessments that the measures received from the European Commission, the International Monetary Fund and the International Energy Agency in the years 2015 and 2016. The financial reality after the challenged measures and the assessments of international bodies show the proportionality and reasonability of the measures adopted and undermine the statements of the Claimants regarding the sector following the adoption of the measures. The mass entry of new investors would only be logical if the new regulation guaranteed reasonable returns. Furthermore, only if the measures are reasonable, proportionate and effective will they merit the positive appraisal of international bodies.[547]

---

[545] Respondent's Counter-Memorial, ¶ 978.

[546] Respondent's Counter-Memorial, ¶ 980.

[547] Respondent's Counter-Memorial, ¶ 982.

463.    According to the Respondent, the main objective of the ECT is non-discrimination in relation to foreign investors. Furthermore, article 10(1) ECT establishes a FET standard and additionally, in relation to the obligation to give investments already made "*no less favorable treatment than that required by international law*", it recognises the minimum standard of protection guaranteed by International Law.[548]

464.    In the Respondent's view, there are different tests that are applied by the international arbitral Tribunals, which make it possible to assess whether the measures adopted by a State are irrational or discriminatory pursuant to the ECT objectives and standards:

    a.   The *EDF v. Rumania* test[549], which makes it possible to examine whether Spain has respected the main objective of the ECT, adopting non-discriminatory measures in respect of the Claimants; and

    b.   The *AES Summit v. Hungary* test[550], accepted by the Claimants as relevant, allowing the question of whether or not the Kingdom of Spain respected the FET standard of Article 10(1) of the ECT; and

    c.   The *Total v. Argentina*[551] case test, to assess the respecting of the financial balance of the investment.

465.    In the *EDF v. Romania* case, the tribunal made use of the verification criteria listed by Dr. Christoph Schreuer in order to assess whether or not the measures adopted by a State are discriminatory. In this respect, Dr. Schreuer considers a measure to be discriminatory when: "*(a) A measure that inflicts damage on the investor without serving any apparent legitimate purpose; (b) A measure that is not based on legal standards but on discretion, prejudice or personal preference; (c) A measure taken for*

---

[548] Respondent's Counter-Memorial, ¶ 864.

[549] *EDF (Services) Limited v. Rumania*, ICSID Case No. ARB/05/13, Award, 8 October 2009, ¶ 909, **Exhibit RL-0035**.

[550] *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶¶ 10.3.7 to 10.3.9, **Exhibit RL-0039**.

[551] *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, **Exhibit RL-0050**.

*reasons that are different from those put forward by the decision maker; (d) A measure taken in willful disregard of due process and proper procedure.*"[552]

466.   According to the Respondent, the purpose of the reform is completely legitimate. The measures attempt to address a situation of unsustainable imbalance, in which the international and national economic circumstances determined a reduction in demand which made it necessary to re-balance the system.[553]

467.   In the Respondent's view, the reform carried out was implemented in full compliance with the existing legal regulations and the case law of the Spanish Supreme Court, guaranteeing the reasonable return that was and is required by the Electricity Sector Law. In addition, Spain asserts that the reform being challenged has a general scope. In other words, for the Respondent, the reform is applicable to all operators and to all sectors intervening in the energy market. Therefore, it is not discriminatory with respect to any investor, either national or international.[554]

468.   The Respondent says that in the present case, the Preamble of RDL 6/2009 and RDL 14/2010, as well as the main of RD 1614/2010, warned about the need to reform the electricity sector in order to guarantee its sustainability. These reasons are the same as those on which the measures being challenged were based.[555]

469.   Finally, Spain alleges that the Spanish government has followed the legally established procedures to enact the regulatory standard of remuneration in the electricity sector.[556]

---

[552] Respondent's Counter-Memorial, ¶ 987.

[553] Respondent's Counter-Memorial, ¶ 988.

[554] Respondent's Counter-Memorial, ¶ 988.

[555] Respondent's Counter-Memorial, ¶ 988.

[556] Respondent's Counter-Memorial, ¶ 988.

470.    According to the Respondent, the test set out in the *AES Summit* case is used to determine whether or not an unreasonable or disproportionate measure exists that does not comply with the FET standard laid down by the ECT.[557]

471.    The Respondent states that according to *AES Summit*, there are two elements that require to be analysed to determine whether a state's act was unreasonable: the existence of a rational policy and the reasonableness of the act of the State in relation to the policy.

472.    The Respondent reiterates that the system providing support for renewables is based on the legal principle of reasonable returns in the context of a sustainable SES. The regulator acted with the purpose of restoring the balance required by the applicable legislation. This imbalance, as well as involving an excessive burden for Spanish consumers, was decisively contributing to the generation of the so-called tariff deficit, the correction of which was required by law. In addition, the imbalance in favour of the producers that the regulator was trying to stem was taking place in a scenario of acute economic crisis, both in the SES in particular and in the Spanish economy as a whole.[558]

473.    The Respondent further affirms that the criterion of *AES Summit* has been subsequently ratified by the *Electrabel* and *Charanne* cases.[559]

474.    The Respondent concludes that its actions were in line with the first of the parameters considered in the *AES Summit v. Hungary* case: the policy carried out by the Kingdom of Spain was valid and fulfilled the objective of a public economic policy. This is the correction and prevention, in order to protect consumers, of the payment to investors of a higher remuneration than what is reasonable. According to the Respondent, the relevance and rationality of the measure is, in conclusion, beyond all doubt.

---

[557] Respondent's Counter-Memorial, ¶ 990.

[558] Respondent's Counter-Memorial, ¶¶ 992-993.

[559] *Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award of 25 November 2015, ¶ 179, **Exhibit RL-0048**; and *Charanne B.V. and Construction Investments S.A.R.L v. The Kingdom of Spain*, SCC Arbitration No. 062/2012, Award of 21 January 2006, ¶ 510, **Exhibit RL-0049**.

475.  Regarding the second criterion, the Respondent affirms that the reform meets this requirement of reasonableness. The reform adopted by the Government affected all subjects involved in the SES. The said reform distributed the measures to increase the income and reduce the costs of the SES between the consumers and all the operators in the system (producers, distributors and transport companies) with the goal of dealing with the tariff deficit.[560]

476.  The Respondent further states that as well as reasonable, the measures adopted are also proportionate. The system of subsidies that enabled producers to achieve reasonable returns of around 7.398%, which could be higher in the case of surpassing the standards established on a standard facility, was maintained, at the same time as correcting and avoiding situations of imbalance, which prejudiced Spanish consumers and contributed to endangering the financial sustainability of the SES.[561]

477.  According to the Respondent, the tribunal in the *Total* case established as a minimum FET standard for these kinds of investments the consideration of whether or not the principle of economic balance that would allow long-term investors to recoup the costs and obtain a reasonable return on their investment had been respected.[562]

478.  The Respondent states that the reform carried out following the investment made by the Claimants, fulfils the said requirements. The remunerative parameters have been calculated to permit the reimbursement of both the operational costs as well as the initial investment.[563]

479.  The Respondent concludes that through the challenged measures, Spain guarantees the remuneration and repayment required by the tribunal in the *Total v. Argentina* case as a minimum standard required to consider the FET minimum standard as not violated by modifications occurring in the general regulatory framework for long-term investments

---

[560] Respondent's Counter-Memorial, ¶ 1001.

[561] Respondent's Counter-Memorial, ¶ 1003.

[562] Respondent's Counter-Memorial, ¶ 1013.

[563] Respondent's Counter-Memorial, ¶ 1017.

of large amounts of capital. Therefore, the Respondent is not violating the FET minimum standard established in the scope of international law, applicable to this case together with the ECT.

### G. Tribunal's Analysis

480. This analysis represents the majority view of the Tribunal and reference to the word "Tribunal" in the analysis is the majority view.

481. The principal issue is whether Spain has violated Article 10(1) of the ECT, namely, the obligation pursuant to Article 10(1) which reads as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent condition for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party.[564]

482. Article 10(1) of the ECT has, in the Tribunal's view, the following obligations:

(1)    to "*encourage and create suitable, equitable, favourable and transparent conditions for the investors*";

(2)    to accord "*at all times, to investments of investors of other contracting parties fair and equitable treatment*";

(3)    to provide investments "*the most constant protection and security*";

(4)    not to impair investments by unreasonable or discriminatory measures;

---

[564] Energy Charter Treaty, Art. 10(1), **Exhibit C-1**.

(5)     to accord investments, treatment that is not [….less favourable….] than that required by international law including treaty obligations;

(6)     that each Contracting Party "*shall observe any obligations it has entered into with an investor of an investment of an investor of any other Contracting Party.*"

483.   The primary claim of the Claimants is that the Respondent failed to provide fair and equitable treatment by failing to protect the Claimants' legitimate expectations.  The protection of legitimate expectations is an essential element in the Tribunal's view, of the provisions of fair and equitable treatment pursuant to the provisions of Article 10(1) of the ECT.

484.   This necessitates the consideration by the Tribunal as to whether Spain, in respect of the Claimants' investments, accorded "*fair and equitable treatment*" and "*stable, equitable, favourable and transparent conditions*" to the Claimants.

485.   The secondary issue is whether Spain is in breach of the Umbrella Clause.

### 1.   Applicable Law

486.   Article 26(6) of the ECT provides that the Tribunal shall "*decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".  The Tribunal will apply customary international law and general principles of international law to this arbitration where the ECT, which is the primary source of law, is silent.  Spain does not dispute the applicability of the said Article.[565]

487.   The ECT being an international treaty, has to be interpreted pursuant to the provisions of Articles 31 and 32 of the VCLT[566] and the provisions read as follows:

---

[565] Respondent's Rejoinder, ¶ 880.

[566] Vienna Convention on the Law of Treaties, 1155 United Nations Treaty Series 331, 23 May 1969 (entry into force 27 January 1980), **Exhibit CL-4.**

Article 31: General rule of interpretation

1.      A treaty shall be interpreted in good faith in accordance with the ordinary
        meaning to be given to the terms of the treaty in their context and in the
        light of its object and purpose.

2.      The context for the purpose of the interpretation of a treaty shall comprise,
        in addition to the text, including its preamble and annexes: (a) any
        agreement relating to the treaty which was made between all the parties in
        connection with the conclusion of the treaty; (b) any instrument which was
        made by one or more parties in connection with the conclusion of the treaty
        and accepted by the other parties as an instrument related to the treaty.

3.      There shall be taken into account, together with the context:

        (a) any subsequent agreement between the parties regarding the
            interpretation of the treaty or the application of its provisions;
        (b) any subsequent practice in the application of the treaty which
            establishes the agreement of the parties regarding its interpretation;
        (c) any relevant rules of international law applicable in the relations
            between the parties.

4.      A special meaning shall be given to a term if it is established that the parties
        so intended.

Article 32: Supplementary means of interpretation

Recourse may be had to supplementary means of interpretation, including
the preparatory work of the treaty and the circumstances of its conclusion,
in order to confirm the meaning resulting from the application of article 31,
or to determine the meaning when the interpretation according to article 31:

        (a)     leaves the meaning ambiguous or obscure; or
        (b)     leads to a result which is manifestly absurd or unreasonable.

488.    Article 31 of the VCLT requires the ECT to be interpreted in good faith in accordance

        with the ordinary meaning of its terms in accordance with the object and purpose of the

        ECT as set out in Article 2 of the ECT which reads as follows:

        … [establish] a legal framework in order to promote long-term co-operation
        in the energy field, based on complementarities and mutual benefits, in
        accordance with the objectives and principles of the [European Energy]
        Charter.[567]

---

[567] Energy Charter Treaty, Preamble, **Exhibit C-1**, which formulates the relevant object and purpose of the ECT as including (i)
placing "*the commitments contained in that Charter* [i.e. the 1991 European Energy Charter] *on a secure and binding international*

489.    The Tribunal is of the view that the applicable law is the ECT and any rules of international law which are relevant with regard to interpretation and application. The Tribunal will only refer to the provisions of Spanish law and EU law if, in the Tribunal's view, it is appropriate.

## 2.    Applicability of EU Law

490.    The *RREEF Decision* in its jurisdictional decision, rejected Spain's jurisdictional objection and the decision also, when considering the merits, found that if there was incompatibility or discrepancy between the ECT and the EU law, then ECT must prevail.

## 3.    Fair and Equitable Treatment

491.    The Tribunal will deal initially with the issue of whether Spain accorded to the Claimants' investment, fair and equitable treatment.

492.    The Tribunal has to consider whether the measures taken by Spain to its electricity regime which include, but are not limited to, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order, constitute a breach and violation of Article 10(1) of the ECT, taking into account that the Claimants have invested approximately EUR 91 million into the Spanish RE electricity sector[568]. The Tribunal has to consider whether these measures adopted by Spain have fundamentally and radically altered the applicable legal and regulatory framework which the Claimants relied upon when they made their investment.

493.    Article 10(1) of the ECT places an obligation on the part of Spain to provide "*a commitment to accord at all times to investments of investors of other contracting parties fair and equitable treatment.*" The issue is whether the disputed measures

---

*legal basis; (ii)* [catalyzing] *economic growth by means of measures to liberalise investment and trade in energy; and (iii) attaching "the utmost importance to the effective implementation of full national treatment and most favoured nation treatment".*

[568] Claimants' Memorial, ¶ 363.

enacted by Spain are in breach of the fair and equitable treatment that should be accorded to the Claimants, especially when they argue that they relied on the legislation and the various representations in order to make their investments and hence their legitimate expectations were breached.

494.  Spain relies on the decision in *AES v. Hungary,*[569] *Electrabel v. Hungary,*[570] *Total v. Argentina,*[571] *Charanne*[572] and *Blusun v. Italy*[573] to argue that the FET standard is limited to providing the minimum standard of treatment.[574]

495.  Spain cites the award in *AES v. Hungary* to contend that legitimate expectations may be found only in presence of "*specific commitments made to an investor that the regulations in force will remain unchanged*".[575]  The Tribunal is of the view Spain failed to clarify what is "*specific commitment*" and how it could give rise to legitimate expectations protected by the FET standard contained in the ECT.[576]  The Tribunal is of the view that Spain apparently is trying to contend that in order to constitute a specific commitment, there has to be a contractual obligation between the investor and the State.[577]  The Tribunal is of the view that specific commitments were in fact made to the Claimants, namely by the relevant legislation and the representations.

496.  Spain also relies on the decision in *Electrabel,* namely that the FET standard under Article 10(1) "*may legitimately involve a balancing exercise or weighing exercise by*

---

[569] *AES Summit Generation Limited and AES-Tisza Erromu Kft v The Republic of Hungary* (AES v Hungary), ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶ 13.3.2 , **Exhibit RL-0039**.

[570], *Electrabel S.A. v The Republic of Hungary* (Electrabel v Hungary), ICSID Case No. ARB/07/19, Award, 25 November 2015, **Exhibit RL-0002**.

[571] Counter-Memorial, ¶¶ 1010-1019, *citing Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/1, Decision on Liability, 27 December 2010, ¶ 122, **Exhibit RL-0050**.

[572] *Charanne B.V. and Construction Investments S.A.R.L v. The Kingdom of Spain*, SCC Arbitration No. 062/2012, Award of 21 January 2006, ¶ 500, **Exhibit RL-0049**.

[573] *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic,* ICSID Case No. ARB/14/3, Award, 27 December 2016, ¶¶ 319, 372, **Exhibit RL-0082**.  *See also* Respondent's Rejoinder, ¶ 925.

[574] Respondent's Counter-Memorial, ¶¶ 888-892.

[575] Respondent's Counter-Memorial, ¶ 907(a).

[576] Respondent's Counter-Memorial, ¶¶ 909-912.

[577] Respondent's Counter-Memorial, ¶ 916.

*the host State*".[578]   The balancing exercise in *Electrabel* was agreed between the parties.[579]   The Tribunal holds that Spain despite relying on the decision in *Electrabel*, does not contend that its right to regulate, stems from the FET standard and the "*balancing exercise*" to which the *Electrabel* tribunal refers. It is the finding of the Tribunal that Spain does not explain the basis for its so-called rights to regulate in the context of Article 10(1) of the ECT and it also does not demonstrate in what way that is consistent with the exceptions which are set out in Article 24 of the ECT. The Tribunal therefore finds that Spain's reliance on the decision in *Electrabel,* is of no assistance.

497.   Spain refers to the decision in *Total v. Argentina*[580] to contend that the tribunal in the *Total* decision, applied the minimum standard of protection required by the FET, which would allow a State to modify its legal framework, provided that the investor is still able to recover its operating costs, amortise its investment and make a "*reasonable return*" over a said period of time.   The Tribunal is of the view that the decision in *Total* does not assist Spain's arguments as it was not a decision pursuant to the ECT but pursuant to the 1991 France-Argentina BIT, which does not contain stability provisions for investors.[581] The Tribunal notes that the tribunal in the *Total* decision, considered the FET standard in the following terms "*cannot be read as 'treatment required by the minimum standard of treatment of aliens/investors under international law*'".[582]   The Tribunal also notes that the quotations that it relies upon in *Total* were made when that tribunal was weighing the investors' legitimate expectations on the one hand and the

---

[578] Respondent's Counter-Memorial, ¶889, *citing Electrabel S.A. v The Republic of Hungary* (Electrabel v Hungary), ICSID Case No. ARB/07/19, Award, 25 November 2015,¶ 154, **Exhibit RL-0002**.

[579] *Electrabel S.A. v The Republic of Hungary* (Electrabel v Hungary), ICSID Case No. ARB/07/19, Award, 25 November 2015,¶¶ 125, 165, **Exhibit RL-0002**.

[580] Respondent's Counter-Memorial, ¶¶ 1010-1017.

[581] *Total S.A. v The Argentine Republic,* ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 116, **Exhibit RL-0050**. The *Total* tribunal itself made it clear at the outset: "[i]*n various disputes between U.S. investors and Argentina under that BIT, tribunals have relied on the explicit mention in its preamble of the desirability of maintaining a stable framework for investments in order to attract foreign investment as a basis for finding that the lack of such stability and related predictability, on which the investor had relied, had resulted in a breach of the fair and equitable treatment standard. ... However, the BIT between France and Argentina does not contain any such reference, following the French BIT model. This absence indicates, at a minimum, that stability of the legal domestic framework was not envisaged as a specific element of the domestic legal regime that the Contracting Parties undertook to grant to their respective investors*".

[582] *Total S.A. v The Argentine Republic,* ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 125, **Exhibit RL-0050**.

respondent State's legitimate regulatory interests on the other hand, in the absence of any specific stability commitment.  The tribunal in *Total* also found that the concept of "*regulatory fairness*" or "*regulatory certainty*" intervenes to ensure that the investors recover their operation costs and make a "*reasonable return*".[583]  The Tribunal is of the view that, having considered the decision in *Total,* the facts are clearly different, the principles are different and hence it does not support Spain's contention that it may radically change the remuneration regime which the Claimants had relied upon, when making their investment in reliance of the express commitments made by Spain.

498.    The Tribunal has to consider in the light of the rival contentions of the Claimants and the Respondent and the terms of the ECT, whether the changes to the Spanish legislation provides a "*reasonable return*" and how is "*reasonable return*" determined.

499.    Spain's principal contention in respect of the decision is that there was a commitment by Spain to investors that there was a guarantee to provide reasonable return.  This finding of the *RREEF* Decision is not supported by a number of awards which have found that Spain did promise investors that it would not alter retroactively the specific tariffs of RD 661/2007 and RD 1614/2010.[584]

500.    The *RREEF* Decision took the view that Spain's regulatory regime was sufficient to create legitimate expectations but contrary to the decisions in *Eiser, Novenergia, Antin* and *Masdar*, the *RREEF* Decision found that neither Article 44.3 of RD 661/2007 or Articles 4 and 5 of RD 1614/2010 protected investors against tariff changes.  The decision went on to hold that the guarantee of reasonable return was the specific

---

[583] *Total S.A. v The Argentine Republic,* ICSID Case No. ARB/04/01, Decision on Liability, 27 December 2010, ¶ 122, **Exhibit RL-0050**.

[584] *See e.g. Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, **Exhibit CL-154**; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain,* SCC Case No. 2015/063, Award, 15 February 2018, **Exhibit CL-160**; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, **Exhibit CL-175**; and *Antin Energia Termosolar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/13/31, Award, 15 June 2018, **Exhibit CL-176**.

commitment of Spain's regulatory regime.[585]  The Tribunal prefers the persuasive views set out in the decisions of *Eiser, Novenergia, Antin* and *Masdar.*

501.  In any event, the *RREEF* tribunal found that the disputed measures lowered the return on the Claimants' CSP investments below the threshold of a reasonable return and it further concluded that it had radically altered the regulatory regime in respect of which the Claimants made their investment.[586]

502.  The *RREEF* Decision found that reasonable return is dynamic in that it was not fixed and could evolve depending on the cost of money in the capital market.  The Tribunal is of the view that this conclusion is inconsistent with the evidence that was before the *RREEF* tribunal especially as the cost of money in the capital markets was substantially the same in 2007 when the RD 661/2007 regime was implemented and in 2013 when the new regime was implemented.  In any event, the dissent of Prof. Volterra is relevant in that he criticised this aspect of the *RREEF* Decision.[587]

503.  The Claimants in this case have put forward extensive evidence of contemporaneous documents showing that Spain offered investors a fixed guaranteed return and not just a reasonable return.  The Tribunal has considered the contemporaneous evidence and it is not persuaded that the evidence adduced by the Respondent is sufficient for determining a "*reasonable return*" and neither is it in fulfilment of the representations made by the Respondent with regard to the stability of the legal and economic regime that would be applicable to RE projects in order to entice investments into the wind sector. The Tribunal concludes that the Respondent's methodology for determining reasonable rate of return in the light of the amendments to the legislation is, in the Tribunal's view, not based on any identifiable criteria.  The Tribunal is therefore of the

---

[585] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30. Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 384, **Exhibit RL-0098**.

[586] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30. Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 328, **Exhibit RL-0098**.

[587] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Partially Dissenting Opinion of Professor Robert Volterra to Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 31-35 and 44, **Exhibit RL-0099**.

view that the *RREEF* Decision does not in any way, assist the Respondent in its primary contention that the Claimants were only entitled to a reasonable return on their investments and that in the Tribunal's view, is a very narrow and erroneous interpretation of the *RREEF* Decision.

504.   The Tribunal has considered the arguments of the Claimants and the Respondent in respect of the *RREEF* Decision with regard to reasonable return and is of the view that the *RREEF* Decision does not, in any way, assist the Respondent in its contention that the Claimants were only entitled to a reasonable return on their investments and the Tribunal is of the view that the argument advanced by Spain is a very narrow and erroneous interpretation of the *RREEF* Decision, especially with regard to the issue of reasonable return.

505.   Spain makes numerous references to Spanish law in order to suggest that the Tribunal should assess the existence and scope of Spain's commitments and obligations towards the Claimants or their investment through the lens of Spanish law.[588]   Spanish law should not be used as a tool to override Spain's international obligations.

506.   In Spain's view, the Claimants' interpretation of the RD 661/2007 economic regime amounts to a claim that the regime would be frozen, thereby precluding Spain's ability to regulate.

507.   The *Eiser* tribunal held as follows:

> [a]bsent explicit undertakings directly extended to investors and guaranteeing that States will not change their laws or regulations, investment treaties do not eliminate States' right to modify their regulatory regimes to meet evolving circumstances and public needs.[589]

508.   The *Eiser* tribunal also held that:

---

[588] *See e.g.* Respondent's Counter-Memorial, ¶¶ 36, 782 and 833.

[589] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 362, **Exhibit CL-154**.

the evidence shows that Respondent eliminated a favourable regulatory regime previously extended to Claimants and other investors to encourage their investment in CSP. It was then replaced with an unprecedented and wholly different regulatory approach, based on wholly different premises. This new system was profoundly unfair and inequitable as applied to Claimants' existing investment.[590]

509.    The Tribunal finds that Spain is not entitled, pursuant to the provisions of Article 10(1) ECT, to deprive the Claimants of the economic rights associated with the RD 661/2007 regime when it freely undertook to grant those rights and guarantee their continuity over the entire operational life of the installations.

510.    Spain contends, relying on the decision in *AES v. Hungary* and also on *Mamidoil v. Albania*, that "*the stable conditions referred to by the ECT clearly allow the adoption of reasonable and proportionate macroeconomic control measures*" and that the reference in the ECT to those stable conditions, does not mean that the ECT contains a stabilisation clause.[591]

511.    The Tribunal refers to the decision of the ICSID tribunal in *Liman Caspian Oil v. Kazakhstan* which reads as follows:

> …[T]he purpose of ECT Article 10(1), second sentence, is to provide a protection which goes beyond the minimum standard to treatment under international law. The ECT was intended to go further than simply reiterating the protection offered by the latter. In this respect, ECT Article 10(1), second sentence, differs from NAFTA Article 1105 (in its interpretation given by the Free Trade Commission on 31 July 2001) which contains an express reference to international law. Therefore, when assessing Respondent's actions, a specific standard of fairness and equitableness above the minimum standard must be identified and applied for the application of the ECT.[592]

---

[590] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 365, **Exhibit CL-154**.

[591] Respondent's Counter-Memorial, ¶¶ 930-932, *citing AES Summit Generation Limited and AES-Tisza Eromu Kft v The Republic of Hungary,* ICSID Case No. ARB/07/22, Award, 23 September 2010, ¶¶ 9.3.29 and 9.3.30, **Exhibit CL-133**; and, *Mamidoil Jetoil Greek Petroleum Products Societe Anonyme S.A. v Republic of Albania,* ICSID Case No. ARB/11/24, Award, 30 March 2015, ¶¶ 617-618, **Exhibit RL-0046**.

[592] *Liman Caspian Oil B.V. & NCL Dutch Investment B.V. v The Republic of Kazakhstan,* ICSID Case No. ARB/07/14, Award (excerpts only), 22 June 2010, ¶ 263, **Exhibit CL-75**.

512.   The FET standard in the ECT has a specific legal meaning for the reasons set out in Articles 31 and 32 of the VCLT and it includes reference to the ordinary meaning of the words "*fair*", which is defined by the Oxford Dictionary as "*just, unbiased, equitable, impartial, legitimate*"[593] and the word "*equitable*" means "*characterised by equity or fairness*", with "*equity*" being defined as "*fairness; impartiality; even-handed dealing*".[594]

513.   The Tribunal has to interpret the concept of FET autonomously taking into account its text according to its ordinary meaning, international law and good faith.[595]

514.   The Tribunal will address the following considerations to determine if Spain is in breach of the FET standard, namely, whether Spain['s]:

- breached the Claimants' reasonable and legitimate expectations when they made their investments;
- failed to provide a stable and predictable legal and business framework in relation to the Claimants' investment;
- conduct was transparent;
- acted in an arbitrary or unreasonable manner; and
- actions were disproportionate.[596]

---

[593] Oxford Dictionaries, Oxford English Dictionary (6th Ed., 2007), p. 920, **Exhibit CL-90**. *See also* Black's Law Dictionary (10th ed. Thomson West), p. 715, which defines "*fair*" as "*impartial; just; equitable; disinterested*" or "*free of bias or prejudice*", **Exhibit CL-47**.

[594] Oxford Dictionaries, Oxford English Dictionary (6th Ed., 2007), p. 856, **Exhibit CL-90**. *See also*: Black's Law Dictionary (10th ed. Thomson West), p. 654, which defines "*equitable*" as "*just; consistent with principles of just and right*" or "*existing in equity*", with "*equity*" being defined as "*fairness; impartiality; even-handed dealing*", **Exhibit CL-47.**

[595] *Técnicas Medioambientales Tecmed S.A. v The United Mexican States,* ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 156 ("*…by including this* [FET] *provision in the Agreement, the parties intended to strengthen and increase the security and trust of foreign investors that invest in the member States, thus maximizing  the use of the economic resources of each Contracting Party by facilitating the economic contributions of their economic operators.  This is the goal of such undertaking in light of the Agreement's preambular paragraphs which express the will and intention of the member States to '…intensify economic co-operation for the benefit of both countries…' and the resolve of the member States within such framework '…to create favourable conditions for investments made by each of the Contracting Parties in the territory of the other' …* "), **Exhibit CL-33**.

[596] *Técnicas Medioambientales Tecmed S.A. v The United Mexican States,* ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 156, **Exhibit CL-33**.

### 4.   Legitimate Expectation

515.   The Tribunal will now consider whether Spain breached the Claimants' legitimate expectations, when they made their investment and thereby was in breach of the FET standard.

516.   The Tribunal finds that there is no burden on the part of the Claimants to prove bad faith or any ulterior motive on the part of Spain in enacting the various measures in order to determine whether the measures taken by Spain constitute a violation of FET standards. However, the Tribunal is of the view that the burden of proving breach of the FET standard in the ECT is on the Claimants. The Tribunal relies on the decision in *Electrabel*, which stated as follows:

> The Tribunal starts with the premise that it is Electrabel which bears the burden of proving its case under the ECT's FET standard.[597]

517.   The expectations of the Claimants have to be based on the facts in this arbitration and it must be viewed objectively.[598]  The Claimants' expectation must be assessed at the time the investment was made and the Claimants' investment must originate from some affirmative action of Spain in the form of specific commitments made by Spain to the investor, or by representations made by Spain, which encouraged the investment.

518.   The principles of international investment law indicate that the host State should not "*affect the basic expectations that were taken into account by the foreign investor to make the investment*."[599]  The FET standard requires the host State to protect the investors' legitimate expectation based on "*any undertakings and representations made explicitly or implicitly by the host State*"[600].

---

[597] *Electrabel S.A. against Hungary (*ICSID Case No. ARB/07/19), Award 25 November 2015, ¶ 154, **Exhibit RL-0048**.

[598] *Charanne* Award, mentioned in *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain,* SCC Case No. 2015/063, Award, 15 February 2018, ¶ 495, 505, **Exhibit CL-160**.

[599] *Técnicas Medioambientales Tecmed S.A. v The United Mexican States*, ICSID Case No. ARB (AF)/00/2, Award, 29 May 2003, ¶ 154, **Exhibit CL-33**.

[600] R Dolzer & Co Schreuer, "*Principles of International Investment Law*" (2n d ed. Oxford University Press, 2012), p. 145, **Exhibit CL-85**; *see also, International Thunderbird Gaming Corporation v The United Mexican States,* UNCITRAL, Award, 26 January 2006, ¶ 147 ("[T]*he concept of 'legitimate expectations' relates ... to a situation where a Contracting Party's conduct creates*

519.   The Tribunal having considered the Claimants and the Respondent's comments on the *RREEF* Decision, notes that the decision found that Spain had implemented a favourable legal framework to attract investment,[601] that Spain had created legitimate expectations that the Claimants could rely upon, that Spain would not significantly modify the legal framework.[602]   The decision also found that Spain breached Article 10.1 of the ECT by implementing disputed measures.

520.   The *RREEF* Decision in the Tribunal's view, also agreed with the decision in *Eiser* in two aspects, namely that there was an obligation under the ECT to accord fair and equitable treatment and that embraces an obligation to provide stability so that it is relied upon by the investor in making long term investments and secondly, the *RREEF* tribunal agreed that the ECT prevented Spain from radically altering the regulatory regime to existing investments, whereby investors in reliance of the legislative regime, are deprived of their investment value.[603]

521.   The Tribunal notes that Spain is entitled to make amendments to its regulatory regime but after having entered into the ECT, there are limitation on its powers to alter the regulatory framework and it should not do so if such fundamental and radical changes would be unfair, unreasonable and inequitable, which would undermine an investor's legitimate expectation[604].

---

*reasonable and justifiable expectations on the part of an investor (or an investment) to act in reliance on such conduct, such that a failure by the Party to honour those expectations could cause the investor (or the investment) to suffer damages*"), **Exhibit CL-41**.

[601] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 386,587, **Exhibit RL-0098**.

[602] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 390, **Exhibit RL-0098**.

[603] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 314, 316, **Exhibit RL-0098**.

[604] *ADC Affiliate Limited and ADC & ADMC Management Limited v Republic of Hungary,* ICSID Case No. ARB/03/16, Award, 2 October 2006, ¶¶ 423-424, **Exhibit CL-45**.

522. An important element of legitimate expectation is the protection from State action that threatens the stability of the legal and business framework upon which an investor reasonably relied on, in making its investment and this concept has been endorsed by a number of tribunals[605].

523. The Tribunal has to ascertain what were the Claimants' expectations, which gave rise to their claim of legitimate expectation.  The Claimants contend it is two-fold:

   (a)   the nature, amount and duration of the FIT offered under RD 661/2007 and RD 1614/2010; and

   (b)   with regard to the stability of the RD 661/2007 economic regime.

524. The Claimants in support of the nature, amount and duration of the FIT offered under RD 661/2007 and RD 1614/2010, contend that once the installations were registered with RAIPRE, that the following would be applicable:

   (a)   the Project companies would have a choice between selling electricity at a Fixed Tariff or at the Premium, as set out in Article 36 of RD 661/2007;

---

[605] *CMS Gas Transmission Company v The Argentine Republic, Award,* ICSID Case No. ARB/01/8, 12 May 2005, ¶ 275, **Exhibit CL-38**.  In this case, the State had provided certain guarantees for tariffs of natural gas, including in legislation, regulations and under the terms of a licence.  These tariff guarantees were first suspended by emergency legislation and later terminated by a series of further enactments.  The tribunal found that "[t]*he measures that are complained of did in fact entirely transform and alter the legal and business environment under which the investment was* made" and thus resulted in an "*objective*" breach" of the FET standard (see ¶¶ 266-275 and 281); *Occidental Exploration and Production Co. v Republic of Ecuador,* Award, UNCITRAL Case No. UN3467, 1 July 2004, ¶ 183, **Exhibit CL-37**.  In this case, the measure at issue was a change in practice on the part of the tax authorities as to the reimbursement of VAT with substantial impact on the claimant's business.  The tribunal found that the framework under which the investor operated had been significantly altered, and without the provision of any satisfactory clarification by the authorities, in breach of the FET standard; *Enron Creditors, Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v The Argentine Republic,* ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 260, **Exhibit CL-53** ("[T]*he Tribunal concludes that a key element of fair and equitable treatment is the requirement of a 'stable framework for the investment', which has been prescribed by a number of decisions.  Indeed, this interpretation has been considered 'an emerging standard of fair and equitable treatment in international law'*"); *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶¶ 124, 125 and 131-133, **Exhibit CL-46**, *Eastern Sugar B.V. v The Czech Republic,* SCC No. 088/2004, Partial Dissenting Opinion of Robert Volterra, 27 March 2007, ¶ 29, **Exhibit CL-52** ("*An investor is entitled reasonably to expect a legal framework that is stable, transparent and predictable*"); *Sempra Energy International v Argentine Republic,* ICSID Case No. ARB/02/16, Award, 28 September 2007, ¶ 300, **Exhibit CL-57**, noting that the FET standard serves to ensure the stability of the law and observance of legal obligations; and *BG Group Plc v Republic of Argentina,* UNCITRAL, Award, 24 December 2007, noting at ¶¶ 307-310, **Exhibit CL-58**, how Argentina's radical alteration of the legal and business environment "*violated the principles of stability and predictability inherent to the standard of fair and equitable treatment*"; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 131, **Exhibit CL-46**.

(b)     the FIT would apply to all of the electricity produced, without any limitations on production;

(c)     the FIT would apply for the entire operational life of the installations; and

(d)     the FIT would be subject to inflation adjustments, as provided in RD 661/2007.[606]

525.    The Claimants' expectation was that any future changes to RD 661/2007 would be prospective.

526.    The Tribunal is of the view that Spain had promised explicitly that the economic regime for the qualifying Special Regime installation would remain stable under RD 661/2007 which contained the stabilisation commitment in Article 44(3)[607] and reiterated in RD 1614/2010 that any revisions to the fixed tariff and premium pursuant to Article 44(3) of RD 661/2007, would not affect duly registered existing installations. [608]

527.    The Tribunal finds that the Claimants' expectations on the continued application of the economic regime to the Project Companies were legitimate and reasonable, for the following reasons:

(a)     RD 661/2007 FIT which the Claimants relied on, provided very specific tariffs that would apply to the Project Companies; Article 36 specified the fixed tariff and premium that the Claimants would receive for 20 years and more;

---

[606] Claimants' Memorial, ¶ 418.

[607] RD 661/2007 of 25 May 2007, Article 44(3), **Exhibit C-44**. Article 44(3) provided for the possibility to review the Fixed Tariff and Premiums (and the floor and cap in the latter case) in consideration of the evolution of the cost of the technology and its coverage in the renewable sector. However, Article 44(3) expressly stated that those revisions would not affect the Fixed Tariff, nor the floor and cap of the Premium option, for existing installations commissioned prior to 1 January of the second year following the year in which the revision was implemented (for instance, if a review was conducted in 2010, it would not affect installations that had obtained a commissioning certificate prior to 1 January 2012). Thus, RD 661/2007 guaranteed that any review of the Fixed Tariff would not apply to existing installations and that in the case of the Premium option, although the amount of the Premium could change, the minimum revenue would not change as any modification of the cap and floor would not apply to existing installations.

[608] RD 661/2007 of 25 May 2007, **Exhibit C-44**; RD 1614/2010 of 7 December 2010, Article 5(3), **Exhibit C-46**.

(b)        there was a commitment in Article 44(3) that the fixed tariff for the upper and lower thresholds of the premium option for existing installation would not be changed, as reiterated in RD 1614/2010, which included the premium within the scope of protection;

(c)        the CNE represented as follows:

> offer[ed] security and predictability for economic incentives during the lifespan of the facilities, establishing transparent mechanisms for the annual updates of said incentives and [pursuant to Article 44(3)] exempt[ed] existing facilities from revision every four years because the new incentives that are being put into place only affect new facilities.[609]

(d)        the economic regime of RD 661/2007 was part of a wider international and domestic policy to develop RE power generation infrastructure and to specifically encourage and attract the necessary investments; and

(e)        the purpose of RD 661/2007 was to attract the necessary investment in RE projects such as wind farms and without these incentives and support schemes, the Claimants would have to compete with conventional generators and in view of the capital investment, such investments would not have been attractive.

528.    The Tribunal is of the view that Spain made this commitment to attract investments by offering stability when Spain had no obligation to do so.  The Claimants through their witness Felipe Moreno, have indicated that without the above representation, the Claimants would not have invested in the Spanish RE sector.[610]

---

[609] CNE Report 30/2008 of 25 May, 29 July 2008, p. 20, **Exhibit C-94**.

[610] Claimants' Memorial, ¶ 420, *citing* Moreno Witness Statement, ¶¶ 59-60.

529.    The Tribunal finds that Spain by enacting RD 1614/2010 which applied to qualifying wind installations confirm that they would not be affected by any review of the FIT under RD 661/2007.  This was consistent with the commitments of Spain pursuant to Article 44(3) of RD 661/2007 and furthermore, RD 1614/2010 also broadened the scope of protection under Article 44(3) to include premiums.

530.    The Tribunal has to consider whether the July 2010 Agreement and RD 1614/2010 amounts to a commitment by Spain.  Spain is of the view that the 2010 Agreement has no bearing on the interpretation of RD 1614/2010 and that the AEE[611] did not consider RD 1614/2010 as providing a stable regime for the existing installations.[612]   The Tribunal having considered the rival arguments on this issue, is of the view that the 2010 Agreement according to the Government Press Release, "*assume*[d] *the reinforcement of the visibility and stability of the regulation of* [CSD] *technologies in the future, guaranteeing the current subsidies and rates of RD 661/2007 for the facilities in operation (and for those included in the pre-registration) starting in 2013*"[613]. Furthermore, Spain has relied on the comment of AEE, entitled "*safeguard against future revisions of the remuneration regime*" and proposed modified wording for RD 1614/2010 as the AEE considered it "*unacceptable*" that the draft sought to restrict that article 44.3 "*safeguard*" to installations with commissioning certificates of a particular date.  Furthermore, the AEE expressed its understanding of RD 1614/2010 in its presentation dated 13 December 2010 as follows:

> For … installations registered under RD 661/2007, the revisions of the tariffs, premiums and upper and lower limits to which article 44.3 of RD 661/2007 WILL NOT AFFECT said installations.[614]

---

[611] AEE is the abbreviation for the Spanish "Associación Empresarial Eólica".

[612] Respondent's Counter Memorial, ¶ 1279.

[613] Government of Spain, Ministry of Industry, Tourism and Commerce, Press Release, "*The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks*", 2 July 2010, **Exhibit C-45**.

[614] Asociación Empresarial Eólica, Work group meeting on prices, 13 December 2010, p. 67, **Exhibit C-212**.

531.    The Tribunal therefore holds that the July 2010 Agreement which is a contemporaneous document of Spain, amounts to a representation to the Claimants especially in view of the fact that Spain referred to the July 2010 Agreement in the following terms:

> This agreement furthermore assumes the reinforcement of the visibility and stability of the regulation of these technologies in the future, guaranteeing the current incentives and rates of RD 661/2007 for the facilities in operation (and for those included in the pre-registration) starting in 2013…[615]

532.    Spain made various representations which included the promotion of advertising materials such as the English Language documents, presentation in foreign countries designed to attract foreign investment for the RE projects.  The Tribunal finds that the Claimants are entitled to rely on these expectations which were reasonable.

### 5.    Did Spain's measures frustrate the Claimants' reasonable and legitimate expectations?

533.    Spain sought investments on the basis of specific representations and undertakings to induce the Claimants to make significant investments in wind farms and the issue that arises is whether after the Claimants having made these investments, Spain took measures to frustrate the Claimants' reasonable and legitimate expectations.

534.    Fair and equitable treatment requires that the treatment of Spain in respect of the Claimants' investment should be over a long period and not be an isolated one. The Tribunal is of the view that the facts will indicate that Spain has since December 2012, taken a number of measures which have frustrated the Claimants' legitimate expectations and these measures by Spain are set out below:

---

[615] Government of Spain, Ministry of Industry, Tourism and Commerce, Press Release, "*The Ministry of Industry, Tourism and Trade Reaches an Agreement with the Solar Thermal and Wind Power Sectors to Revise their Remuneration Frameworks*", 2 July 2010, **Exhibit C-45**.

(a)     Introduction of the 7% levy pursuant to Law 15/2012, would appear to be contrary to the Claimants' expectations of the level of FIT they would be entitled to under RD 661/2007;

(b)     Elimination of the Premium pursuant to RDL 2/2013, frustrates the expectations the Claimants had under RD 661/2007 to choose between selling at a FIT or at the market prices plus Premium.   RDL 2/2013 also replaced the CPI-linked updating mechanism for the RD 661/2007 FIT on which the Claimants relied with an entirely different mechanism; and

(c)     Wiping out the RD 661/2007 economic regime in its entirety in July 2013 pursuant to RDL 9/2013 and introducing an entirely differently regime that is less favourable to the Claimants.

535.   Law 15/2012 was enacted after the Claimants had made their investment and hence it cannot be considered that it is irrelevant in order to assess whether the Claimants had a reasonable expectation at the time of their investment that the Law 15/2012 would be enacted.   However, as the Tribunal has found that it does not have jurisdiction over Law 15/2012, the Tribunal will accordingly, not consider it when making its assessment as to whether the Claimants had a legitimate expectation.

536.   The Tribunal relies on the decision in *Micula v. Romania*[616] where the majority of the Tribunal held that Romania had breached the FET standard in the applicable Sweden-Romania BIT through premature revocation of economic support schemes created by legislation regarding investments made in some of the countries' deprived regions.   The decision states that Romania made specific promises to the investor in respect of the support schemes and there was also an element of inducement on the part of Romania. The relevant passage of the *Micula* tribunal is relevant, and is set out below:

---

[616] *Ioan Micula, Viorel Micula and others v The Republic of Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, **Exhibit CL-88**.

> [I]t cannot be fair and equitable for a state to offer advantages to investors with the purpose of attracting investment in an otherwise unattractive region, require these investors to maintain their investments in that region for twice the period they receive the incentives, and then maintain the formal shell of the regime but eviscerate it of all (or substantially all) content.[617]

537.    The Tribunal holds that in the present instance, Article 36 of RD 661/2007 provided that the FIT would be available for a specified period for kWh electricity produced for the first 20 years, of a wind installation life and thereafter for a different lower amount for each kWh produced in subsequent years.   RD 661/2007, pursuant to Article 44(3), provided a guarantee namely that once the installations were registered and in operation, any reviews of FIT would only affect future wind installations. This was confirmed by RD 1614/2010.

538.    The conduct of Spain indicates that after it enacted RD 661/2007, it reneged on these undertakings and this amounts to a frustration of the Claimants' legitimate expectations. The Tribunal is therefore of the view that Spain has failed to accord fair and equitable treatment to the Claimants pursuant to Article 10(1) of the ECT.

### (a)   Did Spain provide a suitable and predictable regime?

539.    The next question that arises is whether Spain provided a stable and predictable regulatory regime.   The first sentence of Article 10(1) of the ECT reads as follows:

> Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. (emphasis added)

540.    The 1991 Charter which forms part of the ECT states that one of its fundamental objectives is the establishment of a "*stable, transparent legal framework for foreign*

---

[617] *Ioan Micula, Viorel Micula and others v The Republic of Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 687, **Exhibit CL-88**.

*investment*"[618] and this is narrated in the provisions of the ECT.  Spain was therefore under an obligation to provide long term stability.

541.  Article 10(1) of the ECT obligates Spain "*to encourage and create stable, equitable, favourable and transparent conditions*" for investors.  This is important in the RE electricity sector as the Claimants have committed a substantial amount of capital when investing in Wind Farms so that a long-term return is generated and realised.  The ECT is distinct from BITs because the ECT is specific to the energy sector and also because the BITs do not contain the express obligations that are enshrined in Article 10(1).

542.  Spain contends that the ECT is primarily concerned with non-discrimination and national treatment and the ECT's objective was not to guarantee "*petrification*"[619] of the regulatory regime and hence, there can be no breach of the ECT if Spain adopts "*macroeconomic control measures on the grounds of general interest.*"[620]  Spain also contends, relying on the decision in *Isolux* and *Plama*, that Article 10(1) of the ECT does not contain an autonomous standard to create stable conditions for investment.[621]  The Tribunal is of the view that that cannot be a basis for the enactment of the Disputed Measures.

543.  The Tribunal recognises that the obligation to accord "*stable*" and "*transparent*" conditions does not mean that Spain must freeze or alternatively not amend its electricity laws.  The Tribunal is of the view that Spain having entered voluntarily into the ECT, must accept that there are limitations with regard to the amendment of its regulatory regime.  The Tribunal is of the view that Spain should not substantially alter the regulatory framework that was applicable to the Claimants' investment or alternatively, subject it to periods of legal uncertainty, thereby violating the stability provision.

---

[618] Claimants' Memorial, ¶ 334.

[619] Respondent's Counter-Memorial, ¶ 591.

[620] Respondent's Counter-Memorial, ¶ 879.

[621] *Isolux Infrastructure Netherlands, BV v. Kingdom of Spain*, SCC Case No. V2013/153, Award, 12 July 2016, ¶¶ 764-766, **Exhibit RL-0072**.

544.  Spain relies on the decision in *Charanne* [622] to contend that an investor like the Claimants, cannot have an expectation that the regulatory framework will not be modified and also for the proposition that an investor like the Claimants, should investigate the regulatory framework and how it is applied and in what manner it would affect its investment.  The Tribunal is of the view that this decision is distinguishable for a number of reasons:

      (a)  the disputed measures in *Charanne* are different from the disputed measures in the present dispute; and

      (b)  the evidence that was led in the present dispute is different from the evidence in *Charanne*.

545.  The Tribunal notes that the claim in *Charanne* dealt with PV installations and was only concerned with RDL 14/2010 caps on a number of hours to which the PV installations were entitled to under RD 661/2007 and RD 1578/2008 and these changes were implemented in December 2010 and did not affect wind farms.  Spain by implementing RD 1614/2010 in December, reconfirmed the guarantee that RD 661/2007 tariff on wind farms would not be modified.  The tribunal in *Charanne* also did not consider the disputed measures which are the subject matter of the present dispute.  RDL 14/2010 imposed an hour's cap for PV installation, which did not alter the tariff.

546.  The majority award in *Charanne* expressly limited its decision to the 2010 changes to the PV sector as evidenced by the following passage from the award:

> In this context, limited to the 2010 rules only, the Arbitr[al] Tribunal cannot draw the conclusion that Spain has violated its obligation to [provide] regulatory stability. [623]

---

[622] *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain,* SCC Case No. 062/2012, Award, 21 January 2016, ¶¶ 493, 510, **Exhibit CL-151**.

[623] *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain,* SCC Case No. 062/2012, Award, 21 January 2016, ¶ 484, **Exhibit CL-151**.

547.    The majority took care to note that it did not "*intend to prejudge in any way the conclusions that could be reached by another arbitr[al] tribunal could reach based on the analysis of all the regulations adopted to date, including the 2013 regulations…*"[624]

548.    The *Charanne* award indicates that it addressed two documents[625] and hence the key contemporaneous documents which have been considered in this present dispute, were not considered. There were also no fact witnesses in *Charanne*.  The Tribunal, for the reasons set out above, would decline to follow the majority award in *Charanne*.

549.    The Tribunal has to consider what were the stable conditions for investors prior to the Claimants' investment because stability is an important consideration. This was recognised in RD 661/2007 whereby investors were offered certainty with regard to:

    (a)    the exact cents per kWh that RE installations would receive per unit of production;[626]

    (b)    the sale of RE installations' entire production;[627] and

    (c)    the stability of FIT and its protection against its revision for existing installations.[628]

550.    Article 44(3) is important as it protects existing installations against changes in the FIT, which change is otherwise permissible under Spanish law.  Article 44(3) reads as follows:

> In 2010, in view of the results of the follow-up reports on the extent to which the Renewable Energy Plan for 2005-2010 and the Energy Savings and Efficiency Plan for Spain (E4) have been achieved, as well as the new objectives included in the next Renewable Energy Plan for 2011-2020,

---

[624] *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain,* SCC Case No. 062/2012, Award, 21 January 2016, ¶ 542, **Exhibit CL-151**.

[625] *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain,* SCC Case No. 062/2012, Award, 21 January 2016, ¶¶ 95, 102, 299, **Exhibit CL-151**.

[626] RD 661/2007 of 25 May 2007, Article 36, **Exhibit C-44**.

[627] RD 661/2007 of 25 May 2007, Article 17, **Exhibit C-44**.

[628] RD 661/2007 of 25 May 2007, Article 44(3), **Exhibit C-44**.

tariffs, premiums, additional payments, and lower and upper thresholds set out in this royal decree will be reviewed, taking into account the costs associated with each of these technologies, the degree of participation of the special regime in meeting demand and its impact on the technical and economic management of the system, guaranteeing reasonable returns with reference to the cost of money on capital markets. Every four years thereafter a new adjustment will be carried out using the above criteria.

The adjustment to the regulated tariff and the lower and upper threshold referred to in this section will not affect the facilities for which the start-up document was issued before January 1 of the second year in which the adjustment was implemented.[629]

551.   The Tribunal will now consider the conduct of Spain to determine whether it provided a stable regime.

(a)      The CNE, in February 2007, stated as follows:

The CNE understands that transparency and predictability in the future of economic incentives reduces regulatory uncertainty, which incentivises investments in new capacity and minimises the cost of financing projects, thus reducing the final cost to the consumer.  The regulation must offer sufficient guarantees to ensure that the economic incentives are stable and predictable throughout the service life of the facility.[630]
[…]
Ultimately, what the CNE proposes is regulatory stability to recover investments, maintaining regulated tariffs during the service life of existing facilities (with a transparent annual adjustment mechanism).[631]

The CNE also confirmed that Article 44(3) was an important provision which provided stability and legal certainty.[632]

(b)      Spain issued a press release which accompanied the issuance of RD 661/2007 in the following terms:

---

[629] RD 661/2007 of 25 May 2007, Article 44(3), **Exhibit C-44**, pp. 117-118.

[630] CNE Report 3/2007, p. 16, **Exhibit C-85**.

[631] CNE Report 3/2007, p. 25, **Exhibit C-85**.

[632] CNE Report 83/2010, p. 24, **Exhibit C-162**.

[f]uture adjustments to said tariffs will not affect installations which are already in operation. This guarantees legal certainty for the electricity producer and stability for the sector.[633]

(c)      InvestInSpain and the relevant Ministry reiterated that under RD 661/2007 FIT regime "[t]*he subsequent revisions of the tariffs will not affect the installations which have already been commissioned.  This guaranty provides legal certainty to the producer, ensuring the stability and development of the sector.*"[634]

(d)      In a CNE presentation dated 29 October 2008, RD 661/2007 was referred in the following terms:

**Regulatory stability:** Predictability and certainty of economic incentives for the duration of the facility's life span (encourages investors and lower financial costs): no retroactive effect.[635]

552.    The CNE in 3 separate documents in 2009 and 2010,[636] reiterated its position.  A joint Ministry and InvestInSpain publication from November 2009[637] reiterated the stability provisions and this was confirmed by ECOFYS.[638]

553.    The Tribunal is of the view that this conduct on the part of Spain and the documentary evidence referred to above, demonstrate that Spain had created stable conditions for

---

[633] Government of Spain, Ministry of Industry, Energy and Tourism, announcement of RD 661/2007, "*The Government prioritises profitability and stability in the new Royal Decree on renewable energy and combined heat and power*", 25 May 2007, p. 1, **Exhibit C-93**.

[634] Government of Spain, Ministry of Industry, Energy and Tourism, Presentation, "*Legal Framework for Renewable Energies in Spain*", undated, p. 4, **Exhibit C-163**. *See also* InvestInSpain Presentation, "*Opportunities in Renewable Energy in Spain*" (Graz), 15 November 2007, p. 32, **Exhibit C-164**; InvestInSpain Presentation, "*Opportunities in Renewable Energy in Spain*" (Vienna), 16 November 2007, p. 32, **Exhibit C-165**.

[635] CNE Presentation, "*Legal and Regulatory Framework for the Renewable Energy Sector*", 29 October 2008, p. 25, **Exhibit C-95**.

[636] CNE Presentation, "*Las Energias Removables: El Caso Español*" (Cartagena de Indias), 9-13 February 2009, p. 67, **Exhibit C-97**, CNE Presentation, "*Las Energias Renovables: El Caso Español*" (Barcelona), February 2009, p. 25, **Exhibit C-98**; CNE Presentation, "*Renewable Energy Regulation in Spain*", February 2010, p. 29, **Exhibit C-96**.

[637] Government of Spain, Ministry of Industry, Energy, Tourism and Commerce, Presentation. "*Legal Framework for Renewable Energies in Spain*", undated, p. 4, **Exhibit C-163**.

[638] Ecofys, Task 2 Report, "*Design Features of Support Schemes for Renewable Electricity*", 27 January 2014, p. 24, **Exhibit C-152**.

Project Companies prior to the Claimants' investment and the intention of Spain was designed to provide long term stability to investors.

554.  Spain by enacting RD 1614/2010[639] which provided that any future changes to RD 661/2007 would not apply to duly registered existing installations, further confirmed to provide investors, such as the Claimants, stability.

555.  Spain, between 2012 and 2013, enacted a number of legislative measures which, in the Tribunal's view, took away the stability provisions that it had undertaken to provide under RD 661/2007 and RD 1614/2010.

### 6.  Disputed Measures

556.  The Tribunal will now address whether Spain reneged on its investment and adopted measures, which curtailed and repealed the legal and economic regime under which the Claimants had made their investment and also, if the measures were retroactive.

557.  Spain enacted the following measures:

  (i)    in December 2012, Spain enacted Law 15/2012 which imposed a 7% levy on electricity produced and fed into the National Grid during the calendar year which included all generators;

  (ii)   in February 2013, Spain enacted RDL 2/2013 which took away the Claimants' premium option.   This legislation also replaced the annual adjustment index based on the Spanish CPI for updating the FIT capital to account for inflation;

  (iii)  on 12 July 2013, Spain, pursuant to RDL 9/2013, amended the 1997 Electricity Law and repealed RD 661/2007 and established a new regime for RE power generations which was radically different from the framework established by RD 661/2007.  This new regime was not fully implemented until June 2014 and hence there was an 11-month period of uncertainty;

---

[639] RD 1614/2010 of 7 December 2010, Articles 4-5, **Exhibit C-46**.

(iv)     in December 2013, Law 24/2013 was introduced whereby the distinction between the ordinary regime and the special regime announced by RDL 9/2013 disappeared.  Conventional and RE generators were put on an equal footing thereby depriving RE installations of the unconditional right of priority of grid access and priority of despatch that have existed under the previous regime. The Law of 24/2013 also established the concept of "*reasonable return*" over the entire useful life of the plant;

(v)      in June 2014, Spain enacted RD 413/2014 which would apply to RE installations; and

(vi)     on 16 June 2014, the Ministerial Order was approved and it was published on 20 June 2014.

558.    The Tribunal has to consider whether Spain in the exercise of its sovereign rights, can enact the Disputed Measures.

559.    The Tribunal refers to the *Eiser* decision as it is relevant and especially as it concerns an investment into Spain's CSP sector pursuant to the specific commitments offered by RD 661/2007 and confirmed by RD 1614/2010.  The Tribunal in *Eiser* recognised the sector specific nature of the ECT, which was designed to address specific characteristics of investment in the energy sector especially the long term and capital intensive nature. The *Eiser* decision recognised that the ECT obligates Spain to provide investors with a stable framework in the following manner:

> [I]n interpreting ECT's obligation to accord fair and equitable treatment, interpreters must be mindful of the agreed objectives of legal stability and transparency.[640]

560.    The *Eiser* tribunal also recognised that the ECT's obligation to provide stability does not prevent the State from exercising its sovereign rights to regulate, but, if the State regulates in a manner that there is a breach of Article 10(1) of the ECT, then there is a

---

[640] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 379, **Exhibit CL-154**.

frustration of the legitimate expectations. By undermining the legal framework, Spain has to pay compensation.

561. The Tribunal also relies on the decision in *Eiser* where the tribunal held that the purpose of the ECT is to ensure that legal frameworks are "*stable, transparent and compliant with international standards.*"[641]

562. The Tribunal adopts the following passage from the *Eiser* decision:

> Article 10(1)'s obligation to accord fair and equitable treatment necessarily embraces an obligation to provide fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments.  This does not mean that regulatory regimes cannot evolve.  Surely they can. … However, the Article 10(1)'s obligation to accord fair and equitable treatment means that regulatory regimes cannot be radically altered as applied to existing investments in ways that deprive investors who invested in reliance to those regimes of their investment's value.[642]

563. The *Eiser* decision confirms that the Claimants were entitled to an expectation that the Spanish regime in which they invested, would not be radically altered in respect of existing investments.  The Tribunal adopts the persuasive reasons of the *Eiser* Tribunal.

## 7. Retroactivity

564. Spain claims that the Disputed Measures are not "*retroactive*" under domestic or international law[643] and it relies on the decisions in *Nations Energy v. Panama*[644] and *Charanne*[645] to support its view on the non-retroactivity of the measures.  These

---

[641] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 379, **Exhibit CL-154**.

[642] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 382, **Exhibit CL-154**.

[643] Respondent's Counter-Memorial, ¶¶ 939-954.

[644] Respondent's Counter-Memorial, ¶¶ 944-945, *citing Nations Energy Inc. v. Republic of Panama*, ICSID Case No. ARB/06/19, Award, 24 November 2010, ¶¶ 642, 644, **Exhibit RL-0040**.

[645] Respondent's Counter-Memorial, ¶¶ 948-949 *citing Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain*, SCC Arbitration No. 062/2012, Award of 21st January 2006, ¶¶ 546, 548, **Exhibit RL-0049**.

decisions do not assist Spain's case.[646]  The *Nations Energy* decision is irrelevant in the Tribunal's view, as the issue of retroactivity was considered under Panamanian law and not in circumstances which are relevant to the facts in the present dispute.

565.   In *Charanne*, the claimants had argued that there is a principle of international law prohibiting a State from taking regulatory measures with immediate effect *per se*.[647] The Claimants' position in the present case is different.  The Claimants' case is that Spain implemented the Disputed Measures in circumstances where it promised investors in return for their investment, that it would not do so.  The Claimants contend that this constitutes a breach by Spain of its international obligations.[648]

566.   The *Eiser* tribunal also held that the Disputed Measures were retroactive in the following terms:

> Respondent then retroactively applied these 'one size fits all' standards to existing facilities, like Claimants', that were previously designed, financed and constructed based on the very different regulatory regime of RD 661/2007.  No account was taken of existing plants' specific financial and operating characteristics in establishing their remuneration.[649]

567.   The *RREEF* Decision recognised the retroactive nature of the New Regime in that it "*subtracts past remuneration (remuneration that was due under the previous regime) from the future remunerations.*"[650]  This finding of the *RREEF* Decision is not supported

---

[646] In *Nations Energy v Panama,* the tribunal was comprised of Alexis Mourre (President), Claus von Wobeser (Respondent appointed) and Jose Maria Chillon Medina (Claimant appointed).  The majority decision was reached by Alexis Mourre and Clause von Wobeser, with Jose Maria Chillon Medina dissenting.  In *Charanne*, the tribunal was comprised of Alexis Mourre (President), Clause von Wobeser (Respondent appointed) and Guido Santiago Tawil (Claimant appointed).  The majority decision was reached by Alexis Mourre and Claus von Wobeser, with Guido Santiago Tawil dissenting.  Both dissenting opinions differed with the majority on the retroactivity analysis.

[647] *Charanne B.V. and Construction Investments S.A.R.L. v The Kingdom of Spain,* SCC Case No. 062/2012, Award, 21 January 2016, ¶ 548, **Exhibit CL-151**.

[648] Claimants' Memorial, ¶¶ 408-423.

[649] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.r.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 400, **Exhibit CL-154**.

[650] *RREEF Infrastructure (G.P.) Limited and RREEF Pan- European Infrastructure Two Lux S.á r.l. v. Kingdom of Spain,* ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 328, **Exhibit CL-152**.

by a number of awards which have found that Spain did promise investors that it would not alter retroactively the specific tariffs of RD 661/2007 and RD 1614/2010.[651]

568.   The Tribunal has to consider the effect of these regulations which Spain has enacted to the regulatory framework which existed prior to the Claimants' investment.

569.   The Tribunal is of the view that stability cannot exist when Spain continuously changes its legislation and that Spain's conduct from December 2012 breaches the concept of a stable and predictable environment for the Claimants' investment.   The Tribunal is therefore of the view that Spain's conduct demonstrates quite categorically that it failed to provide a stable and predictable regulatory regime.   The Tribunal is of the view that Spain is entitled to enact legislation which would breach its stability commitment. However, Spain, in the Tribunal's view, is not entitled to enact Disputed Measures which would result in Spain breaching its international obligations under the ECT and thereby whittling away measures which the Claimants relied upon to make their investment.   The Disputed Measures are, in the Tribunal's view, a retroactive overhaul of the RD 661/2007 economic regime.

570.   The Tribunal is of the view that the Respondent's course of conduct in enacting the Disputed Measures in particular RDL 9/2013, Law 24/2013, RD 413/2014, Ministerial Order 1045/2014, taken as a whole, violated FET standard as set out in Article 10(1) of the ECT and this breach crystallised on 20 June 2014, which is relevant to determine what would be an appropriate valuation date in so far as damages is concerned.

---

[651] *See e.g. Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, Award, 4 May 2017, **Exhibit CL-154**; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain,* SCC Case No. 2015/063, Award, 15 February 2018, **Exhibit CL-160**; *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, **Exhibit CL-175**; and *Antin Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, **Exhibit CL-176**.

8. **Due Diligence**

571.   The Tribunal will now consider whether the Claimants, prior to investing in the RE sector, had conducted their due diligence.

572.   The argument of Spain is that the due diligence conducted by the Claimants was flawed, as a consequence, they misunderstood the regulatory framework.  Spain also contends that all the due diligence reports were obtained prior to the Claimants making the investment, thereby the Claimants ought to have known that there would be no guarantee or commitment, that the RE remuneration regime would not change.[652]

573.   The Claimants took legal advice from Allen & Overy and a Memorandum was produced so that they could ascertain the understanding of RD 661/2007 in respect of their potential investment in T-Solar.  The witness statement of Mr. Moreno[653] is relevant and the relevant paragraph of Mr. Moreno's First Witness Statement reads as follows:

> This advice gave us comfort that tariff reviews could not affect the revenues of existing installations. Allen & Overy advised that if the Fixed Tariff was reduced, then investors would be entitled to adequate compensation.[654]

574.   Spain further contends that the A&O Memorandum of February could not have informed the Claimants of the applicable regulatory framework since the retroactive changes were only approved at the end of 2010.[655]

575.   The Claimants disagree with this on the grounds that the measures RD 1565/2010 and RDL 14/2010 concerned the PV sector and did not affect the remuneration regime of wind installations.  The Claimants also contend that these measures were highlighted in the A&O Memorandum in the following terms:

---

[652] Respondent's Counter-Memorial, ¶¶ 591-592; *see also* Respondent's Rejoinder, ¶ 964.

[653] First Moreno Witness Statement ¶¶ 32-34, *see also* Second Moreno Witness Statement ¶ 22.

[654] First Moreno Witness Statement, ¶ 34.

[655] Respondent's Counter-Memorial, ¶ 591.

the Government has the right to legislate and implement regulations.  In use of such right, in theory, the Government may pass a new regulation, which amends the 661/2007 Tariff in which case the Government would have to adequately compensate the producers, according to the applicable regulations on expropriation[656]

576.    The Tribunal also notes that the only measure which affected the wind sector, namely RD 1614/2010, was not only previously agreed with the sector but reassured the Claimants that the RD 661/2007 regime would remain stable with regard to the wind farms.  RD 1614/2010 confirmed that RD 661/2007 FIT would not be modified for existing plants and confirmed that such protection included the premium.   The Claimants contend that this was their understanding and they relied on the investment advisory paper dated 20 June 2011 which reads as follows:

> The newly agreed tariff won't be [s]ubject to additional changes and will remain in place for the rest of the life of the operating plants.  In 2010, the Spanish government undertook a review of the remuneration scheme applicable to renewable energies.  This wind remuneration scheme review had a meaningless impact and its scope was agreed with industry players given the role to be played by the energy source going forward.[657]

577.    Spain also argues that the opinion expressed in the A&O Memorandum was "*not even shared by the recipient of the said memorandum T-Solar.*"[658]

578.    The Tribunal having considered the arguments of the Claimants and the Respondent in this issue, finds that the A&O Memorandum that was commissioned by Bridgepoint together with other documents, was relied upon in the Claimants' legitimate expectations that the economic regime would not be altered by retroactive measures.

579.    Spain also argues that the information memorandum[659] in May 2011, makes reference to the retroactive regulatory changes in the renewable energies sector that had already

---

[656] Allen & Overy Memorandum on RD 661/2007 tariff risk with regards to retroactive effect of future regulations dated 24 February 2010, p. 2, **Exhibit C-102**.

[657] Investment Advisory Committee Paper on T-Solar dated 20 June 2011, slide 14 (PDF 11), **Exhibit C-113**.

[658] Respondent's Counter Memorial, ¶ 591.

[659] Société Générale and Mediobanca "*Information Memorandum: Wind assets*" on Project Greco, Lot L Boga, **Exhibit C-103**.

occurred at the end of 2010, thereby implying that the Claimants should have been put on notice that RD 661/2007 could be changed retroactively.[660]

580.   The Claimants, on the other hand, contend that the information memorandum is to the contrary and that the regulatory regime governing wind farms' remuneration, would remain stable.

581.   The information memorandum in the Claimants' view, also provides that the RD 661/2007 economic regime would provide secure cash flows for the entire useful life of the wind farms and that RD 1614/2010 would provide reassurance with regard to the long-term stability of the RD 661/2007 regime for wind farms and the Spanish RE framework was designed to induce investment in RE.[661]

582.   The Tribunal is of the view that the Claimants are entitled to rely on the information memorandum, namely, that the 2010 measures would have no impact on the guaranteed remuneration schemes for wind installations.

583.   Spain also contends that the BCG Report dated 6 July 2011 is not a due diligence report for the following reasons:

(a)   is not a legal due diligence report;

(b)   recognises that future retroactive measures were possible;

(c)   refers to retroactive measures that were implemented in the RE sector in 2010;

(d)   warns of the effect of the tariff deficit on RE producers; and

(e)   acknowledges that both the RD 661/2007 regime and the New Regime aim to grant the same return.

---

[660] Respondent's Counter Memorial, ¶ 595.

[661] Société Générale and Mediobanca "*Information Memorandum: Wind assets*" on Project Greco, Lot L Boga, pp. 5, 8, **Exhibit C-103**.

584.   The Claimants contend that they did not rely on the BCG Report as a legal due diligence. BCG being experts on RE, have advised Spain on certain aspects of its RE policies and regulations.[662]

585.   Spain contends that the BCG Report characterisation of changes to the RD 661/2007 remuneration, is unlikely.  The Claimants disagree and argue that the BCG Report did state numerous times that RD 661/2007 FIT was guaranteed by the State and displayed no regulatory risks.  Furthermore, Spain also argues that the retroactive measures taken at the end of 2010 and mentioned in the BCG Report, should have put investors on notice that RD 661/2007 economic regime could be changed retroactively.  The Claimants however argue there are several references in the Report to the 2010 measures but there is no indication that it would be subject to retroactive changes.

586.   Spain also claims that the BCG Report warned of several challenges to the RE sector in Spain such as tariff deficit and risks of future regulatory measures.  The Claimants however, contend that the Report merely emphasised that the outlook of challenges on renewable changes have improved since 2010 and that wind contribution to system costs would be the lowest among renewables and that the Spanish Government has accepted a deficit in the system to maintain lower end electrical prices.[663]

587.   Spain also suggests that the BGC Report confirms that the RD 661/2007 regime and the New Regime, would have the same target return.  The Claimants contend that the report merely asserts that the target return used in RD 661/2007 is the same as that of a Royal Decree expected to be passed in 2011 to govern remuneration of new RE installations.

---

[662] BCG, "*Technological and prospective evolution of costs of RE. Technical Study PER 2011-2020*" (year 2011) (own translation of title), **Exhibit W-01026_SP**; BCG, Study of the evolution of technology and of the prospective costs of RE technologies from 2020-2030. Wind generation (May 2011) (own translation of title), **Exhibit W-01027_SP**.  *See also* Investment Advisory Committee Paper on Project Greco dated 11 July 2011, p. 2, **Exhibit C-120** ("*Sustainability of the Spanish regulatory framework*: *We have conducted a full analysis of this together with BCG, who are the retained advisers to IDEA, the government energy institute with responsibility for achieving the national renewable energy plan.  BCG view the existing regulatory framework as being stable and sustainable with regard to wind energy*").

[663] BCG Report on Project Greco dated 6 July 2011, pp. 33, 34 and 38, **Exhibit C-115**.

588.  The Tribunal having considered the due diligence conducted by the Claimants in respect of (a) the A&O Memorandum, (b) the information memorandum, and (c) the BCG Report, is of the view that the due diligence exercised by the Claimants, is on the basis that the Claimants believed they had a legitimate expectation that the laws would not be modified especially as the above documents included a stabilisation clause. Furthermore, the Tribunal is of the view that the Claimants did undertake an appropriate fact-finding mission in Spain with a view to their investments in RE.

589.  The Tribunal believes that there is no basis for Spain to contend that the Claimants have not exercised proper due diligence with regards to their proposed investment in the RE sector in Spain.

### 9.  Transparency

590.  The next issue that the Tribunal has to address is whether Spain's conduct was transparent.  The FET standard requires that Spain's conduct towards the Claimants and the legal environment must be transparent.

591.  The Tribunal refers to the ECT decision in *Electrabel v. Hungary* where the tribunal held as follows:

> Article 10(1) ECT not only speaks of fair and equitable treatment and equitable and stable conditions, it also refers to 'favourable and transparent conditions.' The reference to transparency can be read to indicate an obligation to be forthcoming with information about intended changes in policy and regulations that may significantly affect investments, so that the investor can adequately plan its investment and, if needed, engage the host State in dialogue about protecting its legitimate expectations.  Finally, the term "favourable" suggests the creation of an investor-friendly environment.[664]

592.  The Tribunal also refers to the decision in *Plama v. Bulgaria* where the tribunal held as follows:

---

[664] *Electrabel S.A. v The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012, ¶ 7.79, **Exhibit CL-86**.

> [T]he condition of transparency, stated in the first sentence of Article 10(1) of the ECT, can be related to the standard of fair and equitable treatment. Transparency appears to be a significant element for the protection of both the legitimate expectations of the Investor and the stability of the legal framework. [665]

593.   The Tribunal having considered the conduct of Spain, holds that Spain did dismantle the RD 661/2007 economic regime which was not transparent for the following reasons:

(i)     There was in the Tribunal's view, no urgent need for RD 661/2007 to be modified.  Royal Decree Laws are issued by Spain to implement a new regime and they are only issued in cases of extraordinary and urgent need; [666]

(ii)    RDL 9/2013 was responsible for the Claimants' investment being destroyed.  There was then an 11-month period during which Spain did not give any indication with regard to the remuneration that the qualifying plants would be entitled to;

(iii)   RD 413/2014 and the June 2014 Order did not provide any analysis explaining the underlying reasons behind the Special Payment or in what manner the future updates of the economic regime would be underpinned; [667]

(iv)    There was also a lack of visibility and predictability under the new regime, especially as Spain retained the right to review the Special Payment in order

---

[665] *Plama Consortium Limited v The Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 178, **Exhibit CL-63**.  *See also LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic,* ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 128, **Exhibit CL-46** (*"violations of the fair and equitable treatment standard may arise from a State's failure to act with transparency – that is, all relevant legal requirements for the purpose of initiating, completing and successfully operating investments made, or intended to be made under an investment treaty should be capable of being readily known to all affected investors"*) and *Joseph Charles Lemire v Ukraine,* ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, 21 January 2010, ¶ 284, **Exhibit CL-72** noting that a breach of the FET standard can be evaluated against a number of factors, including *"whether there is an absence of transparency in the legal procedure or in the actions of the State"*.

[666] Constitution of Spain of 27 December 1978, Article 86(1), **Exhibit C-50**.

[667] Claimants' Memorial, ¶ 437(c), *see also* First Brattle Regulatory Report, ¶ 226.

to ensure that the prevailing yield on the 10-year Spanish bonds will be considered to be a reasonable return;[668]

(v)     The Special Payment which consisted of two distinct elements, namely a remuneration per MW of installed capacity and a remuneration per MWh of electricity produced seeking to cover operating costs cannot be met by market prices but Spain did not provide a clear indication with regard to the time frame during which remuneration for the installed capacity would apply; and

(vi)    The abolishment of the CNE and the replacement with the CMMC after the CNE criticised the new regime during the drafting process of RD 413/2014.

594.   The above-mentioned acts on the part of Spain demonstrates that Spain's conduct was not transparent.

## 10.   Were Spain's measures unreasonable?

595.   The word "*unreasonable*" is defined in the Oxford English Dictionary as "*beyond the limits of acceptability or fairness*."[669]  The tribunal in *Plama v Bulgaria* defined "*unreasonable*" in the following terms "*those which are founded in reason or fact but on caprice, prejudice or personal preference*."[670]  The Tribunal is of the view in order to determine whether Spain's conduct has been reasonable, it requires a demonstration that the conduct "*bears a reasonable relationship to some rational policy*."[671]

---

[668] First Brattle Regulatory Report, ¶¶ 227-232.

[669] Oxford Dictionaries, Oxford English Dictionary (6th ed, Oxford University Press, 2007) p. 3455, **Exhibit CL-47**.

[670] *Plama Consortium Limited v The Republic of Bulgaria,* ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 184, **Exhibit CL-63**.

[671] *Saluka Investments B.V. v The Czech Republic,* UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 460, **Exhibit CL-43**.

596.   The Tribunal in *Micula v. Romania* held as follows:

> … [F]or a state's conduct to be reasonable it is not sufficient that it be related to a rational policy; it is also necessary that, in the implementation of that policy, the state's acts have been appropriately tailored to the pursuit of that rational policy with due regard for the consequences imposed on investors.[672]

597.   The Tribunal in order to determine if Spain's measures are unreasonable, must identify a rational policy goal and it must then demonstrate that these measures were reasonable. The Tribunal is of the view that Spain cannot satisfy this test because having induced the Claimants to invest, there was a sudden and drastic change in Spain's policy with regard to the RE industry and the legal and regulatory framework was amended over a period of time.

598.   The Tribunal refers by way of analogy to the decision in *BG v. Argentina* where the said tribunal stated that "*withdrawal of undertakings and assurances given in good faith to investors as an inducement to their making an investment is by definition unreasonable and a breach of the treaty.*"[673]

599.   The wind farms were duly registered with RAIPRE by 9 December 2010 and the Claimants were entitled to the RD 661/2007 economic regime.  Spain attempts to justify its regulatory measures due to a tariff deficit but a tariff deficit is a result of Spain's own regulatory conduct and hence cannot be attributed to the Claimants.  This conduct is, in the Tribunal's view, a violation of the Claimants' reasonable and legitimate expectations.  The tariff deficit had existed long before the development of wind farms in Spain and hence the drastic changes to the regulatory regime for renewables cannot be a rational policy goal.

---

[672] *Ioan Micula, Viorel Micula and others v Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 525, **Exhibit CL-88**.

[673] *BG Group Plc. V The Argentine Republic*, UNCITRAL, Award, 24 December 2007, ¶ 343, **Exhibit CL-58**.

600.   The Tribunal finds that Spain by dismantling the legal and business framework which was applicable to the Claimants' investment, is in the circumstances, a measure which was unreasonable.

### 11.   Are Spain's measures disproportionate?

601.   It is a well-established principle in domestic laws as well as the Investment Treaty Arbitration that there must be a requirement of proportionality.[674]  The Tribunal is of the view that the test of proportionality was not satisfied by Spain because Spain's objective as stated, was to address the issue of tariff deficit yet it imposed retroactive changes to the FIT, thereby destroying the RD 661/2007 economic regime and that, in the Tribunal's view, is not an appropriate solution to the problem. Furthermore, FIT for wind plants only played a rather limited role in the accumulation of tariff deficit.  The Tribunal finds that the regulatory measures by Spain which curtailed the FIT for wind, frustrated the legitimate expectations of the Claimants.  These measures cannot in the Tribunal's view be considered as suitable measures.

602.   The other consideration is whether Spain's measures were necessary to achieve the goals that it wished to pursue especially when there were less intrusive means available to achieve Spain's goal.  Spain's State organs did identify alternative solutions such as tax on all $CO_2$ emissions.[675]

603.   The Tribunal is therefore of the view that Spain's actions were disproportionate.

### 12.   Were the Claimants' investment impaired as a result of Spain's measures?

604.   Article 10(1) of the ECT prohibits Spain by "*unreasonable or discriminatory measures*" from impairing the Claimants' investment.  The Tribunal therefore has to ascertain if

---

[674] *Técnicas Medioambientales Tecmed S.A. v The United Mexican States,* ICSID Case No. ARB(AF)/00/2, Award, 29 May 2003, ¶ 122, **Exhibit CL-33**.  *See also Occidental Petroleum Corporation and Occidental Exploration and Production Company v The Republic of Ecuador,* ICSID Case No. ARB/06/11, Award, 5 October 2012, ¶ 404, **Exhibit CL-84**.

[675] Claimants' Memorial, ¶ 446.  *See also* First Brattle Regulatory Report, ¶ 140 *citing* CNE Report on Spanish Electricity Sector, 7 March 2012, pp. 16-64, **Exhibit C-166**.

the measures are either unreasonable or discriminatory.  The Tribunal refers to the decision in *Saluka* which states that the standard of reasonableness requires "*State's conduct bear a reasonable relationship to some rational policy*"[676].  The measures that Spain took were unreasonable and breached the FET standard because Spain's primary justification was because of the growing tariff deficit and the tariff deficit was the result of disparity between the regulated costs and the income of the electricity system which is dependent on the regulated price of the electricity.  The tariff deficit could have been avoided if Spain had set consumer prices as it was required to do under Article 17 of the 1997 Electricity Law and RDL 6/2009.  The Tribunal is of the view that the tariff deficit is a result of Spain's regulatory failures and therefore it is conduct which does not bear a reasonable relationship to Spain's policy.  These measures were therefore harmful to the Claimants' plants.

605.   The Tribunal also notes that the Spanish Supreme Court did issue judgments finding that Spain had failed to comply with the requirements of RDL 6/2009 and hence there was a violation of Spanish law.

606.   The Tribunal concludes that Spain is not only in violation of the FET standard under the ECT, but that Spain also violated its obligations under Article 10(1).

### H.  Umbrella Clause

#### 1.  Claimants' position

607.   The Claimants argue that the purpose of an umbrella clause (such as Article 10(1) of the ECT) is to bring the host State's compliance with commitments assumed *vis-à-vis* investors under the protective "umbrella" of the ECT.[677]

---

[676] *Saluka Investments B.V. v The Czech Republic,* UNCITRAL, Partial Award on Jurisdiction and Merits, 17 March 2006, ¶ 460, **Exhibit CL-43**.

[677] Claimants' Memorial, ¶ 453.

608.   The Claimants explained that as a matter of international law, States may undertake binding legal obligations towards investors through the adoption of general legislation. The power of States to assume binding legal obligations through their unilateral acts has been affirmed by the International Court of Justice on several occasions. The Claimants affirm that the umbrella clause is so broad that it could be interpreted to cover all kinds of obligations, explicit or implied, contractual or non-contractual, undertaken with respect to investment generally.[678] In particular, the expression "[a]*ny obligations*" in this umbrella clause "*means not only obligations of a certain type, but 'any' – that is to say, all – obligations*"[679], including obligations that the host State assumed unilaterally through legislation or executive acts.[680]

609.   The Claimants sustain that pursuant to RD 661/2007 (and, in particular, Articles 36 and 44(3)) and RD 1614/2010 (in particular, Article 5(3)), Spain expressly recognised the application of the RD 661/2007 regulatory regime to the Project Companies, for the entire operational lifetime of the installations. Those commitments are binding obligations on Spain towards the Claimants' investment, which Spain must honour.

610.   As seen above, according to the Claimants, RD 661/2007 contained strong stabilization commitments and in RD 1614/2010 Spain reiterated its guarantee that any revisions to the FIT pursuant to Article 44(3) of RD 661/2007 would not affect duly registered, existing installations.[681]

611.   Therefore, in Claimants' view, it cannot be disputed that under RD 661/2007 and RD 1614/2010, the Government entered into obligations with the Claimants within the

---

[678] Claimants' Memorial, ¶ 454.  *See also* United Nations Conference on Trade and Development, Bilateral Investment Treaties in the Mid-1990s (United Nations Publications, 1998), p. 56, **Exhibit CL-15**.

[679] The Claimants find support in the following cases: *Eureko B. V. v The Republic of Poland*, Partial Award on Jurisdiction and Merits, 19 August 2005, ¶ 246, **Exhibit CL-39**; *Plama Consortium Limited v The Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 186, **Exhibit CL-63**; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, **Exhibit CL-46**; *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, **Exhibit CL-53**.

[680] R Dolzer & C Schreuer, Principles of International Investment Law (2nd edn, Oxford University Press, 2012), p. 177, **Exhibit CL-85**.

[681] Claimants' Memorial, ¶ 463.

meaning of Article 10(1) of the ECT. These obligations consisted of the payment of the FIT (as amended by RD 1614/2014) for all the electricity produced by the installations and for their entire operational lifetime.[682]

612.   The Claimants sustain that the plain language of the Umbrella Clause in Article 10(1) of the ECT does not differentiate between contractual obligations and legislative or regulatory undertakings.[683] The Claimants affirm that this broad scope can be limited at the election of the Contracting Party. For example, Spain could have limited scope of the Umbrella Clause and carved it out from investor-State disputes in the same way that Australia, Hungary and Norway have done (see Article 26(3)(c) and Annex IA of the ECT). Spain chose not to. Consequently, the Umbrella Clause applies to all commitments made by Spain, and "*even representations made by ministers to investors during investment promotion 'road shows.'*"[684]

613.   According to the Claimants, the cases cited by the Respondent to support its position as to the extension of the umbrella clause of the ECT do not assist Spain's position. In the Claimants' view:

(a)   *SGS v. Philippines* recognised that umbrella clauses may cover obligations other than those derived from contractual agreements and thus supports the Claimants' proposition;[685]

(b)   *AES Summit Generation Limit v. Hungary*[686] concerned, inter alia, the contractual rights of the investor. The Claimants state that the tribunal held that it could not rule on the scope of the contractual obligations

---

[682] Claimants' Memorial, ¶ 464.

[683] Claimants' Memorial, ¶ 454.

[684] Claimants' Reply, ¶471.  The Claimants support its position by citing *Khan Resources Inc., Khan Resources B.V., and Cauc Holding Company Ltd. v The Government of Mongolia*, UNCITRAL, Decision on Jurisdiction, 25 July 2012, ¶ 438, **Exhibit CL-138**.

[685] *SGS Société Générale de Surveillance S.A. v. The Republic of the Philippines*, ICSID Case No. ARB/02/6, Decision on Jurisdiction, 29 January 2004, ¶ 121, **Exhibit CL-112**.

[686] *AES Summit Generation Limited and AES-Tisza Erömü Kft v The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010, **Exhibit CL-133**.

because under Annex IA of the ECT, Hungary had not allowed investors to submit a dispute concerning the Umbrella Clause to an international tribunal;

(c)     *Plama v. Bulgaria*,[687] *Eureko v. Poland*,[688] *Enron v. Argentina*[689] and *LG&E v. Argentina*[690] contain clear findings that the Umbrella Clause is not limited to contracts between the State and the investor but covers "[a]*ny obligation*";

(d)     *El Paso v. Argentina* was not concerned with legislative acts falling within the scope of an umbrella clause. Rather, it was focused on the existence of any contracts or licenses that could potentially found a treaty claim. That tribunal made no findings on the issue of whether state promises found in legislation can form the basis of an umbrella-claim.[691]

614.    According to the Claimants, starting in December 2012, Spain passed a series of laws and regulations, which first modified the RD 661/2007 legal and economic regime significantly and to the Claimants' detriment and, ultimately, stripped away that regime entirely. In Claimants' view, that was a clear violation of the Umbrella Clause in Article 10(1) of the ECT.

## 2.    Respondent's position

615.    The Respondent states that the Claimants' arguments regarding the "umbrella clause" cannot be admitted by the Arbitral Tribunal as:

---

[687] *Plama Consortium Limited v The Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, 27 August 2008, ¶ 186, **Exhibit CL-63**.

[688] *Eureko B.V. v The Republic of Poland*, Partial Award on Jurisdiction and Merits, 19 August 2005, ¶ 246, **Exhibit CL-39**.

[689] *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 274, **Exhibit CL-53**.

[690] *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, 3 October 2006, ¶ 175, **Exhibit CL-46**.

[691] Claimants' Reply ¶ 478, *citing El Paso Energy International Company v The Argentine Republic*, ICSID No. ARB/03/15, Award, 31 October 2011, ¶ 533, **Exhibit CL-79**.

(a)     The interpretation the Claimants make is contrary to the literal sense of Article 10(1) of the ECT and the interpretation thereof by doctrine and arbitration precedents.

(b)     The Kingdom of Spain has not made any direct undertakings in relation to the Claimant or its investment through unilateral acts, as declared by one case of arbitration precedent.[692]

616.    The Respondent notes that the Claimants incorrectly interpret the content and purpose of the final subsection of Article 10(1) of the ECT, taking the application of the "*umbrella clause*" beyond a reasonable interpretation. By using the expression "*any*", due to its broad nature, the Claimants would be aiming to include any type of act under the concept of guaranteed obligation. It therefore considers that an applicable *erga omnes* rule, such as RD 661/2007, are specifically agreed commitments with an investor or their investment.[693]

617.    According to the Respondent, this approach implies a lack of awareness of the true scope of the umbrella clause, as it obviates that the final subsection of Article 10(1) of the ECT clearly uses the term "*entered into*" which implies that the State assumes specific obligations with regard to a specific investor or a specific investment.[694]

618.    The Respondent considers that the obligations of the State have to be, therefore, specific, and have to have been assumed by the State with respect to a particular investor, in a *vis-à-vis* relationship.

619.    The Respondent affirms that the "ECT Reader's Guide" produced by the ECT Secretariat, is relevant as an ECT interpretive element. This Reader's guide defines the provision of the final subsection of Article 10(1) of the ECT under the significant label

---

[692] Respondent's Counter-Memorial, ¶ 1021.

[693] Respondent's Counter-Memorial, ¶ 1022.

[694] Respondent's Counter-Memorial, ¶ 1023, *citing Noble Ventures, Inc v Rumania*, ICSID Case No. ARB/01/11, Award of 12 October 2005, ¶ 51, **Exhibit RL-0026**; *Société Générale de Surveillance S.A. v. The Philippines*, ICSID Case No. ARB/02/6, Decision on Objections to the Jurisdiction, of 29 January 2004, ¶ 166, **Exhibit RL-0024**.

"Individual investment contracts" and defines its scope by placing emphasis on its grounding, which is none other than the international principle of *pacta sunt servanda.*[695]

620.    The Respondent points out that the Claimants have invoked as a sole precedent that applies the ECT, the award in the *Plama* case. However, the Respondent notes that in that award the tribunal considers the existing positions in the precedents and given that the dispute arising between the parties derived from a contract, it does not consider it necessary to decide whether Article 10(1) last subsection covers commitments arising from the legal rules. Accordingly, the Respondent concludes that the Claimants have not provided a single precedent that applies the ECT and accepts its theory, according to which, specific commitments arise from general rules "entered into" with investors.

621.    In this case, the Respondent stresses that the Spanish regulatory framework, including RD 661/2007, is *erga omnes* by nature and it is not aimed at any group. Tens of thousands of Spanish and foreign people were the subjects covered by this regulation. The claimed Regulation is not, therefore, the object of this final subsection of Article 10(1) of the ECT.

622.    The Respondent alleges that the *Eureko v. Poland* award does not interpret "*any obligation*" as obligations other than those arising from a contract. Conversely, it rules out the interpretation of the *SGS v. Pakistan* award with the interpretation of the *SGS v. the Philippines* award: the umbrella clause only protects obligations arising from specific State-investor bilateral relations.[696]

623.    The Respondent further states that in the cases cited by the Claimants, *LG&E v. Argentina* and *Enron v. Argentina*, the awards refer to the BIT between the United States and Argentina and that the criterion contained in the decisions mentioned by the Claimants has been rectified in other subsequent arbitral precedents that apply the same

---

[695] Respondent's Counter-Memorial, ¶ 1026.

[696] Respondent's Counter-Memorial, ¶ 1036.

United States-Argentina BIT, such as the *El Paso v. Argentina* case and *CMS v. Argentina* case.[697] Furthermore, unlike Argentine laws, RD 661/2007 does not contain any specific obligation in relation to the investor or foreign investment.[698]

624.    The Respondent reiterates that RD 661/2007 is a piece of legislation passed by the Spanish Government as part of its regulatory powers. This legislation applies to Plant owner companies and to any electrical energy producers included in its scope of application. Furthermore, the scope of application of this regulation was not limited to a few subjects who met subjective requirements, rather it applied to those who met the objective requirements established in the legislation.[699]

625.    The specificity requirement of the umbrella clause demands that an obligation "*with an Investor or an Investment of an Investor*" must exist. RD 661/2007 was directed at any owner of an electrical plant, regardless of both its nationality and the origin of funds with which it is financed.[700]

626.    The Respondent argues that the Agreement of June 2010 between the Ministry and the Wind Sector is not a specific compromise with the investor, as the last subsection of Article 10(1) ECT requires.[701]

627.    Moreover, the Respondent states that in that Agreement there was no specific undertaking to set in stone, neither in favour of the Associations of the renewable energy Sector nor in favour of the Claimants nor in favour of its investment, and states that this alleged commitment has also already been denied in the *Charanne* award.[702]

---

[697] Respondent's Counter-Memorial, ¶ 1036.

[698] Respondent's Counter-Memorial, ¶ 1038.

[699] Respondent's Counter-Memorial, ¶ 1039.

[700] Respondent's Counter-Memorial, ¶ 1040.

[701] Respondent's Counter-Memorial, ¶ 1041.

[702] *Charanne B.V. and Construction Investments S.A.R.L v. the Kingdom of Spain*, Award, 21 January 2006, ¶¶ 510 and 511, **Exhibit RL-0049**.

628.  The Respondent concludes that RD 661/2007 and 1614/2010 do not contain any of the requirements established case law used by the Claimants to allow them to unilaterally create obligations or specific commitments covered by the umbrella clause of the final subsection of Article 10(1) of the ECT.

### 3.  Tribunal's analysis

629.  The Tribunal has determined that Spain has not accorded fair and equitable treatment to the Claimants pursuant to Article 10(1) of the ECT.  The Tribunal is of the view that in the interest of judicial economy, it is not necessary for the Tribunal to address the issue of whether Spain violated the Umbrella Clause.  The Tribunal relies on the decision in *Micula v. Romania* in taking this approach, where the tribunal held as follows:

> In light of the Tribunal's conclusion that, by prematurely revoking the EGO 24 incentives in the manner that it did, the Respondent breached its obligations to treat the Claimants' investments fairly and equitably, the Tribunal does not need to address the Claimants' remaining claims.  Indeed, each of those claims arises from the same facts as the fair and equitable treatment claim, and the Claimants claim the same compensation in each instance […]  Thus, even if the Tribunal were to find in favour of the Claimants with respect to these claims, this would not impact the Tribunal's calculation of damages.  As a result, any legal findings on these matters are unnecessary.[703]

630.  The Tribunal will therefore not deal with the issue of the Umbrella Clause.

## VIII.  REPARATION

631.  In light of the Tribunal's findings in paragraphs 480 to 628 above, the Claimants have been successful in their claim for breach of FET. The Tribunal now turns to the issue of reparation.

---

[703] *Ioan Micula et al. v Republic of Romania,* ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 874, **Exhibit CL-88**.

### A.   Claimants' position

### 1.   Reparation

632.   The Claimants submit that, pursuant to customary international law, they are entitled to full reparation that would wipe out all of the consequences of Spain's unlawful acts.[704] Based on customary international law as codified in Articles 1, 28, 34-36 of the ILC Articles, Spain is obliged to make restitution to, or alternatively compensate, the Claimants for Spain's wrongful acts.[705]

633.   The Claimants say that, under international law, the primary remedy for a State's wrongful act is restitution.[706] Restitution would be effected by Spain: (i) withdrawing all the harmful laws and regulations complained of in Claimants' Memorial (namely the relevant articles of Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014 and the June 2014 Order) and placing the Claimants under the same legal and regulatory framework that existed at the time they made the investment; (ii) compensating the Claimants for all losses suffered before the reinstatement of the original regulatory regime.[707]

634.   Alternatively, if restitution is materially impossible or wholly disproportionate, full reparation requires the Claimants be compensated for any financially assessable damages, including loss of profits, caused by the Disputed Measures.[708]

---

[704] Claimants' Memorial, ¶¶ 469-471 *citing inter ali*a, *Chorzów Factory Case (Germany v. Poland)*, Judgment on the merits, PCIJ Series A, No. 17, 13 September 1928, p. 47, **Exhibit CL-1**.

[705] Claimants' Memorial, ¶¶ 472-473 *citing* ILC Articles, Art. 1, 28, 34, 35 and 36, **Exhibit CL-27**.

[706] Claimants' Memorial, ¶ 474 citing *Chorzów Factory Case (Germany v. Poland)*, Judgment on the merits, PCIJ Series A, No. 17, 13 September 1928, p. 47, **Exhibit CL-1**.

[707] Claimants' Memorial, ¶ 474; *see also* Claimants' Reply, ¶ 612.

[708] Claimants' Memorial, ¶ 475.

### 2. Standard of compensation

635. The ECT provides no compensation standard for breach of Article 10 of the ECT.[709] Therefore, the Claimants ask the Tribunal to turn to customary international law for the applicable standard of relief. The Claimants claim that the standard of compensation for the Respondent's breach of FET is the difference between the fair market value of their investment with and without the Disputed Measures.[710] The Claimants rely on the Discounted Cash Flow ("**DCF**") method to establish the fair market value in the different scenarios (discussed further below).

### 3. Valuation date

636. The Claimants value their investment at 20 June 2014.[711] The Claimants acknowledge that, generally, damages flowing from a breach are valued at the date of harm.[712] However, where a State has implemented multiple measures that cause harm, investor-State tribunals have had regard to the valuation date for indirect expropriation i.e. the date the investor was irreversibly deprived of the property.[713] Further, this irreversible deprivation test is also apposite for cases involving a breach of FET, however the test is slightly different, being the date the most serious damage was suffered.[714]

637. On 20 June 2014 was when Spain published Ministerial Order IET/1045/2014 (approved on 16 June 2014), which sets out the precise economic parameters for calculating the Special Payment under the New Regime i.e. defining the tariffs applying to the Claimants' wind installation. It is the Claimants' position that 20 June 2014 is the most appropriate date to measure harm because it "*represents the ultimate act of a two-year legislative backlash*" which wiped out the value of the Claimants' investments.[715]

---

[709] Claimants' Memorial, ¶ 476.

[710] Claimants' Memorial, ¶¶ 476-481.

[711] Claimants' Memorial, ¶¶ 490-491; *see also* Claimants' Reply, ¶ 623(a).

[712] Claimants' Memorial, ¶ 495.

[713] Claimants' Memorial, ¶¶ 496-498.

[714] Claimants' Memorial, ¶¶ 499-503.

[715] Claimants' Memorial, ¶¶ 504-507; *see also* Claimants' Reply, ¶ 623(a).

This date also allows Brattle to accurately forecast cash flows and the likely financial performance of the Claimants' investments.[716]

### 4.   Proof

638.   The Claimants do not appear to dispute that they bear the burden of proving their loss. However, they assert that the standard of proof for the *quantification* of loss is lower than that for the *existence* of the loss.[717] The Claimants cite *Lemire v. Ukraine* for the proposition that the existence of loss must be "*proved with reasonable certainty*" however for quantification all that is required is that they provide "*a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss*".[718]

### 5.   Valuation method

639.   The Claimants consider that the DCF method is the most appropriate method to assess the fair market value of their investments.[719] This is because it accurately captures the lost future cash flows by: projecting the likely revenues and expenses, year by year, and then applying a discount rate to the future cash flows to calculate the net present value taking into account both market risk and the time value of money.[720] The DCF method is particularly appropriate because: (i) it is pliable and can account for regulatory risk in different scenarios; (ii) it is the most prevalent method of valuing power stations; and (iii) wind farms have very simple business models.[721] The Claimants further say that the Respondent's criticisms of the DCF method are misplaced because: (i) investment-treaty jurisprudence favours the application of the DCF method;[722] and (ii) the future

---

[716] First Brattle Quantum Report, ¶ 13.

[717] Claimants' Reply, ¶ 653.

[718] Claimants' Reply, ¶ 656 *citing Joseph Charles Lemire v The Republic of Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, ¶¶ 246-249, **Exhibit CL-77**.

[719] Claimants' Memorial ¶ 487.

[720] Claimants' Memorial, ¶ 491.

[721] Claimants' Memorial, ¶¶ 492-493.

[722] Claimants' Reply, ¶¶ 636-647.

cash flows of their investment are sufficiently certain because it is mostly based on objective data.[723]

640.   The Claimants reject the Respondent's preferred valuation method, asset-based valuation ("**ABV**") primarily because the ABV analysis fails to assume the Respondent's liability for a breach of the ECT by implementing the new regime.[724] Further, the Claimants say that the fact they made a profit on the sale of their investments does not suggest that there was no value deterioration as a result of the Disputed Measures, rather the question is whether they could have obtained more without the Disputed Measures.[725]

### 6.  DCF analysis

641.   The Claimants' expert put forward a DCF valuation for a primary claim and an alternative claim: (i) the primary claim flows from a finding on the merits that the Claimants had a legitimate expectation to obtain the tariffs under RD 661/2007; and (ii) the alternative claim flows from a finding that the only legitimate expectation the Claimants had was to receive the return that was implicit in those tariffs.[726] Given the Tribunal's findings at paragraph 527 above that the Claimants had a reasonable and legitimate expectation to tariffs under RD 661/2007, only the primary claim DCF valuation is summarised.

642.   Brattle conducts a three-step damage valuation.

    a.      First, Brattle measures the lost historical cash flows of the Claimants' investments resulting from the Disputed Measures by comparing the cash flows from 27 December 2012 (the commencement of the Disputed Measures) to June 2014 (the Valuation Date) under two scenarios: "Actual"

---

[723] Claimants' Reply, ¶¶ 648-671.

[724] Claimants' Reply, ¶¶ 719-729; *see also* Claimants' Post-Hearing, ¶ 29; and Claimants' Post-Hearing Reply, ¶¶ 111-112.

[725] Claimants' Post-Hearing Reply, ¶¶ 118-119.

[726] Tr. Day 1, 158:2-17.

based on the actual historical financial data for the Claimants' investments; and "But-for" calculated on the assumption that the Disputed Measures were never implemented.[727]

b.   Secondly, Brattle estimates the loss in the fair market value of the Claimants' investments as at June 2014 under the But-for and Actual scenarios using a DCF method.[728] Brattle develops two versions of DCF model.[729] The Actual model which calculates the projected future cash flows in the Actual scenario. The But-for model, which is identical to the Actual model save for two differences: (i) it assumes the continued application of FITs as specified under RD 661/2007 starting in January 2013; and (ii) it assumes less regulatory risk than exists under the Actual scenario. For each DCF model, Brattle projects future cash flows and then discounts those cash flows to reflect risk.

c.   Thirdly, Brattle calculates the pre-award interest owing from June 2014 to the notional award date of November 2018 and the tax gross-up.[730]

643.   Brattle's updated DCF valuation values the Claimants' damages at EUR 123.9 million,[731] prior to third step.[732]

**7.   Interest rate**

644.   The Claimants have claimed both pre-award and post-award interest on the amounts due and rely on Article 13 of the ECT, which provides that interest will be calculated "*at a commercial rate established on a market basis from the date of expropriation until the date of payment*"

---

[727] First Brattle Quantum Report, ¶ 15.

[728] First Brattle Quantum Report, ¶ 16.

[729] First Brattle Quantum Report, ¶ 17.

[730] First Brattle Quantum Report, ¶¶ 23-24.

[731] Second Brattle Quantum Report, ¶¶ 32-36.

[732] First Brattle Quantum Report, ¶¶ 13-28.

645.   The Claimants also rely on Article 38 of the ILC which reads as follows:

> interest on any principal sum due under this chapter shall be payable when necessary in order to ensure full reparation.  The interest rate and mode of calculation shall be set so as to achieve that result.

646.   The Claimants also rely on the 10 year Spanish Government Bonds in force as a basis for calculating pre-award interest as set out in the Brattle Report.[733]

647.   The Claimants rely on a number of decisions of tribunals which have held that an award of damages should bear interest.[734]

648.   The Claimants contend that there should be different rates for pre-award and post-award interest as they serve different purposes.  Pre-award interest is awarded to achieve full reparation whilst post-award interest is to ensure that the award is paid promptly.

649.   The Claimants claim the sum of 1.16% compounded monthly as pre-award interest, being the commercial rate established on a market basis and rely on the Quantum Report[735].

650.   The Claimants are of the view that the Tribunal should award post-award interest at a higher rate than 1.16% and also should be compounded on a monthly basis.

### 8.   Gross-up for tax

651.   The Claimants claim that full reparation requires a "*gross-up over the amount awarded for damages*" to ensure the Claimants are placed in the same position they would have

---

[733] First Brattle Quantum Report, ¶ 171.

[734] *Middle East Cement Shipping and Handling Co. S.A. v The Arab Republic of Egypt,* ICSID Case No. ARB/99/6, Award, 12 April 2002, ¶¶ 174-175, **Exhibit CL-29**; *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic,* ICSID Case No. ARB/02/1, Award, 25 July 2007, ¶ 55, **Exhibit CL-55**; and *Continental Casualty Company v The Argentine Republic,* ICSID Case No. ARB/03/9, Award, 5 September 2008, ¶ 308, **Exhibit CL-64**.

[735] First Brattle Quantum Report, Table 14, ¶173.

been in, net of tax.[736] Profit distributions to the Claimants in the Netherlands normally benefit from a tax exemption.[737] However, a damages award to the Claimants in the Netherlands will be treated as a taxable profit and subject to tax rate of 20% up to and including EUR 200,000 and 25% on further amounts.[738]

652.    The Claimants primarily rely on a decision of the Court of Gelderland, where the Court held that a compensation payment received from a breach of a BIT was subject to Dutch corporate income tax.[739] The Claimants have requested a tax ruling from authorities in the Netherlands but have not received it to date.[740] Brattle did not analyse the potential tax consequences but noted the need to add a tax gross-up if an award did attract corporate taxes.[741]

B.  **Respondent's position**

1.  **Reparation**

653.    The Respondent submits that no reparation is required because "*the legal and regulatory regime, from 1997 to present day, has always granted the same thing, a reasonable ret[ ]u[r]n. As such, there is no claim to be made if the Claimant has not been deprived of anything nor is there any damage to speak of*."[742] The Respondent did not dispute the reparation principles quoted by the Claimants, nor provide any response as to the appropriateness or otherwise of reparation by restitution or compensation.

---

[736] Claimants' Memorial, ¶ 539; *see also* Claimants' Reply, ¶ 785.

[737] Claimants' Post-Hearing, ¶ 261.

[738] Claimants' Reply, ¶¶ 786-791.

[739] Judgment of the Court of Gelderland in case 14/4272 dated 17 March 2016, **Exhibit C-221**.

[740] Claimants' Post-Hearing, ¶ 262.

[741] First Brattle Quantum Report, ¶¶ 174-175; *see also* Second Brattle Quantum Report, ¶ 7, fn 5.

[742] Respondent's Counter-Memorial, ¶ 1051.

### 2.   Alternatively, compensation

654.   The Respondent reiterates that "*the disputed measures have not generated any damage to the Claimants. On the contrary, the disputed measures have provided greater stability in the Spanish electrical sector and have thus increased the value of the Claimants' investment*".[743] The Respondent cites the fact that the Claimants acquired the assets for €91 million in 2012 and sold them for €133 million in 2016 to suggest that no damage was suffered, rather the value increased.[744]

655.   The Respondent did not dispute the compensation standard.

### 3.   Valuation date

656.   The Respondent, without citing an alternative date or any reasons, says that the valuation date of 20 June 2014 is a date randomly chosen by the Claimants.[745] However, the Respondent's expert has adopted the June 2014 date when calculating quantum.[746]

### 4.   Proof

657.   The Respondent, citing *Gemplus v. Mexico*, points out that it is the Claimants who bear the overall burden of proving the loss founding their claims for compensation.[747] The Tribunal should reject the Claimants' claims, even if liability is established, where the loss claimed is too uncertain or speculative.

---

[743] Respondent's Post-Hearing, ¶ 189.

[744] Respondent's Post-Hearing, ¶ 190 *citing* Tr. Day 4, 27:9-12, 28:24-5, 29:1.

[745] Respondent's Counter-Memorial, ¶ 1058.

[746] First Accuracy Report, ¶ 120; *see also* Tr. Day 4, 162:22-163:4.

[747] Respondent's Counter-Memorial, ¶ 1074; *see also* Respondent's Rejoinder, ¶ 1132 *citing Gemplus, S.A., SLP, S.A. and Gemplus Industrial, S.A. de C.V. v. United Mexican States*, ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, 16 June 2010, ¶¶ 12-56, **Exhibit RL-0032**.

### 5.   Valuation method

658.   The Respondent contends that the DCF method is inappropriate to use in this case because it is overly speculative. The following factors indicate the DCF method might lead to unnecessary levels of speculation: (i) the investments were capital-intensive with no relevant intangible assets; (ii) there is high dependency on volatile cash flows; (iii) the long-term nature of the forecasts increases uncertainty; and (iv) there is a disproportion between the alleged investments and the amount claimed; (v) there is an insufficient history of operations; and (vi) the economic conditions were constantly fluctuating.[748]

659.   The Respondent instead argues for the application of the ABV method, which is less speculative and simpler to apply.[749] In the Respondent's view, the ABV "*is relevant to verify if the Disputed Measures have undermined the investors' legitimate entitlement to earn at least the opportunity cost of the capital*."[750] The Respondent's quantum expert, Accuracy, finds that there is no damage to the Claimants after undertaking an ABV of their investments.[751] This involves: (i) calculating the investment amount and the project return in a But-For and Actual scenario; and (ii) comparing the NPV obtained from each scenario to determine whether the Disputed Measures have had a financial impact on the plants.[752]

660.   The Respondent also relies on the *RREEF* Decision where the tribunal considered the DCF method was not useful to calculate the reasonable rate of return enshrined in the Spanish Energy Regulators Framework which was to have a general scope and to apply to projects of all kinds.[753]

---

[748] Respondent's Counter-Memorial, ¶¶ 1066-1078; *see also* Respondent's Rejoinder, ¶¶ 1125-1140.

[749] Respondent's Counter-Memorial, ¶¶ 1079-1080; *see also* Respondent's Rejoinder, ¶¶ 1140-1144.

[750] Respondent's Post-Hearing Reply, ¶ 93.

[751] Respondent's Counter- Memorial, ¶ 1054.

[752] First Accuracy Report, ¶¶ 117-121.

[753] Respondent's Comments on the *RREEF* Decision, ¶¶ 11-13

### 6.    Alternatively, "corrected" DCF analysis

661.    Accuracy, alternatively to the ABV, undertakes a subsidiary calculation using Brattle's financial model at June 2015, correcting for a series of incorrect assumptions and parameters.[754] These are discussed further below in the Tribunal's analysis, but include: (i) the reference point for the Actual scenario value; (ii) the operational life of the Plants; (iii) the discount rate and (iv) the regulatory risk premium. Accuracy advocates for other adjustments which have an admittedly "*lower impact on Brattle's But-For*".[755]

### 7.    Interest rate

662.    The Respondent relies on the Accuracy Report[756] dated 10 February 2017 which reads as follows:

> In our opinion, in the case of determining damages as at the valuation date, to update it for the date of the award, a risk-free asset appropriately covering the timeframe ought to be used as a benchmark.  For this purpose, the equivalent rate of the Spanish government bonds at 4-5 years, which is the period between this date and the one estimated by Brattle for the potential payment of the compensation (November 2018).  The rates applicable are 1.16% and 1.38%[757] (4 and 5 years respectively).

663.    There is also another Accuracy Report[758] dated 8 January 2018, which reads as follows:

> In our opinion, the case of determining damages as at a certain valuation date, the value should be carried forward to award date using a risk-free rate that appropriately covers the timeframe until the award date.[759]

Considering a valuation date in 2016, the valid reference for pre-award interests should be the yield of the short-term Spanish Government bonds (2 year – 3 year bonds) which

---

[754] First Accuracy Report, ¶ 137.

[755] First Accuracy Report, ¶ 21(b).

[756] First Accuracy Report, ¶ 174.

[757] Spanish Government OATs (Bloomberg), **Exhibit ACQ-0022** .

[758] Second Accuracy Report, ¶ 181.

[759] Second Accuracy Report, ¶ 181.  The above is in line with the guideline set in the "Litigation Services Handbook – The role of the financial expert, R.L. Weil, D.G. Lentz and D.P. Hoffman, Fifth Edition.  Refer to **Exhibit ACQ-0071**.

are close to zero.[760]  This ensures the consistency with the period between the valuation date and the estimated date of the award.[761]

664.    The Respondent also relies on a passage from the author Mark Kantor who advocates a risk free rate[762].

665.    With regard to post-award interest, the Respondent is of the view that post-award interest rate should not exceed the pre-award interest rate.  The Respondent also contends that post-award interest should not be awarded as the Tribunal should not assume that Spain as a sovereign nation would breach a treaty obligation and neither should it be used as a tool to punish the State and it relies on the decision in *Vestey v. Venezuela* [763] and also on the ILC Articles in particular Comment (4) of Article 36 which states as follows:

> Compensation corresponds to the financially assessable damage suffered by the injured State or its nationals.  It is not concerned to punish the responsible State, nor does compensation have an expressive or exemplary character …[764]

666.    Furthermore, the Respondent relies on the decision in *Micula* which equates the treatment of pre and post-award interest in the following terms:

> As a preliminary matter, the Tribunal does not see why the cost of the deprivation of money (which interest compensates) should be different before and after the Award, and neither Party has convinced it otherwise. Both are awarded to compensate a party for the deprivation of the use of its

---

[760] Indeed the Spanish Government short-term yields (2 years and 3 years) as of June 2016 are negative.  *See* Spanish Government OATs (Bloomberg), **Exhibit ACQ-0022**.

[761] In our subsidiary DCF, we have used the applicable short-term reference when bringing forward past damages to the valuation date.

[762] Respondent's Rejoinder, ¶ 1154.

[763] *Vestey Group Ltd. v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, 15 April 2016, ¶ 445, **Exhibit RL-0068**.

[764] J Crawford, The International Law Commission's Articles on State Responsibility: Introduction, Text and Commentaries (Cambridge University Press), 2002, **Exhibit CL-25**; *see also* ILC Articles, Art. 36, **Exhibit RL-0069**.

funds.  The Tribunal will thus award pre- and post-award interest at the same rate.[765]

### 8. Gross-up for tax

667. The Respondent considers that the Claimants have failed to establish a legal or evidential basis to support their tax gross-up claim.[766] In any event, the Respondent contends that the claim is without basis for three reasons.

668. First, the tax gross-up claim is excluded by Article 21 of the ECT.[767] Article 21(1) of the ECT provides that "*nothing in this Treaty shall create rights or impose obligations with respect to Taxation Measures of the Contracting Parties*". Spain points out that the Netherlands is a Contracting Party of the ECT. Therefore, no tax measure of the Netherlands can create an obligation for Spain based on the ECT. Further, under international law, a State cannot be held liable for taxes imposed by another State.[768]

669. Secondly, a damages award to the Claimants would be tax-exempt income in the Netherlands.[769] The Respondent relies on a memo from R.C.A.R. Wanningen of Tax at Work BV, a Dutch tax lawyer.[770]

670. Thirdly, the tax gross-up claim is speculative and contingent upon the Claimants' private tax planning decisions and the Netherlands' authorities' decisions.[771] The Respondent

---

[765] *Ioan Micula, Viorel Micula and others v. Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶ 1269, **Exhibit RL-0071**.

[766] Respondent's Counter-Memorial, ¶¶  1108-1111; *see also* Respondent's Rejoinder, ¶ 1162.

[767] Respondent's Rejoinder, ¶¶ 1166-1172.

[768] Respondent's Rejoinder, ¶¶ 1173-1179.

[769] Respondent's Rejoinder, ¶¶ 1180-1182.

[770] Memo on applicability of participation exemption on damage payments, **Exhibit ACQ-0082**.

[771] Respondent's Rejoinder, ¶¶ 1183-1190.

relies on decisions of other investment tribunals to support the position that a tax claim should be rejected where there is insufficient evidence of possible future taxation.[772]

### C.   Tribunal's Analysis

671.   This analysis represents the majority view of the Tribunal and reference to the word "Tribunal" in the analysis is the majority view, save for the issue of gross-up for tax, which is dealt with in paragraphs 751 to 759 of the Award.

### 1.   Appropriate reparation

672.   Article 10 of the ECT is silent on the remedies for breach of the FET standard.

673.   In these circumstances, it is appropriate for the Tribunal to apply the standard of reparation found in customary international law. The Claimants correctly cite, and the Respondent does not dispute, the full reparation standard articulated in *Chorzów*:

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by the restitution in kind or payment in place of it – such are the principles which should serve to determine the amount of compensation due for an act contrary to international law.

674.   While the Claimants have made a summary request for restitution, the Tribunal considers that restitution is an inappropriate remedy because the Respondent has a sovereign right to take appropriate legislative and regulatory measures to meet public

---

[772] *Venezuela Holdings, B.V., et al v. Bolivarian Republic of Venezuela,* ICSID Case No. ARB/07/27, Award, 9 October 2014, ¶¶ 386-388, **Exhibit RL-0087**; *Abengoa, S.A. y COFIDES, S.A. v. Mexico*, ICSID Case No. ARB(AF)/09/2, Award, 18 April 2013, ¶¶ 775-777, **Exhibit RL-0075**.

interests. The Tribunal notes that similar conclusions were made in *Eiser v. Spain*,[773] *Masdar v. Spain*[774] and *Antin v. Spain.*[775]

675.   Consequently, the Tribunal will award reparation in the form of monetary compensation.

### 2.   Compensation standard

676.   It follows from above that, as the ECT is silent on the remedies for breach of the FET standard, the ECT also does not detail any standard of compensation that the Tribunal must apply when awarding monetary compensation for breaches of the FET.

677.   Consequently, the appropriate standard for compensation should be based on international law and in particular that articulated in *Chorzów*, namely compensation that will, as far as possible, wipe out all the consequences of the Respondent's illegal acts.

### 3.   Valuation date

678.   Again, the ECT is silent on the valuation date which the Tribunal should apply when awarding monetary compensation for breaches of FET.

679.   The Tribunal follows the findings of the *Azurix* and *Enron* tribunals and considers that, as it has found a series of actions by the Respondent that as an aggregate constitutes a

---

[773] *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v The Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 425, **Exhibit CL-154**.

[774] *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 558-563, **Exhibit CL-175**.

[775] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶ 634-637, **Exhibit CL-176**.

breach of FET, it should calculate the fair market value at the "*watershed*" moment or when "*the most serious damage arose in connection with*" the Disputed Measures.[776]

680. The Tribunal considers that the measure concluding Spain's course of conduct that constituted the breach of the ECT and effecting the most serious damage to the Claimants' investment was Ministerial Order IET/1045/2014 of 20 June 2014 as set out in paragraph 570 above. While it is true that the Claimants were aware much earlier that the regime in Spain was changing, it was only on 20 June 2014 that they could ascertain the extent of the impact of the New Regime on the value of their investment.[777] Consequently, the Tribunal finds that 20 June 2014 is the appropriate valuation date.

681. The Tribunal notes that this valuation date is consistent with the valuation date adopted in *Eiser*, *Masdar*[778] and *Antin*.[779]

### 4.   Proof

682. The Claimants accept that they bear the burden of proof as to their claimed damages. However, the *standard* of proof required for the Claimants to discharge their burden of proof is in contention.

683. The Respondent, by citing *Gemplus*, appears to contend that the standard should be sufficient certainty.[780] In *Gemplus* the tribunal held that when quantifying damages it was an exercise of "*sufficient certainty*".[781] However, the Claimants contend that the

---

[776] *Azurix Corp. v The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006, ¶¶ 417-418, **Exhibit CL-44**, *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007, ¶ 405, **Exhibit CL-53**

[777] Tr. Day 3, 23:19-34:2.

[778] *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶¶ 605-608, **Exhibit CL-175**.

[779] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v Kingdom of Spain*, ICSID CASE No. ARB/13/31, Award, 15 June 2018, ¶ 715, **Exhibit CL-176**.

[780] Respondent's Counter-Memorial, ¶ 1074.

[781] *Gemplus S.A., SLP S.A., Gemplus Industrial S.A. de C.V. v. United States of Mexico*, ICSID Case No. ARB(AF)/04/3, Award, 16 June 2010, ¶¶ 13-91, **Exhibit RL-0032**.

standard is to show the existence of damage with reasonable certainty and then only offer a basis on which the Tribunal can, with reasonable confidence, estimate the amount of their loss.[782]

684.   The Tribunal agrees with the Claimants and adopts the approach of the *Lemire* tribunal. Proving the amount of damages is a notoriously difficult task and it cannot be right that, once liability has been established, the Claimants should be deprived of compensation caused by a State's wrongful acts. Other tribunals have come to similar conclusions.[783]

685.   In light of the above, the Tribunal's considers that the Claimants must prove the existence of the *fact* of damage with sufficient certainty and then provide a reasonable basis for the Tribunal to determine the *amount of loss*. The Tribunal considers this a fair outcome considering that any difficulty that the Claimants may face in proving the amount of loss will have flowed from the Respondent's wrongdoing.

686.   In the Tribunal's view, the Disputed Measures reduced the amount payable to the Claimants, which is most easily demonstrated by the fact that the Project Companies had to pay claw-back payments to Spain under the New Regime as set out in paragraphs 564 to 567 above. This demonstrates that the long-term fixed feed in tariff under the Old Regime was more valuable to the Claimants.  It follows that the Tribunal is sufficiently certain that the Claimants have, as a matter of *fact*, suffered damage as a result of the Respondent's breaches. The Tribunal now proceeds to determine whether the Claimants have provided a reasonable basis to determine the amount of that loss.

### 5.   Lost historical cash flows

687.   As discussed above at paragraph 642a, the Claimants claim the lost historical cash flows of the Claimants' investments resulting from the Disputed Measures from December

---

[782] Claimants' Reply, ¶ 656 *citing Joseph Charles Lemire v The Republic of Ukraine*, ICSID Case No. ARB/06/18, Award, 28 March 2011, ¶ 246, **Exhibit CL-77**.

[783] *Khan Resources v Mongolia (UNCITRAL)*, Award on Merits, 2 March 2015, ¶ 375, **Exhibit CL-138**; *Ioan Micula, Viorel Micula and others v Romania*, ICSID Case No. ARB/05/20, Award, 11 December 2013, ¶¶ 1008-1010, **Exhibit CL-88**.

2012 to June 2015 by comparing the Actual cash flows with the But-For scenario cash flows assuming the Disputed Measures were never implemented.

688. Similar to the tribunal in *Antin*,[784] this Tribunal has found that Spain violated the ECT by its wholesale dismantlement of the Original Regime but not from modifying certain of the elements of the regime. As the course of conduct constituting the breach of the ECT reached "*watershed*" on 20 June 2014 as set out in paragraph 570 above, the Tribunal rejects the Claimants' claim for losses prior to the breach.

### 6. Valuation method

689. The Tribunal considers that it is appropriate to value the Claimants' investments using the DCF method. The Respondent's primary objection to the DCF method's application, uncertainty of future cash flows, is unwarranted. The assets have been operating for a sufficient amount of time to generate sufficiently reliable information on which to calculate future cash flows. Further, the DCF method is widely favoured in the renewable energy sector given that they have a simple business model with predictable income and costs.  The DCF method has been applied in a number Energy Charter claims namely, *Eiser*,[785] *Masdar*,[786] *Antin*,[787] *Novenergia*,[788] *Foresight*.[789]

690. In any event, the Tribunal cannot accept the Respondent's ABV which concludes that there was no reduction in the value of the Claimants' investments. Further, the Respondent's primary reason for using an ABV is because the investments "*are*

---

[784] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v Kingdom of Spain,* ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶¶  666-667, **Exhibit CL-176**.

[785] *Eiser Infrastructure Limited and Energia Solar Luxembourg S.a.R.L. v Kingdom of Spain,* ICSID Case No. ARB/13/36, ¶ 465, **Exhibit CL-154**.

[786] *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018, ¶ 575, **Exhibit CL-175**.

[787] *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. v Kingdom of Spain,* ICSID Case No. ARB/13/31, Award, 15 June 2018, ¶ 691, **Exhibit CL-176**.

[788] *Novenergia II – Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v The Kingdom of Spain* (SCC Arbitration 2015/063), Final Award, 15 February 2018, ¶ 818, **Exhibit CL-160.**

[789] See also *Foresight Luxembourg Solar 1 S. Á.R1., et al. v. Kingdom of Spain*, SCC Case No. 2015/150, ¶ 480.

*capital—intensive investments*" and largely comprise "*physical assets*"[790] is unpersuasive given that the claims comprise of lost profits and no further explanation has been proffered.

691. The Tribunal has also considered the Respondent's contention based on the *RREEF* Decision namely that the DCF method is not useful and rather valuation should be analysed by reference to the internal rate of return (IRR) and that the more appropriate method of valuation was the WACC valuation method.[791]

692. In the Tribunal's view, the *RREEF* Decision rejected the use of the DCF method because that tribunal found that "*the only legitimate expectations the Claimants had* […] *was to obtain the reasonable rate of return that the Respondent committed to*"[792] and the reasonable return by Spanish law was the project IRR.  The *RREEF* tribunal found that comparing income valuations in the But-For and Actual scenario, pursuant to the DCF method, was not a useful assessment of the reasonableness of the Claimants' return under both the old and the new regime.[793]

693. Whereas, in this case, the Tribunal has found that the Claimants legitimately expected that the qualifying special regime installation would remain stable under RD 661/2007. Therefore, the finding of the *RREEF* tribunal is inapplicable because of the Tribunal's findings on the merits. The DCF method is more appropriate than an IRR analysis because it looks to the difference in the value of the Claimants' assets before and after changes to the regime applicable to the Claimants' installation by a comparison of the But-For and Actual scenarios.

---

[790] Tr. Day 2, 7:7-14.

[791] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30. Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶¶ 573-576, **Exhibit RL-0098**.

[792] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30. Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 545, **Exhibit RL-0098**.

[793] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30. Decision on Responsibility and on the Principles of Quantum, 30 November 2018, ¶ 521, **Exhibit RL-0098**.

### (a)   Discounted cash flow analysis

### i.   DCF analysis

694.   The Tribunal largely accepts the DCF valuation conducted by Brattle to determine the reduction in the fair market value of the Claimants' investments as a result of the breach of the ECT. Indeed, Accuracy did not challenge its methodology or many of its assumptions. Rather, Accuracy adopted Brattle's DCF model and "corrected" the inputs they believed to be the proper assumptions.[794]   The Tribunal will look at each of the main disputed assumptions below.

### 1.   *Reference point for actual scenario*

695.   Brattle estimates the June 2014 market value in both the But-For and Actual scenarios using the DCF, which ensures consistency in the underlying expectations and valuation environment.[795]

696.   Brattle rejects the reference point preferred by Accuracy, the 2016 sale price, on the basis that the transaction reflects 2016 (and not 2014) expectations about pool prices and interest rate levels after the valuation date.[796] However, if the 2016 sale price is to be adopted, then the valuation date must be shifted to February 2016 to ensure consistency.[797]

697.   Accuracy considers that the appropriate reference point for the Actual scenario is the 2016 sale price of €133 million, which was negotiated between a willing buyer and seller thus constituting a fair market value.[798] First, Accuracy discounts the sale price using the average value of Spain's 1-year and 2-year bond rate to account for the time

---

[794] Tr. Day 4, 162:18-163:4.

[795] Second Brattle Quantum Report, ¶ 190.

[796] Second Brattle Quantum Report, ¶¶ 190-194.

[797] Second Brattle Quantum Report, ¶¶ 199-201.

[798] First Accuracy Report, ¶ 144; Second Accuracy Report, ¶¶ 136-140.

between the valuation date (June 2014) and the transaction date (February 2016).[799] Second, Accuracy adds two additional cash flows to equity ("**FCFE**"): (i) the capitalised value of the historical FCFE prior to the valuation date using Spain's 1-year bond rate; and (ii) the discounted value of the historical FCFE between the valuation date and the transaction date using the average value of Spain's 1-year and 2-year bond rate.[800] Accuracy concludes that the Actual value of the Claimants' investments at the valuation date was €124.1 million.

698.   Given that the Tribunal has found that the appropriate valuation date is June 2014, the Tribunal considers it inappropriate to have regard to the 2016 sale price in the Actual scenario as it occurs after the valuation date and in different economic conditions. Consequently, the Tribunal adopts the Actual scenario preponed by Brattle i.e. projecting cash flows from the valuation date.

### 2.   *Operational life*

699.   Brattle assumes a 30-year operational life.[801] This assumption is based on a technical due diligence report prepared for the sale of the Claimants' wind projects, which concluded that it was possible to extend the 20-year operating life to 25 or 30 years with increased maintenance.[802] The Claimants consider this a reasonable assumption as the Special Regime envisaged that plants would operate for at least 20 years since they expressly provided for a FIT that would apply for the first 20 years of operation and then for the remaining operational life of the plant from year 21 onwards.[803]

700.   Brattle rejects Accuracy's proposed 25-year operational life on the basis that: (i) it "*ignores that between purchase and sale there was an increase in the expected useful*

---

[799] First Accuracy Report, ¶ 145.

[800] First Accuracy Report, ¶¶ 142, 147-151.

[801] First Brattle Quantum Report, ¶ 70; Second Brattle Quantum Report, ¶ 206.

[802] Tr. Day 3, 127:20-128:2; Technical Due Diligence Report prepared by GL Garrad Hassan Ibérica, 26 May 2015, pp. 38-40, **Exhibit C-47**; Claimants' Reply, ¶ 756.

[803] Claimants' Memorial, ¶ 515(d) *citing* Moreno Witness Statement, ¶ 26.

*life of the wind assets from 25 to 30 years*";[804] and (ii) additional costs were included in Brattle's DCF model to achieve a 30-year operational life.[805] In any event, Brattle conducted a sensitivity analysis on damages in relation to a 25-year operating life.[806]

701.   Whereas, Accuracy assumes a 25-year operational life for the But-for scenario and a 20-year operational life for the Actual scenario.[807] While acknowledging that the technical due diligence report relied on by the Claimants indicates that the operating life will exceed 20 years, it does not strictly conclude that the operating life will be 30 years.[808] Accuracy considers that a conservative estimate is instead 25 years.[809]

702.   Accuracy also relies on the due diligence report prepared by the Claimants when they bought the wind projects, which states the wind projects are designed for an operational life of at least 20 years.[810] Accuracy sees no need to account for an operational life in excess of what the Claimants' explicit expectation was at the time of the acquisition.[811]

703.   As a starting point, the Tribunal consider the evidence establishes that the designed life time of the wind projects are 20 years pursuant to IEC 61400-1 standard.[812]

704.   The evidence on the record, prior to the 2016 sale, shows that the operational life was expected range from 20 to 25 years. The Claimants' initial financial models for the wind projects entitled 'Borawind Operating & Valuation Model' consider a range between 20 to 25 years for the operational life.[813] The technical due diligence report prepared by

---

[804] Tr. Day 3, 35:21-25.

[805] Second Brattle Quantum Report, ¶¶ 204-205; Tr. Day 3, 42:9-12.

[806] Second Brattle Quantum Report, ¶ 206 and Appendix B.

[807] Respondent's Counter-Memorial, ¶ 1016; First Accuracy Expert Report, ¶ 267; Second Accuracy Report, ¶¶ 22, 141(a).

[808] First Accuracy Economic Report, Appendix 8, ¶ 262.

[809] First Accuracy Report, ¶ 157(a).

[810] Second Accuracy Report, ¶ 141(a) *citing* Alatec technical due diligence report, **Exhibit ACQ-0069**.

[811] Tr. Day 4, 40:6-14.

[812] DNV GL Report, p. 38, **Exhibit BQR-45**; First Accuracy Economic Report, Appendix 8, ¶ 260.

[813] Tr. Day 3, 128:14-129:4; Financial Models for Claimants' Assets, "Inputs" tab, **Exhibit BQR 40.3**.

Alatec in 2011 states that the wind projects were "*designed for a useful life of at least 20 years*".[814] The Claimants have adduced no evidence prior to the sale that they expected the operational life to range to 30 years.

705.    Further to this, Accuracy pointed to technical publications that indicated an operational lifetime between 20 to 25 years. The PER 2011-2020 technical study sets an operational lifetime of 20 years.[815] The European Wind Energy Association considers that the operational lifetime of wind projects is between 20 to 25 years.[816] Renewables First considers that a wind turbine could operate for between 20 to 25 years.[817]

706.    In the technical due diligence report prepared for the sale of the projects in 2016, DNV GL opined that "*it is **possible** to extend the service life of a wind project to 25 or 30 years*" provided that the wind projects comply with a series of technical requirements, such as passing a load and fatigue test and additional investment in maintenance is made. However, DNV GL went to pains to state that their review "*refers only to a general understanding of the probability of extending the wind farm life beyond the 20 year IEC design to 25 or 30 years.*"[818] Further, Mr Moreno testifies that "*Wind farms are expected to have a useful life of **up to** 30 years without significant reinvestment*."[819]

707.    Neither party produced an expert on the operating life of wind projects. The quantum experts confirmed at the hearing that they did not have expertise in this quarter.[820]

708.    In light of the above, the Tribunal considers that, on balance, the operating life of the wind projects would exceed 20 years. However, the Tribunal is not satisfied that the

---

[814] Alatec Technical Due Diligence Report, 8 June 2011, **Exhibit ACQ-0069**.

[815] Tr. Day 3, 129:5-22; First Accuracy Economic Report, Appendix 8, ¶ 264(a) *citing* PER 2011-2020, **Exhibit ACQ-0052**.

[816] Tr. Day 3, 130:7-18; First Accuracy Economic Report, Appendix 8, ¶ 264(b) *citing* Wind Energy FAQ EWEA, **Exhibit ACQ-0053**.

[817] First Accuracy Economic Report, Appendix 8, ¶ 264(c) *citing* Renewables First "How long does a wind turbine last?", **Exhibit ACQ-0054**.

[818] DNV GL Report, p. 39, **Exhibit BQR-45**.

[819] First Moreno Witness Statement, ¶ 26 (emphasis added).

[820] Tr. Day 3, 127:17-19; Tr. Day 4, 40:6-12.

operating life would reach 30 years given the caveats proffered by DNV GL and the evidence indicating a 20-year or 25-year operating life. In these circumstances, particularly where Spain's own quantum expert adopts a 25-year useful life in their quantum analysis and only dispute adopting a useful life exceeding 25 years, the Tribunal finds that a presumed operating life of 25 years is a reasonable assumption.

### 3. Discount rate

709. Brattle applies a discount rate to the projected cash flows. Brattle adopts the capital asset pricing model ("**CAPM**") equation that typically relies on the statistical analysis to of publicly traded companies deemed comparable to determine the discount rate for systematic risk. The CAPM equation is as follows:

Discount rate = Risk free rate + (Beta x Market Risk Premium)[821]

710. Brattle uses this discount rate to come to the adjusted present value ("**APV**") of the Claimants' Project Companies. The APV approach is best practice in corporate finance for businesses that rely on project finance, which is the case for the Claimants' Project Companies in Spain.

711. First, Brattle opines that the risk-free rate should be twenty-year Euribor swap rate at June 2014 being 2.09% given the long lives of wind assets.[822] While the risk free rate is typically the Spanish government bond rate, which represent a relatively low yield for safe investments, this should not be adopted because there is large concern over possible Spanish default following the Global and Eurozone crises. Therefore, the Euribor rate should be used as it does not pose a default risk.

712. Brattle rejects Accuracy's risk-free rate which is "*a combination of Accuracy's 1.5% inflation expectation and what Accuracy calls an* (sic) *"standardised interest rate" of*

---

[821] First Brattle Quantum Report, ¶ 93.

[822] First Brattle Quantum Report, ¶¶ 96-97 *citing* Bloomberg Data, **Exhibit BQR-1**.

*2%*" on the basis that this relies on Accuracy's own assumptions and second-guesses the prevailing long-term interest rates at June 2014.[823]

713.   Secondly, Brattle considers the beta should be 0.5. The beta in the CAPM equation serves as the risk adjustment factor.[824] The beta is 1.0 where the relevant investment has exactly the same risk as the average investment, lower than 1.0 where the investment has a lower than average risk compared to the stock market as a whole but equally an expected lower rate of return, and higher than 1.0 where there is higher than average risk and expected rate of return. Bloomberg, a prominent financial research firm, publishes beta estimates for individual companies in the alternative electricity producers' category, based on the past performance of their stock prices compared to the market as a whole. Brattle relies on the Bloomberg data to calculate an average "asset beta" for similar renewable firms of 0.5.[825] This is realistic given that wind assets have highly predictable production and costs, and selling prices depend on the relevant regulatory framework. Further, Brattle has adopted 0.5, which is at the top end of the observed range for the average renewables sample, to be conservative as it translates to a higher discount rate thus reducing the present value of the Claimants' investments and the total damages estimate.

714.   In response to Accuracy's beta estimate of 0.4, Brattle maintains that 0.5 is appropriately conservative because it translates to a higher base-case discount rate that tends to reduce damages.[826]

715.   Thirdly, Brattle contends that the market risk premium ought to be 5.5%. The market risk premium is the amount by which an investor would expect the average investment in the stock market to out-perform the risk-free rate.[827] The CAPM assumes that

---

[823] Second Brattle Quantum Report, ¶ 211.

[824] First Brattle Quantum Report, ¶¶ 98-99.

[825] First Brattle Quantum Report, ¶¶ 100-105.

[826] Second Brattle Quantum Report, ¶ 213.

[827] First Brattle Quantum Report, ¶ 106.

investments in the stock market should on average outperform risk-free investments as compensation for the higher risks involved. Brattle adopts the market risk premium of 5.5% based on the range recommended by Professor Damodaran of the New York University's Stern School of Business, which was estimated by measuring the actual historical performance of stocks relative to short-term government bonds over the long run.

716.   In response to Accuracy's use of a 4.5% market risk premium, Brattle notes that "*reasonable people can disagree about whether the market risk premium is 4.5% or 5.5%*", however, Brattle maintains that 5.5% is preferable as it tends to reduce damages.[828]

717.   Using the above inputs, Brattle concludes that there is a discount rate for June 2014 of 4.84% based on a risk-free rate of 2.09%, a market risk premium of 5.5% and an asset Beta of 0.5.[829] Following the CAPM equation: 4.84% = 2.09% + (0.5 x 5.5%).

718.   Accuracy adopts the CAPM equation used by Brattle while "*correcting*" certain parameters.[830]

719.   First, Accuracy considers that a standardised risk-free rate of 3.5% should be adopted "*consistent with a long-term inflation perspective of 1.5% and a real interest rate of 2%.*"[831]

720.   Secondly, Accuracy proposes a deleveraged beta coefficient of 0.4 for a June *2014* valuation.[832] This is based on a sample of 24 companies and calculating the average leveraging of the companies, the beta coefficient of debt and then following that, the

---

[828] Second Brattle Quantum Report, ¶ 212.

[829] First Brattle Quantum Report, ¶ 107.

[830] First Accuracy Report, ¶ 160.

[831] First Accuracy Report, ¶ 160(a); *see also* Second Accuracy Report, ¶ 141(b).

[832] First Accuracy Report, ¶ 160(b).

deleveraged beta.[833] Accuracy then undertakes a similar exercise for calculating a June *2016* deleveraged beta of 0.6.[834]

721. Thirdly, Accuracy adopts the market risk premium of 4.5% recommended by the Equity Premia Around the World by Dimson, Marsh and Staunton (2011).[835]

722. Using the above inputs, Accuracy concludes that there is a discount rate for June *2014* of 5.3% based on a risk-free rate of 3.5%, a market risk premium of 4.5% and an asset beta of 0.4.[836] Following the CAPM equation: 5.3% = 3.5% + (0.4 x 4.5%). However, in Accuracy's second report, Accuracy concludes that there is a discount rate for June 2016 of 6.2% based on a risk-free rate of 3.5%, a market risk premium of 4.5% and an asset beta of 0.6.[837] Following the CAPM equation: 6.2% = 3.5% + (0.6 x 4.5%).

723. The parties' experts both agree that the discount rate should be calculated using the CAPM model, however they dispute the three components. The Tribunal will examine each of these disputed components below.

       a. Risk-free rate

724. The Tribunal rejects Accuracy's risk-free rate on the basis that both the "*inflation expectation*" and "*real interest rate*" components were not supported by any evidence nor any explanation as to how Accuracy arrived at these figures.

725. The Tribunal prefers the risk-free rate adopted by Brattle and considers it appropriate, in the circumstances to adopt the twenty-year Euribor swap rate at June 2014 given the long lives of wind assets and the need to sanitise the rate from the default risk attributed to Spain.

---

[833] First Accuracy Report, Appendix 9.

[834] Second Accuracy Report, ¶ 141(b).

[835] First Accuracy Report, ¶ 160(c); Second Accuracy Report, ¶ 141(b).

[836] First Accuracy Report, ¶ 160, Table 14.

[837] Second Accuracy Report, ¶ 141(b), fn. 128.

b.   Beta

726.   As the Tribunal has previously adopted the valuation date of June 2014, Accuracy's 2016 unleveraged beta coefficient is rejected.

727.   The Tribunal adopts Brattle's beta coefficient of 0.5 on the basis that it considers the sampled pool is more analogous to the Claimants' Project Companies and, in any event, this beta coefficient is more conservative and tends to reduce damages than Accuracy's 2014 unleveraged beta coefficient. As a sanity check, the Tribunal has regard to the fact that Brattle's beta coefficient of 0.5 is also very close to the average and median unleveraged beta supplied by Accuracy once the standard deviation of 0.12 is applied, being 0.52 and 0.49 respectively.[838]

c.   Market risk premium

728.   To support the market risk premium rate of 5.5%, Brattle relies on the following. First, Professor Damodaran, considers that, since the financial crisis in 2008, the mature market equity risk premium should be between 5-6%.[839] Secondly, the average market risk premium used by professors and analysts in 2010 ranged between 5.1% and 6%.[840]

729.   To support the market risk premium rate of 4.5%, Accuracy relies on a study showing, which considers the world risk premium was 4.5%.[841]

730.   Professor Damodaran is one of the leaders in his field, and in light of the above evidence, the Tribunal is persuaded that it would be more appropriate to apply a market risk premium rate of 5.5%.

---

[838] First Accuracy Report, Appendix 9.

[839] Aswath Damodaran, "Equity Risk Premiums (ERP): Determinants, Estimation and Implications – A Post-Crisis update," Stern School of Business Working Paper (October 2009): 67, **Exhibit BQR-6**.

[840] *See* Shannon P. Pratt and Roger J. Grabowski, Cost of Capital: Applications and Examples, 4th Edition (Wiley: London, 2010), 158, **Exhibit BQR-7**.

[841] Equity Premia Around the World de Dimson, Marsh and Staunton, **Exhibit ACQ-0023**.

d.   Conclusion

731.   In light of the above findings, the Tribunal adopts Brattle's discount rate in its entirety, namely a discount rate for June 2014 of 4.84% based on a risk-free rate of 2.09%, a market risk premium of 5.5% and an asset beta of 0.5.[842]

*4.   Regulatory risk*

732.   Brattle states that the CAPM discount rates only measure systematic risk and therefore a regulatory risk factor needs to be taken into account.[843] This regulatory risk should be calculated using a probabilistic analysis of the type that investors use when determining the market price of a bond, in particular using the credit quality of tariff deficit securities, which enjoy long-term tariff collections rights analogous to those of renewable generators.[844]

733.   Before 2012, the private tariff deficit securities were rated AAA by ratings agencies. By June 2014, the private tariff deficit securities had deteriorated to BBB or A3 by ratings agencies. This deterioration in credit quality reflects the introduction of regulatory risk insofar as there were concerns that the regulator would not set electricity tariffs high enough to permit recovery of long-term collection rights, which would lead to collection shortfalls and reliance on the Spanish government to make up for those shortfalls in the required repayments to lenders who funded the establishment costs of renewable operators.[845]

734.   Brattle measures the regulatory risk for both scenarios, assigning to: (i) the Actual a rating of BBB+, consistent with the June 2014 ratings of both the tariff deficit securities and Spanish government bonds; and (ii) the But-for a rating of A+, which is a three-

---

[842] First Brattle Quantum Report, ¶ 107.

[843] First Brattle Quantum Report, ¶ 108

[844] First Brattle Quantum Report, ¶¶ 109, 111.

[845] First Brattle Quantum Report, ¶ 110

notch uplift, consistent with published ratings for tariff deficit securities in the absence of such regulatory risks, such as has occurred in Portugal.[846]

735.   The regulatory risk is then translated into a revenue "haircut" by having regard to the likelihood that Spain might not honour its tariff promises, and then uses the recovery rate to estimate the remaining level of financial support that investors could anticipate if Spain interfered.[847] This revenue haircut is equivalent to adding a 0.5% regulatory risk premium to the discount rate of 4.8% derived from the CAPM in both the But-for and Actual scenarios.[848]

736.   Brattle rejects Accuracy's increased regulatory risk premium in the But-for scenario on a number of bases.[849] First, Accuracy wrongfully attributes to the Disputed Measures the entire decline and subsequent improvement of Spanish ratings from 2010 to the present and into the future, the decline and improvement occurred for numerous reasons.[850] Secondly, Accuracy assumes that Spain's tariff deficit problem could only have been solved with the Disputed Measures yet provides no basis or analysis for this assumption, this is because there are alternatives.[851] Thirdly, Accuracy's claim that the Disputed Measures reduced regulatory risk is inconsistent with market commentary.[852] Fourthly, reducing damages for an inverted regulatory risk theory is just a denial of liability.[853]

737.   Accuracy considers it more appropriate to reflect non-systemic risk as a premium in the discount rate rather than as a revenue haircut.[854]

---

[846] First Brattle Quantum Report, ¶ 112.

[847] First Brattle Quantum Report, ¶ 113-114.

[848] First Brattle Quantum Report, ¶ 123; Second Brattle Quantum Report, ¶ 214.

[849] Tr. Day 3, 45:7-16.

[850] Second Brattle Quantum Report, ¶ 218.

[851] Second Brattle Quantum Report, ¶ 219.

[852] Second Brattle Quantum Report, ¶¶ 220-221.

[853] Second Brattle Quantum Report, ¶ 222.

[854] First Accuracy Report, ¶ 161.

738.    For the Actual scenario, Accuracy adds a 0.5% regulatory risk premium to the discount rate, which is, like Brattle, based on the credit rating of the tariff deficit securities.[855]

739.    However, Accuracy considers that the But-for scenario should take into account the continuous degradation in the sustainability of the Spanish electricity regime.[856] This degradation increases the probability of default. In the absence of the Disputed Measures, the credit rating of the tariff deficit securities would have continued to worsen until it reached the level of the Spanish bond i.e. BBB-, which translates to 2.2% discount rate.[857] Accuracy updates the regulatory risk premium to 2.5% if valued in 2016.[858]

740.    For the Actual scenario, the parties' experts agree that a 0.5% regulatory risk premium on the discount rate, or Brattle's equivalent regulatory haircut approach, should be applied to be DCF valuation. The Tribunal considers it appropriate in the circumstances to adopt the 0.5% regulatory haircut approach on the discount rate for the Actual scenario.

741.    For the But-for scenario, Accuracy's estimation of an increased regulatory risk is unpersuasive simply because it is largely predicated on the basis that introducing the Disputed Measures was the only way to address the allegedly degrading Spanish electricity regime.  In the Tribunal's view, the Disputed Measures raised regulatory risk as the fixed tariff regime provided certainty for investors whereas the "*reasonable rate of return*" regime is inherently uncertain being hinged to a third party's, here Spain's, opinion.

---

[855] First Accuracy Report, ¶¶ 161-163.

[856] First Accuracy Report, Appendix 6, ¶¶ 226-234.

[857] First Accuracy Report, ¶ 164.

[858] Second Accuracy Report, ¶ 141(c).

742. Consequently, the Tribunal prefers Brattle's calculation of the discount rate for the But-For scenario on the basis that it is unlikely the risk was higher in the But-For than in the Actual.

### 5. Conclusion

743. The Tribunal has considered Accuracy's other contended adjustments to Brattle's DCF valuation, namely: to adopt the Spanish 1-year, rather than the 10-year, bond rate to bring forward historical cash flows;[859] to exclude the financial income of the Plants from operating cash flows;[860] to measure the book value of debt rather than market value of debt;[861] and to use only one financing side-effect, the debt tax shield, rather than all.[862] Accuracy admitted that it "*basically corrected […] two parameters of the Brattle [But-For] model: (i) useful life […]; and (ii) regulatory risk premium […] other adjustments […] have a lower impact*."[863] Similarly, at the hearing, Mr Barsalou of Accuracy stated "*the number of matters in contention was limited, although I should say the number of material matters in contention is limited*" and referred to the three main areas of contention being the actual scenario value, the regulatory risk and the operational life.[864] The Tribunal rejects Accuracy's other adjustments to Brattle's DCF calculation on the basis that they are of little impact to the measure of damages and, in any event, Brattle's measures appear reasonable.

744. Applying the adjustment of operational life to Brattle's DCF valuation, the Tribunal finds that the diminution in the fair market value of the Claimants' investments resulting from the breach of the ECT was EUR 77 million at 20 June 2014.[865]

---

[859] First Accuracy Report, ¶¶ 148.

[860] First Accuracy Report, ¶ 157(b).

[861] First Accuracy Report, ¶¶ 166-167.

[862] First Accuracy Report, ¶ 168.

[863] First Accuracy Report, ¶ 21(b).

[864] Tr. Day 4, 38:4-38:13.

[865] Second Brattle Report, Appendix B, Table 13.

### 7.    Interest rate

745.    The guiding principle when determining the applicable interest rate is to ensure full reparation by compensating the Claimants for the loss of their ability to use the principal compensation when it fell due. The parties correctly agree that this should be a commercial interest rate.

746.    The parties' experts both agreed that Spanish government bond rates were an appropriate commercial rate to apply. The Tribunal finds that the appropriate commercial rate for pre-award interest is 1.16% being the average 10-year Spanish government bond-rate over the relevant period on the basis that this rate is used by Spain under the New Regulatory Regime to determine the allowed return, which indicates it is a reasonable reference point for long-term financial interests such as those for renewable energy plants.

747.    The Tribunal considers, along with the *Pezold* tribunal,[866] that awarding post-award interest serves the purpose of incentivising compliance with the terms of the Award as expediently as possible. Consequently, it is appropriate that the post-award interest rate is 2.16% (1.16% plus an additional 1%) to incentivise Spain's compliance with this Award.  The Tribunal agrees with the approach of previous tribunals namely in *Eiser* and *Masdar* which have awarded both pre and post award interest compounded monthly.

748.    The Tribunal further finds that interest should be compounded on a monthly basis. Awarding compound interest accords with modern financial activity and was not disputed by the Respondent.

749.    The Tribunal having considered the submissions of the Claimants and the Respondent on interest, is of the view that the Claimants are entitled to compound interest, compounded on a monthly basis.

---

[866] *Bernhard von Pezold and others v Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, 28 July 2015, ¶ 943, **Exhibit CL-159** referring to I Marboe, Calculation of Compensation and Damages in International Investment Law, (Oxford University Press, 2009), ¶ 6.246, **Exhibit CL-68**.

750.    The Tribunal awards interest from 20 June 2014 to the date of the Award at 1.16% per annum, compounded monthly, and also awards post-award at the rate of 2.16% per annum, compounded monthly from the date of the Award to the date of payment.

## 8.    Gross-up for tax

751.    The parties disagree on whether money payable under the Award will be subject to tax in the Netherlands and therefore whether the Award should be increased to account for this.

752.    Pursuant to Article 13(1) of the Dutch Corporate Income Tax Act 1969 "*benefits under participation as well as the costs regarding the recruitment or disposal of that participation (participation exemption) will not be included.*" [867] A taxable entity "*participates*" when, among other things, it is a shareholder of more than 5% of a company's shareholding.[868]

753.    In the judgment of the Court of Gelderland, cited by the Claimants, it was held that "*Having regard to the term 'benefits from the participation' stated in Article 13(1) of the CTA, it relates to benefits that are directly connected to the possession of shares.*"[869] On that basis, the Court found that a payment under an award relating to a breach of an agreement to transfer further shares in a company to a 30% shareholder of that company was not subject to the participation exemption. This was because the payment did not have a sufficient connection with the existing shareholding.

754.    The Tribunal agrees with the Respondent that the Gelderland decision can be distinguished from the case at hand because the damages under the award related to a

---

[867] Dutch Corporate Income Tax Act, **Exhibit C-218**.

[868] Dutch Corporate Income Tax Act, Article 13(2), **Exhibit C-218**.

[869] Court of Gelderland, 17 March 2015, case no. 14/4274, ¶ 30, **Exhibit C-221**.

breach of contract to *acquire* shares rather than damages in relation to the *possession* of shares.[870]

755.    In the judgment of the Dutch Supreme Court, cited by the Claimants, it was ruled that a compensation payment received by a party, who was a shareholder, was not covered by the participation exemption because the compensation was for non-payment of the purchase price under a contract to sell those shares.[871]

756.    In the Tribunal's view, the Supreme Court decision can also be distinguished from the case at hand because the compensation related to a breach of contract to *transfer* shares rather than compensation in relation to the *possession* of shares. This is supported by the Supreme Court stating "*If necessary, the interested party could have lowered the value of the participation. The loss resulting therefrom is covered by the participation exemption.*"[872] Consequently, it appears possible that a loss in profits resulting from a breach of treaty, would be covered by the participation exemption.

757.    The Claimants' counsel, at the hearing, noted that the "*ultimate evidence will be a tax ruling from the Dutch tax authorities […] We don't yet have the tax ruling; we have applied to obtain it.*"[873] Unfortunately, the Claimants have not adduced this evidence.

758.    In light of the above, the Tribunal finds that the Claimants have failed to discharge the evidentiary burden of a future obligation to pay tax in the Netherlands on compensation received under this Award and consequently rejects this part of their claim.

759.    As the Tribunal has found that the Claimants have failed to provide sufficient evidence that they will have to pay tax on the amount awarded, the Tribunal need not, and does not, consider the Respondent's other defences.

---

[870] Memo on applicability of participation exemption on damage payments, p. 3, **Exhibit ACQ-0082**.

[871] Dutch Supreme Court, 6 March 1985, Case No. 22 572, , ¶ 4.3, **Exhibit C-240**.

[872] Dutch Supreme Court, 6 March 1985, Case No. 22 572, , ¶ 4.2, **Exhibit C-240**.

[873] Tr. Day 1, 7:20-9:2.

## IX.   COSTS AND EXPENSES

### A.   Costs

#### 1.   Claimants' Position

760.   The Claimants submitted their Submissions on Costs dated 30 November 2018 and particulars of their claim for costs are as follows:

 Legal Costs and Disbursements:
(a)  Legal Fees: €2.4 million
(b)  Disbursement: €102,789.46
(c)  Translations: €66,082.75

Experts' Fees and Disbursements:
(a) Experts fees: €466,272.19 which includes disbursements

Costs of Disbursement paid directly by Bridgepoint:
(a) €5,670.10

761.   The Claimants rely on Article 61 of the ICSID Convention in particular, Article 61(2) which reads as follows:

> In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and charges for the use of the facilities of the Centre shall be paid.  Such decision shall form part of the award.

762.   The Claimants also contend that the ECT is silent on how the Tribunal should allocate costs but contend that the Tribunal has a broad discretion with regard to the allocation of costs.

763.   The Claimants contend that if they should succeed in this arbitration, that they are entitled to costs on a full indemnity basis and therefore request the Tribunal to award them costs in the total sum of €3,353,722.25.

### 2.  Respondent's Position

764.   The Respondent informed the Tribunal on 30 October 2018 that it was unable to file its Submissions on Costs pursuant to the Tribunal's directions due to technology issues. The Tribunal on 2 November 2018, extended the deadline to 30 November 2018.  The Respondent on 30 November 2018 requested a further extension because it was not able to resolve its technology issues.   The Tribunal on 3 December 2018, granted the Respondent a further extension to file its Submissions on Costs until 2 January 2019. The Respondent on 28 December 2018, requested a further extension to file its Submissions on Costs and the Tribunal granted a further extension.  The Respondent submitted its Submission on Costs on 16 January 2019.

765.   The Respondent's claim for costs is as follows:

Costs paid to ICSID:
€462,023

Expert Report:
€462,687.41

Translations:
€32,704.35

Editing Services:
€70,832.15 (in Madrid-Spain)
€52,294.88 (in Paris-France)

Courier:
€3,120.34

Travelling Expenses:
€15,550.48

Legal Costs:
€622,763.49

766.    The total costs claimed by the Respondent is €1,555,976.10.

767.    The Respondent takes the position that in the event the Kingdom of Spain succeeds, the Claimants should pay the Respondent's costs of €1,555,976.10.

### B.    Tribunal's Analysis on Costs

768.    Article 61(2) of the ICSID Convention provides the Tribunal with a discretion to allocate all costs of the arbitration including legal costs and other costs that have been incurred by the parties as the Tribunal deems appropriate.  The Tribunal refers to the decision in *LG&E*[874] where the tribunal held as follows:

> The Tribunal notes that Article 61(2) of the ICSID Convention and Rule 28 of the ICSID Arbitration Rules grant discretion to ICSID tribunal with regard to the award of costs.

769.    The Respondent submitted two jurisdictional objections, one of which was rejected by the Tribunal.  The Claimants have prevailed on the principal issue with regard to jurisdiction.  The Claimants have also established a breach of Article 10(1) of the ECT.  The Claimants with regard to the issue of damages, have had their claim in damages reduced for the reasons set out in the Tribunal's analysis on damages.  The Tribunal does not accept all the items of the Claimants' claim for costs.

770.    The Tribunal is also of the view that the costs incurred by the parties in connection with the arbitration, is reasonable bearing in mind the length of the arbitration, the voluminous documentation and the comprehensive submissions in this matter.

771.    The costs of the arbitration, including the fees and expenses of the Tribunal, ICSID's administrative fees and direct expenses, amount to (in USD):[875]

---

[874] *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v The Argentine Republic,* ICSID Case No. ARB/02/1, Award, 25 July 2007, Para. 112.

[875] The ICSID Secretariat will provide the parties with a detailed Financial Statement of the case account once all invoices are received and the account is final.

**Arbitrators' fees and expenses**

| | |
|---|---|
| Tan Sri Dato' Cecil Abraham, President | US$ 139,402.27 |
| Dr. Michael Pryles, Co-arbitrator | US $149,774.44 |
| Prof. Dr. Hélène Ruiz Fabri, Co-arbitrator | US$ 111,146.44 |
| ICSID's administrative fees | US$ 148,000.00 |
| Direct expenses (estimated)[876] | US$ 131,932.47 |
| **Total** | **US$ 680,255.62** |

772.   The above costs have been paid out of the advances made by the Parties in equal parts.[877]

773.   The Tribunal is of the view that as the Claimants have not succeeded in respect of all their claims on damages and as the Respondent has partial success with regard to the claim on jurisdiction and damages, the Tribunal is of the view that the Claimants are to be paid 75% of:

(a)   the Claimants' legal costs and disbursements;

(b)   the administrative expenses incurred by ICSID and the fees of the arbitrators which have been determined by ICSID.

774.   The Respondent shall bear its own legal representation costs and expenses.

## X.   AWARD

775.   For the reasons stated in the Award, the Tribunal decides as follows:

(a)   Unanimously, the Tribunal has jurisdiction under the ECT and the ICSID Convention over the Claimants' claim;

---

[876] This amount includes estimated charges relating to the dispatch of this Award (courier, printing and copying).

[877] The remaining balance will be reimbursed to the parties in proportion to the payments that they advanced to ICSID.

(b)     Unanimously, the Tribunal has no jurisdiction under the ECT and the ICSID Convention with regard to the claim that the Respondent's tax measures namely the 7% tax on the value of electrical energy production created by Law 15/2012 violates the ECT;

(c)     By Majority, the Respondent has breached Article 10(1) of the ECT by failing to accord fair and equitable treatment to the Claimants;

(d)     By Majority, in the light of the Tribunal's decision in (c), the Tribunal for purposes of judicial economy, does not need to determine the Claimants' claim with regard to the violation of the Umbrella Clause;

(e)     By Majority, the Claimants are awarded damages in the sum of €77 million for violation of the ECT;

(f)     By Majority, the Respondent shall pay interest on the sum awarded in (e) from 20 June 2014 to the date of this Award at 1.16% per annum compounded monthly;

(g)     By Majority, the Respondent shall pay post-award interest at the rate of 2.16% per annum compounded monthly from the date of the Award to the date of payment;

(h)     Unanimously, the Claimants' claim for gross-up tax is dismissed;

(i)     By Majority, the Respondent shall pay the Claimants 75% of the Claimants' cost of the proceedings;

(j)     Any claim, request or defence of the parties that has not been expressly accepted in this section X is hereby dismissed.

776.   Prof. Dr. Hélène Ruiz Fabri has written a Dissenting Opinion which is attached to this Award.

Dr. Michael C. Pryles AO PBM
Arbitrator
Date:   6 JAN 2020

Prof. Dr. Hélène Ruiz Fabri
Arbitrator
*Subject to the attached dissenting opinion*
Date:   9 JAN 2020

Tan Sri Dato' Cecil W.M. Abraham
President of the Tribunal
Date:   8 JAN 2020

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the arbitration proceeding between

## WATKINS HOLDINGS S.À R.L. & OTHERS

(Claimants)

v.

## THE KINGDOM OF SPAIN

(Respondent)

## ICSID Case No. ARB/15/44

## DISSENT ON LIABILITY AND QUANTUM

## Prof. Dr. Hélène RUIZ FABRI

1.      I support the conclusion that the Tribunal has jurisdiction over large parts of the claims brought by Watkins Holdings S.à r.l. & Others, including the dismissal of the Respondent's intra-EU jurisdictional objection (Award, paras. 142-226). I also agree that the Tribunal does not have jurisdiction with respect to the Tax on the Value of the Production of Electrical Energy (TVPEE) (Award, paras. 227-274).

2.       However, with all due respect for my esteemed colleagues, I have to disagree with the conclusion that the majority reached in the instant case on liability and quantum, concerning mainly the meaning and functioning of the fair and equitable treatment standard (FET), on the basis of the record before the Tribunal in this case.

3.       This case is to be located in the broader context of a series of cases concerning a large number of arbitrations conducted against Spain for its normative changes in the regulatory framework of the renewable energy sector (sometimes named as the "Spanish saga"). In a situation where many different cases stem from the same general measures and are conducted in parallel, the clarity of the reasoning is especially important. I fear that the Tribunal in this award is far from bringing the necessary clarity to the discussion.

4.       More generally, the Tribunal does not justify sufficiently the reasoning that brings it to reach its conclusion regarding FET. In my view, the judicial function of an international investment tribunal entails a duty of legal reasoning that goes far beyond the exercise of qualifying certain awards as convincing or discarding the reasons of others as non-satisfactory. The Tribunal has to develop its own argumentation, answering carefully the arguments of the parties. Evidence presented in the case must take precedence. In this regard, it might be noted that the *Watkins* case is one of the very few, besides *RREEF*, which has to deal with the wind industry, whereas the vast majority of the cases deal with solar (or PV or CSP) energy. And yet, the *Watkins* award fails to point out whether this is a particularity to be taken into account or not, sometimes finding it is a factor of distinguishing to discard the relevance of some other awards or, on the contrary, ignoring it when espousing the findings of others.

5.       The clarity of the reasoning is all the more crucial when fair and equitable treatment is at stake: a fine-tuned balance should be found between the protection of the investment, especially the legitimate expectations of the investor,[1] and the sovereign prerogatives of the State to legislate for purposes in the general interest.

---

[1] As stated by the Tribunal in *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award of 25 November 2015, para. 7.75: "It is widely accepted that the most important function of the fair and equitable treatment standard is the protection of the investor's reasonable and legitimate expectations."

"As firmly established in the case-law, an international obligation imposing on the State to waive or decline to exercise its regulatory power cannot be presumed, given 'the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders.' The regulatory power is essential to the achievement of the goals of the State, so to renounce to exercise it is an extraordinary act that must emerge from an unequivocal commitment; more so when it faces a serious crisis."[2]

6.    In all the awards in the Spanish saga, investment tribunals have agreed on the existence of some legitimate expectations on the side of the investor, the fundamental question being the extent of those legitimate expectations in every single case. It is not questioned that the starting point is the State's right to regulate. Nor is it questioned that the role of the arbitrator is to determine what the commitment, taken under the Energy Charter Treaty, to exercise this regulatory power within certain limits means. The question is whether the State has overstepped the boundaries set by the fair and equitable treatment obligation, inscribed in Article 10 of the Energy Charter Treaty (ECT).

7.    In its recent case *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, the ICJ dismissed Bolivia's argument that the doctrine of "legitimate expectations" exists in general international law outside the context of fair and equitable treatment clauses.[3] The doctrine is at the heart of the functioning of the treaty standard. In this regard, I regret that the Tribunal did not seize the opportunity to clearly rebut the attempt to read in Article 10(1) ECT an autonomous standard of stability, existing alongside FET.

8.    The protection granted by the FET standard is of variable intensity. Depending on the existence of a stabilization clause or of specific commitments towards the investor (including representations), the contours of the legitimate expectations will be different than in the case where no such circumstances exist and the legitimate expectations stem from the general regulatory framework of the State. In any event, since the inception of the doctrine of legitimate expectations

---

[2] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, para. 244.
[3] ICJ, *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, Judgment of 1 October 2018, para. 162.

in the *Tecmed* Award,[4] the date of the investment and the standard of the reasonable investor have always contributed to circumscribe its scope.

9.      Generally, "the investor's legitimate expectations are based on [the host state's] legal framework and on any undertakings and representations made explicitly or implicitly by the host state".[5] In the Spanish saga, different tribunals have reached different solutions concerning the extent and morphology of the legitimate expectations. First, some tribunals have relied on the existence of specific commitments equivalent to a stabilization clause in the favour of the investor at hand. Second, other tribunals have found that individual representations of the State toward the investor existed in the case at hand. Third, when no such specific commitments exist and in the absence of individual representations, the question becomes whether the general regulation can create legitimate expectations such that there will be no change of the normative framework. In this case, the functioning of the FET standard requires balancing the regulatory margin of the State with the legal security of investors, the assessment of such a balance being based on a proportionality control. As recalled in *Charanne*, "in the absence of a specific commitment, an investor cannot have a legitimate expectation that existing rules will not be modified",[6] but the State should not overstep the limits of the fair and equitable treatment.

10.      Now, provided, *arguendo*, that we are in the first scenario and that, based on evidence on record in the case, the Tribunal considered that there were such "firm undertakings" on the side of the State, equivalent to a firm pledge of regulatory stabilization, I cannot adhere to the solution reached by the Majority for two main reasons.

11.      First, I cannot agree with the method used to justify the legal analysis of the qualification of the obligation of stabilization allegedly created with Article 44(3) of the Royal Decree (RD) 661/2007 or the identification of specific commitments allegedly stemming from RD 661/2007. This is because an in-depth analysis of Article 44(3) of the RD 661/2007 is missing, including regarding its exact scope and the arguments raised in this regard by the Respondent, as summarised in para. 407 of the Award. All the same, the Majority never demonstrated that Article 44(3) was

---

[4] *Técnicas Medioambientales Tecmed, S.A. v. The United Mexican States*, Award of 29 May 2003.

[5] R. Dolzer, C. Schreuer, *Principles of International Investment Law*, OUP, 2008, p. 134.

[6] *Charanne and Construction Investments v. Spain*, SCC Case No. V 062/2012, Final Award of 21 January 2016, para. 499.

4

grandfathered and could not be repealed or replaced. And yet, there would not be so many different approaches and divergences between tribunals of the Spanish saga if the legal qualification and status of Article 44(3) could be treated so lightly.

12.     Second, I cannot adhere to the solution reached by the Majority as it did not take into sufficient consideration the date of the investment. The Tribunal did not consider how the date of the investment would change the intensity of the legitimate expectations. Even admitting *arguendo* that there was a stabilization commitment in 2007, can it be considered that the same commitment still existed in 2011, where the stability became so uncertain that a "regulatory risk" became plausible? The Tribunal in *Watkins* should have answered this question with the highest clarity, explaining its positions concerning the "clear possibility of modification resulting from Articles 4 and 5 of RD 1614/2010".[7]

13.     Different arbitral tribunals have clearly done so. The tribunal in *Cube* has for instance considered that there was in 2010 a "climate of change", because of unambiguous signals that a regulatory change of some sort was coming:

> "330. The regulatory regime was largely the same as that applicable when the PV investments were made, but with the important difference that the 2010-2011 regulatory changes had by that time been adopted and with retroactive effect. The laws of 2010 and 2011 had demonstrated that the Respondent would at least adjust the periods for which price incentives were payable and the levels of price incentives, if it considered this necessary in order to address the tariff deficit.
>
> 333. In these circumstances, the Tribunal considers that any reasonable investor would have taken a much more cautious view of the extent to which the continuation of the existing legal regime could be relied on, but would not have had reason to expect the complete abandonment of the Special Regime."[8]

---

[7] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, para. 321.
[8] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum of 19 February 2019.

In *Isolux*, the tribunal considered the fact that the Spanish Supreme Court has clearly stated in 2009 that there could be no guarantee that the regulatory regime was not going to change in the near future,[9] and therefore drew the conclusion that an informed investor could not ignore this wind of change.[10] The tribunal in *Novenergia* confirmed this need of distinguishing based on the date of the investment: "In *Isolux*, again, as the Claimant rightly points out, the arbitral tribunal was faced with an investor that had made investments in October of 2012, i.e. at a stage when it must have been clear to the investor that changes were being made to the Special Regime."[11] And yet, the Majority in *Watkins* fails to even analyse the issue of the date of the investment and its eventual effect on the asserted legitimate expectations.

14.      Further than that, the Tribunal proceeds to assess both the reasonableness and the proportionality of the disputed measures without identifying the framework for this control. Utmost clarity would have been necessary though, as the intensity of this control changes depending on the scenario of the case (existence -or not- of specific commitments, or of firm undertakings). Inasmuch as the core of the problem is whether the State has overstepped the boundaries set by the FET standard, the Majority should have explained the method adopted to operate the proportionality control. Notwithstanding what one may think about the proportionality of the changes in the Spanish legal system, I cannot adhere to a reasoning that does not clearly set the parameters of proportionality and does not follow them just as clearly, as what is at stake is the balance between investment protection and the respect of the regulatory power of the State. And yet, the Majority simply states abruptly that "changes to the FIT... [are] not an appropriate solution to the problem" of tariff deficit, thus substituting its appreciation to Spain's (at para. 601 of the Award). Moreover, the Majority further asserts that there were "less intrusive means available"

---

[9] Judgment Supreme Court 3rd Chamber, sect. 3, S 9-12-2009, appeal 152/2007: the Claimant in the case "does not pay enough attention to the case-law of this Chamber specifically referred to with regard to the principles of legitimate expectation and non-retroactivity applied to the successive incentives' regimes for electricity generation. This involves the considerations set out in our decision dated October 25, 2006 and repeated in that issued on March 20, 2007, inter alia, about the legal situation of the owners of electrical energy production installations under a special regime to whom it is not possible to acknowledge for the future an "unmodifiable right " to the maintenance unchanged of the remuneration framework approved by the holder of the regulatory authority provided that the stipulations of the Law on the Electricity Sector are respected in terms of the reasonable return on investments." (Respondent's Exhibit R-0002).
[10] *Isolux Netherlands, BV v. Kingdom of Spain*, SCC Case V2013/153, Final Award of 17 July 2016, paras. 792-800.
[11] *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v. The Kingdom of Spain*, SCC Case No. 2015/063, Final Award of 15 February 2018, para. 686.

without verifying and justifying their effective accuracy and feasibility. I regret that no proper exercise of weighing and balancing was conducted and that the context of the economic crisis was not even acknowledged. Other awards have not hesitated to borrow from other courts or tribunals which have developed a strong framework for proportionality control, be it the WTO Appellate Body or the European Court of Human Rights.

15.     Furthermore, concerning the impact of the proportionality control, provided *arguendo* that State responsibility is the outcome of the proportionality test, I believe that the Majority should have analysed clearly what was the impact of the "regulatory risk" existing at the date of the investment on the amount of reparation. Provided, again *arguendo*, that the DCF method of calculation was the most appropriate method (and some tribunals did not consider that that was the case because of the particularities of the issue at stake), I cannot agree with the way in which the Majority applied it, as the date of the investment and the surfacing of a regulatory risk had to be taken into account even in this last phase of judicial reasoning, eventually adapting the amount of damages (as the tribunal did for example in *Cube*).

16.     Last but not least, contrary to what the Majority considered (at para. 593 (ii) of the Award), the investment of the Claimants was not "destroyed". The investment was bought at €91 million in 2011, valued €98 million at the moment of the alleged intervention of the wrongful act in 2014 and sold at €133 million in 2016 (which meant a return of 11.2%). What is the Majority considering as "destroyed" and what is the Tribunal repairing exactly, when awarding damages in the sum of €77 million, without taking into account the date of the investment and the impact of the context on reparation?

Dated: 9 January 2020

Prof. Dr. Hélène Ruiz Fabri